UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

XIAOMENG LIAN, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

     vs.

TUYA INC., XUEJI (JERRY) WANG,
LIAOHAN (LEO) CHEN, YI (ALEX) YANG,
YAO (JESSIE) LIU, SCOTT SANDELL,
CARMEN CHANG, JEFF IMMELT, QING
GAO, JING HONG, MORGAN STANLEY &
CO. LLC, BofA SECURITIES, INC., and
CHINA INTERNATIONAL CAPITAL
CORPORATION HONG KONG
SECURITIES LIMITED,

                    Defendants.

——————————————————— x

Civil Action No. 1:22-cv-06792-JHR

CLASS ACTION

**AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

DEMAND FOR JURY TRIAL

Lead Plaintiffs Kyle Nelson and Jiyi Qiu ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Tuya, Inc. ("Tuya" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Tuya; (c) review and analysis of analyst reports regarding the Company; and (d) review of other publicly available information concerning Tuya, including transcripts of Tuya's investor calls. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.    **NATURE OF THE ACTION**

1.    This is a securities class action on behalf of all persons or entities who purchased Tuya American Depositary Shares ("ADSs") pursuant or traceable to the Company's March 2021 initial public offering (the "IPO") seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.    Tuya is a China-based company that developed and offers a purpose-built "Internet of Things" ("IoT") cloud platform that delivers a suite of offerings, including Platform-as-a-Service ("PaaS"), finished smart devices[1] containing Tuya's PaaS, and Software-as-a-Service, ("SaaS"). Tuya's IoT PaaS business is its core business, accounting for the majority of its revenue, followed by its smart device distribution business, and last, by its SaaS offerings, which are primarily offered to business customers.

3.    Tuya was founded in 2014 by former directors and employees of Alibaba, a Chinese

---

[1]    A smart device is a product that is linked to the Internet, so it can share information about itself, its environment, and its users.

e-commerce platform where various fraudulent schemes proliferated, including the sale of counterfeit goods and fake customer reviews.

4.    Tuya's customers are comprised of brands, original equipment manufacturers ("OEMs"), industry operators, and system integrators.  Tuya's products and services are deployed on a wide variety of smart products, including home appliances, kitchen appliances, lighting, Bluetooth handsets, security cameras, and sports and health products.  Its products are sold worldwide.

5.    A material percentage of Tuya's customers rely on e-commerce platforms, such as Amazon, to sell their products to end users.  For example, in 2021, 30% of sales of products powered by Tuya were generated by China's cross-border e-commerce brands.

6.    Customer reviews are vital to the success of merchants on e-commerce platforms. For example, a March 20, 2017 Business Insider article entitled "Here's why user reviews on sites like Amazon are such a big deal," reported that one-third of online shoppers refuse to purchase products that have not received positive reviews from customers.

7.    E-commerce merchants have long utilized fake reviews and related tactics to survive on overcrowded, competitive China-based e-commerce platforms.  Alibaba's Vice President disclosed that in 2013 alone, his conservative estimate was that 1.2 million sellers on Alibaba's main shopping site had faked 500 million transactions.

8.    Such fake review practices did not become popular on other e-commerce platforms available in the United States, such as Amazon, until years after their emergence on Chinese e-commerce platforms.  Up until October 2016, Amazon allowed sellers to offer free or heavily discounted products in exchange for product reviews, as long as the reviewer disclosed that they had received the reviewed product for free or at a discount.  Then in October 2016, Amazon banned incentivized reviews.  Amazon sellers nevertheless found various workarounds to gain customer

reviews, and Amazon repeatedly attempted to crack down on such sellers; for example, in April 2018, Amazon deactivated a large number of accounts of customers faking reviews.

9.    Following the onset of the global COVID-19 pandemic, the number of Amazon Prime[2] members and Amazon orders skyrocketed as millions of people were confined to their homes. From the beginning of the pandemic until mid-2021, Amazon gained 50 million Prime members and made profits exceeding $26 billion. Amazon merchants seeking to compete amongst, and capitalize on, the frenzied purchasing increasingly turned to fake reviews—in 2020, all 50 states in the U.S. issued warnings about unsolicited packages received by consumers in the mail—a tactic called "brushing" that has long been popular in China, whereby merchants duplicate the accounts of consumers, using consumers' names and addresses to send them products that they did not buy, and then post fake positive reviews of the products.

10.    After years of racking up net losses with minimal profitability, Tuya's business started to rapidly take off in 2020. In Tuya's Registration Statement filed with the SEC,[3] Tuya stated, "Our business has scaled rapidly in recent periods. For 2020, our revenue grew to US$179.9 million in 2020 representing an increase of over 70% over the same period in 2019." Tuya claimed that in 2020, it had over 5,000 customers, that there were approximately 204.3 million smart devices powered by Tuya, and that its IoT PaaS had enabled customers to sell smart devices in more than 1,100 categories and in more than 220 countries and regions globally.

11.    Tuya touted its sales and marketing efforts, its deep relationships with its customers,

---

[2]    Amazon Prime is a subscription service that gives members access to a variety of member benefits.

[3]    As used herein, the term "Registration Statement" refers to, collectively, the Registration Statement that was filed by the Company on February 26, 2021, all amendments thereto, and the Prospectus filed on Form 424B4 on March 19, 2021, which was incorporated into and formed a part of the Registration Statement that became effective on March 17, 2021.

and its ability to gain new customers and increase adoption of its products and services, but did not disclose that a material percentage of its e-commerce customers were engaged in fake review practices in violation of Amazon's policies, and as such, there was a substantial risk that Amazon would ban these customers and cause significant harm to Tuya's sales and prospects.

12.     On or about March 19, 2021, Tuya filed a Registration Statement and Prospectus with the SEC in connection with its IPO.  Tuya offered 43.6 million ADSs at $21 per share.  Tuya raised over $946 million in gross proceeds from unwitting investors in connection with its IPO.

13.     On March 1, 2021, a cybersecurity organization, Safety Detectives, discovered a data leak from a server based in China.  The server leak revealed a massive fake review scam where more than 200,000 people engaged in unethical conduct targeting American and European citizens.  The information on the server outlined a common procedure whereby Amazon vendors, or parties acting on their behalf, solicited reviewers to buy products and leave positive reviews.  The reviewers were then fully refunded through PayPal for the products, which they were able to keep after posting their reviews.  In May 2021, Safety Detectives published its findings.  In the ensuing days, numerous Amazon accounts of major Chinese e-commerce merchants were suspended, including that of Tuya's major customer, Aukey Technology Co. Ltd. ("Aukey"), which makes, among other things, home health appliances, digital products, and power tools.

14.     The Amazon ban negatively impacted additional Tuya customers besides Aukey, including Shenzhen VanTop Technology & Innovation Co. Ltd. ("VanTop"), which develops and sells smart products such as dash cams, projectors, drones, and smart home devices; Shenzhen Apeman Innovation Technology Co. Ltd.  ("Apeman"), which designs, develops, and sells cameras and video-related products in healthcare and smart home; Zebao Innovation Technology Co., Ltd. ("Zebao"), which develops and sells consumer electronic products, small household appliances,

Bluetooth speakers, LED lights, and more.

15.    Tuya did not disclose that any of its customers had been impacted by the Amazon ban.  Instead, on May 13, 2021, in connection with announcing its financial results for the first quarter following its IPO, Tuya continued to tout the expansion of its products and services and its ability to grow revenues from its customers, and issued positive guidance for the following quarter.

16.    Over the next few months, Amazon banned hundreds of thousands of Chinese brands across thousands of sellers' accounts.  Finally, on August 18, 2021, Tuya was forced to admit the truth: the fake-review scam and resulting Amazon ban had materially harmed its business.  Tuya announced projected revenue for the next quarter between $83 million and $86 million, significantly lower than analysts and investors had anticipated.  Tuya explained that the reason for its low forecast was because ***"our customers face a series of challenges, including Amazon's strict execution of seller policy,"*** and claimed that the Amazon ban ***"was an unexpected event [that] happened in the last couple of months."***  On this news, Tuya's ADS price dropped $2.85 per share, or 19%, to close at $12.15 on August 18, 2021.  Tuya's ADS price further fell $1.74 per share, or 16.71%, to close at $10.41 per unit on August 19, 2021 – a two-day decline of 30.6%.

17.    In September 2021, the Vice President of Asia Global Selling at Amazon revealed that over the past five months, Amazon had permanently banned 600 Chinese brands, involving 3,000 online stores.  The losses incurred by affected Chinese cross-border e-commerce businesses was estimated at $15.4 billion.

18.    The negative impact of the Amazon ban on Tuya's customers continued to materialize following the Company's August 18, 2021 disclosure.  On November 22, 2021, Tuya announced disappointing Q3 2021 financial results, and admitted that "[t]he third quarter of 2021 was a challenging quarter," citing the impact of "Amazon store closures."  On this news, Tuya's

share price fell $0.41 per share or 7.6%, to close at $4.99 per share on November 23, 2021.

19.    On March 14, 2022, Tuya announced poor Q4 2021 financial results and claimed that *"certain e-commerce customers affected by store closures in the third quarter are also showing signs of recovery[,]"* and projected total revenue for the first quarter of 2022 to be in the range of a mere $50-$57 million.  On this news, Tuya's share price fell $0.21 per share, or 9.5%, to close at $1.99 per share on March 15, 2022.

20.    Contrary to Tuya's representations, efforts by Tuya's customers to recover from the Amazon ban were unsuccessful.  For example, the Amazon ban shrunk VanTop's business by more than two-thirds, as Amazon was VanTop's main sales platform.

21.    On June 14, 2022, Tuya announced its Q1 2022 financial results.  Tuya disclosed that it had experienced a *2.7% year-over-year decrease in revenue*, which it attributed to a decrease in its core IoT PaaS business.  Tuya admitted that it had experienced "a slowdown in the U.S. and Europe"—the two countries thought to be targeted in connection with the Amazon fake review data leak reported by Safety Detectives.  On this news, Tuya's share price fell by $0.54, or 18%, to close at $2.42 per share on June 15, 2022.  Tuya's ADSs never recovered.

## II.    JURISDICTION AND VENUE

22.    The claims alleged herein arise under §§11 and 15 of the Securities Act of 1933, 15 U.S.C. §§77k and 77o.

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act of 1933.

24.    This Court has personal jurisdiction over each of the defendants and venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22 of the Securities Act of 1933 (15 U.S.C. §77v).  Defendants conducted the IPO in this District, disseminated the Registration Statement into this District, and solicited purchasers of Tuya ADSs in this District. The Tuya ADSs issued in the

IPO also trade in this District.  The Underwriter Defendants (as defined below) also have substantial operations and/or conduct substantial business in this District (directly or via agents), and represented Tuya and all or some of the other defendants in carrying out the IPO.

25.     In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiffs

26.     Lead Plaintiff Kyle Nelson, as set forth in the previously filed certification (ECF No. 32-2) incorporated by reference herein, purchased or acquired Tuya ADSs pursuant or traceable to the Company's Registration Statement issued in connection with the Company's IPO, and was damaged thereby.

27.     Lead Plaintiff Jiyi Qiu, as set forth in the previously filed certification (ECF No. 32-2) incorporated by reference herein, purchased or acquired Tuya ADSs pursuant or traceable to the Company's Registration Statement issued in connection with the Company's IPO, and was damaged thereby.

