# EXHIBIT 9

Presented to the Court by the foreman of the Grand Jury in open Court, in the presence of the Grand Jury and FILED in the U.S. DISTRICT COURT at Seattle. Washington

September 16, 2020

WILLIAM M. McCOOL. Clerk

By _____ Deputy

## UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. **CR20-151 RAJ** |
| Plaintiff, | **INDICTMENT** |
| v. | |
| EPHRAIM ROSENBERG, JOSEPH NILSEN, HADIS NUHANOVIC, KRISTEN LECCESE, ROHIT KADIMISETTY, and NISHAD KUNJU, | |
| Defendants. | |

The Grand Jury charges that:

## INTRODUCTION

1. Amazon.com, Inc. is a Seattle-based company that operates the Amazon Marketplace, one of world's largest online marketplaces. The Amazon Marketplace is an electronic commerce (or "e-commerce") digital platform, on which consumers can purchase goods, multimedia, and services, from online merchants. The merchants who make sales on the Amazon Marketplace include Amazon itself and "third-party" or "3P" sellers, the latter of which are non-Amazon individuals and entities.

Indictment
*United States v. Rosenberg, et al.* - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2.     Since at least 2017, the Defendants, and others known and unknown to the Grand Jury, have conspired to pay, and have paid, over $100,000 in commercial bribes to complicit Amazon employees and contractors (collectively referred to herein as "Amazon insiders"). In exchange for bribes, and the promise of such bribes, the Amazon insiders baselessly and fraudulently conferred tens of millions of dollars of competitive benefits upon hundreds of 3P seller accounts that the Defendants purported to represent in their capacity as prominent "consultants" to 3P sellers. Through this scheme, the Defendants intended to cause harm to Amazon, and to 3P sellers and consumers on the Amazon Marketplace, including by depriving Amazon of the exclusive use and confidentiality of its internal business information, interfering with Amazon's ability to ensure the safety and authenticity of goods sold on the Amazon Marketplace, and impairing consumers' access to accurate, reliable information about merchants and products on the Amazon Marketplace.

3.     The Defendants are members of an interdependent community of 3P sellers, consultants to 3P sellers, and Amazon insiders who have accessed and coopted, without authorization and for private financial gain, the computer systems, processes, and information that regulate day-to-day operations of the Amazon Marketplace. Through the use of bribes, and the promise of bribes, the Defendants, and Amazon insiders, engaged in the following conduct, among other conduct:

a.     **Stealing Amazon confidential business information**: Defendants, and other 3P sellers and consultants, bribed Amazon insiders to send them terabytes of confidential information that the insiders misappropriated from Amazon's protected networks, including a trove of internal standard operating procedures (SOPs) and Wikis. The stolen files included, among other things, the formulae for the algorithms that power the Amazon Marketplace search engine, Amazon's product-review rankings, and the coveted "buy boxes" that list default sellers on particular product listings; the criteria that Amazon considers when determining whether to suspend or reinstate accounts or product listings; Amazon's internal notes (or "annotations") about hundreds of 3P accounts; and

Indictment
*United States v. Rosenberg, et al.* - 2

thousands of consumers' and employees' identities and contact information. The Defendants, and other 3P sellers and consultants, derived substantial commercial benefits from the misappropriated information, including by sharing and selling it within their professional networks.

b.      **Reinstating suspended 3P accounts and products**: Defendants, and other 3P sellers and consultants, bribed Amazon insiders to reinstate merchant accounts and product listings that Amazon had suspended in response to customer-safety concerns, counterfeiting complaints from intellectual-property holders, the merchants' manipulation of product reviews, and other violations of Amazon's policies and codes of conduct. Since their baseless and fraudulent reinstatement, the previously suspended merchant and product listings have generated over $100 million dollars in total revenue from sales on the Amazon Marketplace.

c.      **Circumventing Amazon restrictions on 3P accounts**: Defendants, and other 3P sellers and consultants, bribed Amazon insiders to circumvent and/or waive Amazon-imposed limitations and fees relating to the amount of inventory, including hazmat inventory, oversized inventory, and long-term inventory, that 3P sellers may store at Amazon's warehouses and fulfillment centers. The Amazon insiders also helped 3P sellers and consultants defraud Amazon into approving the 3P sellers' requests to sell restricted products, such as dietary supplements, also referred to as "ungating," on the basis of fraudulent and forged supplier invoices.

d.      **Facilitating attacks against 3P sellers and product listings**: Defendants, and other 3P sellers and consultants, bribed Amazon insiders to attack other 3P sellers and those sellers' product listings, in order to gain an unfair competitive advantage over those victims and to settle other scores. To facilitate these attacks, Amazon insiders shared competitive intelligence about the victim sellers' businesses, products, and advertising strategies, with 3P sellers and their consultants; used their inside access to Amazon's network to suspend the victim sellers' accounts and product

Indictment
*United States v. Rosenberg, et al.* - 3

listings; and helped consultants flood the victims' product listings with content and fraudulent customer reviews designed to hurt sales.

These attacks included self-styled "takedowns" against victim 3P sellers, through which the Defendants, and other 3P sellers and consultants, adulterated victims' product listings with replacement, and in some cases lewd and offensive, content and images, designed to drive away consumers and intimidate the victims. Examples of such adulterated product listings are set forth below:



\*\*\*



\*\*\*

Indictment
*United States v. Rosenberg, et al. - 4*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



The intended and actual impact of such adulteration attacks was to effectively incapacitate the 3P accounts.

## A.   THE AMAZON MARKETPLACE

4.      The Amazon Marketplace consists of geographically defined online marketplaces, including a United States-based marketplace and a United Kingdom-based marketplace.  Online consumers can browse millions of product listings on the Amazon Marketplace, place items in virtual shopping carts, complete purchases using credit cards and/or other forms of digital payment, arrange for products to be delivered to addresses that they designate, and return products to Amazon in exchange for a refund.  Amazon provides consumers with a centralized search engine, categorized hyperlinks, online directories, and other digital tools, in order to navigate the Amazon Marketplace.  Using a standardized format and organization, every product listing sets forth the relevant

Indictment
*United States v. Rosenberg, et al.* - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

product's attributes, appearance, price, customer reviews, and an Amazon Standard Identification Number ("ASIN"), an alphanumeric identifier assigned to each product.

5. Merchants on the Amazon Marketplace consist of Amazon, as well as 3P sellers. 3P sellers pay Amazon fees in connection with making sales on the Amazon Marketplace. To facilitate 3P sellers' operations, Amazon offers 3P sellers a range of additional fee-based services, including the "Fulfillment by Amazon" (or "FBA") service, through which Amazon stores inventory for 3P sellers, arranges for that inventory to be shipped to purchasers, and handles customer-service inquiries and returns. Amazon also assigns employees at its offices around the world to one or more "Seller Support" teams, which assist 3P sellers.

6. When registering an account with Amazon, 3P sellers provide Amazon with identifying information, which may include an email address, a form of identification that can be used to verify identity, a credit card, and a financial account to which Amazon can transmit sales proceeds. Products sold by 3 P sellers may consist of (a) products that they acquire elsewhere and resell, in potential competition with other 3P sellers who engage in the sale of the same products; and (b) products that they sell under a registered "brand," in connection with a variety of brand-protection programs and services that Amazon may offer.

7. Amazon restricts the sale of certain categories of products, by requiring 3P sellers to obtain Amazon's approval before selling these items. Examples of restricted products include copyrighted multimedia, dietary supplements, over-the-counter medicines, and medical products. 3P sellers that seek to sell products in restricted product categories typically provide Amazon with invoices showing that they purchased these items from a bona fide supplier, in order to establish that the products they intend to sell are authentic, and that they are not engaging in retail arbitrage.

