UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————— x

XIAOMENG LIAN, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

      vs.

TUYA INC., XUEJI (JERRY) WANG,
LIAOHAN (LEO) CHEN, YI (ALEX) YANG,
YAO (JESSIE) LIU, SCOTT SANDELL,
CARMEN CHANG, JEFF IMMELT, QING
GAO, JING HONG, MORGAN STANLEY &
CO. LLC, BofA SECURITIES, INC., and
CHINA INTERNATIONAL CAPITAL
CORPORATION HONG KONG
SECURITIES LIMITED,

                    Defendants.

————————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:22-cv-06792-JPC

CLASS ACTION

**LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
THE AMENDED CLASS ACTION
COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF FACTS ...................................................................................2

        A.      Tuya's IoT Cloud Platform.......................................................................2

        B.      Amazon Reviews Are Crucial to Tuya's Business and Revenues..........................3

        C.      Tuya Issued Materially False and Misleading Statements in the
                Registration Statement ................................................................................5

        D.      The Truth Emerges About the Impact Amazon's Ban on Incentivized
                Reviews Was Having on Tuya.......................................................................6

III.    ARGUMENT.........................................................................................................9

        A.      Legal Standards Disfavor Defendants' Motion ............................................9

        B.      Plaintiffs Have Alleged Actionable Misrepresentations and Omissions ...............10

                1.      A Significant Portion of Tuya's Customers Engaged in Fake-
                        Review Practices at the Time of the IPO, Rendering the
                        Registration Statement False and Misleading............................................10

                2.      The Omitted Information Was Material ......................................................13

                3.      Plaintiffs Are Not Required to Plead that Tuya—the Issuer—
                        Should Have, or Could Have, Known of Its Customers' Fake-
                        Review Practices........................................................................................14

                4.      Investors Were Not Aware of Tuya's Customers' Fake-Review
                        Practices ...................................................................................................16

                5.      Defendants' Inadequate Risk Disclosures Are Actionable........................19

                6.      Defendants Violated Their Affirmative Disclosure Obligations
                        Under Applicable SEC Rules and Regulations..........................................21

                7.      The Defendants (Other than Tuya) Should Have Known that
                        Tuya's Customers Were Engaging in Fake-Review Practices ...................23

IV.     CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*,
2020 WL 3318029
(S.D.N.Y. June 18, 2020)...................................................................................................20

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)...............................................................................................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................................9

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019)...............................................................................18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................................9

*Bettis v. Aixtron SE*,
2016 WL 7468194
(S.D.N.Y. Dec. 20, 2016)..................................................................................................18

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)..................................................................................11

*City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.*,
2016 WL 6652731
(S.D.N.Y. Nov. 10, 2016) ..................................................................................................25

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................................................21

*Degulis v. LXR Biotech., Inc.*,
1997 WL 20832
(S.D.N.Y. Jan. 21, 1997)..............................................................................................10, 15

*Degulis v. LXR Biotechnology, Inc.*,
928 F. Supp. 1301 (S.D.N.Y. 1996)...................................................................................16

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...............................................................................................13

*Ernst & Ernst v. Hochfelder*,
425 U.S. 986 (1976)...........................................................................................................10

**Page**

*Ganino v. Citizens Utils. Co.*,
 228 F.3d 154 (2d Cir. 2000)................................................................................................16, 17

*Garber v. Legg Mason, Inc.*,
 537 F. Supp. 2d 597 (S.D.N.Y. 2008).................................................................................20, 21

*Garnett v. RLX Tech. Inc.*,
 2022 WL 4632323
 (S.D.N.Y. Sept. 30, 2022)........................................................................................................22

*Greenapple v. Detroit Edison Co.*,
 618 F.2d 198 (2d Cir. 1980).....................................................................................................10

*Gutman v. Lizhi Inc.*,
 2022 WL 4646471
 (E.D.N.Y. Oct. 1, 2022) ...........................................................................................................21

*Herman & MacLean v. Huddleston*,
 459 U.S. 375 (1983)........................................................................................................ *passim*

*Hutchison v. CBRE Realty Finance, Inc.*,
 638 F. Supp. 2d 265 (D. Conn. 2009), *aff'd on other grounds sub nom.*
 *Hutchison v. Deutsche Bank Sec. Inc.*,
 647 F.3d 479 (2d Cir. 2011)........................................................................................15, 16, 19

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
 757 F. Supp. 2d 260 (S.D.N.Y. 2010).....................................................................................17

*In re Bank of America AIG Disclosure Securities Litigation*,
 980 F. Supp. 2d 564 (S.D.N.Y. 2013).................................................................................18, 20

*In re CannaVest Corp. Sec. Litig.*,
 307 F. Supp. 3d 222 (S.D.N.Y. 2018)...............................................................................9, 12, 13

*In re CIT Grp., Inc. Sec. Litig.*,
 349 F. Supp. 2d 685 (S.D.N.Y. 2004).......................................................................................15

*In re DraftKings Inc. Sec. Litig.*,
 2023 WL 145591
 (S.D.N.Y. Jan. 10, 2023)...........................................................................................................21

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
 986 F. Supp. 2d 487 (S.D.N.Y. 2013).......................................................................................19

**Page**

*In re Fuwei Films Securities Litigation*,
    634 F. Supp. 2d 419 (S.D.N.Y. 2009)..............................................................14, 15

*In re IndyMac Mortgage-Backed Securities Litigation*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010).................................................................19

*In re Initial Pub. Offering Sec. Litig.*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008).................................................................15

*In re Lehman Brothers Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011).................................................................23

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010).........................................................................10, 23

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007).................................................................25

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016).............................................................................11

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004).................................................................21

*Kassner v. 2nd Ave. Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007)..............................................................................9

*Kronfeld v. Trans World Airlines, Inc.*,
    832 F.2d 726 (2d Cir. 1987).........................................................................9, 17

*Lin v. Interactive Brokers Grp. Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008).................................................................14

*Litwin v. Blackstone Group, L.P.*,
    634 F.3d 706 (2d Cir. 2011).........................................................................17, 18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015).............................................................................25

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..........................................................................................13

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013).........................................................................9, 18

**Page**

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ..................................................................................13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)........................................................................................................9

*P. Stolz Fam. P'ship L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004)..........................................................................................20

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012).........................................................................................23

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
2020 WL 5757628
(S.D.N.Y. Sept. 27, 2020) .................................................................................21, 22, 23

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)..........................................................................................19

*Rubinstein v. Credit Suisse Group AG*,
457 F. Supp. 3d 289 (S.D.N.Y. 2020)......................................................................20, 21

*Schoenhaut v. American Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997) ...............................................................................20

*Slack Techs., LLC v. Pirani*,
143 S. Ct. 1433 (2023)..............................................................................................10, 16

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)..........................................................................................20

*Thomas v. Roach*,
165 F.3d 137 (2d Cir. 1999).....................................................................................19, 20

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
985 F.2d 1190 (2d Cir. 1993).........................................................................................17

*Wandel v. Gao*,
590 F. Supp. 3d 630 (S.D.N.Y. 2022)...........................................................................21

*Wang v. Cloopen Grp. Holding Ltd.*,
2023 WL 2534599
(S.D.N.Y. Mar. 16, 2023) .............................................................................................22

**Page**

*Willard v. UP Fintech Holding Ltd.*,
  527 F. Supp. 3d 609 (S.D.N.Y. 2021)..................................................................22