### B.     Defendants

#### 1.     The Company

28.     Defendant Tuya is incorporated in the Cayman Islands and headquartered in Zhejiang Province, China.  Tuya ADSs trade in the United States, including in the state of New York, on the New York Stock Exchange ("NYSE") under the ticker symbol "TUYA."  Each Tuya ADS represents one Class A ordinary share of the Company.  Tuya conducts substantially all of its business operations through its wholly owned subsidiary, Hangzhou Tuya Information Technology

Co. Ltd.  Hangzhou Tuya Information Technology Co. Ltd. controls Hangzhou Tuya Technology Co., Ltd. ("Hangzhou Tuya Technology") through a series of contractual arrangements.  As a result of these contractual arrangements, Tuya has control over, and is the primary beneficiary of, Hangzhou Tuya Technology Co., Ltd.

### 2.    The Individual Defendants

29.    Defendant Xueji (Jerry) Wang ("Wang") co-founded Tuya and served as Tuya's Chief Executive Officer and a director of the Company at the time of the IPO.  Defendant Wang, along with defendant Liaohan (Leo) Chen, beneficially owned all of Tuya's Class B ordinary shares and collectively controlled 83.7% of the total voting power of Tuya's voting shares immediately following the completion of the IPO (reduced to the extent the underwriters exercised their option to purchase additional ADSs).  Immediately following the completion of Tuya's IPO, Wang held 20.3% of Tuya's equity interests.  Prior to founding Tuya, Wang was a senior director at Alibaba, responsible for launching a number of major technology and product innovations for Alibaba Cloud and Alipay.

30.    Defendant Liaohan (Leo) Chen ("Chen") co-founded Tuya and served as President and a director of the Company at the time of the IPO.  Immediately following completion of Tuya's IPO, Chen held 5.1% of Tuya's equity interests.  Prior to co-founding Tuya, Chen served as an operations director at Alibaba Cloud and worked on Alibaba's O2O business.

31.    Defendant Yi (Alex) Yang ("Yang") co-founded Tuya and served as Chief Operation Officer since May 2015, responsible for Tuya's sales, business development and product operations. Yang became a director of the Company immediately upon the effectiveness of the Company's Registration Statement.  Prior to co-founding Tuya, Yang worked at Alibaba, where he was responsible for launching a number of Alibaba's strategic initiatives, such as Cloud E-commerce and Cloud OS.

32.     Defendant Yao (Jessie) Liu ("Liu") served as Tuya's Chief Financial Officer and Senior Vice President since May 2019.  Liu became a director of the Company immediately upon the effectiveness of the Company's Registration Statement.  Prior to joining Tuya, Liu served as an executive director at the investment banking division of UBS and was a founding partner of RJ Capital, an investment management and advisory firm.

33.     Defendant Scott Sandell ("Sandell") served as a director of Tuya between December 2014 and August 2017 and was re-appointed as a director in April 2018.  Sandell has served as Managing General Partner of New Enterprise Associates, Inc. ("NEA"), a venture capital firm, since April 2017.

34.     Defendant Carmen Chang ("Chang") served as a director of Tuya since December 2014.  Chang joined NEA in 2012 and serves as a General Partner and Chairman and Head in Asia.  Prior to joining NEA, Chang was a partner at a major Silicon Valley law firm.

35.     Defendant Jeff Immelt ("Immelt") became a director of Tuya immediately upon the effectiveness of the Company's Registration Statement.  Immelt joined NEA in 2018 as a Venture Partner on both the technology and healthcare investing teams.  Immelt previously served as Chairman and CEO of GE for 16 years.

36.     Defendant Qing Gao ("Gao") served as an observer on Tuya's Board of Directors since August 2017 and became a director of Tuya immediately upon the effectiveness of the Company's Registration Statement.  Gao serves as a partner managing director at China International Capital Corporation Limited and is the founding partner and manager of several private equity funds.

37.     Defendant Jing Hong ("Hong") became a director of Tuya immediately upon the effectiveness of the Company's Registration Statement.  Hong is the founding partner of Gaocheng

- 9 -

Capital, a growth fund focusing on innovation and software sectors.

38.    The defendants identified in ¶¶29-37 are referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement, other than defendants Immelt, Gao, Hong and Yang, who were named as directors of the Company with their consent in the Registration Statement.  In addition, the Individual Defendants participated in the solicitation and sale of Tuya ADSs to investors in the IPO for their own benefit and the benefit of Tuya as directors, executive officers, and/or major shareholders of the Company.

### 3.    The Underwriter Defendants

39.    Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), BofA Securities, Inc. ("BofA") and China International Capital Corporation Hong Kong Securities Limited ("CIC") served as underwriters for the IPO and are collectively referred to herein as the "Underwriter Defendants."  Morgan Stanley, BofA, and CIC acted as joint bookrunners of Tuya's IPO.

40.    Morgan Stanley agreed to purchase 21,271,900 ADSs in Tuya's IPO, exclusive of options to purchase additional Tuya ADSs.  Based on the underwriting discount of $0.84 per ADS to be paid from Tuya to the underwriters in the IPO, Morgan Stanley received approximately $17,868,396.00 in connection with the IPO.

41.    BofA agreed to purchase 17,959,100 ADSs in Tuya's IPO, exclusive of options to purchase additional Tuya ADSs.  Based on the underwriting discount of $0.84 per ADS to be paid from Tuya to the underwriters in the IPO, BofA received approximately $15,085,644.00 in connection with the IPO.

42.    CIC agreed to purchase 4,358,800 ADSs in Tuya's IPO, exclusive of options to purchase additional Tuya ADSs.  Based on the underwriting discount of $0.84 per ADS to be paid from Tuya to the underwriters in the IPO, CIC received approximately $3,661,392.00 in connection with the IPO.

43.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement as follows:

a.      The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities. They served as the underwriters of the IPO and shared over $37 million in fees collectively for their services. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of Tuya ADSs in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates, and counsel, to market Tuya ADSs, and those personnel worked on and approved the content of Tuya's Registration Statement and other offering materials.

b.      The Underwriter Defendants demanded and obtained an agreement from Tuya that Tuya would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

c.      Representatives of the Underwriter Defendants also assisted Tuya and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Tuya, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Tuya's operations and financial prospects.

d.      The Underwriter Defendants solicited and sold in the IPO Tuya ADSs to Plaintiffs and other members of the Class. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of

- 11 -

herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Tuya's Business

44.    Tuya was founded in 2014 by Wang, Chen and Yang.  The Company is based in China but operates internationally with local headquarters in the U.S., India, Germany and Japan.

45.    Tuya's business is centered around its Tuya IoT Cloud platform.  IoT, or Internet of Things, is the concept of connecting physical devices to a large, interconnected network.  Based upon the underlying infrastructure of Tuya IoT Cloud's platform, the Company offers three categories of products and services: PaaS, smart device distribution, and SaaS.  Tuya's IoT PaaS offerings comprise the Company's core business.  The Company's proprietary products and services enable so-called "smart devices," *e.g.*, household items and appliances connected to the internet, to communicate and interact with end users and online information and services.

46.    The Company's customers are brands, OEMs, industry operators and system integrators.  The Company primarily develops and maintains the "smart" software upon which smart devices manufactured and sold by third parties are based.  Thus, the Company depends heavily on the ability of its product partners to effectively market and sell their products to end users.  Tuya's customers and end users span a broad range of industries, such as smart home, smart business, healthcare, education and agriculture.

47.    The vast majority of Tuya's revenue is derived from its IoT PaaS offerings.  In 2020, Tuya's IoT PaaS segment comprised 84% of the Company's revenue.  Tuya's IoT PaaS provides a platform for its customers to develop, run and manage applications, as well as device optimization solutions, such that its customers do not have to also build and maintain the cloud infrastructure required to develop and launch applications.  Tuya generally does not make any of its IoT PaaS offerings available without the others, and charges fees to use Tuya's IoT PaaS as a single,

integrated offering.  The Company's IoT PaaS revenue is consumption-based, meaning that Tuya generates revenue from charging its customers, a one-time fee per "deployment."  One deployment refers to one device on which Tuya's IoT PaaS is deployed.  As such, Tuya's IoT PaaS revenue grows as the number of deployments increases.  Tuya monitors deployment of IoT PaaS as a key performance indicator of adoption of Tuya's IoT PaaS offering.

48.    Tuya's ability to grow the number of its IoT PaaS customers is a key indicator of its business and future growth opportunities.  Tuya defines an IoT PaaS customer in a given period as a customer who has directly placed at least one order for IoT PaaS with Tuya that period.  Tuya's IoT PaaS is deployed in a wide variety of smart products, including Bluetooth handsets, home appliances, kitchen appliances, lighting, security cameras, scooters, watches, and sports and health products such as treadmills and rowing machines.  Tuya's IoT PaaS offering serves both brands and OEMs, and the Company works closely with its brand customers to plan, design, develop and market their smart devices.  Tuya also offers a membership program to its customers that gives them the option to pay a membership fee primarily in exchange for IoT PaaS discounts based on the customer's expected deployment volume.

49.    The Registration Statement described Tuya's "close relationship" with its brand customers, which purportedly enabled Tuya to grow the volume of deployment of its core IoT PaaS products on end-user products, stating:

> Our IoT PaaS combines cloud-based connectivity and basic IoT services, edge capabilities, app development, and device optimization solutions, which we believe are the most fundamental elements of technology enabling a product to become smart.  We generate revenue from the fees we charge for these capabilities as a single, integrated offering and generally do not make any one of these capabilities available without the others.  We believe that an integrated approach helps improve the value and usage of our IoT PaaS.  We call a smart device on which our IoT PaaS is deployed a "deployment" of IoT PaaS.  The fees that we charge IoT PaaS customers are based on the number of IoT PaaS products that are deployed. As a result, our revenue from IoT PaaS grows as the number of deployments increases.

We typically do not impose minimum order requirements or usage requirement on customers, making us a valuable partner for newcomers to the IoT space as we enable them to kick-start their ventures with little upfront cost.

Our IoT PaaS serves both brands and OEMs. It is typically our OEM customers who directly place orders for deployment of IoT PaaS. ***In addition, we also work closely with the brands to plan, design, develop and market their smart devices. Our close relationship with brands enables our softwares and services to be adopted rapidly and allows us to significantly improve our visibility to brands on a global scale cost-efficiently.*** We offer a membership program to our customers that gives them the option to pay a membership fee primarily in exchange for IoT PaaS discounts based on a tiered membership status in accordance with their expected deployment volume. ***The membership program allows us to foster long-term relationship with our customers.*** In 2020, approximately 63% of our IoT PaaS deployments were from our membership customers.

50.    The second largest segment of Tuya's revenue is generated by its smart device distribution, which comprised 12% of the Company's total revenue in 2020. Some of Tuya's customers, primarily brands and system integrators, prefer not to conduct business with multiple OEMs. Instead, such customers may purchase finished smart devices with Tuya's IoT PaaS deployed from Tuya, which Tuya sources from OEMs. These customers typically place purchase orders with Tuya by specifying the type of smart devices they wish to purchase, and Tuya then chooses OEMs to produce the desired smart devices.