8. Amazon requires 3P sellers to agree to selling policies and codes of conduct as a condition to make sales on the Amazon Marketplace. Amazon's selling policies and codes of conduct prohibit 3P sellers from providing inaccurate information to consumers,

Indictment
*United States v. Rosenberg, et al.* - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

manipulating product reviews, otherwise contacting consumers independently of Amazon, and attacking other 3P sellers and those sellers' product listings. In practice, a wide range of 3P seller conduct may violate these policies and codes of conduct, including: (a) the sale of unsafe products; (b) the sale of used or refurbished products that are marketed as "new"; (c) the sale of counterfeit products; (d) 3P sellers' infringement of intellectual-property rights in product listings, product packaging, and products; and (e) 3P sellers' manipulation of product reviews, including by posing falsely as product purchasers, and offering gifts to consumers in exchange for their agreement favorably to post or revise product reviews.

9. Amazon also maintains, including on computers and servers located in the Western District of Washington, a wide array of information about 3P sellers and their products, including price and sales history, product-review history, the rate at which customers return 3P sellers' products and the reasons that consumers provide for such returns, 3P sellers' timeliness in delivering products to customers and refreshing their inventory of products that Amazon stores at its warehouses, and identifying information regarding customers. 3P sellers have access to some information about their own 3P accounts and products, including product-specific data regarding their revenues over time. Amazon does not, however, provide 3P sellers with access to non-public merchant-specific and/or product-specific information about other 3P sellers; nor does it provide 3P sellers with the contact information for customers who review their products.

10. Amazon uses algorithms to control the operation of various aspects of the Amazon Marketplace, including, in particular, the Amazon Marketplace's central search engine, the prominence of merchants and product reviews in product listings, limits on 3P sellers' ability to store different types of inventory in Amazon's warehouses, and the potential suspension of 3P accounts or their product listings. For instance, Amazon's central search engine may rank product listings in response to customer queries, in part by reference to "keywords" that 3P sellers use to designate their product listings. The "buy box" on a product listing may provide consumers with a default seller who has a

Indictment
*United States v. Rosenberg, et al. - 7*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

long history of positive customer reviews and timely product deliveries. In addition, the most prominent product review shown on a product listing may be one that is recent, lengthy, and voted "helpful" by other consumers. Amazon takes reasonable measures to maintain the confidentiality of information about the algorithms and other systems that control the Amazon Marketplace, including by restricting access to this information and by marking it confidential, and such information derives independent economic value from its secrecy.

11. Amazon uses "suspensions" to regulate 3P sellers and products on the Amazon Marketplace. Various teams within Amazon, and the employees and contractors that compose those teams, have the authority to suspend 3P sellers and products for reasons that can include product safety, intellectual-property violations, the sale of restricted products without first obtaining Amazon's preapproval through the use of a legitimate supplier invoice, improper contact with consumers, and review manipulation. Suspensions may be temporary, *e.g.*, in order to provide Amazon time to inspect a product that consumers have identified as unsafe. Suspensions may also be conditional upon the relevant 3P seller supplying a "plan of action" to Amazon that adequately explains the cause of the conduct that gave rise to the suspension and satisfactory remedial measures. In certain cases, suspensions may be permanent. Amazon provides 3P sellers the option to appeal from (or "escalate") adverse suspension decisions.

12. Amazon's computer network includes tools that enables authorized employees and contractors to suspend 3P sellers and products, receive and review "plans of action" from suspended 3P sellers, and to revive (or "reinstate") suspended 3P sellers and product listings. Amazon requires employees and contractors with access privileges to these tools only to use those privileges in furtherance of their job responsibilities, and prohibits them from using those access privileges in furtherance of any private, pecuniary, objective. Amazon further requires employees and contractors not to provide outsiders with access to the tools that they use in connection with the regulation of 3P sellers and products on the Amazon Marketplace. Amazon also provides SOPs, Wikis,

Indictment
*United States v. Rosenberg, et al.* - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Case 2:20-cr-00151-RAJ   Document 65-1   Filed 09/16/20   Page 9 of 38

and other written guidance, to its employees and contractors in connection with their regulation of the Amazon Marketplace. Amazon takes reasonable measures to maintain the confidentiality of these SOPs, Wikis, and other written guidance, including by restricting access to this information and by marking it confidential, and such information derives independent economic value from its secrecy.

13. Amazon keeps a record of each 3P seller's suspension and reinstatement activity (and other related information about the merchant's account and product listings) in a running log of annotations, referred to herein as an "annotation history." Annotation histories may reflect confidential complaints from other 3P sellers and/or customers, details of Amazon's internal investigation regarding the relevant 3P account, a record of account or product suspensions, and a record of account or product reinstatements. Amazon does not make annotation histories available to 3P sellers, and otherwise restricts access to those annotation histories to the employees and contractors whose roles and responsibilities include the regulation of the Amazon Marketplace.

14. The Amazon employees, contractors, and computers that play a role in the processes described in this section are located in the Western District of Washington and elsewhere.

**B. THE DEFENDANTS**

15. EPHRAIM ROSENBERG ("ROSENBERG"), also known as ("aka") "Ed Rosenberg," is a resident of Brooklyn, New York, and the owner of Effyzaz, Inc. ("Effyzaz"), a New York company. ROSENBERG purports to provide fee-based consulting expertise to 3P sellers, including through a service named "Amazon Sellers Group TG" ("ASGTG"). In addition to providing individualized consulting to 3P sellers, ROSENBERG hosts an annual 3P seller conference in Brooklyn, provides informational digital videos about 3P sales through an account on the video-sharing website www.youtube.com, and hosts interactive 3P consulting webinars.

16. JOSEPH NILSEN ("NILSEN") is a resident of New York, New York, and is the founder and Chief Executive Officer ("CEO") of Digital Checkmate, Inc. ("Digital

Indictment
*United States v. Rosenberg, et al. - 9*

Checkmate"), a New York company. NILSEN purports to provide fee-based consulting expertise to 3P sellers, including by advising 3P sellers regarding their online product offerings on the Amazon Marketplace, providing competitive intelligence to 3P sellers, devising marketing campaigns for 3P sellers, and assisting and/or representing 3P sellers in connection with the suspension of their accounts and product listings. NILSEN also has made sales on the Amazon Marketplace through numerous 3P accounts in his name, the names of others, and dozens of aliases that he uses in order to conceal his identity and his association with the 3P accounts from Amazon.

17. HADIS NUHANOVIC ("NUHANOVIC") is a resident of Acworth, Georgia, and is the owner of Buddibox, LLC ("Buddibox"), a Georgia company. NUHANOVIC operated a 3P account under the name "Buddibox" between in or around October 2013 and in or around August 2018, when Amazon suspended the account for fraud. Since August 2018, NUHANOVIC has continued to operate 3P accounts under various aliases that he uses in order to conceal his identity and his association with the 3P accounts from Amazon. NUHANOVIC also offers fee-based consulting services to other 3P sellers.

18. KRISTEN LECCESE ("LECCESE") is a resident of New York, New York, and marketed herself as the Vice President of Digital Checkmate. In conjunction with NILSEN, NUHANOVIC, and others, LECCESE assisted in providing consulting services and also has operated numerous 3P accounts on the Amazon Marketplace.

19. ROHIT KADIMISETTY ("KADIMISETTY") is a resident of Northridge, California. Between in or around September 2014 and in or around December 2015, KADIMISETTY worked as an Amazon Seller Support Associate in Hyderabad, India. Since in or about January 2017, KADIMISETTY has lived in California and provided consulting services for 3P sellers.