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §77k.................................................................................................. *passim*
  §77k(b)..........................................................................................................10
  §77o............................................................................................................1, 25

Federal Rules of Civil Procedure
  Rule 15..........................................................................................................25

17 C.F.R.
  §229.105........................................................................................................21
  §229.303(a) ...................................................................................................21
  §229.303(b)(2)(ii) .........................................................................................21


**LEGISLATIVE AUTHORY**

Conference Report:
  H.R. Rep. No. 85, 73d Cong.,
  1st Sess., 2 (1933) ..........................................................................................9


**SECONDARY AUTHORITIES**

SEC Release No. 7558
  1998 WL 425894
  (July 29, 1998) ..............................................................................................21

Lead Plaintiffs Kyle Nelson and Jiyi Qiu ("Plaintiffs") respectfully submit this memorandum in opposition to Defendants' motion to dismiss (ECF No. 64, the "MTD") the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 56, the "AC").[1]

## I.    INTRODUCTION

This is a securities class action alleging claims under §§11 and 15 of the Securities Act of 1933 (the "Securities Act"), arising from Tuya's March 18, 2021 IPO.  Tuya primarily offers an "Internet of Things" ("IoT") cloud platform to its customers.  Tuya's products and services enable smart devices, such as household items connected to the internet, to communicate and interact with end users and online information and services.  Tuya and a material percentage of its customers rely on e-commerce platforms, such as Amazon, to sell products and services.  In 2021, 30% of Tuya's product sales were generated by China-based cross-border e-commerce merchants.  Product reviews are essential to the success of a merchant's business on e-commerce platforms, and brands constantly seek out ways to get positive reviews for their products.  In the years leading up to Tuya's IPO, however, Amazon had been flooded by fake five-star reviews of products sold on its platform.

In fact, at the time Tuya filed its Registration Statement with the SEC, several of its significant customers were engaged in widespread fake-review practices.  On March 1, 2021, weeks before Tuya's IPO, a cybersecurity organization discovered a data server located in China that contained 7 GB of data and over 13 million records apparently linked to a widespread fake-review scam, potentially implicating more than 200,000 people in unethical and improper activities.

---

[1]    All "¶" citations are to the AC, brought on behalf of a class of investors who purchased Tuya, Inc. ("Tuya" or the "Company") American Depositary Shares ("ADS") pursuant or traceable to the Company's initial public offering ("IPO").  Emphasis is added unless otherwise specified, and internal citations and quotations are omitted unless otherwise noted.  Capitalized terms not defined herein have the meanings ascribed to them in the AC.

Defendants are: (1) Tuya; (2) CEO Xueji (Jerry) Wang, President and director Liaohan (Leo) Chen, COO and director Yi (Alex) Yang, CFO and director Yao (Jessie) Liu, director Scott Sandell, director Carmen Chang, director Jeff Immelt, director Qing Gao, and director Jim Hong (collectively, the "Individual Defendants"); and (3) Morgan Stanley & Co. LLC, BofA Securities, Inc., and China International Capital Corporation Hong Kong Securities Limited (collectively, the "Underwriter Defendants").  ¶¶28-43.  Although Plaintiffs have not yet served the AC on defendants Wang, Chen, Yang, Liu, Gao, and Hong (all of whom are located in China), Plaintiffs have commenced service of process via the Hague Convention.  *See* ECF Nos. 59, 61.

Defendants failed to disclose in the Registration Statement that Tuya's significant customers were then engaged in these improper practices, rendering certain statements materially false and/or misleading. In the aftermath of the IPO, the public disclosure of the fake-review practices resulted in a massive crackdown on Chinese e-commerce merchants, and Amazon suspended at least four of Tuya's customers. The disclosure of this information and its impact on Tuya's business caused Tuya's ADS price to decline precipitously.

Defendants contend that the allegations are merely fraud by hindsight, but they ignore the express allegations in the AC: that Tuya's customers' fake-review practices were ongoing when the Registration Statement was filed. Defendants attempt to distance themselves from the illicit activities alleged in the AC, asserting that those practices were undertaken by customers of Tuya's customers. But Tuya admitted that the fake-review practices were carried out by its own customers, and at this juncture, the AC's allegations must be taken as true and all reasonable inferences must be drawn in Plaintiffs' favor.

Critically, Defendants misstate the standard for §11 liability for issuers of securities. Defendants attempt to blur the distinction between Tuya and the other defendants and argue that Plaintiffs must plead that all Defendants could have, or should have, known of the omitted facts. Under binding Supreme Court precedent, however, an issuer's liability under §11 is "virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). Tuya is therefore strictly liable for the omitted material facts—even if it could not have known of them. Defendants' other arguments concerning, *inter alia*, truth-on-the-market and Items 105 and 303, likewise fail. Accordingly, Defendants' motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Tuya's IoT Cloud Platform

In 2014, Defendants Wang, Chen, and Yang founded Tuya – a China-based company with

international operations.  ¶44.  Tuya's founders were former directors and employees of Alibaba, a Chinese e-commerce platform where various fraudulent schemes proliferated, such as the sale of counterfeit goods and fake customer reviews.  ¶¶3, 56-57.  Tuya's customers consist of brands, original equipment manufacturers ("OEMs"), industry operators, and system integrators.  ¶4.

Tuya offers three categories of products and services to its customers: an IoT cloud platform that provides Platform-as-a-Service ("PaaS"); finished smart devices containing Tuya's PaaS; and Software-as-a-Service ("SaaS").  ¶¶2, 45.  IoT connects physical devices to a large, interconnected network.  ¶45.  Tuya's core business is the IoT PaaS offerings, which comprised 84% of its revenue in 2020.  ¶¶45, 47.  In 2020, Tuya had over 5,000 customers, and its IoT PaaS offerings enabled Tuya's customers to sell smart devices in more than 1,100 categories and in more than 220 countries and regions globally.  ¶10.  Tuya develops and maintains smart-device software and is thus dependent on its product partners to market and sell their products containing Tuya's software to end users in a range of industries such as smart home, smart business, healthcare, and education.  ¶46.

**B.    Amazon Reviews Are Crucial to Tuya's Business and Revenues**

Tuya and a material percentage of its customers rely on e-commerce platforms to sell products and services.  ¶52.  In 2021, 30% of Tuya's product sales were generated by China-based cross-border e-commerce merchants.  ¶¶5, 52.  Product reviews are essential to the success of a merchant's business on e-commerce platforms.  ¶53.  For example, in 2017, Northwestern University found it is 270% more likely that a consumer will buy a product with five reviews than a product with zero reviews.  *Id*.  In 2020, a Bazaarvoice study found that 56% of U.S. e-commerce shoppers rely on reviews when deciding whether to make a purchase.  *Id*.  Accordingly, brands constantly seek out ways to get positive reviews for their products.  *Id*.

Amazon previously allowed brands to offer free or highly discounted products to customers in exchange for reviews, but banned this practice in October 2016.  ¶54.  To circumvent the ban on

- 3 -

incentivized reviews, Amazon merchants utilized other practices such as rebates and "brushing" to continue receiving product reviews. ¶55. They offered rebates that covered most or the entire price of a product in exchange for a review. *Id*. Brushing first emerged on Chinese e-commerce platforms like Alibaba around 2013. ¶56. With brushing, merchants duplicate customer accounts and use their contact information to send them products they never bought. *Id*. The merchants would then post positive reviews from these fake accounts for a different product than the item they mailed. *Id*.