51.    The remainder of Tuya's revenue is generated from SaaS and other offerings, which comprised 3.4% of Tuya's total revenue in 2020. Tuya offers Industry SaaS, which are software solutions that enable businesses to deploy, connect, and manage large numbers of different types of smart devices. Tuya charges Industry SaaS customers annual subscription fees or one-time project-based fees. Tuya's Industry SaaS customers include hotels, apartment buildings, and real estate groups. As part of Tuya's SaaS offerings, Tuya offers specific services to brands and OEMs that are complementary to Tuya's IoS PaaS, and offers a variety of cloud-based services directly to end users of Tuya-powered smart devices, such as IoT data storage and push messaging.

52.    Tuya and a material percentage of its customers rely on e-commerce platforms to sell

their products and services.  For example, in 2021, 30% of devices powered by Tuya were sold by Chinese cross-border e-commerce merchants.

53.    On e-commerce platforms such as Amazon, product reviews are crucial to the success of a merchant's business.  For example, a 2017 report by Northwestern University's Spiegel Research Center found that the likelihood that a consumer will buy a product with five reviews is 270% higher than the likelihood they will buy a product with zero reviews.  A March 20, 2017 Business Insider article entitled "Here's why user reviews on sites like Amazon are such a big deal," reported that one-third of online shoppers refuse to purchase products that have not received positive reviews from customers.  A 2020 study from Bazaarvoice found that for 56% of U.S. e-commerce shoppers, reviews are the feature they rely on the most to make purchase decisions.  Reviews are crucial, so brands selling on Amazon have long sought ways to acquire positive product reviews.

54.    Before Amazon banned incentivized reviews in October 2016, it allowed sellers to provide free or heavily discounted products to customers in exchange for product reviews, as long as the reviewer disclosed that they received the product for free or at a discount.

55.    Despite the incentivized review ban, Amazon merchants found workarounds, like offering "rebates" to customers that covered most or the entire price of the product in exchange for reviews and by "brushing."

56.    Brushing first emerged on Chinese e-commerce platforms such as Alibaba as early as 2013.  Brushing consists of third-party sellers on e-commerce websites duplicating the accounts of actual customers and using their names and addresses to send them products that they did not actually buy; the sellers then use the fake accounts to write positive reviews.  Often, the "brushers" send cheap, lightweight items that cost less to ship as opposed to the products for which they write the fake reviews.

57.     A Wall Street Journal article published March 2, 2015, entitled "Inside Alibaba, the Sharp-Elbowed World of Chinese E-Commerce," reported that Alibaba's Vice President Yu Weimin had disclosed that his conservative estimate was that 1.2 million sellers on Alibaba's main Taobao shopping site had faked 500 million transactions worth 10 billion yuan in 2013.  The article described brushing as commonplace and crucial to Chinese vendors' survival on e-commerce platforms—one vendor stated that without fake transactions "your product will end up at the very back of the search results, and people will never be able to find it."  The article reported that Chinese e-commerce merchants even take classes on how to avoid getting caught for fake transactions.  The article reported that at that time, fake transactions were much less common on U.S. e-commerce platforms like Amazon.

58.     In 2015, researchers from the College of William and Mary tracked the sales of 4,109 sellers using brushing methods on Taobao, a leading Chinese e-commerce platform, and discovered that they were able to raise their rankings up to 10 times faster than they could via legitimate means; they also found that only 2.2% of accounts they monitored were penalized.

59.     In April 2018, Amazon deactivated a large number of accounts for customers that were allegedly using the platform for improper commercial purposes, such as accepting rebates in exchange for positive reviews.

60.     In April 2019, the consumer website Which? published a report claiming that Amazon had been "flooded by fake five-star reviews."  According to Which?, sellers were listing products that carried tens of thousands of unverified reviews – meaning that there was no evidence that the people leaving the reviews had actually bought the product on Amazon or elsewhere.  The report found that in some categories of products, 90% of reviews were unverified.  Throughout 2019, brushing practices started to widely impact Amazon customers from all across the U.S., and Amazon

claims to have spent over $500 million and employed over 8,000 people to reduce fraud and abuse on its platform for that year alone.

61.     When COVID-19 confined millions of people to their homes, Amazon added millions of Amazon Prime members and its profits skyrocketed.  As Amazon purchases increased at a frenzied rate, so did Amazon merchants' unscrupulous tactics.  On June 13, 2021, The Wall Street Journal reported in an article entitled "Fake Reviews and Inflated Ratings Are Still a Problem for Amazon," that since the beginning of the pandemic, Amazon had added 50 million Amazon Prime members, and made profits of over $26 billion—more than the previous three years combined.

62.     In 2020, the Better Business Bureau reported an increase in brushing.  A CNN Business article entitled "Got a package you didn't order?  It could be a scam," published on January 25, 2021, stated that in 2020, all 50 states issued warnings about unsolicited packages received by consumers in the mail, containing goods such as power cords, seeds, and coffee-cup warmers, with some consumers receiving random packages as often as every two weeks.  CNN reported that an Amazon spokesperson stated that Amazon analyzes more than 10 million reviews every week to try to keep fake ones from being published.

63.     In August 2020, researchers at the University of California, Los Angeles, Sherry He and Brett Hollenbeck, together with Davide Proserpio from the Marshall School of Business of the University of Southern California, posted a research paper that analyzed the market for fake reviewed products on Amazon entitled "The Market for Fake Reviews."  The paper found that "the vast majority, 84%" of sellers benefitting from fake reviews were located in China.  The paper also found that fake reviews were associated with improvements in ratings and sales.  The paper noted that "[a]lmost none of the sellers purchasing reviews in these markets are well-known brands," and that "[i]n the weeks after they start to purchase fake reviews, the number of reviews posted per week

roughly doubles. The average rating and share of five-star reviews also increase substantially, as do search position and sales rank." The paper found that for the products observed buying fake reviews, ultimately, Amazon deleted roughly half of their reviews, but Amazon's deletions occurred with an average lag of over 100 days, allowing sellers to benefit from the short-term sharp boost in ratings, reviews, and sales. Further, the paper found that even after Amazon deleted reviews for these products, they still enjoyed a heightened keyword search position rank that lasted several more months.

64.    On September 4, 2020, the Financial Times published an article entitled "Amazon deletes 20,000 reviews after evidence of profits for posts." The article stated that Amazon had deleted approximately 20,000 product reviews, written by 7 of its top 10 U.K. reviewers, following a Financial Times investigation into suspicious review activity. The article stated that, "[o]verwhelmingly, those products were from little-known Chinese brands, who often offer to send reviewers products for free in return for positive posts." The article stated that "reviews are a crucial factor in pushing the products up Amazon's rankings and help gain algorithmically calculated endorsements, such as the influential 'Amazon's Choice' badge." The article quoted Neena Bhati, head of campaigns at Which?, saying, "You are more than twice as likely to choose an inferior product online versus the best product online if there are fake reviews on those inferior products[.]"

65.    On September 18, 2020, the U.S. government indicted six people with conspiracy and wire fraud in relation to an ongoing scheme since at least 2017, wherein Amazon employees were paid hefty bribes to reinstate suspended merchant accounts and product listings on Amazon's marketplace. The fraudulently reinstated accounts included accounts that Amazon had suspended for manipulating product reviews to deceive consumers and making improper contact with consumers. The products and merchants earned in excess of $100 million in sales revenue after their

fraudulent reinstatement.  Amazon employees were also bribed to provide merchants with unauthorized access to Amazon's highly confidential standard operating procedures and algorithms, which gave the merchants unfair insight into the systems that power Amazon's search engine, Amazon's product reviews, and Amazon's enforcement processes.  The misappropriated data also included the contact information for consumers.

66.    On February 16, 2021, Which? published a follow-up report finding that "[d]espite measures to combat fake reviews on its platform, our latest investigation has discovered a thriving industry of review manipulation businesses targeting Amazon marketplace and evading its checks."

**B.    Defendants Raise Gross Proceeds Of Over $946 Million From Unwitting Investors In Tuya's IPO**

67.    On February 26, 2021, Tuya filed with the SEC a registration statement on Form F-1 for the IPO, which, after amendments on March 12, 2021 and March 16, 2021, was declared effective on March 17, 2021.  On March 19, 2021, the Company filed with the SEC a Prospectus on Form 424B4, which incorporated and formed part of the Registration Statement.

68.    At the time of the IPO, despite having been in operation for seven years, Tuya had a history of large losses, substantial indebtedness, limited cash on hand, and limited ability to generate revenue.  For example, in the Registration Statement, Tuya reported net loss of $70.5 million and $66.9 million in 2019 and 2020, respectively.  As of December 31, 2020, Tuya had an accumulated deficit of $192.5 million.  In the Registration Statement, Tuya admitted that "[w]e have a history of net losses and may not be able to achieve or sustain profitability in the future."  Therefore, at the time of the IPO, Tuya had a pressing need for cash.

69.    The Registration Statement touted Tuya's thousands of customers and rapid growth and success in recent years.  Specifically, the Registration Statement stated:

*We had over 5,000 customers in 2020, primarily including brands, original equipment manufacturers or OEMs, industry operators and system integrators.*

For the same period, our IoT PaaS empowered over 2,700 brands to develop their smart devices, including leading brands such as Calex, Philips and Schneider Electric. Our IoT PaaS currently enables businesses and developers to develop smart devices in more than 1,100 categories sold across over 220 countries and regions globally.

*        *        *

***Our business has scaled rapidly in recent periods. For 2020, our revenue grew to US$179.9 million in 2020, representing an increase of 70% over the same period in 2019***.

70.    The Registration Statement misleadingly claimed that Tuya's success and growth were a result of the strength of its products, and that it had generated increasing brand awareness through, *inter alia*, "word-of-mouth referrals." Specifically, the Registration Statement stated:

***We have established a thriving ecosystem of brands, OEMs, developers, partners and end users on our platform due to powerful network effects***. End users of smart devices demand a single interface to interact with various types of devices from different brands—an experience similar to using different apps on one smartphone. Our platform provides an open architecture to connect any device from any brand, while enabling users to manage all devices across brands through a single portal—the exact experience they desire. As a result, more brands want to join our platform to integrate their devices onto the single user interface through which devices from other brands are connected. These self-reinforcing network effects further ***increase our brand awareness and generates word-of-mouth referrals, helping us form an extensive, vibrant and increasingly interconnected IoT ecosystem***.

71.    The Registration Statement emphasized Tuya's "Expansive end user base[,]" stating:

In 2020, we powered over 116.5 million smart devices, making us the largest IoT PaaS business in the global market in terms of the volume of smart devices powered, according to CIC. As of December 31, 2020, there were approximately 204.3 million smart devices powered by Tuya.

72.    In the Registration Statement, Tuya stated that its growth strategies consisted of the following tactics, but excluded that a material percentage of its sales were a result of fake review tactics:

- Extend our technology leadership;
- Deepen our relationship with our existing customers;
- Acquire new customers;
- Broaden our reach by expanding into verticals such as industrial and agriculture;

- 20 -

- Grow and broaden our SaaS offerings; and
- Expand "Powered by Tuya" brand awareness.