20. NISHAD KUNJU ("KUNJU"), aka "Tina" and "Jonathan Li," is a resident of Hyderabad, India. Until his termination in or around August 2018, KUNJU worked as an Amazon Seller Support Associate in Hyderabad, India. In this position, before his

Indictment
*United States v. Rosenberg, et al.* - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

termination in or about August 2018, KUNJU helped manage the operation of the Amazon Marketplace, and was granted restricted access to tools and files on the Amazon network relevant to his roles and responsibilities. Such access privileges enabled him to review and download internal Amazon SOPs and Wikis, review and download data regarding 3P sellers and products, enforce suspensions against 3P sellers and products, and reverse certain enforcement actions. After his August 2018 termination, KUNJU performed fee-based consulting for 3P sellers, including through NILSEN, NUHANOVIC, and others known and unknown to the Grand Jury.

## COUNT 1
### (Conspiracy)

21. The allegations contained in Paragraphs 1 through 20 of this Indictment are re-alleged and incorporated as if fully set forth herein.

### A.   THE OFFENSE

22. Beginning at a date unknown, but no later than July 2017, and continuing through September 2020, at Seattle, within the Western District of Washington, and elsewhere, the defendants, EPHRAIM ROSENBERG, JOSEPH NILSEN, HADIS NUHANOVIC, KRISTEN LECCESE, ROHIT KADIMISETTY, and NISHAD KUNJU, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree together to commit offenses against the United States, to wit:

a. to use a facility in interstate and foreign commerce, namely, the wires, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, Commercial Bribery, in violation of New York Penal Code Section 180.03, and California Penal Code § 641.3, in violation of Title 18, United States Code, Section 1952(a)(3)(A); and,

b. to intentionally access a computer without authorization, and exceed authorized access to a computer, and aid and abet the same, and thereby obtain

Indictment
*United States v. Rosenberg, et al.* - 11

information from a protected computer, for purposes of commercial advantage or private financial gain, and to obtain information with a value that exceeds $5,000, in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and (c)(2)(B)(i) and (iii).

## B.   OBJECTS OF THE CONSPIRACY

23.   It was an objective of the conspiracy to provide 3P sellers with an illegitimate competitive advantage on the Amazon Marketplace, and to benefit those 3P sellers' financially, by gaining unauthorized access to the systems, processes, and information that regulate the Amazon Marketplace, and using that access baselessly and fraudulently to benefit certain 3P accounts and product listings and to harm other 3P accounts and product listings.

24.   It was an objective of the conspiracy to enhance the marketability and financial success of consulting operations to 3P sellers that relied on recruiting Amazon insiders, providing bribes and promises of bribes to those insiders, and obtaining benefits from those insiders in exchange for bribes and the promise of bribes.

25.   It was an objective of the conspiracy to conceal, protect, and perpetuate the commercial success of 3P sellers and consultants who relied on commercial bribery and unauthorized access to Amazon's protected computer network.

## C.   MANNER AND MEANS OF THE CONSPIRACY

26.   The manner and means used to accomplish the conspiracy included the following:

a.   It was part of the conspiracy that the Defendants, and others known and unknown to the Grand Jury, collaborated to provide fee-based consulting services to 3P sellers.

b.   It was part of the conspiracy that the Defendants, and others known and unknown to the Grand Jury, recruited Amazon employees and contractors to accept bribes. It was further part of the conspiracy that such recruitment relied on information that other Amazon insiders misappropriated from Amazon's protected computer network regarding employees' and contractors' identities, roles, and contact information. It was

Indictment
*United States v. Rosenberg, et al.* - 12

Case 2:20-cr-00151-RAJ   Document 95   Filed 09/16/20   Page 13 of 38

further part of the conspiracy that such recruitment targeted employees and contractors with roles, responsibilities, knowledge, and access privileges that would be commercially valuable to the consultants and the consultants' 3P clients, including access to computer systems, tools, processes, and information on Amazon's protected computer network that could help secure an unfair competitive advantage over other 3P sellers.

c.      It was part of the conspiracy that, in exchange for bribes and the promise of bribes, Amazon insiders provided the Defendants, and others known and unknown to the Grand Jury, with unauthorized access to Amazon protected computers and Amazon files, systems, servers, and computer networks, all of which were used in and affecting interstate or foreign commerce or communication.

d.      It was part of the conspiracy that defendants employed a variety of methods designed to conceal their communications, identity, and participation in the scheme. Such techniques included, but were not limited to, (i) using encrypted messaging platforms, such as WhatsApp, WeChat, Signal, and Telegram; (ii) creating email and other accounts, using aliases, for limited use between compartmentalized participants in the scheme; (iii) using shared cloud-based documents and file storage services; and (iv) communicating through draft and unsent email messages to avoid the transmission of emails that could be traced by law-enforcement agents.

e.      It was part of the conspiracy that, without Amazon's knowledge or consent, the Defendants, and others known and unknown to the Grand Jury, paid, and offered to pay, bribes to Amazon employees for the purpose of influencing their conduct in relation to their employment, specifically, in order to benefit 3P accounts operated by the members of the conspiracy and their clients, and to cause harm to Amazon.

f.      It was part of the conspiracy that the Defendants, and others known and unknown to the Grand Jury, transmitted, routed, and received bribes using various means, including but not limited to bulk cash transfers, personal and cashier's checks, standard bank wires, payment processing services like Payoneer, and online remittance and transfer services, such as PayPal, Remitly, Xoom, Transfast, and MoneyGram.

Indictment
*United States v. Rosenberg, et al.* - 13

g.      It was part of the conspiracy that the Defendants, and others known and unknown to the Grand Jury, used aliases, apparently unrelated intermediaries, and false and fraudulent identifiers and information in order to conceal the transmission, routing, and receipt of bribes.  Such concealment included, but was not limited to, ROSENBERG's use of a PayPal account registered under the name "Tom Landry," NUHANOVIC's use of a PayPal account under the name "Vinara," registered under his wife's name, and the Amazon insiders' use of Remitly, MoneyGram, and bank accounts registered under the names of their associates and family members.

h.      It was part of the conspiracy that, in exchange for bribes and the promise of bribes, Amazon insiders provided the Defendants, and others known and unknown to the Grand Jury, with access devices, including the insiders' credentials and network access privileges, which could be and were indeed used to gain unauthorized access to Amazon protected computers.

i.      It part of the conspiracy that the Defendants marketed to 3P sellers and other consultants their access to Amazon insiders.

j.      It was part of the conspiracy that the Defendants referred 3P sellers to each other, to other consultants, to other 3P sellers, and to Amazon insiders, such that the Defendants were mutually interdependent upon each other for continued commercial success.

k.      It was part of the conspiracy that, in exchange for bribes and the promise of bribes, Amazon insiders provided consultants and 3P sellers, including the Defendants, with confidential information taken from Amazon's protected computers. The information obtained through these acts of misappropriation included, but was not limited to:

i.      SOPs, Wikis, and information regarding Amazon's internal algorithms, systems, and teams;

ii.      client 3P account information, including annotations, performance reports, and pending enforcement actions;

Indictment
*United States v. Rosenberg, et al.* - 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206)553-7970

iii.    competitor 3P account information, including the identity and personal identifiers of account owners and operators, performance data, and disciplinary history;

iv.    customer information, including identifying and contact information for consumers/buyers and restricted data regarding customer reviews and complaints on particular 3P accounts;

v.    employee information, including contact information and organizational charts for particular groups or teams within Amazon;

vi.    enforcement actions and other measures taken by Amazon to regulate and remediate the Amazon Marketplace; and,

vii.    suppliers, inventory, sales prices, revenues, profit margins, advertising reports, and other records and information about particular goods and product listings on the Amazon Marketplace, including copies of legitimate invoices from *bona fide* suppliers submitted by other 3P sellers in relation to restricted categories.