In April 2018, Amazon deactivated accounts that were allegedly accepting rebates in exchange for positive reviews. ¶59. In April 2019, the consumer-rights website *Which?* published a report describing how Amazon had been "flooded by fake five-star reviews." ¶60. According to the report, up to 90% of Amazon reviews were unverified in some product categories. *Id*. Brushing had an immense impact on Amazon customers in the U.S. throughout 2019, and Amazon claimed to have spent over $500 million to reduce fraud and abuse on its platform. *Id*. Nevertheless, improper practices on Amazon continued, with an increase in brushing reported during the COVID-19 pandemic. ¶¶61-62. Amazon reportedly continued deleting fake reviews, but not quickly enough, and sellers reaped the benefits in ratings, reviews, and sales. ¶63.

According to CNN Business, in 2020, all 50 states issued warnings about consumers receiving unsolicited packages up to every two weeks due to brushing. ¶62. On September 4, 2020, the Financial Times published an article, "Amazon deletes 20,000 reviews after evidence of profits for posts," which revealed that Amazon deleted approximately 20,000 product reviews following a Financial Times investigation into suspicious review activity. ¶64.

The crackdown on fake-review practices continued. On September 18, 2020, the U.S. government indicted six people for conspiracy and wire fraud related to an ongoing scheme beginning in 2017 where Amazon employees reinstated suspended merchant accounts and product

listings in exchange for bribes.  ¶65.  On February 16, 2021, *Which?* published a follow-up report that found the effort to stop fake reviews was ineffective, as a "thriving industry of review manipulation businesses targeting Amazon" was evading these efforts.  ¶66.

**C.      Tuya Issued Materially False and Misleading Statements in the Registration Statement**

On February 26, 2021, Tuya filed a Registration Statement on Form F-1 with the SEC for its IPO, which became effective on March 17, 2021, after amendments on March 12 and 16, 2021.  ¶67. On March 19, 2021, Tuya filed a Form 424B4 Prospectus with the SEC that incorporated and formed part of the Registration Statement.  *Id.*  Despite the Company's history of large losses, substantial indebtedness, limited cash, and a limited ability to generate revenue, the Registration Statement touted Tuya's rapid growth and success.  ¶68.

At the time the Registration Statement was filed, however, several significant Tuya customers were engaged in widespread fake-review practices.  ¶¶78-87.  Tuya misleadingly warned of purportedly future risks that may harm its business, including if Tuya was unable to "generate positive customer feedback and minimize negative feedback on social media channels" when, unbeknownst to investors, Tuya's customers had ***engaged in and were then engaging in*** extensive fake-review practices designed to generate artificial positive customer feedback.  ¶73.  Tuya claimed that an increase in brand awareness was due to "word-of-mouth referrals," but failed to disclose that the brand awareness was promoted by fake-review practices.  ¶70.  The Registration Statement also listed Tuya's growth strategies, but failed to disclose that a material percentage of its customers' sales were the result of fake-review tactics.  ¶72.

Meanwhile, on March 1, 2021 – less than three weeks before the IPO – Safety Detectives, a cybersecurity organization, discovered a data server likely located in China that contained 7 GB of data and over 13 million records appearing to be linked to a widespread fake-review scam,

- 5 -

potentially implicating more than 200,000 people in unethical activities. ¶¶13, 78. The information found on the server included contact details for people providing fake reviews, as well as Amazon vendors. ¶78. Safety Detectives reported that the information found on the server outlined a common procedure by which Amazon vendors sent reviewers a list of products for which they would like a five-star review; the people providing the fake reviews would then buy the products, leave a five-star review on Amazon a few days after receiving the products, and then the vendor would issue a refund for the purchased products to the reviewers through PayPal and allow them to keep the products. *Id.* The server was assumed to be located in China because records that were unrelated to messages between vendors and reviewers were written in Chinese. *Id.* It appeared that the scam leaked information from citizens of the U.S. and Europe at a minimum. *Id.*

> **D.     The Truth Emerges About the Impact Amazon's Ban on Incentivized Reviews Was Having on Tuya**

These fake-review practices were ongoing for months, if not years, prior to the IPO. *See* ¶78. After Safety Detectives published its report on May 6, 2021, Amazon suspended the accounts of numerous China-based merchants, including many of Tuya's significant customers, such as Aukey, VanTop, Apeman, and Zebao. ¶¶79-85. Indeed, on May 11, 2021, TechCrunch reported in an article entitled, "Prime today gone tomorrow: Chinese products get pulled from Amazon," that "several top Chinese sellers disappeared from Amazon over the past few days. At least eleven accounts that originate from Greater China were suspended . . . TechCrunch has reached out to Mpower and Aukey, whose Amazon stores are gone and were two of the most successful brands native to the American marketplace. In total, the suspended accounts contribute over a billion dollars in gross merchandise value (GMV) to Amazon." ¶80. PC Mag reported that "the timing certainly suggests the removal" from Amazon was in response to the discovery of the sellers' fake reviews. ¶79. The TechCrunch article stated that several of the suspended Chinese accounts

belonged to the same parent firms, as it is typical for such big sellers to operate multiple brands on Amazon to maximize sales.  TechCrunch reported that Chinese merchants represented about 75% of Amazon's new sellers in January 2021.  ¶81.  On July 9, 2021, verdict.co.uk reported that Amazon had "closed 340 online stores of one of its largest Chinese retailers in the first half of this year" as it cracked down against paid reviews and other violations of Amazon's terms of use.  ¶87.  In subsequent weeks, Amazon banned hundreds of Chinese brands across thousands of sellers' accounts.  *Id*.  Amazon stated that these sellers knowingly, repeatedly, and significantly violated Amazon's seller policies, particularly its policies around review abuse.  *Id*.  As a result of Amazon's suspensions, Tuya's customers suffered significant financial harm.  ¶¶82-85.

Notwithstanding the impact of the Amazon ban, Tuya continued to tout its growth and stability.  ¶86.  On May 13, 2021, the Company issued a press release announcing its Q1 2021 financial results and stated, "[o]ur first quarter results were distinguished by strong revenue growth as we leveraged our leading technology and brand reputation to capitalize on growing market demand[.]"  *Id*.  Tuya's positivity was short lived, however, as the truth began to emerge about the material impact that Amazon's crackdown had on Tuya's business.  ¶88.

On August 18, 2021, Tuya issued its Q2 2021 results, disclosing a $41.5 million loss from operations, a $38.1 million net loss for the quarter, and a projection of disappointing results for the following quarter.  *Id*.  On an earnings call the same day, Defendant Liu blamed Tuya's lower revenue forecast for Q3 2021 on its customers' challenges with Amazon, stating, "***our customers face a series of challenges, including Amazon's strict execution of seller policy***."  ¶90.

Analysts reacted negatively to Tuya's third quarter forecast the same day.  Morgan Stanley lowered its guidance by 6%, citing headwinds on cross-border e-commerce merchants, and BofA Global Research lowered its Q3 2021 revenue guidance for Tuya due partly to Amazon's imposition

of a stricter seller policy. ¶¶93-94. The same day, Tuya's ADS price declined 19%; the next day, it dropped another 16.71%. ¶95. Tuya's ADS price suffered a two-day decline of 30.6%. *Id.*

The impact of the fake-review practices continued to materialize on November 22, 2021, when Defendant Wang revealed that Amazon's ban was still having a negative effect on Tuya's business. ¶99. Specifically, Wang stated: "[t]he third quarter of 2021 was a challenging quarter for the industry" with "Amazon store closures" as a leading challenge. *Id.* On this news, Tuya's ADS price declined 7.6% on November 23, 2021. ¶101.