73.    The Registration Statement further described hypothetical, future risks that "may"

harm Tuya's business, including "if" Tuya was unable to "generate positive customer feedback and

minimize negative feedback on social media channels"; "if" "reviews of [its] products . . . are

negative or not as strong as reviews of [its] competitors' products and services"; and "if" Tuya was

unable "to effectively develop and expand [its] marketing and sales capabilities."  The Registration

Statement also touted Tuya's high net promoter score of 75, which Tuya stated demonstrated ***"the***

***willingness of customers to recommend a company's products or services to other potential***

***customers[.]"***

74.    These statements were materially false and misleading because they failed to disclose

that Tuya's customers were then engaging in a scheme to promote fake reviews of Tuya products.

75.    Based on Tuya's representations in the Registration Statement, analysts issued

positive reports about Tuya.  For example, on April 12, 2021, Morgan Stanley published a report

which noted "Tuya's strong and globally consistent technology performance with high recognition

from nearly all Fortune 500 home appliance brands (e.g., Schneider and Siemens), as well as from

global distribution channels (e.g., Amazon.com and Walmart)."  The report also noted that ***Tuya's***

***"NPS [net promoter score] of 75 suggests that the majority of its developer customers are***

***proactively promoting Tuya's offering in their communities, and this creates a network effect and***

***high efficiency in marketing."***

76.    BofA published a report on April 12, 2021, which similarly stated that ***Tuya's "75***

***NPS and 98% customer retention rate . . . speaks to the quality and stickiness of its platform."***

The report stated that Tuya's IoT PaaS consistently achieved a best-in-class dollar-based net

expansion rate, growing 80%+ revenue from existing customers, supported by its ***"'land-and-***

*expand' sales motion with cross-and up-selling efforts.''*  The report further emphasized that Tuya spent about 20% of its total revenue on sales and marketing in 2020, "much lower than the SaaS/PaaS average of about 40%[,]" which the report attributed in part to ***"word-of-mouth referrals supported by network effects and 'Powered by Tuya' campaign[.]"***

77.    In connection with the IPO, Tuya offered 43.6 million ADSs at $21 each.  On April 20, 2021, the Underwriter Defendants exercised their over-allotment option to purchase an additional 1,486,479 ADSs at the price of $21 per ADS.  Tuya raised $946.6 million in gross proceeds in its IPO, which was the largest IPO of a Chinese technology company to list in the U.S. that year.

C.    **At The Time Of Tuya's IPO, Chinese Merchants – Including Tuya's Customers – Were Violating Amazon's Policies Prohibiting Fake Reviews, And Following The IPO, Amazon Engages In A Massive Crackdown**

78.    On May 6, 2021, Safety Detectives, a cybersecurity organization, released a report entitled "Amazon Fake Reviews Scam Exposed in Data Breach," which revealed that on March 1, 2021, Safety Detectives had obtained access to a data server likely located in China that contained 7GB of data and over 13 million records appearing to be linked to a widespread fake review scam, potentially implicating more than 200,000 people in unethical activities.  The information found on the server included contact details, such as email addresses, for people providing fake reviews, as well as Amazon vendors.  Safety Detectives reported that the information found on the server outlined a common procedure by which Amazon vendors sent reviewers a list of products for which they would like a 5-star review; the people providing the fake reviews would then buy the products, leaving a 5-star review on Amazon a few days after receiving the products and then the vendor would issue a refund for the purchased products through PayPal to the reviewer and allow them to keep the products.  Amazon does not have access to PayPal details, which allows fake reviewers and vendors to avoid suspicion.  The server was assumed to be located in China

because records that were unrelated to messages between vendors and reviewers were written in Chinese, but it appeared that the scam targeted citizens and also leaked information from citizens of the U.S. and Europe at a minimum. Safety Detectives was unable to identify the owner of the server and the server was secured a few days after Safety Detectives discovered the breach, making it inaccessible to outside parties. Specific vendors engaged in the fake review scam were not identified.

79. In the ensuing days, Amazon suspended the accounts of numerous major Chinese merchants, including significant customers of Tuya. As reported by PC Mag on May 11, 2021, in an article entitled "Database Reveals Over 200K People Involved in Posting Fake Reviews on Amazon," Amazon declined to comment on specific brand removals, but for Chinese brands such as Aukey, whose products had suddenly become unavailable on Amazon, "the timing certainly suggests the removal" was in response to the discovery of the brand's fake reviews.

80. On May 11, 2021, TechCrunch reported in an article entitled, "Prime today gone tomorrow: Chinese products get pulled from Amazon," that:

> *. . . [S]everal top Chinese sellers disappeared from Amazon over the past few days. At least eleven accounts that originate from Greater China were suspended . . . TechCrunch has reached out to Mpower and Aukey, whose Amazon stores are gone and were two of the most successful brands native to the American marketplace. In total, the suspended accounts contribute over a billion dollars in gross merchandise value (GMV) to Amazon . . . .* Amazon didn't comment on the status of the suspended accounts, but said in a statement for TechCrunch that it has "long-standing policies to protect the integrity of our store, including product authenticity, genuine reviews and products meeting the expectations of our customers."

81. The May 11, 2021 TechCrunch article further stated that several of the suspended Chinese accounts belonged to the same parent firms, as it is typical for such big sellers to operate multiple brands on Amazon to maximize sales. The article reported that Chinese merchants represented about 75% of Amazon's new sellers in January 2021. The article quoted Bill Zhang,

who develops and exports smart training suits through Amazon, as saying, *"This isn't the first time Amazon has shut down accounts over fake reviews and other behavior that violate its rules, but the scale of this wave is unprecedented."*

82.     Aukey was a major e-commerce customer of Tuya that relied heavily on Amazon as a sales channel, and never recovered from the Amazon ban.  For example, 72.94% of Aukey's sales revenue was generated by Amazon sales in 2018, and 75.6% of Aukey's sales revenue was generated by Amazon sales for the first three months of 2019.  Aukey was preparing for its IPO on the Shenzhen Stock Exchange since August 2020, but the IPO was suspended since the Amazon crackdown in May 2021.

83.     VanTop, a Tuya customer since December 2020, suffered significant financial harm due to the Amazon ban.  Amazon banned VanTop from its platform starting in April or May 2021.

84.     Another Tuya customer negatively impacted by the Amazon ban was Apeman, which had been a Tuya customer since December 2019.  Apeman was banned from Amazon starting in May 2021.

85.     Zebao, one of Tuya's e-commerce clients, had 367 of its stores suspended by Amazon and had funds of 32.24 million in Chinese Yuan Renminbi ("RMB")[4] frozen.  Zebao relied heavily on Amazon as a sales channel; 93.4% of Zebao's sales revenue was generated from Amazon sales in 2020, which dropped to 76.5% in 2021 as a result of Amazon's suspension.  Zebao's total sales revenue dropped by 46% in 2021. Additional Tuya customers were negatively impacted by Amazon's mid-2021 crackdown on Chinese merchants that were found in violation of Amazon's policies.

86.     Nonetheless, Tuya continued to tout its growth and stability to investors.  On May 13,

---

[4]     As of March 2, 2023, 1 RMB = 0.145 USD.

2021, Tuya issued a press release announcing its Q1 2021 financial results (the "Q1 2021 Press Release"). The Q1 2021 press release quoted Wang as follows:

> Our first quarter results were distinguished by strong revenue growth as we leveraged our leading technology and brand reputation to capitalize on growing market demand. . . . Demand for smart devices continues to look promising . . .. [W]e continued to cultivate sustainable growth in demand from our existing customers by empowering them to quickly develop and take competitive and cost-effective IoT devices to market with very little R&D investment.

87.     On July 9, 2021, verdict.co.uk reported that Amazon had ***"closed 340 online stores of one of its largest Chinese retailers in the first half of this year"*** as it cracked down against paid reviews and other violations of Amazon's terms of use. In subsequent weeks, Amazon banned hundreds of Chinese brands across thousands of sellers' accounts. Amazon stated that these sellers knowingly, repeatedly, and significantly violated Amazon's seller policies, particularly its policies around review abuse.

### D.    The Truth Begins To Emerge About The Amazon Ban's Material Impact On Tuya's Business, And Tuya's Stock Price Plummets

88.     On August 18, 2021, Tuya issued a press release announcing the Company's financial results for the second quarter of 2021 (the "Q2 2021 Press Release"). The Q2 2021 Press Release disclosed that: (1) Tuya's loss from operations was $41.5 million for the quarter, compared to a loss of $15.6 million in the same period of 2020; (2) net loss was $38.1 million for the quarter, compared to $14.7 million in the same period of 2020; (3) net margin was negative 45% for the quarter, compared to negative 38% for the same period of 2020; and (4) operating margin was negative 49% for the quarter, compared to 40.1% for the same period of 2020. The Q2 2021 Press Release also provided the Company's outlook for the third quarter of 2021, stating that Tuya expected revenue to be in a range of just $83 million to $86 million, which surprised and disappointed analysts and investors.

89.     The Q2 2021 Press Release quoted Wang as follows:

- 25 -

We are seeing strong momentum across the entire business as we continue to successfully execute our growth strategy despite the macro headwinds that are impacting the industry . . .. As our highest priority, data security and compliance together with R&D investment serves as the solid foundation for our sustained future growth.

90.      During an earnings call held that same day with analysts and investors (the "Q2 2021 Call"), Liu revealed the reason for Tuya's low third quarter revenue forecast, explaining that ***"our customers face a series of challenges, including Amazon's strict execution of seller policy,"*** in which Amazon had banned cross-border e-commerce stores.

91.      On the Q2 2021 Call, when asked by an analyst about the impact of Amazon's ban on cross-border e-commerce shops and the impact to Tuya's customers, Liu responded:

> ***. . . [T]his was an unexpected event [that] happened in the last couple of months . . .. We roughly estimate 80% of Powered by Tuya IoT devices were sold through off-line retail channel. So there are limited number of e-commerce customers who were impacted by this unexpected event. Our e-commerce customers all have deep experiences in product development, supply chain and the e-commerce operation, and they are very resilient for a limited number of e-commerce customers impacted, they are very actively responding to the changes. They are opening new stores in Amazon and also opening stores in other online platforms, setting up their own independent e-commerce store, and also through our help, explore offline retail channels***.

92.      Following the Q2 2021 Call, analysts estimated that the Amazon bans would negatively affect Tuya's 2021 second half revenues by 10%, and that 20% of all Tuya IoT- enabled devices were sold through online channels such as Amazon. However, contrary to Liu's representations on the Q2 2021 Call, Tuya subsequently acknowledged that about 30% of Tuya's powered by Tuya devices were sold through e-commerce sites such as Amazon. On Tuya's Q4 2021 earnings call on March 14, 2022, Liu stated that ***"[i]n 2021, China's cross-border e-commerce brand[s] accounted for about 30% of the sales of products powered by Tuya."*** Further, Tuya's customers impacted by the Amazon ban were unable to recover from the negative impact of the ban despite their best and most creative efforts.

93.    Morgan Stanley published a report on August 18, 2021, stating that their guidance for Tuya's Q3 2021 was 6% lower than their forecast due to headwinds on cross-border e-commerce merchants.