l.    It was part of the conspiracy that, in exchange for bribes and the promise of bribes, Amazon insiders agreed to facilitate the baseless and fraudulent reinstatement of 3P seller accounts and product listings, including by:

i.    Sending one or more commands through Amazon's internal computer network (in a process the conspirators called "flick[ing] the switch"), which resulted in the reinstatement of 3P accounts and product listings, and enabled those 3P accounts and product listings immediately to resume sales on the Amazon Marketplace.

ii.    Entering false and fraudulent notes and annotations in Amazon's internal computer network, which caused other Amazon employees and contractors to conclude that reinstatement was required under Amazon's policies.

iii.    Assigning affected 3P sellers' plans of action to themselves by instructing the 3P sellers and their representatives to submit plans of action to Amazon at a date and time when an Amazon insider could log into Amazon's computer network and self-assign the project to themselves before any other employee or contractor could

Indictment
*United States v. Rosenberg, et al.* - 15

do so. Following such self-assignment, Amazon insiders approved the otherwise fraudulent or inadequate plans of action. If their access privileges did not permit them to approve the plans of action, the Amazon insiders held such plans of action in abeyance in an effort to identify other Amazon insiders who were willing to approve the plans of action.

iv.     Drafting fraudulent plans of action for 3P sellers, which used materially false statements, representations, and omissions, to induce Amazon to reinstate the affected 3P seller accounts and product listings, including by asserting falsely that the 3P sellers lacked any knowledge or control of the conduct that had given rise to the underlying suspension and/or that one or more employees or contractors of the 3P sellers had committed that conduct without appropriate authority.

m.     It was part of the conspiracy that the Defendants, and others known and unknown to the Grand Jury, used bribes, the promise of bribes, misappropriated information from Amazon's protected computer network, and materially false statements, representations, and omissions, to manipulate the reviews that appeared on product listings on the Amazon Marketplace.  These acts of review manipulation included:

i.     Amazon insiders' transmission of commands to Amazon's protected computer network, which resulted in the deletion of negative product reviews from product listings.

ii.     Using misappropriated information from Amazon's protected computer network regarding consumers' contact information, in order to induce or intimidate consumers to revise or remove negative product reviews.

iii.     Using misappropriated information from Amazon's protected computer network about the operation of Amazon's review-ranking algorithm to engineer reviews to appear legitimate, when in truth and in fact, they were not legitimate.  For instance, the Defendants, and others known and unknown to the Grand Jury, attempted to trick Amazon's review-ranking algorithm into believing that fraudulent product reviews had been posted by *bona fide* purchasers, including by "aging" buyer accounts through a

Indictment
*United States v. Rosenberg, et al.* - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

pattern of fictitious product purchases of an extended duration of time, buying products and directing Amazon to sell them to random residential addresses in an effort to make it look like a real purchase had occurred, using other buyer accounts to rate fictitious reviews as "helpful," and concealing their control over the accounts through the use of digital tools like virtual private networks and virtual machines. Through this process, the Defendants, and others known and unknown to the Grand Jury, caused fictitious positive reviews to appear frequently and prominently in beneficiary 3P sellers' products listings and caused fictitious negative product reviews to appear frequently and prominently in victim 3P sellers' product listings.

iv.    Using misappropriated information from Amazon's protected computer network, including Amazon's SOPs, to take action designed to induce Amazon into concluding falsely that victim 3P seller accounts had violated Amazon's prohibition against review manipulation, resulting in the baseless and fraudulent suspension of those victim 3P sellers. More specifically, the Defendants, and others known and unknown to the Grand Jury, used digital tools fraudulently to make it appear as if accounts controlled by digital devices operating from victim 3P sellers' offices had posted exceedingly positive product reviews on those victim 3P sellers' product listings.

n.    It was part of the conspiracy that the Defendants, and others known and unknown to the Grand Jury, used bribes, the promise of bribes, misappropriated information from Amazon's protected computer network, and materially false statements, representations, and omissions, to attack 3P seller accounts and their product listings, to gain a competitive advantage and to settle scores.

o.    It was part of the conspiracy, in exchange for bribes and the promise of bribes, Amazon insiders misappropriated legitimate supplier invoices that 3P sellers submitted to Amazon in furtherance with successful requests to sell restricted product categories on the Amazon Marketplace. It was further part of the conspiracy that, after obtaining these misappropriated legitimate supplier invoices, the Defendants, and others known and unknown to the Grand Jury, altered the invoices to make it appear as if 3P

Indictment
*United States v. Rosenberg, et al.* - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

seller accounts that they owned and controlled, and that their clients owned and controlled, were the counterparties to the sales reflected in those invoices. It was further part of the conspiracy that the Defendants, and others known and unknown to the Grand Jury, sent the altered invoices to Amazon in order successfully to defraud Amazon into granting 3P seller accounts approval to make sales in restricted product categories.

p. It was part of the conspiracy that, in exchange for bribes and the promise of bribes, Amazon insiders effectively eliminated limits on 3P seller accounts' ability to store hazmat inventory, oversized inventory, and long-term inventory in Amazon's warehouses.

q. It was part of the conspiracy that, in exchange for bribes and the promise of bribes, Amazon insiders erased shipping tracking information from Amazon's computer network, which induced Amazon falsely to conclude that it had not returned certain inventory to 3P sellers, and to reimburse those sellers for inventory that Amazon falsely believed had been lost in transit.

r. It was part of the conspiracy that defendants concealed the scheme and the underlying conduct, including the use of complicit insiders, from being discovered by Amazon and others.

s. It was part of the conspiracy that defendants secured a commercial advantage and private financial gain, both for themselves and for their clients. The value of the information misappropriated through their access to protected Amazon networks far exceeded $5,000 in any one year period.

t. It was part of the conspiracy that defendants caused economic harm to Amazon, to sellers on the Amazon Marketplace, and to consumers who purchased goods from 3P sellers improperly aided through illicit means described herein. The economic impact of the scheme was substantial, estimated in excess of $100 million. That economic impact consisted of sales earned by products and 3P sellers following their improper reinstatement, financial harm endured by 3P sellers as a result of attacks against them, and costs to Amazon.

Indictment
*United States v. Rosenberg, et al.* - 18

## D.    OVERT ACTS

27.    In furtherance of the conspiracy, and to achieve the objects thereof., the defendants, and others known and unknown to the Grand Jury, did commit, and cause to be committed, the following overt acts, within the Western District of Washington and elsewhere.

28.    Dating back to at least 2017, members of the conspiracy collaborated, conspired, and aided and abetted one another, and others, to provide a variety of services to manipulate the Amazon Marketplace and to confer benefits and advantages to certain 3P accounts, through use of insiders and unauthorized access to protected computers and the confidential data and information stored thereon.  Such conduct involved, but was not limited to, the following representative acts:

a.    On or about January 13, 2018, NILSEN sent ROSENBERG an email discussing the cost of certain account suspension reinstatements, which included an amount purportedly for the Amazon insiders plus a surcharge for ROSENBERG and NILSEN.  For instance, NILSEN stated: "They want 5.5k for any Jeff B Final Word reinstatement and I am being honest with you which I hope you respect I think it is fair to tack on 1k – so the reinstatements would be 6.5k.  Regarding timeframe, they aren't going to commit to any times.  They work very fast, though."

b.    On or about February 5, 2018, NILSEN sent an email to ROSENBERG instructing ROSENBERG to submit a plan of action seeking reinstatement related to a 3P account at a particular time, so that one of NILSEN's "guys" at Amazon could assign the plan of action to himself.

c.    On or about February 6, 2018, NILSEN sent ROSENBERG an email stating: "Alright... I wouldn't tell your boy that it's going to be reinstated right away so he's not disappointed if my guys has a natural delay ... but between me and you, very good chance response will come back by 12:45A."  Later the same date, at approximately 12:50 a.m. ET, NILSEN sent ROSENBERG an email stating "It's done."  In a