On March 14, 2022, Tuya reported disappointing earnings for Q4 2021. ¶103. During a conference call the same day, Wang tried to emphasize that the Amazon ban's effect on Tuya's business was in the past, stating: "certain e-commerce customers affected by store closures in the third quarter are also showing signs of recovery," and Tuya "will focus on the optimization of our organizational structure and our operating efficiency as we aim to better balance our business growth[.]" ¶104. Liu stated that Tuya expected revenue to be between $50 million and $57 million for Q1 2022. ¶105. The next day, Tuya's ADS price fell 9.5%. ¶106.

On March 15, 2022, Morgan Stanley published a report stating that Tuya's "sequential slowdown mainly reflects the lasting effect of store closure at Amazon.com, global inflation, and supply chain disruptions," and reduced its revenue forecast for Tuya for 2022-2024. ¶107. Tuya's downward spiral continued on June 14, 2022, when the Company announced its Q1 2022 results. ¶108. On a conference call that day, Liu stated, "not only have we refined our team structure, we are also reducing our office lease by toning down our office plans to match our current growth trajectory." ¶111. Tuya also admitted that it experienced "a slowdown in the U.S. and Europe" – the two regions targeted in connection with the Amazon fake-review data leak. ¶21. Tuya's ADS price fell 18% on June 15, 2022, and has never recovered. ¶¶112-113.

## III. ARGUMENT

### A. Legal Standards Disfavor Defendants' Motion

"'In considering a motion to dismiss[,] the court is to accept as true all facts alleged in the complaint,' and must 'draw all reasonable inferences in favor of the plaintiff.'" *In re CannaVest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 235 (S.D.N.Y. 2018) (quoting *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007)). The question is whether a claim is plausible and, therefore, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). "Fact-specific questions cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

To plead a claim under §11, a plaintiff need only allege: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading" in a registration statement or prospectus. *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013). A plaintiff alleging a §11 claim "need not allege scienter, reliance, or loss causation." *Id*. Because these claims "need not include allegations of fraud, this is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of [Rule] 8(a)." *Id.*

"Congress adopted §11 to ensure that issuers 'tell[] the whole truth' to investors." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) (quoting H.R. Rep. No. 85, 73d Cong., 1st Sess., 2 (1933)). Section 11 "'was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.'" *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 734-35 (2d Cir. 1987) (quoting *Herman & MacLean*, 459 U.S. at 381-82). As a result, it

- 9 -

"places a relatively minimal burden on a plaintiff." *Herman & MacLean*, 459 U.S. at 382.  Section 11 is "notable both for the limitations on [its] scope as well as the *in terrorem* nature of the liability [it] create[s]." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

"Issuers" such as Tuya "are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants under section[ ] 11 . . . may be held liable for mere negligence." *Id*. (citing *Herman & MacLean*, 459 U.S. at 382); *see also* 15 U.S.C. §77k(b) (listing potential defenses only for persons "other than the issuer").  Issuer liability under §11 is "virtually absolute, ***even for innocent misstatements***."  *Herman & MacLean*, 459 U.S. at 382; *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 986, 200 (1976) (in §11, "Congress did not adopt uniformly a negligence standard even as to express civil remedies. . . . [In certain] circumstances Congress created express liability ***regardless of the defendant's fault***"); *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433, 1437 (2023) (§11 "imposes ***strict liability*** on issuing companies when their registration statements contain material misstatements or misleading omissions.") (citing 15 U.S.C. §77k and *Herman & MacLean*, 459 U.S. at 380);[2] *Greenapple v. Detroit Edison Co*., 618 F.2d 198, 203 (2d Cir. 1980) (same); *Degulis v. LXR Biotech., Inc.*, 1997 WL 20832, at \*3 (S.D.N.Y. Jan. 21, 1997) ("[T]o make out a *prima facie* case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission.  Neither knowledge ***nor reason to know*** is an element in a plaintiff's *prima facie* case."); *see also id*. at \*1 ("Plaintiffs need not allege that the Issuer Defendants knew or ***could have known*** of the Blech Defendants' misconduct to state a non-disclosure claim under Section[] 11").

**B.**    **Plaintiffs Have Alleged Actionable Misrepresentations and Omissions**

**1.**    **A Significant Portion of Tuya's Customers Engaged in Fake-Review Practices at the Time of the IPO, Rendering the Registration Statement False and Misleading**

"It is well-established . . . that once a company speaks on an issue or topic, there is a duty to

---

[2]    Strict liability is "Liability that does not depend on actual negligence or intent to harm, but that is based on the breach of an absolute duty to make something safe[.]"  Black's Law Dictionary (1996).

tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016). Moreover, "[c]ourts in this district have held that where a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices." *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 86 (S.D.N.Y. 2022).

In the Registration Statement, Defendants touted Tuya's ability to gain new customers and increase adoption of its products, its sales and marketing efforts, and its deep relationships with its customers. ¶11. But Defendants did not disclose that, at the time of the IPO, a significant number of its e-commerce customers were engaged in fake-review practices in violation of Amazon's policies, and as such, that there was a substantial risk that Amazon would ban these customers and cause significant harm to Tuya's sales and prospects. *Id*.; *see also supra* at 5-8. Nor did Tuya disclose that its financial and operational successes were due, in part, to its customers' fake-review practices. Defendants' statements concerning Tuya's financial and operational successes were materially false and misleading because Defendants put the source of Tuya's success at issue without disclosing that Tuya's customers' fake-review practices were key drivers of the Company's growth.

Defendants' failure to disclose these facts rendered false and misleading the following categories of statements in Tuya's Registration Statement: (1) statements touting Tuya's deep relationships with its customers (¶¶125-127, 129, 149); (2) statements discussing Tuya's ability to gain new customers and increase adoption of its products and services (¶¶138, 144); (3) statements attributing Tuya's success to reasons other than its customers' fake-review practices (¶¶125, 127, 129, 140, 142, 144, 146-147); (4) statements touting Tuya's sales and marketing efforts (¶¶151, 153); and (5) purported risk warnings describing potential risks of receiving negative reviews of its

products and not receiving sufficiently positive reviews of its products (¶132).

Defendants contend that Plaintiffs' theory is nothing more than fraud by hindsight. *See* MTD at 16; *id*. at 23 ("all the events Plaintiffs allege Tuya should have disclosed took place *after* its IPO") (emphasis in original). They argue that Plaintiffs' claims "are premised on the notion that Tuya should have anticipated that its business would suffer when some of its alleged third-party customers were suspended from Amazon months *after* the IPO." MTD at 11 (emphasis in original). This is a red herring. Defendants simply ignore that the AC alleges that **at the time of the IPO**, a material portion of Tuya's customers were engaged in fake-review schemes, which logically could, and indeed did, lead to these customers being banned from Amazon.[3] This is not fraud by hindsight.[4]

Defendants intimate that the fake-review scheme was carried out by Tuya's customers' customers. *See* MTD at 3, 6-7, 15. Even assuming, *arguendo*, that it matters, Defendants themselves stated that Tuya's customers were negatively impacted by the Amazon ban. *See, e.g.*, ¶90 ("**our customers** face a series of challenges, including Amazon's strict execution of seller policy"), ¶91 (a "limited number of **e-commerce customers** who were impacted by" Amazon banning cross-border e-commerce stores), ¶104 ("**certain e-commerce customers** affected by store closures in the third quarter"), ¶110 ("If we look into the ultimate demand contributions to our revenue across the globe, which represents our estimate based on various businesses information from and regarding **our customers**, we did experience a slowdown in the U.S. and Europe"); *see also* MTD at 6-7 ("Tuya affirmatively disclosed . . . that it had come to learn that **some of its customers** had been impacted by the Amazon bans"). Defendants described these affected customers as Tuya's

---

[3]    These concealed facts are what should have been disclosed; they are not, as Defendants contend, a "chain of future, post-IPO events unrelated to [Tuya's] own operations." MTD at 11; *see also id*. at 1.