94.    On August 18, 2021, BofA Global Research published a similar report stating that Tuya's revenue guidance for Q3 2021 of $83-$86 million fell below BofA's forecast of $95 million due in part to Amazon imposing a stricter seller policy, which affected its cross-border e-commerce customers.    BofA stated that "[m]anagement believes the impact from Amazon's policies is temporary and expects growth to resume in 4Q given [ ] affected customers are actively expanding their presence to other platforms, and re-opening stores on Amazon in compliance with the new rules[.]"

95.    On this news, Tuya's ADS price dropped $2.85 per share, or 19%, to close at $12.15 per share on August 18, 2021.    The next day, Tuya's ADS price further fell $1.74 per share, or 16.71%, to close at $10.41 per share on August 19, 2021, a two-day decline of 30.6%.

**E.    The Risks Of Tuya's Customers' Fake Review Practices Further Materialize**

96.    On September 17, 2021, Cindy Tai, Vice President of Asia Global Selling at Amazon, revealed that over the previous five months, Amazon had permanently banned ***600 Chinese brands, involving 3,000 online stores.***

97.    As reported by Republic World in an article last updated on September 11, 2021, entitled "Amazon Bans Chinese Sellers With $1 Billion Revenue Over 'manipulating Customer Feedbacks,'" the Shenzhen Cross-border E-commerce Association reported that as many as 50,000 Chinese merchant accounts had been suspended since Amazon's crackdown starting in May 2021. The article reported that the May 2021 Amazon ban had caused Chinese cross-border e-commerce businesses to incur losses estimated at $15.4 billion.    The banned merchants had been violating

Amazon's policies by, *inter alia,* offering rewards, including gift cards, to Amazon customers in exchange for positive product reviews, in violation of Amazon's policies.

98.     TechWire Asia reported in an article entitled "Why did Amazon ban 3,000 Chinese-backed online stores?," which was published on September 22, 2021, that "Amazon's current crackdown is thought to be greater in scale than any of its previous campaigns.  The retail giant also intends to continue improving abuse detection and take enforcement action against bad actors, including those that knowingly engage in multiple and repeated policy violations, including review abuse."

99.     On November 22, 2021, Tuya filed a Form 6-K with the SEC after close of market, announcing its Q3 2021 financial results.  Tuya held a public conference call that same day to discuss its Q3 2021 results (the "Q3 2021 Call").  On the Q3 2021 Call, Tuya admitted that the negative impact of the Amazon ban on Tuya's business was still materializing.  Wang stated: ***"The third quarter of 2021 was a challenging quarter for the industry[,]"*** and noted the impact of ***"Amazon store closures"*** amongst the leading challenges that Tuya had faced.

100.     On the Q3 2021 Call, Liu stated:

Our IoT PaaS revenue reached $72.6 million, achieving year-over-year growth of 37.4%.  ***Compared with the first half of 2021 is a relatively slow year-over-year growth for third quarter IoT PaaS revenue was mainly due to the range of challenges [Wang] mentioned earlier.  Because we are in the sector of IoT that involved real physical devices, the majority of which are consumer level devices, our short-term revenue may be impacted by the downstream fluctuations of the entire consumer electronics industry.***

101.     On this news, Tuya's share price fell $0.41 per share or 7.6%, to close at $4.99 per share on November 23, 2021.

102.     According to sources on Maimai, a popular Chinese career networking social platform, Tuya initiated a massive wave of layoffs following its IPO in the second half of 2021. Contractors and interns were let go first, followed by employees on probation.  For the remaining

employees, Tuya cut off year-end bonuses and enforced stricter key performance indicators that forced low performers to quit. On February 22, 2022, a source on Maimai stated that Tuya planned to lay off an additional 500-700 employees. On February 24, 2022, Zhengguan News, a Chinese state-owned newspaper, reported that a Tuya employee had confirmed that Tuya was soon to cut over 800 jobs.

103.    On March 14, 2022, after close of market, Tuya issued a press release announcing its Q4 2021 results. Tuya disclosed that operating margin for the quarter was negative 68.8% compared to negative 29.7% for the same period in 2020; loss from operations was $51.6 million for the quarter, compared to $18.7 million in the same period of 2020; net loss was $48.8 million for the quarter, compared to $18.4 million in the same period of 2020; and net margin for the quarter was negative 65.2%, compared to negative 29.2% in the same period of 2020.

104.    On that same day, Tuya held a public conference call to discuss its Q4 2021 results (the "Q4 2021 Call"). On the Q4 2021 Call, Wang tried to reassure investors that the effects of the Amazon ban were behind Tuya, stating that:

> *. . . [C]ertain e-commerce customers affected by store closures in the third quarter are also showing signs of recovery.* Our plan is to navigate the challenges in the macro environment through the 3 growth drivers: the private cloud solution, cost-effective smart light IoT solution and our industry SaaS. *At the same time, we will focus on the optimization of our organizational structure and our operating efficiency as we aim to better balance our business growth and time line to profitability.*

105.    On the Q4 2021 Call, Liu stated that for the first quarter of 2022, Tuya expected total revenue to be in the range of just $50 million to $57 million.

106.    On this news, Tuya's share price fell $0.21 per share, or 9.5%, to close at $1.99 per share on March 15, 2022.

107.    Analysts expressed further concern about Tuya's stability following the release of its Q4 2021 results. For example, Morgan Stanley published a report on March 15, 2022 which stated

that "[l]ack of visibility and profitability cannot give support amid market turbulence."  The report stated that Tuya's "sequential slowdown *mainly reflects the lasting effect of store closure at Amazon.com*, global inflation, and supply chain disruptions."  Morgan Stanley reduced its revenue forecast for Tuya by "20% for 2022, 22% for 2023 and 27% for 2024, to reflect lingering uncertainties[.]"

108.    On June 14, 2022, after close of market, Tuya issued a press release announcing its Q1 2022 financial results (the "Q1 2022 Press Release") and held a public conference call to discuss its Q1 2022 financial results (the "Q1 2022 Call").  In the Q1 2022 Press Release, Tuya stated that operating margin for the quarter was negative 100.3%, compared to negative 72.6% for the same period of 2021; loss from operations for the quarter was $55.5 million, compared to $41.3 million for the same period of 2021; and net loss was $55 million for the quarter, compared to $40.5 million for the same period of 2021.

109.    On the Q1 2022 Call, Wang disclosed:

> *Revenue represented a year-over-year decrease of 2.7% compared to the quarter of 2021, where we saw rapid growth across the industry.  Our IoT PaaS business revenue decreased year-over-year to $41.8 million in the quarter . . ..  Overall, the first quarter is full of challenges, economic and other disruptions that started in second part of the 2021, intensified in the first quarter, aided by the Ukraine war*.

110.    On the Q1 2022 Call, Liu stated:

> The decline [in revenue] was driven by a 16.1% year-over-year decrease in our IoT PaaS revenue, which reduced to $41.8 million for the quarter, impacted by factors [Wang] mentioned earlier.  *If we look into the ultimate demand contributions to our revenue across the globe, which represents our estimate based on various businesses information from and regarding our customers, we did experience a slowdown in the U.S. and Europe[.]*

111.    On the Q1 2022 Call, Liu further stated:

> And our non-GAAP net loss was $37.3 million in the first quarter, representing 67.4% of total revenue.  *In fact, with increasing uncertainty in the macroeconomic environment, we are pivoting away from top line growth towards balanced efficiency, profitability and sustainability.  As part of our efficiency-first strategy,*

*not only have we refined our team structure, we are also reducing our office lease by toning down our office plans to match our current growth trajectory*.

112.    On this news, Tuya's share price fell by $0.54, or 18%, to close at $2.42 per share on June 15, 2022.

113.    Tuya's ADS price has never recovered.  Currently, Tuya ADSs are trading at less than $2 per share— more than 90% below the price at which Tuya ADSs were sold to the investing public in the IPO.

## V.    DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT AND ITEMS 303 AND 105 OF REGULATION S-K

114.    "The Securities Act of 1933 . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

115.    To effectuate this purpose, a company's registration statement must provide a full disclosure of material information.  Failure to do so gives rise to private rights of action under the Securities Act.

### A.    Section 11 Disclosure Requirements

116.    Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC.  *See* 15 U.S.C. § 77k.  Accordingly, Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).

Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: "(1) every person who signed the registration statement; (2) every person who was a director . . . at the time of the filing of . . . the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration as being or about to become a director [;]" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement[;]" and (5) "every underwriter with respect to such security."  15 U.S.C. § 77k(a)(1)-(5).

### B.    Disclosure Requirements Under Regulation S-K Item 303

117.    Item 303 of Regulation S-K imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required." *Id.*

118.    Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

   a.    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

   b.    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.")

(citation and quotation omitted).

119.    Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact on results, must be disclosed.  Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

120.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information."  *See* Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operation, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  *Id.* at *3, *17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

121.    Here, the ongoing and widespread violations of Amazon's policies prohibiting fake reviews and brushing by Tuya's China-based customers, whose businesses comprised a material percentage of Tuya's sales and revenue, were known trends or uncertainties likely to have a material unfavorable impact on Tuya's business, sales, revenues, and prospects.  Tuya's Registration Statement repeatedly emphasized Tuya's "close relationship" with its brand customers, which

purportedly enabled Tuya to grow the volume of deployment of its core IoT PaaS offerings on end user products, and further, as Tuya confirmed, about 30% of sales of powered by Tuya devices in 2021 were generated by its China-based cross-border e-commerce brand customers—thus Tuya knew or should have known of the trend or uncertainty likely to have a material adverse impact on its business presented by its customers' systematic violations of Amazon's policies.  As such, Tuya was required to include specific disclosures regarding the same in its Registration Statement.  It did not.

### C.    Disclosure Requirements Under Regulation S-K Item 105

122.    Item 105 of Regulation S-K requires that offering documents "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).  Item 105 further requires the offering documents to "[c]oncisely explain how each risk affects the registrant or the securities being offered." 17 C.F.R. § 229.105(b).  The discussion of risk factors:

> must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered.  Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.

Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

123.    Here, Tuya failed to adequately disclose, and in fact, did not disclose at all, in the "Risk Factors" section of the Registration Statement, the risks to Tuya's sales, revenue, and prospects of its China-based customers' ongoing, systematic practice of engaging in violations of Amazon's policies, namely, Amazon's policies prohibiting fake reviews and brushing.  These risks were some of the most significant factors that made an investment in Tuya ADSs speculative or risky.  Instead, the Registration Statement contained boilerplate discussions of hypothetical, future

issues, but failed to disclose that these risks had already materialized. Moreover, the Registration Statement misleadingly discussed the risks that "may" occur "if" reviews of Tuya's products and services were "negative or not as strong as reviews of our competitors' products and services," but failed to disclose that reviews for a material portion of its products and services were fraudulently positive and violated Amazon's long-standing policies.

## VI.    TUYA'S REGISTRATION STATEMENT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS

124.    The Registration Statement contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation (specifically including Item 303 and Item 105 of SEC Regulation S-K).