Indictment
*United States v. Rosenberg, et al. - 19*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

subsequent email, NILSEN stated, "Let me pay the guy first thing tomorrow – let it reach him – and then run more accounts by him."

       d.     On or about February 6, 2018, a bank account registered to ROSENBERG's company Effyzaz wired $9,730 to a bank account registered to NILSEN's company Digital Checkmate.

       e.     On or about February 14, 2018, ROSENBERG sent NILSEN an email stating that ROSENBERG's accumulated tab with NILSEN was "7700 total," which included "1200" for "fruit," a term ROSENBERG used to describe annotation histories misappropriated from Amazon's network, and additional amounts for other services, such as the fraudulent increases in hazmat storage limits for a 3P account.

       f.     On or about February 15, 2018, ROSENBERG sent NILSEN and LECCESE a suitcase containing approximately $8,000 in cash, through the ride-sharing application Uber.

       g.     On or about March 5, 2018, ROSENBERG sent NILSEN an email requesting the alteration of internal Amazon records for a 3P account, stating: "is there a way to have this case deleted 4910461581?" NILSEN responded to ROSENBERG by email affirmatively, stating: "They will make this go away – case w/ associated email will be gone from case log. 2k confirmed right they are about to handle it."

       h.     On or about March 22, 2018, NILSEN sent ROSENBERG an email stating that the task of resetting a 3P account's hazmat storage quotas "will be done in 15 minutes – one of the guys with the tool starts at 1 est he'll bang it out as soon as he gets in."

       i.     On or about June 26, 2018, NILSEN sent an email to ROSENBERG bearing the subject line "Two-Fer Tuesdays – Exclusive Deal for Mr. Ed Rosenberg." In the email, NILSEN explained that "a bunch of friends" were covering for others in a particular Amazon department and would be able to expedite certain suspension reinstatements. NILSEN described the opportunity as follows: "This is like a lightning

deal on crack. . . To be clear, this is Kobe laying it up and Shaque [*sic*] coming in to crush the backboard. If approved, all cases will be slammed [*sic*] dunk."

j.   On or about November 2, 2018, another consultant, also based in New York, with whom the defendants frequently collaborated ("Consultant-1"), sent NILSEN a WhatsApp message requesting the "customer contact info for 500 ppl that left negative reviews" on a particular 3P account listing, noting "he is willing to pay big bucks. You interested in it ?" Consultant-1 further shared a link to the 3P seller's product listing and explained that the requested confidential Amazon customer information would be used by the 3P account operator to attempt to "remove negative reviews."

k.   On or about November 14, 2018, Consultant-1 sent NILSEN a WhatsApp message requesting internal Amazon information regarding a particular product listing suspended by Amazon as an "unapproved medical device." In response, NILSEN sent multiple photographs of a computer monitor displaying internal Amazon files regarding the particular suspension action.

**Examples of Misappropriation of Internal Files and Information**

29.   In furtherance of the course of this conspiracy, members of the conspiracy misappropriated, shared, and disseminated internal confidential and propriety records and information from protected computers on Amazon networks. This misappropriation, through unauthorized access to Amazon's protected computers, involved, but was not limited to, the following representative acts:

a.   On or about February 4, 2019, an Amazon insider logged into Amazon's confidential internal Wiki database under his Amazon username. The insider downloaded an HTML page from Amazon's confidential internal Wiki database. The document, which was marked "Amazon Confidential," described an internal Amazon algorithm and formula to determine how product reviews are placed vis-à-vis other product reviews. Later the same date, the insider sent an email to NILSEN and KUNJU attaching the misappropriated Wiki page, along with other confidential internal files misappropriated from Amazon's computer network.

Indictment
*United States v. Rosenberg, et al.* - 21

b. On or about February 4, 2019, NILSEN sent an email to a 3P seller for whom the defendants provided repeated services ("Client-2") attaching a PDF file containing the misappropriated data that the Amazon insider had sent to NILSEN and KUNJU earlier that same day. NILSEN's email to Client-2 bore the subject line "Please do not give to the cool kids/made men – they do not deserve this." The stolen Amazon information was contained in an attachment bearing the file name "Soccer Schedule.pdf." Later the same date, Client-2 sent NILSEN a Facebook message, stating: "You are a freaking magician. Will you please coach my kids soccer team?"

c. On or about February 21, 2019, NILSEN emailed ROSENBERG a hyperlink to an encrypted PDF containing the misappropriated data that an Amazon insider emailed to NILSEN earlier that day. ROSENBERG responded to NILSEN, stating: "wow – cool" and "how much I owe you?" NILSEN responded, stating "they are doing 175 per … 350."

d. On or about February 21, 2019, ROSENBERG sent $350 to NILSEN over the online payment service, PayPal.

e. On or about February 23, 2019, a Remitly account registered to LECCESE transferred $2,500 to an India bank account registered to a third-party, which included amounts payable to the Amazon insider. In a WhatsApp chat, NILSEN and LECCESE discussed sending funds to a "soldier" through this bank account. LECCESE agreed to execute the transfer.

### Examples of Reinstatements

30. **Client-1:** On multiple occasions, members of the conspiracy collaborated on reinstatements, attacks, and other services for a 3P seller ("Client-1"). For instance, in June 2018, members of the conspiracy obtained the reinstatement of Client-1's account, which had been suspended for review manipulation. This reinstatement involved, but was not limited to, the following representative acts:

a. On or about June 6, 2018, an insider sent NUHANOVIC a WhatsApp message conveying internal Amazon information and documents regarding

Indictment
*United States v. Rosenberg, et al* - 22

Amazon's enforcement actions. Later, on or about June 13, 2018, NUHANOVIC sent $3,700 to that insider through MoneyGram.

b.      On or about June 9, 2018, NILSEN sent KUNJU a WhatsApp message agreeing to pay KUNJU "2/3" of the fee paid by Client-1 for the reinstatement of its suspended 3P account. The following day, KUNJU confirmed that he "pinged someone [about Client-1's reinstatement] bro.. he said he's looking into it."

c.      On or about June 12, 2018, Client-1 submitted to Amazon a plan of action containing knowingly false and fraudulent representations, which NILSEN, NUHANOVIC, LECCESE, KUNJU, and others, prepared on its behalf. Among other things, the plan of action represented that the 3P account had utilized a "third-party early reviewer program" that caused the violation of Amazon policies.

d.      On or about June 25, 2018, KUNJU sent a WhatsApp message to NILSEN regarding Client-1, stating: "I'll get that done today bro ... Today people shud be online." Later the same date, Amazon reinstated Client-1's 3P account.

31.     In early December 2018, Amazon suspended Client-1's 3P account again for suspected account manipulation. In December 2018 and January 2019, members of the conspiracy collaborated to obtain the reinstatement of Client-1's 3P seller account, once again using illicit means. Client-1 agreed to pay, and did pay, the defendants a total of $200,000, in exchange for successful account reinstatement. In order to achieve the reinstatement, the defendants accessed and obtained internal information about Amazon's suspension determination regarding Client-1 and, using such information, advised and assisted Client-1 in preparing reinstatement requests (plans of action), which included materially false statements. Through Amazon insiders, the defendants tracked and managed the progress of Client-1's appeal. This reinstatement involved, but was not limited to, the following representative acts:

a.      On or about December 9, 2018, KUNJU sent NILSEN a WhatsApp message conveying information about Client-1's account, including account annotations, that an insider had misappropriated from Amazon's protected network.