[4]    It does not matter that Tuya may not have had advance knowledge of the Safety Detectives Report, which was published after the IPO. *Cf*. MTD at 5, 8. Safety Detectives obtained access to the data server weeks before the IPO. ¶78. Thus, it is reasonable to infer that Tuya's customers' fake-review practices were ongoing for a significant amount of time prior to the IPO. *See CannaVest*, 307 F. Supp. 3d at 235 (court must "draw all reasonable inferences in favor of the plaintiff").

customers, and that suffices at the pleading stage.  *See CannaVest*, 307 F. Supp. 3d at 235.

### 2.    The Omitted Information Was Material

The AC adequately alleges the materiality of the omitted information.  A misstatement or omission is "material" if there is a "substantial likelihood" that its disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).  The Second Circuit has noted that a "five percent numerical threshold is a good starting place for assessing . . . materiality." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009).  The omitted facts concerning Tuya's customers' fake-review practices were material because the Chinese e-commerce business was material to Tuya—indeed, 30% of devices powered by Tuya were sold by China-based cross-border e-commerce merchants—and the loss of the affected customers impacted Tuya's second-half 2021 revenues by a substantial 10%.  ¶92.

Also, analysts lowered their forecasts based on the impact Tuya's customers' Amazon ban had on the Company.  *See* ¶93 (Morgan Stanley lowered guidance for Q3 2021 by 6% due to headwinds on cross-border e-commerce merchants); ¶94 (BofA Global Research's revenue guidance for Q3 2021 of $83-$86 million fell below forecast of $95 million due in part to Amazon imposing a stricter seller policy, which affected Tuya's cross-border e-commerce customers); *see also* ¶107 (Morgan Stanley: Tuya's "sequential slowdown ***mainly reflects the lasting effect of store closure at Amazon.com***, global inflation, and supply chain disruptions").  Further, Defendants' disclosure of the impact of the Amazon ban on Tuya's business on August 18, 2021 caused Tuya's stock price to fall a significant 30.6% over two trading days.  ¶95; *see also supra* at 8 (describing multiple precipitous stock-price declines); *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (materiality satisfied by, *inter alia*, "the precipitous decrease in share price that occurred" after disclosure of the omitted information).  Moreover, Defendant Wang

admitted that "[t]he third quarter of 2021 was a challenging quarter for the industry[,]" and noted the impact of "***Amazon store closures***" as among the leading challenges that Tuya had faced.  ¶99.

In any case, Defendants do not challenge the materiality of the allegedly omitted information except on the grounds that it was already purportedly disclosed to the market.  *See* MTD at 16-18. As explained below, their truth-on-the-market argument fails.  *See infra* at 16-18.

> **3.      Plaintiffs Are Not Required to Plead that Tuya—the Issuer—Should Have, or Could Have, Known of Its Customers' Fake-Review Practices**

Defendants misstate the standard for §11 liability for issuers of securities.  *See* MTD at 11-16.  Rather than explain that under §11, issuer liability is "virtually absolute, even for innocent misstatements," *Herman & MacLean*, 459 U.S. at 382, Defendants attempt to blur the distinction between Tuya and the other defendants.  They state that a "cognizable Section 11 claim exists only when the allegedly undisclosed information 'both existed and w[as] known ***or knowable***' to the issuer 'at the time of the offering.'"  MTD at 11 (quoting *Lin v. Interactive Brokers Grp. Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008)); *see also id*. at 13 (asserting that plaintiff must "explain why or how the defendant ***should have known*** of information in the possession of customers and other third parties").  This is not the correct standard.  As controlling case law from the Supreme Court demonstrates, *see supra* at 10, Plaintiffs are not required to plead that Tuya could have or should have known of the omitted material facts that existed at the time of the IPO.

In *In re Fuwei Films Securities Litigation*, then-District Judge Richard J. Sullivan explained how the availability of §11's statutory defenses differed between issuers and all other parties:

> Defendants may, on a motion for summary judgment, avail themselves of the various "due diligence" or "reasonable care" affirmative defenses provided for by section[ ] 11 . . . Specifically, section 11 provides for two distinct "due diligence" defenses for all of the statutorily enumerated parties ***other than the issuer of a security***. *See* 15 U.S.C. § 77k(b)(3)(A), (b)(3)(C); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 383, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("***Liability against the issuer of a security is virtually absolute, even for innocent misstatements***."). . . . Thus, to be

precise, although the *prima facie* analysis of claims brought pursuant to section[ ] 11 . . . is generally limited to assessing the materiality of the alleged misrepresentations or omissions, ultimately, ***section 11 imposes strict liability on issuers*** and negligence liability on the issuer's officers, directors, and experts[.]

634 F. Supp. 2d 419, 435 n.10 (S.D.N.Y. 2009).

In *Hutchison v. CBRE Realty Finance, Inc.*, the plaintiffs failed to allege that, prior to the IPO, the defendant issuer knew or should have known of the allegedly omitted information. 638 F. Supp. 2d 265, 273 (D. Conn. 2009), *aff'd on other grounds sub nom. Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir. 2011). The court was initially uncomfortable with the notion that an issuer could be liable "for a lack of omniscience," and observed that "the requirement that a defendant knew or reasonably should have known of the allegedly omitted material fact is a sensible one." *Id.* at 273-74. Nevertheless, the *Hutchison* court held that it was compelled by the Securities Act and controlling Supreme Court precedent to impose strict liability on the issuer defendant, "regardless of whether the material omitted facts were known or knowable or not":

> ***Under current prevailing law, however, securities issuers do appear to be subject to strict liability with regard to material misstatements and omissions, regardless of whether the material omitted facts were known or knowable or not. . . . [T]he prevailing case law suggests that innocent misstatements, even when the issuer was duly diligent in preparing the securities offering at question, are subject to a strict liability standard.*** *See, e.g., Herman & MacLean,* 459 U.S. at 382, 103 S.Ct. 683 (due diligence defense is available to other defendants, but "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements."). District courts within and outside the Second Circuit have taken this approach.[5] . . . ***Absent countervailing authority, I am compelled to apply the law as set forth in Herman & MacLean. Where, as here, plaintiffs plead violations of sections 11 and 12(a)(2) based on alleged material omissions from securities offering statements, those claims are subject to a strict liability standard and issuers are held liable despite***

---

[5] Citing *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 290 n.89 (S.D.N.Y. 2008) (citing *Herman & MacLean*, 459 U.S. at 382); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 688 (S.D.N.Y. 2004) ("As to issuers the provision imposes a form of strict liability, such that plaintiffs need only show that the misstatements or omissions were material in order to state a claim."); *Degulis*, 1997 WL 20832, at *3 ("[I]n this Circuit there is no serious question that sections 11 and [12(a)(2)] impose strict liability for materially false statements or omissions. . . . [T]o make out a prima facie case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission. Neither knowledge nor reason to know is an element in a plaintiff's prima facie case.").