125.    In the Registration Statement, Tuya misleadingly touted its "Large and loyal global customer base[,]" stating:

> *We had over 5,000 customers in 2020, primarily including brands, original equipment manufacturers or OEMs, industry operators and system integrators*. For the same period, our IoT PaaS empowered over 2,700 brands to develop their smart devices, including leading brands such as Calex, Philips and Schneider Electric. Our IoT PaaS currently enables businesses and developers to develop smart devices in more than 1,100 categories sold across over 220 countries and regions globally. *In 2020, we powered over 116.5 million smart devices, making us the largest IoT PaaS business in the global market of IoT PaaS in terms of the volume of smart devices powered, according to CIC. As of December 31, 2020, there were approximately 204.3 million smart devices powered by Tuya. We are also attracting an increasing number of Industry SaaS customers*. We have also established a large and active community of over 262,000 IoT device and software developers as of December 31, 2020. Our IoT cloud platform is currently capable of processing over 84 billion cloud requests and over 122 million AT voice interactions daily. Today, smart devices powered by Tuya are available in over 100,000 stores all over the world.

126.    The Registration Statement touted Tuya's "Thriving Ecosystem with Powerful Network Effects," stating:

> *We have established a thriving ecosystem of brands, OEMs, developers, partners*

*and end users on our platform due to powerful network effects*. End users of smart devices demand a single interface to interact with various types of devices from different brands—an experience similar to using different apps on one smartphone. Our platform provides an open architecture to connect any device from any brand, while enabling users to manage all devices across brands through a single portal—the exact experience they desire. *As a result, more brands want to join our platform to integrate their devices onto the single user interface through which devices from other brands are connected. These self-reinforcing network effects further increase our brand awareness and generates word-of-mouth referrals, helping us form an extensive, vibrant and increasingly interconnected IoT ecosystem. Additionally, we allow our customers to try out new ideas based on our consumption-based revenue model to accelerate their adoption of our platform and cultivate a vibrant culture for innovation*.

127.   The Registration Statement further stated:

*We help our customers succeed and we benefit from their growth through our consumption-based revenue model as we deploy IoT PaaS to more smart devices developed by our customers*. We had 188 premium IoT PaaS customers, defined as IoT PaaS customers who individually contributed more than US $100,000 of revenue during the immediately preceding 12-month periods, as of December 31, 2020. In 2020, our premium IoT PaaS customers contributed approximately 87% of our revenues generated from IoT PaaS. *Our dollar-based net expansion rate of IoT PaaS was 181% for the trailing 12-month period ended December 31, 2020, indicating strong growth within our existing customer base*.

\*    \*    \*

*Our business has scaled rapidly in recent periods. For 2020, our revenue grew to US $179.9 million, representing an increase of 70% over the same period in 2019*.

128.   The foregoing statements in ¶¶125-127 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of Tuya's IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; (b) at least in significant part, it was due to said violations of Amazon's policies that Tuya's "business ha[d] scaled rapidly in recent periods"; that Tuya had "5,000 customers in 2020"; and that "[a]s of December 31, 2020, there were approximately 204.3 million smart devices

powered by Tuya"; (c) as a result of (a) and (b), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects; and (d) as a result of (a)-(c), the representations in Tuya's Registration Statement concerning Tuya's historical financial and operational metrics and purported market opportunities and expected growth did not accurately reflect the actual business and operations of the Company at the time of the IPO.

129.    In the Registration Statement, Tuya's growth strategies were described as follows:

**Our Growth Strategies**

We believe we are the leading IoT cloud platform based on our leading position in the global market of IoT PaaS. According to CIC, we are the largest IoT PaaS business in the global market of IoT PaaS in terms of volume of smart devices powered in 2020. We intend to strengthen our position as the leading IoT cloud platform and continue to grow our business by pursuing the following strategies.

*Extend our technology leadership*

We will continue to invest in research and innovation, particularly in our core capabilities such as IoT core, edge computing, AI algorithms and data analytics, to extend our technology leadership in the industry. We plan to bring additional features and functionalities to our PaaS and SaaS offerings and scale our value-added services to end users of Tuya-powered products.

***Deepen our relationship with our existing customers***

***We grow with our customers as they develop and sell more Tuya-powered smart devices. To achieve this, we help our customers increase sales volume of products already powered by Tuya, thereby encouraging them to bring more product families to our platform. We leverage our ecosystem partners to help customers further penetrate online e-commerce platforms and offline retail channels. Customers with initial success tend to expand our services to more product families to maximize the benefits of our platform. A robust long-term customer relationship helps us lock in deployment and increase customers' stickiness. We strive to develop and maintain long-term relationship[s] with our customers through our dedicated membership program. We plan to attract more customers to our membership program.*** In 2020, approximately 63% of our IoT PaaS deployments were from our membership customers.

***Acquire new customers***

- 37 -

*We believe the low penetration rate of smart devices presents significant opportunities for us to tap into new customers. We strive to acquire new customers to grow our customer base. We will strengthen the network effects of our platform to attract more brands to join our platform and promote our brand awareness and word-of-mouth referrals, which in turn enables us to acquire new customers rapidly at low customer acquisition costs. We will also enhance our sales and marketing efforts to attract new customers to try out our products and services and accelerate their adoption of our platform.*

*Broaden Our Reach by Expanding into New Verticals Such as Industrial and Agriculture*

We have successfully attracted brands from a number of verticals including smart home and smart business. We intend to broaden our reach into more verticals such as industrials and agriculture. ***We will continue to develop more products and acquire new customers in all these verticals globally through our effective product development capabilities and R&D efforts.***

*Grow and Broaden Our SaaS Offerings*

We develop pilot SaaS solutions to set a benchmark for SaaS application on top of our IoT cloud platform. We have seen significant growth in revenues generated by our SaaS solutions for selected verticals spanning over smart commercial lighting, smart hotel, smart consumer security, smart apartment, smart community and real estate, to name a few. We intend to penetrate into more verticals including industrials and agriculture, and develop sector-defining SaaS applications that cater to the needs of end users in such verticals.

**Expand brand awareness**

***We aim to increase brand awareness among the end users by promoting the "Powered by Tuya" concept.*** We intend to educate our end users the critical role Tuya plays in delivering a connected and software product experience for them. Additionally, we have also rolled out selected value-added services to end users such as internet protocol camera, or IP camera, cloud storage service for a fee. ***As we introduce more services directly to end users, our brand will be increasingly recognized. Growing mind share among the end users will attract more business customers and developers to our platform.***

130.    The Registration Statement further described Tuya's "growth strategies" as follows:

***Our growth strategies are tailored around our customers and their specific demands. For example, we have proactively engaged in co-marketing with well established, leading brands to promote the "Powered by Tuya" brand awareness. For leading OEMs in target categories and those with large demands in our products, we are focused on providing bespoke support and services by, for example, offering free trials of product enhancements and new features and***

*functionality . . ..  In January 2021, we achieved a Net Promoter Score (NPS) of 75, which indicated a high degree of satisfaction for our products and services among our customers.  NPS measures the willingness of customers to recommend a company's products or services to other potential customers, and is viewed as a proxy for measuring customers' loyalty and satisfaction with a company's product or service*.

131.    The foregoing statements in ¶¶129-130 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; (b) at least in significant part, it was due to said violations of Amazon's policies that Tuya had attained a high Net Promoter Score of 75; (c) Tuya's statement that it "leverage[d] [its] ecosystem partners to help customers further penetrate online e-commerce platforms and offline retail channels" and it "acquire[d] new customers . . . through [its] effective product development capabilities and R&D efforts[,]" failed to disclose that Tuya's customers penetrated e-commerce platforms and Tuya acquired new customers through violations of Amazon's policies, including manipulation of product reviews and improper contact with consumers; (d) Tuya's growth strategies included turning a blind eye to its customers' violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; and (e) as a result of (a)-(d), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects.

132.    Included in the Registration Statement's list of "Risks Related to Our Business and Industry" were the following statements:

*Our business depends on our strong reputation and the value of Tuya brand.  If we are unable to maintain and enhance our Tuya brand and increase market awareness*

*of Tuya and its products and services, our business, operating results and financial condition may be adversely affected.*

We must maintain and enhance the "Tuya" brand identity and increase market awareness of Tuya-powered smart devices generally and our products and services. The successful promotion of our brand will depend on our efforts to achieve widespread acceptance of our platform and products and services, attract and retain customers and our ability to maintain our current market leadership and successfully differentiate our products and services from competitors. These efforts require substantial expenditures, and we anticipate that they will increase as our market becomes more competitive and as we expand into new markets. These investments in brand promotion and thought leadership may not yield increased revenue. To the extent they do, the resulting revenue still may not be enough to offset the increased expenses we incur. *In addition, independent industry analysts often provide reviews of our products and competing products and services, which may significantly influence the perception of our products and services. If these reviews are negative or not as strong as reviews of our competitors' products and services, our brand may be harmed. Adverse publicity (whether or not justified) relating to events or activities attributed to us, members of our workforce, agents, or third parties we rely on, may tarnish our reputation and reduce the value of our brand.*

\*      \*      \*

*Negative publicity about us, our products and services, operations and our directors, management and business partners may adversely affect our reputation and business.*

We may, from time to time, receive negative publicity, including negative internet and blog postings, ratings or comments on social media platforms or through traditional media about our company, our business, our directors and management, our brands, our products and services, our suppliers or other business partners. Certain of such negative publicity may be the result of malicious harassment or unfair competition acts by third parties. We may even be subject to government or regulatory investigation as a result of such third-party conduct and may be required to spend significant time and incur substantial costs to defend ourselves against such third-party conduct, and we may not be able to conclusively refute each of the allegations within a reasonable period of time, or at all. We may receive complaints from our customers and end users on our products and services, pricing and customer support. If we do not handle customer complaints effectively, our brand and reputation may suffer, our customers and end users may lose confidence in us and they may reduce or cease their use of our products and services. *Our success depends, in part, on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing and potential customers and end users seek and share information. If actions we take or changes we make to our products and services or platform upset these customers and end users, their online commentary could negatively affect our brand and*

*reputation. Complaints or negative publicity about us, our products and services or platform could materially and adversely impact our ability to attract and retain customers and end users, our business, results of operations and financial condition.*

133.    The foregoing statements in ¶132 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; and (b) there was a substantial probability and risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects.  The foregoing statements were also materially false and misleading when made because they presented these risks to Tuya's business as mere hypothetical risks that "may" harm Tuya's business, when in fact, these risks to Tuya's business were already materializing due to its China-based customers' ongoing and systematic violations of Amazon's policies.  Moreover, Tuya was not faced with the risk of ***negative*** customer reviews – to the contrary, Tuya was faced with the risk of ***fraudulently positive*** customer reviews.

134.    The Registration Statement violated Item 303 of Regulation S-K because it failed to disclose the adverse, ongoing trend and uncertainty of Tuya's China-based customers, which comprised a material portion of Tuya's sales and revenue, engaging in violations of Amazon's policies prohibiting fake reviews and brushing.  These undisclosed trends and uncertainties would (and did) have an unfavorable impact on the Company's sales, revenues, and growth from continuing operations.  Tuya's Registration Statement repeatedly emphasized Tuya's "close relationship" with its brand customers, which purportedly enabled Tuya to grow the volume of deployment of its core IoT PaaS offerings on end-user products and further, as Tuya confirmed,

about 30% of sales of powered by Tuya devices in 2021 were generated by its China-based cross-border e-commerce brand customers—thus Tuya knew or should have known of the trend or uncertainty likely to have a material adverse impact on its business presented by its customers' systematic violations of Amazon's policies.  As such, Tuya was required to include specific disclosures regarding the same in its Registration Statement.  It did not.