Indictment
*United States v. Rosenberg, et al.* - 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b. On or about December 10, 2018, NILSEN emailed NUHANOVIC a draft plan of action prepared on Client-1's behalf, which contained knowingly false statements. NILSEN and NUHANOVIC further discussed aspects of the plan of action that were "made up." Later the same day, NUHANOVIC and Client-1's principal discussed payment of $200,000 in exchange for the successful reinstatement of Client-1's account. For instance, Client-1's principal stated to NUHANOVIC in a WeChat message: "Tell them, we will do 200k."

c. On or about December 18, 2018, NILSEN and NUHANOVIC discussed over WhatsApp the status of Client-1's reinstatement. For instance, NILSEN explained that one of his contacts had "tucked it [the pending plan of action] away" until they could "find the right person to reinstate" the account.

d. On or about December 28, 2018, NILSEN and representatives of Client-1 participated in a teleconference with members of Amazon's seller support team in Seattle, Washington, regarding Client-1's suspension.

e. On or about January 8, 2019, ROSENBERG contacted one or more Amazon employees regarding Client-1's suspension. For instance, in an email sent to an Amazon employee located in Seattle, Washington, ROSENBERG included various representations regarding Client-1 and a link to a video, which he created, of Client-1's representative, which contained false statements.

f. On or about January 9, 2019, NILSEN informed a representative of Client-1 that Client-1's account would be reinstated, stating, among other things: "Please don't tell people this … Your account manager or somebody hears that you knew that you were getting reinstated and she could really screw you." Later that same day, Amazon reinstated Client-1's 3P account.

g. On or about January 9, 2019, Client-1's agent sent NILSEN a WeChat message stating: "rather transfer not happening in usa," "better in Hongkong or India. U know what I mean. Cash is too much very risky move too."

Indictment
*United States v. Rosenberg, et al.* - 24

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

h. On or about January 9, 2019, a bank account registered to Client-1 wired $55,000 to a bank account registered to NUHANOVIC. Later the same date, the bank account registered to NUHANOVIC transferred $55,000 to a bank account registered to ROSENBERG's company, Effyzaz.

i. On or about January 11, 2019, NILSEN and NUHANOVIC discussed Client-1's reinstatement over WhatsApp, with NILSEN stating "That account was fucked beyond fucked … does he know how lucky he is that his Asian partner got in touch with some guy in atl who got in touch with some guy in ny who got in touch with some [redacted] out of Brooklyn who got in touch with somebody high up and paid them off to save his account."

j. On or about January 12, 2019, a Hong Kong bank account controlled by Client-1 wired $145,000 to a Hong Kong bank account controlled by NUHANOVIC's associate.

k. On or about January 18, 2019, a Hong Kong bank account controlled by NUHANOVIC's associate made two fund transfers, namely, (i) $71,460 to a bank account registered to NUHANOVIC's company, Buddibox, and (ii) $71,460 to a bank account registered to NILSEN's company, Digital Checkmate.

l. On or about January 18, 2019, a Remitly account registered to LECCESE transferred $2,900 to an India bank account registered to KUNJU.

32. **Client-2:** On multiple occasions, members of the conspiracy collaborated on reinstatements and other services for a 3P seller (Client-2), whose seller accounts had been suspended for various violations of Amazon policies. These reinstatements involved, but was not limited to, the following representative acts:

a. On or about July 28, 2018, Client-2 sent a Facebook message to NILSEN regarding Amazon's suspension of a dietary-supplement product on Client-2's primary 3P seller account for product compliance reasons.

b. On or about July 29, 2018, KUNJU sent NILSEN a WhatsApp messaging confirming that he would assist with reinstatement, stating "I am in bro. Let's

Indictment
*United States v. Rosenberg, et al.* - 25

make some money." Later the same date, KUNJU sent a command from his Amazon workstation to Amazon's protected computer network, which resulted in the reinstatement of Client-2's 3P account's suspended product listing.

c. On or about February 24, 2019, Client-2 sent NILSEN a Facebook message, stating "Another urgent situation ☹. My BEST SELLER just went down." Later the same date, NILSEN responded "reinstated bro," attaching a screenshot of a chat between NILSEN and an insider, which contained a photograph of a computer logged into Amazon's protected computer network.

d. On or about February 24, 2019, Client-2 sent NILSEN a Facebook message, stating: "Wowow. That was a record. PayPal address please ☺ I would like to tip, please tell me appropriate amount. I think it's only right." NILSEN responded to Client-2, stating: "I have to pay this guy $500."

e. On or about February 24, 2019, Client-2 sent $500 to NILSEN over the online payment service, PayPal.

33. **Client-3:** On multiple occasions, members of the conspiracy collaborated on reinstatements and other services related to a 3P seller ("Client-3"), who was referred to NILSEN by Client-2. These services involved, but were not limited to, the following representative acts:

a. On or about March 10, 2019, Client-2 contacted NILSEN over Facebook about assisting Client-3 with a product listing suspended by Amazon for suspected fraud. Later that same date, NILSEN responded with internal information, obtained from an insider, about Client-3's 3P account and the suspension action from an insider, confirming that "soldiers" were assisting and further stating: "[s]trong blocked … sucks … one of them said they need 5 minutes and they will be able to either reinstate it or let me know that it will take 2-3 days." Later the same date, NILSEN sent Client-2 a Facebook message containing photographs of Client-3's reinstated 3P account and account information from Amazon's internal systems, along with the note: "Done bro…reinstated…bammmmmm."

Indictment
*United States v. Rosenberg, et al.* - 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b.      On or about March 11, 2019, Client-3 sent NILSEN a Facebook message expressing appreciation for the product listing reinstatement and discussing future business together.

c.      On or about May 22, 2019, Client-3 sent NILSEN a message over Facebook requesting assistance in the suspension of a product listing on his 3P account because of customer complaints, stating: "our top seller our collagen was removed from our store, it's live under our second account so we didn't know what the hell was going on."

d.      On or about May 23, 2019, NILSEN sent Client-3 a Facebook message about the suspension after consulting with an Amazon insider addressing the need for payment.  For instance, NILSEN stated: "what he is saying when he says 'it's risky' is 'This case is too reckless for me to resolved [*sic*] without getting paid.'  Just being straight up with you – my advice – offer him funds & have him resolve it."

e.      On or about May 23, 2019, an insider sent a command from his Amazon workstation, resulting in the reinstatement of Client-3's suspended product listing.  Later the same date, NILSEN sent a Facebook message to Client-3 requesting payment of $1,000 for the reinstatement.

f.      On or about May 23, 2019, Client-3 wired $1,000 to a bank account registered to NILSEN's company, Digital Checkmate.

g.      On or about May 24, 2019, KUNJU sent multiple separate wire transfers to the insider.

h.      On or about May 25, 2019, KUNJU sent NILSEN a WhatsApp message stating: "Were u able to send those funds back? ... Soldier wanted funds so I gave to him.  He thought the last 2k was received."  On the same date, a Remitly account registered to LECCESE attempted to transfer $1,000 to an India bank account registered to KUNJU.

34.     **Client-4:**  On multiple occasions, members of the conspiracy collaborated on reinstatements, attacks, and other services for a 3P seller account ("Client-4").  For

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

instance, in January 2019, they collaborated on a reinstatement of Client-4's product listing, which Amazon had suspended based on product safety concerns. This reinstatement involved, but was not limited to, the following representative acts:

a. On or about January 7, 2019, Consultant-1 sent NILSEN a WhatsApp message about assisting in the reinstatement of Client-4's product listing, a hair straightener suspended for product safety issues, inquiring whether NILSEN had "someone that can flip the switch" on the suspended product. Later the same date, NILSEN sent a WhatsApp message to KUNJU asking him to "look into" Client-4's product suspended for a "[s]afety warning or some shit." KUNJU responded affirmatively, stating: "Whatever it is we will get it sorted."

b. On or about January 14, 2019, KUNJU informed NILSEN over WhatsApp that an insider had reinstated the suspended product.

c. On or about January 15, 2019, Consultant-1, through his company's account, issued approximately 13 separate checks in varying amounts, totaling over $2,000, to NILSEN's company Digital Checkmate.

d. On or about January 18, 2019, and on January 26, 2019, a Remitly account registered to LECCESE transferred $2,900 and $2,800, respectively, to an India bank account registered to KUNJU.

e. On or about February 1, 2019, and on or about February 2, 2019, KUNJU made multiple wire transfers to the insider.