> ***any otherwise available due diligence defense or lack of knowledge***.  Accordingly, the plaintiffs need not plead that the defendants knew or should have known that the Triton Loans were at risk of impairment in order to state a claim for failure to disclose that risk in CBRE's offering statements.

638 F. Supp. 2d at 274-75.

Applying this well-established principle, in *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301 (S.D.N.Y. 1996), the underwriter of several companies' public offerings carried out the alleged fraud.  *See id*. at 1305, 1307-08.  The issuers argued that they bore no obligation to investigate their underwriter, and that to do so "would stand the securities law regime on its head."  *Id*. at 1314.  The *Degulis* court disagreed, reasoning that "[a]n issuer of securities is strictly liable for material misrepresentation[s] and omissions in its registration statement and prospectus under [§]11.  Unlike certain other [§]11 defendants, the issuer has no 'due diligence' defense available."  *Id*.

Defendants' cited cases are inapposite.  *See* MTD at 16.  In each, the court found there was no duty to disclose information that was not known or knowable at the time of the IPO.  This is contrary to §11's strict-liability regime for issuers, which is enshrined in the clear text of the Securities Act and has been articulated by the Supreme Court for decades, including as recently as its current term.  *See Slack*, 143 S. Ct. at 1437.  As for the remaining defendants, the AC adequately alleges that the omitted information was knowable at the time of the IPO.  *See infra* at 23-25.

### 4.    Investors Were Not Aware of Tuya's Customers' Fake-Review Practices

Defendants contend that fake-review schemes, including on Amazon, were widely known to the public before the IPO, relieving them of any disclosure obligation.  *See* MTD at 9, 17-19.  Not so.  Defendants' argument invokes the truth-on-the-market defense, which provides that an otherwise actionable misstatement or omission may be deemed "immaterial" if the truth is already fully known to the investing public.  *See Ganino v. Citizens Utils. Co*., 228 F.3d 154, 167 (2d Cir. 2000).  To prevail on such a defense, "the corrective information must be conveyed to the public

with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id*. "The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismiss[al.]" *Id*.; *see also In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010) (same).

The truth-on-the-market defense fails because investors could not have made the connection between Tuya and the existence of fake-review schemes that were prevalent among Chinese e-commerce companies at the time of the IPO. Although the market may have known generally about fake reviews on Amazon, Tuya did not disclose in the Registration Statement that a material portion of its revenue came from China-based e-commerce merchants or from Amazon, or that there was at least a substantial risk that significant customers of Tuya were engaged in fake-review practices. Indeed, Defendants speak out of both sides of their mouths: they say fake reviews were so well-known to the market that Tuya did not need to disclose the risk, yet they also say there was no way Defendants could have, or should have, known of Tuya's customers' fake-review schemes. *See* MTD at 12-16. Just the opposite: the market was not tasked with knowing that Tuya's customers were engaged in fake-review practices, but Defendants could have, or should have, known this.

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011), is instructive. In *Litwin*, the defendant contended that, "as the complaint itself alleges based on citations to news articles and analysts' calls, the [omitted facts were] publicly known at the time of the IPO." *Id*. at 718. The Second Circuit rejected this truth-on-the-market argument, noting that "case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information."[6] *Id*. In *Litwin*, the allegedly concealed information was whether, and to what extent,

---

[6]    *See also United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (stating that "the mere presence in the media of sporadic news reports . . . should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials"); *Kronfeld*, 832 F.2d at 736 ("There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a . . . prospectus on the basis that the information is public

the particular known trend, event, or uncertainty might have been reasonably expected to materially affect Blackstone's investments.  The Second Circuit found that "this potential future *impact* was certainly not public knowledge, particularly in the case of FGIC, which was not even mentioned in Blackstone's Registration Statement and thus cannot be considered part of the 'total mix' of information already available to investors."  *Id*. at 719 (emphasis in original).

Similarly, in *New Jersey Carpenters*, the defendants argued that two newspaper articles would have informed the plaintiff of the very information it claimed the prospectus withheld.  709 F.3d at 126-28.  The Second Circuit, however, held that the articles "are only 'sporadic news reports,' which do not alone clarify or contextualize the alleged misstatements in the . . . Prospectus."  *Id*. at 127.  Moreover, the Second Circuit found, "neither article discloses what the fund alleges, namely, that NMI [the defendant's subsidiary] had abandoned its published underwriting guidelines.  Instead, the claim that NMI had 'eased up on the required documentation' might only have referred to the number of loans it issued under its 'No Documentation' and 'Stated Income' programs. . . . Thus, rather than revealing what the . . . Prospectus omitted, these articles could be interpreted as criticisms of NMI for what that prospectus disclosed.  Such vague criticisms of NMI did not render the alleged abandonment of its underwriting guidelines 'public knowledge.'" *Id*.  In *New Jersey Carpenters*, the publicly available articles explicitly criticized the defendant's subsidiary, yet that was not sufficient to establish that the truth was on the market.  All the more so here, where the public news reports cited in the AC mention neither Tuya nor its customers at all.[7]

---

knowledge and otherwise available to them").

[7]    Defendants' cases are inapt.  *See* MTD at 18.  In *Bettis v. Aixtron SE*, unlike here, by plaintiff's "own admission, the information that he claims was omitted was public information, equally available to the Defendants and investors alike." 2016 WL 7468194, at *12 (S.D.N.Y. Dec. 20, 2016).  In *In re Bank of America AIG Disclosure Securities Litigation*, the very information that plaintiffs alleged was omitted was "plainly within the public domain."  980 F. Supp. 3d 564, 576 (S.D.N.Y. 2013).  In *Barilli v. Sky Solar Holdings, Ltd*., plaintiffs claimed that defendants' "positive characterizations of the Japanese [solar] market, both generally and as it would affect [the defendant], were false and materially misleading in that actual conditions were unfavorable."  389 F. Supp. 3d 232, 254 (S.D.N.Y. 2019).  The court held this information was not "uniquely within Defendants' control and thus Defendants had no duty to disclose such information."  *Id*. at 255.

### 5.    Defendants' Inadequate Risk Disclosures Are Actionable

The purported risk disclosures that Defendants made in the Registration Statement about reviews of Tuya's products were materially false and misleading. "Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). "[P]laintiffs need not plead that the defendants knew or should have known [of the undisclosed risk] in order to state a claim for failure to disclose that risk in [the defendant's] offering statements." *Hutchison*, 638 F. Supp. 2d at 274-75.