135.    This failure also violated Item 105 of Regulation S-K, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Tuya ADSs speculative or risky.  To the contrary, the Registration Statement contained boilerplate discussions of possible *future* issues but failed to disclose that these risks had already materialized.

136.    The Registration Statement emphasized Tuya's ability to grow revenue from its existing customers:

> Our ability to maintain long-term revenue growth is dependent on our ability to increase customers' usage of our platform over time and grow revenue generated from existing customers . . ..  ***Our dollar-based net expansion rate for IoT PaaS has remained higher than 150% for five consecutive quarters since we began tracking this metric for the trailing 12-month period ended December 31, 2019***.  Our dollar-based net expansion rate demonstrates our strong ability to continue to expand customers' usage of our platform over time and grow revenue generated from existing customers.

137.    The foregoing statements in ¶136  were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; (b) at least in significant part, it was due to said violations of Amazon's policies that Tuya's "dollar-based net expansion rate for IoT PaaS has remained higher than 150% for five consecutive quarters since

[it] began tracking this metric for the trailing 12-month period ended December 31, 2019;" (c) as a result of (a) and (b), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects, and (d) as a result of (a)-(c), the representations in Tuya's Registration Statement concerning Tuya's historical financial and operational metrics, including its representation that its "dollar-based net expansion rate for IoT PaaS had remained higher than 150% for five consecutive quarters … for the trailing 12-month period ended December 31, 2019," and purported market opportunities and expected growth did not accurately reflect the actual business, operations, financial results, and projections of the Company at the time of the IPO, and such statements lacked a reasonable factual basis.

138.    The Registration Statement included the following in a section titled, "Factors Affecting Our Performance":

*Expanding Usage by Existing Customers*

**We have amassed a large and diversified customer base covering a wide spectrum of verticals.  We believe that there are significant growth opportunities within our existing customers.  As our platform is built to be product- and brand-agnostic, many customers using our IoT cloud platform for one product category expand their usage to more brands, categories and use cases in order to maximize the benefits of our platform and ensure consistent, high quality IoT experience for their end users.  Through the increase in usage, we grow more brands and OEMs on our platform into larger customers, such as premium customers who contribute more than US $100,000 of revenue within 12 months.  As this trend continues over time, our brand awareness also increases, generating word-of-mouth referrals that not only attract more brands, developers and partners, but also lead to growing end user demand, better user insights and a more vibrant IoT ecosystem.  We expect to expand into additional product categories and use cases to expand cross- and up-selling opportunities and continue to invest in sales and marketing and customer success activities to achieve additional revenue growth from existing customers**

\*      \*      \*

*New Customer Acquisition*

Our operating results and growth prospects will depend in part on our ability to

attract new customers. ***We are intensely focused on growing our customer base. We continue to invest in our sales and marketing efforts and developer community outreach, which are critical to driving customer acquisition. We have built a developer and partner network through our effective marketing efforts which continuously raises awareness of our IoT cloud platform.*** For example, through our self-service developer portal, a developer can begin using our platform and developing a smart device within minutes. ***This has allowed us to acquire customers rapidly and cost-effectively. Furthermore, we seek to improve the breadth and quality of our platform and products, and to enhance our brand recognition, which will allow us to capture additional market share, better optimize the pricing of our products and services, and reach customers in a broader range of verticals and use cases***.

139.    The foregoing statements in ¶138 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; (b) Tuya had "amassed a large and diversified customer base covering a wide spectrum of verticals" and had "acquire[d] customers rapidly and cost-effectively" at least in significant part by engaging in said violations of Amazon's policies; and (c) as a result of (a)-(b), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects.

140.    The Registration Statement touted Tuya's increasing revenues in its core segment of IoT PaaS and its SaaS offerings as follows:

> ***Our revenues generated from IoT PaaS increased by 98.6% from US $76.4 million for 2019 to US $151.7 million for 2020, mainly driven by an increase in our number of deployments by 93.8% from 60.1 million to 116.5 million which, in turn, was driven by (i) growth in the SKUs and categories of products supported by IoT PaaS; and (ii) increased sales to existing customers as their sale of smart devices continued to grow and to a lesser extent, acquisition of new customers***. Of the increase in revenues generated from IoT PaaS, US $62.0 million was due to sales to existing customers and US $13.3 million was due to sales to new customers.

*    *    *

Our revenues generated from SaaS and others increased by 214.2% from US $2.0 million for 2019 to US $6.1 million for 2020, primarily driven by an increase in revenues from the Industry SaaS business which started to grow and to a lesser extent, an increase in revenues from value-added services we offer to customers, particularly data analytics and app customization services. *We launched our Industry SaaS business in March 2020, and its rapid growth since its inception was mainly driven by strong demand from business operators for sophisticated, brand-agnostic Industry SaaS offerings.*

141.    The foregoing statements in ¶140 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; (b) at least in significant part, it was due to said violations of Amazon's policies that: Tuya's "revenues generated from IoT PaaS increased by 98.6% from US $76.4 million for 2019 to US $151.7 million for 2020," Tuya's number of deployments increased by "93.8% from 60.1 million to 116.5 million," and Tuya's revenues generated from SaaS and others "increased by 214.2% from US $2.0 million for 2019 to US $6.1 million for 2020"; (c) as a result of (a) and (b), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects; and (d) as a result of (a)-(c), the representations in Tuya's Registration Statement concerning Tuya's historical financial and operational metrics, including its representation that "revenues generated from IoT PaaS increased by 98.6% from US $76.4 million for 2019 to US $151.7 million for 2020," Tuya's number of deployments increased by "93.8% from 60.1 million to 116.5 million," and Tuya's revenues generated from SaaS and others "increased by 214.2% from US $2.0 million for 2019 to US $6.1 million for 2020," and purported market opportunities and expected growth did not accurately reflect the actual business, operations, financial results, and projections of the Company at

- 45 -

the time of the IPO, and such statements lacked a reasonable factual basis.

142.    With respect to Tuya's smart device business, the Registration Statement noted:

*Our revenue from smart device distribution depends, to a greater extent, on customers' purchase patterns and demands as we strategically position smart device distribution as a way to nurture long term customer relationships, and thus fluctuates from period to period*.

143.    The foregoing statements in ¶142 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; (b) Tuya's "revenue from smart device distribution" and "customers' purchase patterns and demands" depended on said violations of Amazon's policies and the degree of enforcement that Amazon was willing and able to undertake; (c) Tuya "nurture[d] long term customer relationships" by turning a blind eye to its customers' violations of Amazon's policies regarding fake reviews and brushing; and (d) as a result of (a)-(c), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects.

144.    The Registration Statement also noted the positive impact of Tuya's "overall business growth" and "increased number of customers" on other aspects of the Company's financial results as follows:

*The difference between our net loss of US $66.9 million and the net cash used in operating activities was mainly due to (i) an increase in advance from customers of US $13.0 million which was largely driven by our overall business growth and increased number of customers*, (ii) an increase in accruals and other payables of US $11.9 million, (iii) an increase in accounts payables of US $11.0 million due to increased payables to our suppliers which, in turn, *was largely driven by our overall business growth*, and (iv) share-based compensation of US $9.4 million, partially offset by (i) an increase in inventories of US $19.8 million as we increased our stock

of materials to meet the needs of our growing business, (ii) an increase in notes receivable of US $8.7 million due to increased customer payments in the form of commercial notes, and (iii) *an increase in accounts receivable of US $7.2 million, driven by our overall business growth and increased number of customers*.

145.    The foregoing statements in ¶144 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; (b) at least in significant part, said violations of Amazon's policies resulted in: "the increase in advance from customers of US $13.0 million," "an increase in accounts payable of US $11.0 million due to increased payables to our suppliers," and "an increase in accounts receivable of US $7.2 million"; (c) Tuya's "overall business growth and increased number of customers" was caused by Tuya's customers' violations of Amazon's policies prohibiting fake reviews and brushing; (d) as a result of (a)-(c), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects; and (e) as a result of (a)-(d), the representations in Tuya's Registration Statement concerning Tuya's historical financial and operational metrics, including its representations that it had experienced an " increase in advance from customers of US $13.0 million," "an increase in accounts payable of US $11.0 million due to increased payables to our suppliers," and "an increase in accounts receivable of US $7.2 million," and purported market opportunities and expected growth did not accurately reflect the actual business, operations, financial results, and projections of the Company at the time of the IPO, and such statements lacked a reasonable factual basis.

146.    The Registration Statement stated that the fair value of Tuya's ordinary shares had

increased from US $2.82 in July 2020 to US $12.48 in January 2021, with one of the primary factors for the increase due to "***organic growth of our business and the continuous improvement in our financial performance and an updated business outlook[,]***" which included:

- the increased deployments of our IoT PaaS; the deployment of our IoT PaaS in January 2021 significantly exceeded our deployments in the first quarter of 2020 [and],

- the significant increases in both the number of our IoT PaaS premium customers and the revenue contribution per IoT PaaS premium customers in the second half of 2020 as compared to the first half of 2020[.]

147.    The Registration Statement further noted that the fair value of Tuya's ordinary shares increased from $12.46 in January 2021 to $14.46 in February 2021, and then from $14.46 in February 2021 to $18.50, the midpoint of the estimated public offering price range of the IPO, primarily attributing the increases to the following:

- Substantial growth in our business performance and prospects

    o ***Organic growth of our business and the continuous improvement in our financial performance and updated business outlook***, with particularly further growth of the followings in the 2-month period ended February 28, 2021: (i) our core business IoT PaaS and SaaS and others revenues; (ii) the gross margins of our business IoT PaaS as well as our overall gross margins; (iii) the contribution from our core business IoT PaaS and SaaS and other revenue to our total revenues further increased in the 2-month period ended February 28, 2021; and (iv) the number of our employees, most of which were research and development personnel.

    o ***Increased business and revenue expectation, given that (i) during the year 2020, especially in the fourth quarter of 2020, we experienced significant business growth; (ii) we has also observed the increasing acceptance of, and demand for, a software-enabled IoT experience globally as people continue to work, learn, and play from home, which we believe will continue to drive demands for smart devices and services powered by our IoT PaaS in the long term***.

    ***As a result of the above factors, the expectations for our business and financial performance in terms of revenue, number of customers, the number of use cases supported, etc., have increased relative to the date of our most recent valuation***.

- The continued recovery of the global economic situation and the improvement of COVID-19 situation leading to stronger investor confidence and increased

expectations.

o   .   .   . *Different from other cloud infrastructure companies or SaaS or PaaS companies in other industries, our business is deeply integrated with our customers' own businesses, which in turn are affected by the ultimate demands and purchasing power of the end users. The recovery of the end-user market and customers' own business are positive signals for our business to maintain rapid growth, which has led to stronger investor confidence in us and our valuation and future performance*.