### Examples of Account Sabotage and Attacks

35. **Victim-1:** At the request of their client, Client-1, members of the conspiracy collaborated on multiple attacks on a competing 3P seller ("Victim-1") on the Amazon Marketplace. For instance, in June 2018, Client-1 offered to pay $35,000 in cash to "wipe out" Victim-1's 3P account. Through illicit conduct, members of the conspiracy induced Amazon to suspend Victim-1's seller account, thus depriving Victim-1 of revenue, for a period of approximately a week. This attack involved, but was not limited to, the following representative acts:

Indictment
*United States v. Rosenberg, et al.* - 28

a. On or about June 5, 2018, Client-1 asked NUHANOVIC to coordinate an attack against Victim-1, a 3P seller that competed against Client-1 on the Amazon Marketplace. NUHANOVIC later requested and obtained through an Amazon insider confidential information about Victim-1 misappropriated from Amazon's protected computer network.

b. On or about June 11, 2018, NILSEN, directly or indirectly, registered the internet domain name "globebrandlawgroup.com." The same date, NILSEN and KUNJU discussed in WhatsApp messages the coordinated plan to "wipe out" Victim-1's 3P account.

c. On or about June 13, 2018, NILSEN submitted a complaint to Amazon, in which he posed as a purported member of the "Globe Brand Law Group" and provided the email address BChambers@globebrandlaw.group. In the complaint, NILSEN alleged that Victim-1 had infringed upon intellectual property rights licensed to "Globe Brand Law Group" by a multinational technology provider. Later that same date, Amazon suspended Victim-1's 3P account.

36. **Victim-2:** In December 2018, members of the conspiracy collaborated on and executed an attack on a 3P seller ("Victim-2"), at the request of Consultant-1. According to Consultant-1, Victim-2 was a client that had failed to pay for Consultant-1's services, and Consultant-1 wanted to send Victim-2 and other clients a clear message. NILSEN defaced Victim-2's seller page with vulgar images, effectively incapacitating it on the Amazon Marketplace. This attack involved, but was not limited to, the following representative acts:

a. On or about December 27, 2018, Consultant-1 sent NILSEN a WhatsApp message with the Amazon merchant identification number for Victim-2, along with the note "hey got a client refusing to pay can you push masks up on the main images there?" The reference to "masks" alluded to prior defacement attacks involving images of the Guy Fawkes mask.

Indictment
*United States v. Rosenberg, et al.* - 29

b.      On or about December 30, 2018, NILSEN and KUNJU communicated and collaborated over WhatsApp about the planned attack on Victim-2, including regarding what replacement images to use.

c.      On or about December 31, 2018, NILSEN, directly or indirectly, uploaded a "flat file" to Amazon's protected computer network, resulting in the modification of Victim-2's product listing to replace the product images with lewd images, including a smiley face with a raised middle finger, displayed above.

d.      On or about December 31, 2018, NILSEN sent Consultant-1 a WhatsApp message, stating: "Who's got your back? *NO PAY – NO PLAY* I left him one ASIN as a nice F U," along with s screenshot of Victim-2's defaced product listing. Consultant-1 responded, "damn this guy is freaking out. I keep on telling him there is nothing i can do this is the collection agency."

e.      On or about December 31, 2018, NILSEN sent KUNJU a WhatsApp message requesting that an Amazon insider restore Victim-2's account to its original form, which KUNJU agreed to accomplish once the "soldier" was available.

37.     **Victim-3:** At the request of Client-4, members of the conspiracy collaborated on one or more attacks on a competing 3P seller ("Victim-3") on the Amazon Marketplace. For instance, from in or about December 2018 through at least February 2019, defendants employed a variety of techniques, including use of internal Amazon information, to successfully obtain the suspension of multiple product listings and in an effort to takedown Victim-3's account entirely. Consultant-1, on behalf of Client-4, and NILSEN arranged the attack on Victim-3. The attack involved, but was not limited to, the following representative acts:

a.      On or about December 19, 2018, an Amazon insider emailed KUNJU and NILSEN internal information regarding Victim-3's account obtained from Amazon's protected computer network. Later the same date, NILSEN sent the information regarding VICTIM-3 received from the Amazon insider to Consultant-1 over WhatsApp.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b.    On or about December 26, 2018, a bank account registered to Consultant-1's company wired $25,000 to a bank account registered to NILSEN's Digital Checkmate bank account.

c.    On or about January 31, 2019, NILSEN, LECCESE, and KUNJU joined a WhatsApp group chat named "Takedown," which they used to discuss Victim -3 and the ongoing efforts to attack this 3P account. Among other things, they discussed using shill buyer accounts, registered in others' names or aliases, to purchase goods from Victim-3 and submit negative customer feedback and fraudulent complaints. The participants agreed to initially target particular product listings and considered wording of negative reviews that would trigger a product suspension.

d.    On or about February 12, 2019, after Amazon had suspended one or more product listings on Victim-3's 3P account based on reports of fraud, NILSEN and Consultant-1 exchanged WhatsApp messages regarding this suspension and the ongoing attack on Victim-3.

e.    On or about February 16, 2019, in a WeChat chat, NILSEN solicited further assistance of another consultant, located outside the United States, with whom the defendants often collaborated ("Consultant-2"), who agreed to assist in the ongoing attack on Victim-3 in exchange for $5,000. NILSEN later confirmed the $5,000 fund transfer, attaching a screenshot of the wire receipt.

f.    On or about February 21, 2019, NILSEN and Consultant-1 discussed additional product suspensions recently imposed on Victim-3 account.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### (Conspiracy to Commit Wire Fraud)

38.    The allegations set forth in Paragraphs 1 through 20 and 27 through 37 of this Indictment are re-alleged and incorporated as if fully set forth herein.

Indictment
*United States v. Rosenberg, et al.* - 31

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## A.   THE OFFENSE

39.    Beginning at a time unknown, but no later than July 2017, and continuing through September 2020, at Seattle, within the Western District of Washington, and elsewhere, the defendants, EPHRAIM ROSENBERG, JOSEPH NILSEN, HADIS NUHANOVIC, KRISTEN LECCESE, ROHIT KADIMISETTY, and NISHAD KUNJU, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree together to commit an offense against the United States, to wit: to knowingly and willfully devise and execute and attempt to execute, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises; and in executing and attempting to execute this scheme and artifice, to knowingly cause to be transmitted in interstate and foreign commerce, by means of wire communication, certain signs, signals and sounds as further described below, in violation of Title 18, United States Code, Section 1343.

## B.   OBJECTS OF THE CONSPIRACY

40.    The objects of the conspiracy are set forth in Paragraphs 23 through 25 of this Indictment and are re-alleged and incorporated as if fully set forth herein. The objects of the conspiracy further involved (i) obtaining and depriving Amazon of the confidentiality and exclusive use of information stored on its protected computer network; (ii) obtaining money and property from Amazon through deceit, and (iii) securing money through the sale of goods to customers by 3P accounts benefited by their services, through materially false and fraudulent representations, including manipulated product reviews and reinstated accounts and product listings.