In the Registration Statement, Defendants misleadingly warned that: (1) if reviews by independent industry analysts "are negative or not as strong as reviews of our competitors' products and services, our brand may be harmed"; and (2) "Our success depends, in part, on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing and potential customers and end users seek and share information. If actions we take or changes we make to our products and services or platform upset these customers and end users, their online commentary could negatively affect our brand and reputation." ¶132. These purported risk disclosures conveyed the misleading impression that, *inter alia*, Tuya was faced with the risk of ***negative*** customer reviews or the ***inability*** to achieve positive customer reviews, whereas, to the contrary, Tuya was actually faced with the risk of ***fraudulently positive*** customer reviews. ¶133. Defendants did not challenge Plaintiffs' allegations concerning Tuya's misleading risk disclosures in their motion to dismiss, and have therefore conceded them at this stage. *See Thomas v. Roach*, 165

---

In *In re IndyMac Mortgage-Backed Securities Litigation*, the allegedly omitted information "had been known publicly for years." 718 F. Supp. 2d 495, 512 (S.D.N.Y. 2010). These cases are a far cry from the facts alleged in the AC.

- 19 -

F.3d 137, 145 (2d Cir. 1999) (argument is waived unless a party raises it in its opening brief).

Defendants argue that the Registration Statement warned investors that Tuya may lose customers and that the loss of customers could have a significant negative impact on its business, and that "many factors not within our control" could affect Tuya's business.  *See* MTD at 4, 18-19. These boilerplate "warnings" are generic and inadequate, as a heightened risk of losing customers due to their fake-review practices had already materialized at the time the Registration Statement was filed.  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010) (cautionary language is not meaningful if it is "boilerplate," "general," and "vague"); *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at \*4 (S.D.N.Y. June 18, 2020) (registration statement "warned that 'each of [defendant's] employees may terminate his or her employment at any time.'  This cautionary language did not, as a matter of law, warn investors that the risk of [the CFO's] departure had already materialized by the time of the offering").  "[T]he cautionary language contained with the disclosure must, when examined in context, 'warn of the specific contingency that lies at the heart of the alleged misrepresentation.'"  *Id*. at \*3 (quoting *P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004)).

Defendants' cited authorities are unavailing.  *See* MTD at 19-20.[8]  Here, unlike in those cases, the risk of Tuya's customers' illicit fake-review practices had already materialized by the time of the IPO.  Moreover, Tuya issued separate, materially misleading risk disclosures, which affirmatively created a misleading impression concerning the risks associated with customer reviews.[9]  The boilerplate risk disclosures that Defendants point to do not offset Tuya's misleading

---

[8]     The court in *Bank of America AIG Disclosure Securities Litigation* found that the risk of a lawsuit by AIG was adequately disclosed "in light of information communicated to the market about BoA's exposure to MBS litigation generally and to . . . **AIG specifically**."  980 F. Supp. 2d at 579.  In *Rubinstein v. Credit Suisse Group AG*, the court found that the plaintiffs' allegation that Credit Suisse misrepresented the extent of its hedging was "belied by the ***express language of the disclosures***."  457 F. Supp. 3d 289, 296-97 (S.D.N.Y. 2020).  Tuya, however, failed to warn of the subject risks with similar specificity.

[9]     In *Schoenhaut v. American Sensors, Inc.*, 986 F. Supp. 785, 791 (S.D.N.Y. 1997), and *Garber v. Legg Mason, Inc.*,

risk disclosures concerning customer reviews.

### 6. Defendants Violated Their Affirmative Disclosure Obligations Under Applicable SEC Rules and Regulations

**Item 105**.  Plaintiffs have adequately pled that Defendants violated Item 105 (formerly Item 503) by failing to disclose the risks to Tuya's sales, revenue, and prospects of its customers' ongoing, systematic practice of violating Amazon's policies prohibiting fake reviews.  ¶¶122-123. Item 105 requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and an explanation of "how each risk affects the registrant or the securities being offered."  17 C.F.R. §229.105; *see also* SEC Release No. 7558, 1998 WL 425894, at *14 (July 29, 1998).  An alleged Item 105 violation is evaluated under the materiality standard, and a "[p]laintiff need not allege Defendants' knowledge in order to plead" such a violation. *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020); *see also Gutman v. Lizhi Inc.*, 2022 WL 4646471, at *5 (E.D.N.Y. Oct. 1, 2022) ("While Plaintiff is correct that Item 105 does not require a plaintiff to plead actual knowledge, it does require the presence of a significant risk"); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426-27 (S.D.N.Y. 2011) ("courts typically analyze the sufficiency of Item 503 disclosures with the familiar materiality standard").[10]  "Generic or boilerplate discussions" will not suffice.  SEC Release No. 7558, 1998 WL 425894, at *14.  The adequacy of such disclosure is a question of fact, which is inappropriately resolved on a motion to dismiss.  *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 691-92 (S.D.N.Y. 2004).

---

537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008), unlike here, the risk disclosures that the court found adequate were not accompanied by separate, affirmatively misleading risk disclosures.

[10]    *But see In re DraftKings Inc. Sec. Litig.*, 2023 WL 145591, at *8 (S.D.N.Y. Jan. 10, 2023); *Wandel v. Gao*, 590 F. Supp. 3d 630, 646-47 (S.D.N.Y. 2022); *Rubinstein*, 457 F. Supp. 3d at 300-01.

A comparison of the language of Items 303 and 105 demonstrates that Item 105 does not require pleading actual knowledge of the risk.  Item 303 requires management's discussion and analysis to "focus specifically on material events and uncertainties ***known to management***" and to "[d]escribe any ***known trends or uncertainties***," 17 C.F.R. §229.303(a) & (b)(2)(ii), whereas Item 105 contains no such knowledge requirement.

Defendants argue that Item 105 did not require Tuya to "disclose what it did not and could not know at the time of its IPO." MTD at 20-21. Defendants' attempt to impose a knowledge requirement for Item 105 is incorrect and contrary to the text of Item 105. In any case, the AC adequately alleges that Defendants should have, or could have, known that Tuya's customers were engaged in widespread fake-review practices. *See infra* at 23-25.

**Item 303**. Item 303 required Tuya's regulatory filings to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" (¶118(b)), including the adverse, ongoing trend and uncertainty of Tuya's customers' fake-review practices. ¶¶121, 134.[11] Plaintiffs satisfy the knowledge requirement of Item 303 based on the AC's allegations of public reports of fake-review practices among e-commerce companies, especially those based in China. *See supra* at 3-5; *infra* at 23-24. The *Panther Partners* court held that similar allegations satisfy Item 303. *See* 2020 WL 5757628, at *10 (complaint "explicitly alleges that the trends underlying Plaintiff's allegations . . . were 'known' to Defendants. . . . This allegation is plausible given ***multiple public reports*** – cited in the [Complaint] – to the effect that 'the Interim Measures were widely expected to lead to an exodus of P2P companies from the online consumer finance market.'"). The *Panther Partners* court found that "[a]lthough the Amended Complaint does not allege 'that any of the [D]efendants . . . engaged in intentional or reckless misconduct or acted with fraudulent intent,' this circumstance is irrelevant. The issue is whether the above-described trends were 'known' for purposes of Item 303, not whether Defendants acted with fraudulent intent.

---

[11]     Defendants argue that "Item 303 is not applicable at all to a registration statement on Form F-1[.]" MTD at 21 n.8. This is inaccurate because although "Item 303 does not apply to foreign corporations, the SEC has stated that its interpretations of Item 303 'apply to [Management Discussion & Analysis disclosures] drafted pursuant to Item 5 on Form 20-F,' which does apply to foreign corporations." *Panther Partners*, 2020 WL 5757628, at *7 n.5 (interpreting Item 5 of Form 20-F as requiring the same disclosures under Item 303). Indeed, "courts in this Circuit 'have treated Form F-1 as calling for the same disclosure as Item 303 of Regulation S-K.'" *Wang v. Cloopen Grp. Holding Ltd.*, 2023 WL 2534599, at *13 n.7 (S.D.N.Y. Mar. 16, 2023); *Garnett v. RLX Tech. Inc.*, 2022 WL 4632323, at *16 (S.D.N.Y. Sept. 30, 2022) (same); *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021) (same).