148.    The foregoing statements in ¶¶146-147 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; (b) at least in significant part, said violations of Amazon's policies resulted in: "the growth of [Tuya's] business and the continuous improvement in [Tuya's] financial performance," "the increased deployments of [Tuya's] IoT PaaS," "the significant increases in both the number of [Tuya's] IoT PaaS premium customers and the revenue contribution per IoT PaaS premium customers in the second half of 2020," and the "increasing acceptance of, and demand for, a software-enabled IoT experience"; (c) as a result of (a) and (b), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects; and (d) as a result of (a)-(c), the representations in Tuya's Registration Statement concerning Tuya's historical financial and operational metrics, including its representations that the fair value of its ordinary shares "had increased from US $2.82 in July 2020 to US $12.48 in January 2021," and that the fair value of its ordinary shares had increased from $12.48 in January 2021 to $14.46 in February 2021, and further increased from $14.46 in February 2021 to $18.50, as well as Tuya's purported market opportunities and expected growth did not accurately reflect the actual business, operations, financial

results, and projections of the Company at the time of the IPO, and such statements lacked a reasonable factual basis.

149.    The Registration Statement further stated:

> *We believe the efficient distribution of Tuya-powered smart devices to target audiences is key to our long term competitive edge and sustainability* . . .. Some of our customers, primarily brands and system integrators, prefer not to deal with multiple OEMs. These customers have the option to purchase directly from us finished smart devices deployed with IoT PaaS sourced from qualified OEMs. They typically place purchase orders directly with us by specifying the type of smart devices. We then source these products for these customers by engaging qualified partner OEMs based on the type of products, hardware specifications and other metrics. We earn the difference between the prices at which the products are sourced and sold. *We believe there are continued demands in the market for this type of services, and we intend to continue to help our brand customers save time, cut costs, gain visibility into the supply chain and ensure an efficient distribution process by providing quality smart device distribution services*.

150.    The foregoing statements in ¶149 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; (b) Tuya intended to "help [its] brand customers" "gain visibility" by turning a blind eye to its customers' practices of posting fake reviews and brushing, in violation of Amazon's policies; and (c) as a result of (a) and (b), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects.

151.    The Registration Statement claimed that Tuya generated sales through its direct marketing efforts and touted Tuya's sales and marketing channels, but did not disclose the then-existing improprieties involved in its customers' marketing efforts on e-commerce platforms. Specifically, the Registration Statement stated:

*We generate sales primarily through our direct marketing efforts targeting brands and OEMs, with a focus on attracting new customers as well as expanding usage within our existing customer base . . .. We also generate customer leads indirectly through offline retail channels and e-commerce platforms*. We currently operate dedicated regional sales forces covering a number of our key overseas markets, such as the U.S., India, Japan and Germany. *As we expand our footprint globally, we have invested substantially in developing localized marketing strategies and employing sales and support staff*. In particular, we focus on educating customers about the "Powered by Tuya" smart ecosystem. *We raise customers' awareness that any smart device labeled with the "Powered by Tuya" tag can interact with each other regardless of brands and product categories. We utilize a multitude of sales and marketing channels, including:*

- online marketing channels such as search engine optimization, private domain operations and the online developer platform on our website;

- offline channels such as word-of-mouth referrals from brands owners, OEMs, retailers and other industry participants;

- brand marketing through industry conferences and events, including Mobile World Congress, International Consumer Electronics Show, and Hong Kong Electronics Fair where we demonstrate how we empower developers to push the boundary of IoT; and

- developer outreach via code sharing platforms and Q&A websites such as GitHub and Zhihu.

152. The foregoing statements in ¶151 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies prohibiting the manipulation of product reviews and making improper contact with consumers; (b) Tuya did not "generate sales primarily through [its] direct marketing efforts targeting brands and OEMs" and it had not developed "localized marketing strategies" nor had it "invested substantially" in "employing sales and support staff"—instead, it had generated a material portion of its sales and achieved increasing adoption of its products and services by way of its customers' violations of Amazon's policies prohibiting fake reviews and brushing; (c) Tuya "generate[d] customer leads

indirectly through . . . e-commerce platforms" through Tuya's customers' practices of posting fake reviews and brushing, in violation of Amazon's policies; and (d) as a result of (a)-(c), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects.

153.    The Registration Statement claimed that Tuya had an edge over its competitors, stating:

> The global IoT platform market is rapidly evolving and increasingly competitive. Currently, our competitors include both large, well established IoT service providers, such as Amazon AWS in the United States and the IoT business of Alibaba Cloud in China, and less-established IoT companies or companies that offer capabilities that compete with some of our offerings. ***We believe that none of our competitors currently competes directly with us across all of our offerings, and we compete favorably on the basis of the factors below:***
>
> - ability to support multiple use cases on a single platform;
>
> - ease of deployment, implementation and use;
>
> - platform performance, interoperability, scalability and reliability;
>
> - ability to help customers achieve global IoT deployment;
>
> - ability to build a supply chain ecosystem;
>
> - customer support and platform maintenance;
>
> - ***brand awareness and reputation;***
>
> - ***sales and marketing efforts; and***
>
> - ability to ensure data security and privacy.

154.    The foregoing statements in ¶153 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) a material percentage of Tuya's China-based customers had been and were currently engaged in widespread, systematic violations of Amazon's policies, namely, Amazon's policies

prohibiting the manipulation of product reviews and making improper contact with consumers; (b) Tuya did not "compete favorably" and had increased its "brand awareness and reputation" as a result of its customers' practices of posting fake reviews and brushing, in violation of Amazon's policies; (c) Tuya's "sales and marketing efforts" consisted, at least in significant part, of its customers' practices of posting fake reviews and brushing, in violation of Amazon's policies; and (d) as a result of (a)-(c), there was a substantial risk that a material percentage of Tuya's customers would be banned from selling products on Amazon, which would negatively impact Tuya's business, revenue, earnings, reputation, and prospects.

## VII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

155.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the "Class," consisting of all individuals and entities that purchased or acquired Tuya ADSs pursuant and/or traceable to the Company's false and misleading IPO Registration Statement, seeking to pursue remedies under Sections 11 and 15 of the Securities Act.  Excluded from the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

156.    The members of the Class are so numerous that joinder is impracticable.  Tuya ADSs are actively traded on the NYSE and millions of shares were sold in the IPO.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe there are hundreds, if not thousands, of members in the Class.  Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

157.    Common questions of law and fact exist as to all Class members and predominate

over any questions solely affecting individual Class members, including:

    a.   whether Defendants violated the Securities Act, as alleged herein;

    b.   whether the Registration Statement misrepresented and/or omitted material information in violation of the Securities Act;

    c.   whether the Individual Defendants have a viable "due diligence" defense to the strict liability imposed by Sections 11 of the Securities Act;

    d.   whether Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Sections 11 of the Securities Act;

    e.   whether the Individual Defendants are control persons of Tuya for purposes of Section 15 of the Securities Act; and

    f.   whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

158.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

159.    Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in securities class actions.

160.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## VIII.  NO SAFE HARBOR

161.    Defendants are liable for any false and misleading forward-looking statements made in connection with the IPO.  The safe harbor provision of §27A of the Securities Act, 15 U.S.C. §77z-2(b)(2)(D), specifically excludes those statements "made in connection with an initial public offering," which includes all of the false and misleading statements made in connection with the IPO alleged herein.

## IX.    CAUSES OF ACTION

### FIRST CLAIM

### Violations of Section 11 of the Securities Act
### Against All Defendants

162.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

163.    This claim is brought under §11 of the Securities Act (15 U.S.C. §77k), on behalf of the Class, against all Defendants.

164.    This claim does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.  This claim is based solely on strict liability and negligence.

165.    The Registration Statement for the IPO contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

166.    Tuya is the registrant for the IPO.  Defendants were responsible for the contents and dissemination of the Registration Statement.  The Individual Defendants signed or authorized the signing of the Registration Statement on their behalves.  The Underwriter Defendants marketed and underwrote the IPO and sold the Tuya ADSs issued in the IPO to Plaintiffs and the Class.

- 55 -

167.    As the issuer of the shares, Tuya is strictly liable to Plaintiffs and the Class for the Registration Statement's material misstatements and omissions.  Signatories of the Registration Statement, and possibly other defendants may also be strictly liable to Plaintiffs and the Class for such material misstatements and omissions.  None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate or non-misleading.

168.    Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Registration Statement inaccurate.  Because Defendants failed to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, the Registration Statement contained misrepresentations and/or omissions of material fact.  As such, Defendants are strictly liable to Plaintiffs and the Class.

169.    By reason of the conduct alleged herein, Defendants violated §11 of the Securities Act.  Plaintiffs and the Class members purchased ADSs pursuant and/or traceable to the Registration Statement and have sustained damages as a result.  The value of the ADSs has declined substantially subsequent and due to Defendants' violations.  At the time of their purchases, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

170.    Because of the foregoing, Plaintiffs and the members of the Class are entitled to damages under Section 11 of the Securities Act.

## SECOND CLAIM

### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

171.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

172.    This claim is brought under §15 of the Securities Act (15 U.S.C. §77o), against the Individual Defendants.

173.    This claim does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.  This claim is based solely on strict liability and negligence.

174.    As detailed herein, each of the Individual Defendants committed primary violations of the Securities Act by committing conduct in contravention of §11 of the Securities Act.

175.    By reason of the conduct alleged herein, the Individual Defendants violated §15 of the Securities Act, and Plaintiffs and the Class have suffered harm as a result.

176.    The Individual Defendants, due to their control, ownership, offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Tuya within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power, influence, and knowledge—and exercised the same—to cause Tuya to engage in the acts described herein.

177.    The Individual Defendants, at all relevant times, participated in the operation and management of Tuya, and conducted and participated, directly and indirectly, in the conduct of Tuya's business affairs.  The Individual Defendants were under a duty to disseminate accurate and truthful information with respect to Tuya's financial condition and prospects.  Because of their positions of control and authority as officers and directors of Tuya, the Individual Defendants were

able to, and did, control the contents of the Registration Statement (including the IPO Prospectus), which contained materially untrue and/or misleading statements and/or omitted to state material facts required to be stated therein.

178.    Because of their conduct, the Individual Defendants are liable under Section 15 of the Securities Act to Plaintiffs and the members of the Class who purchased or acquired ADSs pursuant to the Registration Statement.  As a direct and proximate result of the Individual Defendants' wrongdoing, Plaintiffs and the other members of the Class suffered damages in connection with their purchase and acquisition of ADSs pursuant to the Registration Statement.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XI.    DEMAND FOR A TRIAL BY JURY

179.    Plaintiffs hereby demand a trial by jury.

DATED:  March 2, 2023

GLANCY PRONGAY & MURRAY LLP
CASEY E. SADLER (admitted pro hac vice)
NATALIE S. PANG (admitted pro hac vice)


*BY:  CASEY E. SADLER*
CASEY E. SADLER

1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310/201-9150
310/201-9160 (fax)
csadler@glancylaw.com
npang@glancylaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ALAN I. ELLMAN
NATALIE C. BONO
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com
nbono@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs Kyle Nelson
and Jiyi Qiu*

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL JR.
Murray House
40 Powder Springs Street
Marietta, GA  30064
Telephone: 470/632.6000
770/200.3101 (fax)
michaelf@johnsonfistel.com

*Additional Plaintiffs' Counsel*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On March 2, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 2, 2023.


*s/ Casey E. Sadler*
Casey E. Sadler