## C.   MANNER AND MEANS OF THE CONSPIRACY

41.    The manner and means used to accomplish the conspiracy are forth in Paragraph 26 of this Indictment and are re-alleged and incorporated as if fully set forth herein. The manner and means used to accomplish the conspiracy further included the following:

Indictment
*United States v. Rosenberg, et al.* - 32

a. It was part of the conspiracy that defendants, through the use of Amazon insiders, submitted false and fraudulent information to Amazon's protected computer network in order to gain access to and obtain confidential files and information stored on Amazon's protected networks.

b. It was part of the conspiracy that defendants, through the use of Amazon insiders, submitted false and fraudulent information onto Amazon's protected networks in order to affect the status and prevalence of 3P accounts on the Amazon Marketplace.

c. It was part of the conspiracy that defendants submitted false and fraudulent documents and information, including fake invoices, to Amazon in order to obtain authorization to sell goods in restricted product categories, such as dietary supplements, and thus obtain money through the sale of products on the Amazon Marketplace.

d. It was part of the conspiracy that defendants submitted false and fraudulent documents and information to Amazon in order to obtain "brand" protections that allowed 3P sellers to exclude competition and thus obtain money through the sale of products on the Amazon Marketplace.

e. It was part of the conspiracy that defendants submitted false and fraudulent documents and information, including plans of action and other material that contained intentional misrepresentations of material fact, in order to appeal suspension actions and to gain reinstatement of a suspended or blocked seller account or product listing and thus obtain money through the sale of products on the Amazon Marketplace.

f. It was part of the conspiracy that defendants submitted false and fraudulent customer reviews in order to promote 3P sellers and thus obtain money through the sale of products on the Amazon Marketplace.

g. It was part of the conspiracy that defendants submitted false and fraudulent customer reviews in order to undermine competing 3P sellers and thus obtain money through the sale of products on the Amazon Marketplace.

Indictment
*United States v. Rosenberg, et al.* - 33

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

h.      It was part of the conspiracy that that defendants, through the use of Amazon insiders, altered shipping and tracking information on Amazon's computer network, which induced Amazon falsely to conclude that it had not returned certain inventory to 3P sellers, and to reimburse those sellers for inventory that Amazon falsely believed had been lost in transit.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 3 – 9
## (Wire Fraud)

42.     The allegations set forth in Paragraphs 1 through 20 and 27 through 37 of this Indictment are re-alleged and incorporated as if fully set forth herein.

## A.     THE SCHEME AND ARTIFICE TO DEFRAUD

43.     Beginning at a time unknown, but no later than July 2017, and continuing through September 2020, at Seattle, within the Western District of Washington, and elsewhere, the defendants, EPHRAIM ROSENBERG, JOSEPH NILSEN, HADIS NUHANOVIC, KRISTEN LECCESE, ROHIT KADIMISETTY, and NISHAD KUNJU, and others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud and to obtain money and property from Amazon and from customers on the Amazon Marketplace by means of materially false and fraudulent pretenses, representations and promises.

## B.     MANNER AND MEANS

44.     The manner and means of the scheme and artifice to defraud are set forth in Paragraphs 26 and 41 of this Indictment and are re-alleged and incorporated as if fully set forth herein.

## C.     EXECUTION OF THE SCHEME AND ARTIFICE TO DEFRAUD

45.     On or about the dates set forth below, at Seattle, within the Western District of Washington, and elsewhere, the defendants, and others known and unknown to the Grand Jury, having devised a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and

Indictment
*United States v. Rosenberg, et al.* - 34

Case 2:20-cr-00151-RAJ   Document 25   Filed 09/16/20   Page 35 of 38

promises, did knowingly transmit and cause to be transmitted writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme, by means of wire communication in interstate and foreign commerce, including the following transmissions, each of which caused the transmission of an electronic signal between the state of Washington and a location outside of the state of Washington, and each of which constitutes a separate count of this Indictment:

| Count | Date(s) | Wire Transmission |
|---|---|---|
| 3 | 10/2/2017 | Transfer of $753.99, or thereabouts, by KADIMISETTY, directly or indirectly, via an online money transfer service, headquartered at and operating from Seattle, Washington, to an Amazon insider's bank account outside the United States |
| 4 | 6/13/2018 | Email sent from BChambers@globebrandlaw.group to an Amazon employee within the State of Washington, regarding Victim-1 |
| 5 | 7/29/2018 | Transmission of a command from an Amazon computer outside the United States, regarding the reinstatement of a product listing for Client-2 |
| 6 | 12/15/2018 | Submission of a plan of action, from outside the State of Washington, to Amazon on behalf of Client-1 |
| 7 | 12/28/2018 | Telephone call, involving participants outside the State of Washington and Amazon employees within the State of Washington, regarding the suspension of Client-1's 3P account |
| 8 | 1/8/2019 | Email from ROSENBERG from outside the State of Washington, to an Amazon employee within the State of Washington, regarding the suspension of Client-1's 3P account |
| 9 | 6/26/2019 | Transfer of $1,000, or thereabouts, by NILSEN and LECCESE, directly or indirectly, via an online money transfer service, headquartered at and operating from Seattle, Washington, to an Amazon insider's bank account outside the United States |

All in violation of Title 18, United States Code, Sections 1343 and 2.

Indictment
*United States v. Rosenberg, et al.* - 35

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## FORFEITURE ALLEGATION

**46.** All of the allegations contained in this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture.

**47.** Upon conviction of the offense charged in Count 1, each of the relevant defendants shall forfeit to the United States any property that constitutes or is traceable to proceeds the defendant obtained from his commission of the offense, including but not limited to a sum of money reflecting the proceeds the relevant defendant obtained from the offense, as well as any personal property that facilitated the offense. All such property is forfeitable pursuant to pursuant to Title 18, United States Code, Section 981(a)(1)(C) (by way of Title 28, United States Code, Section 2461(c)), Title 18, United States Code, Section 982(a)(2)(B), and Title 18, United States Code, Section 1030(i), and includes but is not limited to:

a. approximately $103,860 in U.S. currency seized from the Defendant Hadis Nuhanovic's residence in Acworth, Georgia on August 19, 2020; and,

b. a sum of money reflecting the proceeds the relevant defendant obtained from the offense.

**48.** Upon conviction of any of the offenses charged in Counts 2 through 9, the relevant defendant shall forfeit to the United States any property that constitutes or is traceable to proceeds the defendant obtained from his commission of the offense, including but not limited to a sum of money reflecting the proceeds the relevant defendant obtained from the offense. All such property is forfeitable pursuant to pursuant to Title 18, United States Code, Section 981(a)(1)(C) (by way of Title 28, United States Code, Section 2461(c)) , and includes but is not limited to:

a. approximately $103,860 in U.S. currency seized from the Defendant Hadis Nuhanovic's residence in Acworth, Georgia on August 19, 2020; and,

b. a sum of money reflecting the proceeds the relevant defendant obtained from the offense.

Indictment
*United States v. Rosenberg, et al. - 36*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**49.** **Substitute Property.** If any of the property described above, as a result of any act or omission of the relevant defendant:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the court;

    d.   has been substantially diminished in value; or,

    e.   has been commingled with other property which cannot be divided without difficulty,

Indictment
*United States v. Rosenberg, et al.* - 37

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

it is the intent of the United States to seek the forfeiture of any other property of the defendant, up to the value of the above-described forfeitable property, pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL:

DATED: 9/16/2020

*(Signature of Foreperson redacted pursuant to the policy of the judicial conference.)*

_____
**FOREPERSON**

_____
BRIAN T. MORAN
United States Attorney

_____
ANDREW C. FRIEDMAN
Assistant United States Attorney

_____
STEVEN T. MASADA
Assistant United States Attorney

_____
SIDDHARTH VELAMOOR
Assistant United States Attorney

Indictment
*United States v. Rosenberg, et al.* - 38

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970