The Amended Complaint's allegations are consistent with Plaintiff pleading obligations in alleging violations of Section[ ] 11 . . . ; as noted above, these provisions have no scienter requirement." *Id.*[12]

### 7.    The Defendants (Other than Tuya) Should Have Known that Tuya's Customers Were Engaging in Fake-Review Practices

The Individual Defendants and the Underwriter Defendants should have, or at a minimum could have, known that Tuya's customers were engaged in, or at risk of engaging in, widespread fake-review practices due to the pervasive, longstanding nature of such practices among e-commerce merchants based in China.[13]    Defendants attempt to confuse the issues and mischaracterize Plaintiffs' allegations as "offensive and discriminatory" by arguing that the AC alleges Defendants should have known about the fake-review practices "simply because those customers were Chinese and Tuya is based in China."  MTD at 14.  Faux righteousness aside, Defendants are wrong.

Defendants cannot deny the AC's allegations of the prevalence of fake-review schemes among e-commerce sellers in China.  *See* ¶63 (August 2020 research showing that "the vast majority, 84%[,] of sellers benefitting from fake reviews were located in China."); ¶64 (in September 2020, Financial Times reporting that Amazon had deleted approximately 20,000 product reviews and noting, "[o]verwhelmingly, those products were from little-known Chinese brands, who often offer to send reviewers products for free in return for positive posts"); ¶57 (Wall Street Journal

---

[12]    While Item 303 does have a knowledge component, it is not akin to scienter.  *Panther Partners*, 2020 WL 5757628, at \*10 ("While Item 303 requires a description of 'any known trends or uncertainties that are material … plaintiffs need not plead defendants' knowledge[,] as there is no scienter requirement in Section 11").  Instead, in order to state a Securities Act claim based on an Item 303 violation, a plaintiff only needs to plead facts sufficient to give rise to a *plausible* inference (rather than a strong inference) that management knew about the trend or uncertainty and that management reasonably expected it would likely have a material effect on the registrant's financial condition.  *See, e.g.*, *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 116 (2d Cir. 2012) ("the proposed complaint stated a claim because it *plausibly* alleged that the defects constituted a known trend or uncertainty that the Company reasonably expected would have a material unfavorable impact on revenues").  Plaintiffs also satisfy Item 303's knowledge requirement for the reasons discussed below.

[13]    To the extent Defendants (besides Tuya) raise the due-diligence affirmative defense to §11 liability at the pleading stage, the defense must appear on the face of the AC, and Defendants bear the burden to prove it.  *See In re Lehman Brothers Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 317 (S.D.N.Y. 2011); *Morgan Stanley Info. Fund*, 592 F.3d at 359 n.7 ("Generally speaking," due diligence defense is "unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)").

describing brushing as commonplace and crucial to Chinese vendors' survival on e-commerce platforms—one vendor stated that without fake transactions "your product will end up at the very back of the search results, and people will never be able to find it"; article reported that Chinese e-commerce merchants even take classes on how to avoid getting caught for fake transactions). Further, Tuya "conduct[s] [its] business primarily in China" (Registration Stmt., Def. Ex. 1 at 40),[14] with 30% of its product sales generated by China-based cross-border e-commerce brands (¶92), so Defendants should have, or at least could have, known that fake-review schemes were particularly prevalent among e-commerce sellers in China.

The history of fake reviews on Chinese e-commerce platforms such as Alibaba and Taobao, as well as Amazon, show the existence of the risk. *See* ¶¶56-58 (Alibaba and Taobao), ¶¶59-63 (Amazon), ¶66 (one month before Tuya's IPO, *Which?*'s "latest investigation has discovered a thriving industry of review manipulation businesses targeting Amazon marketplace and evading its checks"). Furthermore, Tuya was founded in 2014 by former directors and employees of Alibaba, a Chinese e-commerce platform where various fraudulent schemes proliferated, including the sale of counterfeit goods and fake customer reviews. ¶3. Finally, the fake-review scheme at issue here was run out of China (¶78), and the Amazon ban deeply impacted China-based e-commerce merchants engaged in fake-review practices. ¶¶79-87, 96-97 ("as many as 50,000 Chinese merchant accounts had been suspended since Amazon's crackdown starting in May 2021," with the Amazon ban causing Chinese cross-border e-commerce businesses to lose $15.4 billion).

Defendants feign outrage at the notion that e-commerce companies in China are at higher risk for fake-review schemes. MTD at 14. The facts belie their indignity. The issue in this action is what risks and information did Tuya need to disclose to its investors in order to comply with the

---

[14]   Defendants were well-acquainted with the China market. According to the Registration Statement, "[s]ubstantially all of [Tuya's] assets and operations are located in China" (Def. Ex. 1 at 62), and "substantially all" of Tuya's OEM customers are located in China. *Id*. at 41.

Securities Act's disclosure requirements.[15]

Defendants also argue that Tuya's "deep relationships with its customers" (¶¶11, 121) "does not come close to supporting an inference that Tuya knew the details of how those customers sold *those customers' own* products to third-party end users, let alone that those customers employed a scheme on a third-party platform that was specifically designed to avoid detection."  MTD at 13 (emphasis in original).  Yet Tuya admitted that the fake-review practices were carried out by its own customers, *see supra* at 12-13, and reasonable inferences must be drawn in Plaintiffs' favor.[16]

## IV.    CONCLUSION

For the reasons detailed herein, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety.  Alternatively, should the Court grant any part of Defendants' motion, Plaintiffs respectfully request leave to amend the AC.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015) (dismissal of claim without leave to amend violates the spirit of Fed. R. Civ. P. 15 and must be supported by a finding that there is an issue as to which "the complaint is deficient and [ ] amendment would be futile").

DATED:  June 30, 2023                Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ALAN I. ELLMAN
NATALIE C. BONO


                                     */s/ Alan I. Ellman*
                                     ALAN I. ELLMAN

---

[15]    Defendants' cases are inapposite because they involved China-based companies' knowledge of the severity of COVID-19 based simply on their location.  *See* MTD at 14.

[16]    Because the AC adequately pleads a violation of §11, the §15 control-person claim is not subject to dismissal for lack of a primary violation.  *See City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.*, 2016 WL 6652731, at \*16 (S.D.N.Y. Nov. 10, 2016).  Relying on one out-of-Circuit case, Defendants argue that Defendant Immelt is not liable under §15 because he did not sign the Registration Statement and did not become a director until the Registration Statement became effective.  MTD at 22.  However, "whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."  *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007).

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com
nbono@rgrdlaw.com

GLANCY PRONGAY & MURRAY LLP
CASEY E. SADLER (admitted *pro hac vice*)
NATALIE S. PANG (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone:  310/201-9150
310/201-9160 (fax)
csadler@glancylaw.com
npang@glancylaw.com

*Lead Counsel for Lead Plaintiffs Kyle Nelson
and Jiyi Qiu*

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL JR.
Murray House
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632.6000
770/200.3101 (fax)
michaelf@johnsonfistel.com

*Additional Plaintiffs' Counsel*