O29HLiaO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

XIAOMENG LIAN, Individually
and on behalf of all others
similarly situated,

                    Plaintiffs,

          v.                          22 Civ. 6792 (JPC)

TUYA INC., XUEJI (JERRY) WANG,
LIAOHAN (LEO) CHEN, YI (ALEX)
YANG, YAO (JESSIE) LIU, SCOTT
SANDELL, CARMEN CHANG, JEFF
IMMELT, QING GAO, JING HONG,
MORGAN STANLEY & CO. LLC, BofA
SECURITIES, INC., and CHINA
INTERNATIONAL CAPITAL
CORPORATION HONG KONG
SECURITIES LIMITED,
                                      Oral Argument

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      February 9, 2024
                                      12:00 p.m.

Before:

               HON. JOHN P. CRONAN,

                                      District Judge


                    APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys for Plaintiffs
BY:  ALAN IAN ELLMAN
     NATALIE BONO
     -and-
GLANCY PRONGAY & MURRAY LLP
BY:  BRIAN D. BROOKS


               SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

O29HLiaO

                              APPEARANCES (Cont'd)

DAVIS POLK & WARDWELL
     Attorneys for Defendants Tuya and individual defendants
BY:  EDMUND POLUBINSKI III
     MARIE KILLMOND

ROPES & GRAY, LLP
     Attorneys for Defendant Underwriters
BY:  GREGG L. WEINER
     ANDREW SIMON TODRES

O29HLiaO

(Case called)

MR. ELLMAN:  Good afternoon, your Honor.  Alan Ellman from Robbins Geller Rudman & Dowd on behalf of the plaintiffs.

THE COURT:  Good afternoon, Mr. Ellman.

MS. BONO:  Good afternoon, your Honor.  Natalie Bono from Robbins Geller Rudman & Dowd on behalf of the plaintiffs.

MR. BROOKS:  Brian Brooks with Glancy Prongay & Murray on behalf of plaintiffs as well.

THE COURT:  Good afternoon, Mr. Brooks.

MR. POLUBINSKI:  Good afternoon, your Honor.  Ted Polubinski from Davis Polk.  I'm here for Tuya and also for the individual defendants.

THE COURT:  Good afternoon, Mr. Polubinski.

MS. KILLMOND:  Good afternoon, your Honor.  Marie Killmond from Davis Polk, also for Tuya and the Tuya defendants.

THE COURT:  Good afternoon, Ms. Killmond.

MR. WEINER:  Good afternoon, your Honor.  Gregg Weiner from Ropes & Gray on behalf of the underwriter defendants.

THE COURT:  Good afternoon, Mr. Weiner.

MR. TODRES:  Good afternoon, your Honor.  Andrew Todres from Ropes & Gray on behalf of underwriter defendants.

THE COURT:  Good afternoon, Mr. Todres.

So we're here for oral argument on the motions to dismiss filed by the defendants.  I should say I appreciate the

O29HLiaO

parties' accommodating the change in time for the argument. Let me just confirm one thing first, probably with Mr. Weiner.

I understand from a submission that, I believe last week, CICC is no longer seeking dismissal on personal jurisdiction grounds. Is that right?

MR. WEINER:  Yes, that's correct, your Honor.

THE COURT:  As I think I previewed in my order scheduling this, I have in mind roughly 30 minutes of argument for each side and allow a little bit of time for brief rebuttal from the defendants.  But let me ask the defendants, how do you plan to split up your time?

MR. POLUBINSKI:  Your Honor, I plan to handle argument for all defendants, and I sincerely hope that I'll take a good deal less than 30 minutes.

THE COURT:  Thank you.

And for the plaintiffs, Mr. Ellman, will you be handling it?

MR. ELLMAN:  Yes, your Honor.

THE COURT:  So, Mr. Polubinski, you may begin whenever you're ready.

MR. POLUBINSKI:  Great.  Thanks very much, your Honor.

So, your Honor, this Section 11 case should be dismissed with prejudice because the plaintiffs here have failed to allege any actionable omission.  As we explained in our briefing, and as your Honor is aware, this is a pure

O29HLiaO

omissions case.  So, in other words, the plaintiffs do not allege that anything in Tuya's registration statement was actually affirmatively false.  Instead, they seek to recover for something that Tuya did not disclose in his registration statement, and now it's crystalized by the briefing.  That omission is remarkably straightforward.  Plaintiffs contend that Tuya should have disclosed that unaffiliated third-party customers of Tuya, whose products used Tuya's technology, should have disclosed secret —— or that Tuya should have disclosed secret violations of Amazon's policies by those third-party customers.

Plaintiffs concede that Tuya was not at all involved in their customers' conduct.  Plaintiffs also concede that Tuya did not know about its customers' conduct.  Instead, the allegation here, as I understand it, is the fact that Tuya did not discover and then disclose this unknown information about its nonparty customers was somehow an actionable omission under Section 11, and it clearly is not.  The simplest reason for that is plaintiffs have failed to identify any duty to disclose the omitted information here.  That's the principle that animated Judge Rakoff's decision in the *Missfresh* case which we submitted last week as supplemental authority.  It applies squarely here, and it's dispositive.

The relevant legal principles here are well-established.  Section 11 does not require disclosure of

O29HLiaO

all potentially material information, known or unknown, in a registration statement.  Instead, Section 11 is very clear that disclosure is required and omissions are actionable in only two very specific circumstances.  The first is when there's an affirmative legal obligation to disclose the omitted information, and then the second is if disclosure is necessary to prevent existing disclosures in the registration statement from being misleading.  Plaintiffs cannot satisfy either of those specific circumstances.

As to the first, they haven't identified any affirmative legal duty here to disclose information about unaffiliated, nonparties' compliance with Amazon's seller policy.  Plaintiffs quote language and a variety of authorities for the proposition that Section 11 is a strict liability statute, but those sources address and answer a different question, the question of whether a state of mind is required on the part of an issuer in order to do a Section 11 violation. None of those authorities purport to suggest there's some generalized duty to disclose all potentially material information, nor do plaintiffs identify anything in Tuya's registration statement that's misleading by omission. Plaintiffs refer to statements like Tuya's —— in Tuya's registration statement about things like its deep relationships with customers or its strategy for growth or to gain more customers, but there is nothing that was misleading by omission

O29HLiaO

about any of these statements.  None of them related in any way to Tuya's customers' compliance with Amazon's policies.  None of them touted positive reviews from their customers.  In fact, none of them referred to positive reviews at all.  Bottom line is there was nothing misleading by omission about any of those statements.

As the *Missfresh* case explained, I think very concisely, the question here in deciding whether something is misleading by omission is whether an affirmative statement "misleadingly suggested that the subsequently identified deficiencies," or, here, the seller policy violations, "did not exist."  That's on *12 of the *Missfresh* case.  None of the statements here meet that test.  None of them suggest that Tuya's customers were all in compliance with Amazon seller policy.

Plaintiffs also suggest ——

THE COURT:  But there were statements emphasizing Tuya's deep relationship with its customers and talking about the reasons why Tuya was experiencing success.  Why was there not an omission there by not disclosing that there was the real risk that many of these customers would be kicked off Amazon?

MR. POLUBINSKI:  Your Honor, it's because none of those generalized statements about deep relationships with customers offered any suggestion one way or the other about customers' compliance with Amazon seller policies.  None of

O29HLiaO

them, again, to use the words in *Missfresh*, misleadingly suggested that the seller policy violations did not exist.

THE COURT:  But don't they suggest that the customers would remain customers?

MR. POLUBINSKI:  Respectfully, your Honor, I don't think that they did actually.  I think there are statements generally about its deep relationship with customers and their knowledge about the customers' products.  There's nothing in the registration statement that offered any suggestion that Tuya was involved in or had knowledge about or was —— knew anything about the compliance with seller policies or, more generally, how those customers actually sold the products.

Your Honor also mentioned that plaintiffs suggest the generalized statements about Tuya's financial performance somehow also were misleading by omission.  Again those assertions fail here for the same basic reasons.  None of them purported to offer reasons for Tuya's financial performance at that point.  None of them provided express or even implicit assurances that Tuya's customers were in compliance with Amazon seller policy.

Then, finally, plaintiffs' also suggested that Tuya's risk disclosures were somehow inadequate because the risks at issue had already materialized.  But I think, again, a review of the actual disclosures here shows that that's wrong.  None of the risk factors at issue in the complaint or referenced in

O29HLiaO

the complaint at all addressed positive customer reviews at all or implied that customers were complying with Amazon seller policy.  There's nothing that would have implied compliance with those policies, which, again, is what's required to allege an actionable omission here.

In their opposition, plaintiffs actually gave relatively little attention, or almost no attention, to the question of the underlying duty to disclose.  Instead what they focused on was a different question which I mentioned before, which is a different element of Section 11 and is not really in dispute here.  That's the question of whether a plaintiff needs to plead scienter or some state of mind on the part of an issuer to state a Section 11 claim.  We obviously agree that there's no state of mind requirement for Section 11.  That's black-letter law.  We don't dispute the point, that point which is the point that's made in the *Herman & MacLean* Supreme Court case and also the *Winter* case and the *Degulis* case and others.  An issuer can be liable for not disclosing something irrespective of that issuer's intent or state of mind provided that the issuer had a duty to disclose the underlying omitted fact, and that's ultimately the point here, that there needs to be an underlying fundamental duty to disclose the omitted information.  And that's what plaintiffs fail to identify in *Missfresh*.  That's what plaintiffs have failed to identify here.

O29HLiaO

That's why *Hutchison* and *Degulis* and *Winter* do not control here. In each of those cases, there was a clear duty to disclose the omitted information. So, for example, in the *Hutchison* case, the issuer said that none of its loans had exhibited signs of impairment when, in fact, two of the biggest loans had actually exhibited clear signs of impairment.

Likewise, in the *Winter* case, the issuer said he anticipated delivery of cryptocurrency mining equipment, but it knew that it hadn't made payments for that mining equipment. In each of those cases, there was a specific affirmative statement in the registration statement that was clearly misleading by omission or potentially even affirmatively false, and there's nothing like that here.

I'd finally like to address items 303 and 105 of Regulation S-K. Those are specific technical SEC regulations that require disclosure of certain information in certain circumstances. The registration here —— the registration statement here clearly complied with both of those.

As to Item 303, the analysis is quite straightforward. The rule includes expressly a knowledge requirement. It imposes a duty to disclose only "known trends or uncertainties that are reasonably likely to have a material impact on financial condition or continuing operations," and here Tuya concededly did not know about the Amazon seller policy violations by its own customers.

O29HLiaO

Likewise, there's no duty to disclose anything additional under Item 105 either.  As an initial matter, most courts conclude that, like Item 303, Item 105 includes a knowledge requirement.  Both of the circuit Courts of Appeal that have addressed this question have so concluded.

THE COURT:  The Second Circuit hasn't addressed that, and there is a bit of a split on the district court level within the circuit.

You discussed Item 303, which, as you noted, refers to any known trends or uncertainties.  The SEC knew how to insert the word "known" if they wanted to include a knowledge requirement.  That's noticeably absent from Item 105.  Why should I read that in?

MR. POLUBINSKI:  So, agreed, there's no express reference to "known," but I guess what I would say is that the only way to actually read item 105 in a way that makes sense and to prevent it from becoming a completely impossible regulation to comply with is to understand that knowledge is implicitly a requirement.  The reason for that is an issuer — if an issuer doesn't know about a risk at all, it would be impossible to "describe that risk."  It would also be impossible to explain how that risk affects the registrant or the securities being offered, both of which come straight out of the language of the rule.

I will agree with your Honor that there's actually —

O29HLiaO

although there's, I think, a substantial weight of authority that concludes that there is a knowledge requirement, there are some cases that go the other way in that the language is not as clear as 303, but I think we get there anyway.

The other point I'd make, though, is that separately, even if there were not a requirement that a risk be known or knowable, there is no material risk requiring disclosure here under Item 105 at the time of the IPO.  The reason for that is that any risk here is evident only when you look back at it in hindsight.  The reason I say that is that at the time of the IPO, the only then present but unknowable fact was that some unknown number of third-party customers were not complying with Amazon's seller policy.

THE COURT:  The safety detective knew it.

MR. POLUBINSKI:  What's that?

THE COURT:  The safety detective figured it out before the IPO.

MR. POLUBINSKI:  You're right, the safety detectives figured it out before the IPO.  I think there's a separate question as to whether it reasonably knowable on Tuya's part.  But even accepting for sake of argument that this information was actually knowable, the only information that was knowable, again, was that some number of third-party customers were violating Amazon's seller policy.  I'd respectfully submit that that information by itself, without the benefit of hindsight,

O29HLiaO

does not rise to a material factor that makes an investment in Tuya speculative or risky.

The reason for that is that fake reviews are not the reason that Tuya's business ultimately suffered.  The reason that Tuya's business ultimately suffered was that there were downstream future unanticipated knock-on impacts of the fact that there were —— that there were seller policy violations.  It would have, in Tuya's case, required a chain of speculation to assume that that would lead to a risk.  Tuya would have had to assume that those sellers would get caught.  They would have to assume that Amazon would have engaged in an unprecedented —— "unprecedented" is the word in the complaint —— unprecedented crackdown on sellers; that it would have banned those sellers from the platform.

THE COURT:  Unprecedented maybe in the extent of the crack down.  Isn't it commonly known if Amazon discovers a seller is going to engage in fake reviews, it's going to pull that seller from the platform?

MR. POLUBINSKI:  Your Honor, I'm not sure that's entirely true.  I guess, either way, the point is what we're talking about is a long chain of speculation here: the discovery by Amazon, the suspension from the platform, and the fact that that would happen in sufficient numbers to actually impact Tuya's business.  It's a classic "butterfly flaps its wings in Brazil and causes a tornado in Texas" situation.

O29HLiaO

Every time a butterfly flaps its wings in Texas —— or in Brazil, rather, doesn't require an issuer to disclose a risk of a tornado in Texas.  That's exactly the situation that's going on here.

Again, based on the information that was available, there was no material factor that made an investment in the registrant or the offering speculative or risky, and that's even assuming that there's no knowledge requirement.  And again, the overwhelming majority of courts have concluded there is for the reasons I just articulate.

So, your Honor, for all those reasons —— go ahead.

THE COURT:  Let me go back to the Section 11 issue and, in particular, what must be alleged.

You agree that there was no state of mind requirement. Does that mean you agree that Section 11 does not require pleading that the issuer knew or should have known the omission?

MR. POLUBINSKI:  Your Honor, I agree that Section 11 does not require the issuer to have known, and I think that there is authority for the proposition that a fact needs to be known or knowable.  The *Lin v. Interactive Brokers* case stands for that proposition.  The *Panther Partners v. Jianpu* case which the plaintiffs' site cited in their briefing also stand for that proposition.  But what I would say, your Honor, now is that for the purposes of this case, you don't need to decide

O29HLiaO

that question.  You don't need to decide whether a risk is —— that it's not known or knowable could give rise to an omission violation, and the reason for that is that there's a more basic problem with the claim here, which is there is no underlying duty to disclose.

THE COURT:  In your lead brief, though, weren't your arguments for why there was no duty to disclose really tied to your point that the omissions were not known or knowable to Tuya?

MR. POLUBINSKI:  That, your Honor, correct.  That was definitely a point that we made in our opening brief, and I think it sometimes happens in briefing like this, I think the allegations at issue, I think, become more crystalized in the course of the briefing.  So I would suggest that that is, your Honor, a basis on which, again applying the *Lin v. Interactive Brokers* case and applying the *Panther Partners* case, the Court could dismiss; that could provide an alternate basis.

I think, ultimately, fundamentally I think the simpler route to the same place is the route that was applied in the *Missfresh* case, that there's no duty to disclose.  But, again, either one of those rationales, I think, would support dismissal here.

THE COURT:  What is your view on, putting aside the duty issue, whether or not the risks here, in particular, that a large chunk of customers were engaging in the fake review

O29HLiaO

scheme and if Amazon discovered that, those customers might be delisted, or whatever the appropriate term would be, whether that was knowable, bearing in mind that the data leak made it knowable at least to the safety detectives.

MR. POLUBINSKI:  Yeah, I guess what was knowable or what safety detectives ultimately uncovered is the fact that there were some number of third-party customers — some number of third-party sellers on Amazon who were in violation of the seller's policy.  I think we could probably — again, I would respectfully suggest that whether that information is reasonably knowable to Tuya, given that it was information that I think was received or revealed as a result of a hack, I think is questionable, at best.

But I think what I do know for sure is that what was not knowable at the time was that those sellers would later be discovered by Amazon, that those sellers would later be suspended by Amazon, and that that would happen in sufficient numbers to impact Tuya's business.  That part was not knowable. That part would have required clairvoyance, which the securities laws clearly don't require.  So that is clearly not known or knowable.  Again, I think there's a good argument to be made that even the threshold hack information wouldn't have been reasonably knowable for Tuya at the time either.

THE COURT:  I guess one other question is other than, I guess, with respect to Tuya, for the other defendants, why

O29HLiaO

aren't these more arguments for affirmative defenses for due diligence?

MR. POLUBINSKI:  So, your Honor, I would say on that point, we're, obviously, not raising due diligence defenses for any of our clients.  We couldn't raise one for Tuya.  I think that, without a doubt, all of these things, I think, would make a due diligence defense quite straightforward if it were necessary.  But, again, what I would say is, for purposes of all defendants, there's no sufficiently pled omissions claim here because there's no duty to disclose.

THE COURT:  Thank you.

MR. POLUBINSKI:  Great.  Thank you, your Honor.

I think I probably honored my promise to do less than 30 minutes, so I'd be grateful if I could have just a few minutes for rebuttal.

THE COURT:  Absolutely.

MR. POLUBINSKI:  Thank you.

THE COURT:  Mr. Ellman, maybe before you begin, I'll just ask you one question, just to confirm.  You are not pursuing claims against Tiger Brokers (NZ) Limited and CMB International Capital Limit, is that right?

MR. ELLMAN:  That's correct.

THE COURT:  Great.  Thank you.

MR. ELLMAN:  Good afternoon, your Honor.

I'd like to focus on three categories of actionable

O29HLiaO

misstatements, affirmative misstatements in Tuya's registration statement, false and misleading risk disclosures in the registration statement, and Tuya's failure to disclose risks pursuant to Item 105. The main issue here is not whether defendants knew or should have known of the fake review scheme because this is a Section 11 case. It is whether Tuya's statements about customer feedback were misleading for failure to disclose a then-existing fake review scheme perpetrated by Tuya's customers and also whether Tuya adequately warned investors in the registration statement about the risk of fake review schemes in the Chinese e-commerce space.

THE COURT: This is an omissions case like Mr. Polubinski said, correct? You're not making any arguments about misstatements, are you?

MR. ELLMAN: No, your Honor, we are alleging misstatements.

THE COURT: You are. OK.

MR. ELLMAN: I will very shortly get to that.

THE COURT: Sure.

MR. ELLMAN: This risk of customers —— fake review schemes in the Chinese e-commerce space was foreseeable and known to the defendant. In fact, it wasn't a risk at all. Tuya's customers were engaged in a fake review scheme at the time of the IPO. To plead a claim under Section 11, a plaintiff need only allege a material misrepresentation, a

material omission in contravention of an affirmative legal disclosure obligation, or a material omission of information that is necessary to prevent existing disclosures from being misleading in a registration statement.

A plaintiff alleging a Section 11 claim, as is well known, need not allege scienter, reliance, or loss causation. The Supreme Court held in *Herman & MacLean v. Huddleston* that issuer liability is virtually absolute, even for innocent misstatements, and because these claim need not include allegations of fraud, this is an ordinary notice pleading case pursuant to Rule 8(a).

Defendants argue that this is a pure omissions case, and that is incorrect. Tuya misleadingly stated in the registration statements —— and I'm quoting from paragraph 132 of the amended complaint —— and I quote: "Our success depends in part on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing and potential customers and end users seek and share information."

Unbeknownst to investors, however, Tuya customers had engaged in and were then engaging in extensive pay-per-view practices designed to generate artificial positive customer feedback. We allege that in paragraph 73 of the complaint as well as paragraph 133. Thus, Tuya's success actually depended in part on their ability to generate artificially positive

customer feedback.  Tuya failed to disclose this material fact, making the statement that I just quoted from false and misleading.

THE COURT:  Why is that not an omission of the artificial part?

MR. ELLMAN:  Well, it is, but the duty to disclose, which, as Mr. Polubinski homed in on, which is really the crux of the case here, the statement itself invokes a duty to disclose.  As the Second Circuit in *Vivendi* said, "It is well-established that once a company speaks on the issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information on the issue or topic."  And that's a quote from *Vivendi*.

Here, defendants made a specific affirmative statement regarding customer feedback, thereby triggering the duty to disclose.  Tuya also made misleading risk warnings in the registration statement.  Plaintiffs allege in the registration statement defendants misleadingly warned that –– and I'm reading from paragraph 132 –– "If actions we take or changes we make to our products and services or platform upset these customers and end users, their online commentary could negatively affect our brand and reputation."

And later on in the same paragraph 132:

"Independent industry analysts often provide reviews of our products and competing products and services, which may

O29HLiaO

significantly influence the perception of our products and services.  If these reviews are negative or not as strong as reviews of our competitors' products and services, our brand may be harmed."

These purported risk disclosures conveyed the misleading impression that Tuya was faced with the risk of negative customer reviews or the inability to achieve positive customer reviews, whereas to the contrary, Tuya was actually faced with the risk of fraudulently positive customer reviews. The social media and online commentary language in these quoted statements clearly implies that end users are contemplated. Original equipment manufacturers and brands are not likely leaving customer feedback on social media.  They presumably provide formal feedback to Tuya.

And misleading risk disclosures are actionable under the law.  I'm quoting the Facebook case:  "Courts in this circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized."

Defendants argue that Tuya's disclosures regarding the risks of its customer giving negative reviews of Tuya's products could not trigger a duty to disclose risks related to reviews of Tuya's customers' products.  That's from their reply brief on page 7.  However, the difference between Tuya's products and Tuya's customers' products is not as clear as

O29HLiaO

defendants make it seem.  End users would be reviewing the complete product, and that would include Tuya's smart technology.  For example, Tuya enabled the smart technology in smart light bulbs.  A smart light bulb customer would not differentiate between Tuya and the manufacturer of the light bulb.  The end user is the reviewing the technology of the smart light bulb more so than the light bulb itself.

Also, the power by Tuya brand awareness concept is meant for end users.  Certain finished products would have a "powered by Tuya" label on them.  So those products were Tuya's as well as far as customers were concerned, and we cited this discussion in the registration statement about powered by Tuya at paragraphs 129, 130, and 151.

Just to speak a little bit more about how the powered by Tuya brand awareness campaign connected Tuya to its end users, I'll quote from paragraph 151, and I quote:

"As we expand our footprint globally, we invested substantially in developing localized marketing strategies and employing sales and support staff.  In particular, we focus on educating customers about the Powered by Tuya smart ecosystem. We raise customers' awareness that any smart device labeled with the 'Powered by Tuya' tab can interact with each other regardless of brands and product categories."

This demonstrates that end users are also Tuya's customers.  The "Powered by Tuya" label is on smart devices,

O29HLiaO

and customers know the devices contain Tuya technology.

Defendants argue that plaintiffs cite cases where the risk at issue had already transpired and therefor was known. But here, defendants argue Amazon's unprecedented crackdown on fake review schemes did not begin until after the publication of the safety captain's report, which was roughly two months after the IPO.  However, the undisclosed risk was not the Amazon crackdown but the fake review itself.  The Amazon crackdown was a consequence of the fake review scheme, which even defendants do not dispute was ongoing at the time of the IPO.

THE COURT:  The fake review scheme without the Amazon crackdown doesn't pose a risk.

MR. ELLMAN:  I mean, it is the source of any number of potential consequences that could happen.  I mean, it's material to investors to know that —— you could say that any type of illegal activity in the company, or most types, are not the risk, and that just them getting found out is the risk. But that's not what is required to be disclosed.

THE COURT:  I thought your theory was really the risk here was that Amazon would take action against these customers.

MR. ELLMAN:  No, the main risk was that fake reviews —— the real risk here is that fake reviews and a material percentage of Tuya's customers was ongoing at the time of the IPO.  Any number of potential consequences could have flowed

O29HLiaO

from that, but at its core the main risk is that the fake review practices by Tuya's customers was happening.

In fact, at the time of the IPO, the risk of fake reviews in the Chinese e-commerce industry was both foreseeable and had materialized with respect to Tuya's customers.  At the time of the IPO, 30 percent of Tuya's product sales were generated by China-based cross-border e-commerce merchants.  And product reviews are essential to the success of a merchant's business on e-commerce platforms and brands are constantly seeking out ways to get positive reviews for their products.

In the years leading up to Tuya's IPO, however, Amazon had been flooded by fake five-star reviews of products sold on its platforms.  The complaint cites a litany of facts illustrating the foreseeability of the risks to its business posed by fake Amazon reviews.  They include risks known in the Chinese e-commerce industry, as well as risks specifically known to Tuya's three cofounders, defendants in this case, who are senior executives at Alibaba, often referred to as the Amazon of China.  The complaint discusses them in detail in paragraphs 55 through 66.  I'll just cite a few examples here.

In August 2020 —— I note that the IPO was in March of 2021.  In August 2020, researchers at UCLA and USC analyzed the market for fake reviewed products at Amazon.  The paper found that "the vast majority, 84 percent" of sellers benefiting from

O29HLiaO

fake reviews were located in China.  The paper also found that fake reviews were associated with improvements in ratings and sales.  That's paragraph 63.

Paragraph 66 of the complaint, we allege:  "On February 16, 2021, one month before Tuya's IPO, the publication which found the effort to stop fake reviews was ineffective as a 'thriving industry of review manipulation businesses targeting Amazon' was evading these efforts."

In addition, Tuya's three cofounders who founded the company in 2014, were former directors and employees of Alibaba, a Chinese e-commerce platform where various fraudulent schemes proliferated, such as the sale of counterfeit goods and fake customer reviews.  Tuya's CEO Wang was a senior director at Alibaba prior to founding Tuya in 2014.  Its president was an operations director at Alibaba Cloud, and its COO Yang was responsible for launching a number of Alibaba's strategic initiatives, such as cloud e-commerce.  And importantly, Alibaba's vice president disclosed that in 2013 alone, the year before Tuya was founded and while Wang was a senior director of Alibaba, his conservative estimate was that 1.2 million sellers on Alibaba's main shopping site had faked 500 million transactions.

THE COURT:  What do you ask me to infer from that, the fact that Tuya's founders had come from Alibaba?  You're asking for me to infer knowledge of the scheme?

O29HLiaO

MR. ELLMAN:  The foreseeability of the risk in this industry.  I think these facts, all taken together, show that it was foreseeable that in the China e-commerce space there was a risk that was known that fake review practices proliferated on those platforms.

I also would like to note that defendants waived any argument at the pleading stage challenging the misleading nature of these risk disclosures.  Defendants did not challenge plaintiffs' allegations concerning Tuya's misleading risk disclosures regarding customer reviews in their motion to dismiss and have therefore conceded them at this stage. Defendants only point to the following risk disclosure.  This is on page 4 of their motion to dismiss:  "The loss of any major customer or significant decrease in the volume of customer demand or the price at which we sell our products to customers could materially adversely affect our financial condition and results of operations."

This is mere boilerplate, and it is not the relevant then-existing risk, which was fraudulent customer reviews. Plaintiffs raise these allegations very clearly in the complaint, paragraphs 132 and 133, and also your Honor's recent case *Lozada v. TaskUs*, 2024 WL 68571, at \*12, stands for the same proposition regarding waiver.

In addition, defendants argue in their briefing that they had no connection — I'm sorry, they argue that their

customers are far removed from Tuya.  They intimate that the fake review scheme's carried out by Tuya's customers' customers.  Yet defendants themselves stated that Tuya's customers were negatively impacted by the Amazon ban.  We cite the complaint, paragraphs 90, 91, 104, 110.  Defendants describe these affected customers as Tuya's customers, and that suffices at the pleading stage.

At this point I would like to talk about this legal issue about whether plaintiffs have to plead that facts were known or knowable.

Section 11, plaintiffs are not required to plead that defendants could have known or should have known of their customers' fake review practices.  This is what strict liability under Section 11 is about.  Defendants misstate the standard for Section 11 liability for issuers of securities. Under Section 11, issuer liability is, as I quoted before, "virtually absolute, even for innocent misstatements," *the Herman & MacLean* Supreme Court case.

Defendants attempt to blur the distinction between Tuya and the other defendants.  They state, and this is quoting from their motion to dismiss at 11:  "A cognizable Section 11 claim exists only when the allegedly undisclosed information both existed and was known or knowable to the issuer at the time of the offering."

THE COURT:  And that's the standard you're endorsing

O29HLiaO

here, unknowable?

MR. ELLMAN:  It does not have to be knowable.

THE COURT:  It doesn't even have to be knowable?

MR. ELLMAN:  No, and the *Missfresh* case which defendants brought to the Court's attention last week is instructive on this point.  In that case, Judge Rakoff held:

"While there were some district court opinions that suggest a defendant must have at least known or had reason to believe a challenged statement was untrue.  Properly understood, these cases do not establish a requirement that a Securities Act plaintiff plead any form of knowledge.  Rather, as Judge Abrams recently explained, these cases turned on whether plaintiffs alleged that a defendant could have known of an alleged misstatement or omission, i.e., whether the relevant event had already transpired at the time of the offering."

So the question is, was the undisclosed fact in existence at the time of the IPO?  Here, the undisclosed fact was the fake review practices of a substantial number of Tuya's customers, and as safety detectives found out prior to the IPO, it absolutely existed at the time of the IPO.

To quote from the *Hutchison v. CBRE Realty Finance* case:  "Under current prevailing law, securities issuers do appear to be subject to strict liability with regard to material misstatements and omissions, regardless of whether the material omitted facts were known or knowable or not."

O29HLiaO

THE COURT:  Mr. Ellman, you do agree that the undisclosed facts must at least be knowable, correct?

MR. ELLMAN:  Well, knowable in the sense that they exist at the time of the IPO.

THE COURT:  Well, a fact could exist but not necessarily be knowable to anyone other than the maybe one person who knows that fact.  For example, if there were not the data leak here and safety detectives learned about the fake review scheme, would it be knowable?

MR. ELLMAN:  Yes, your Honor, because I think the policy behind Section 11 and why Congress passed this statute to not have a knowledge requirement, it's that as between the issuer and the investors, the onus is on the issuer to find out facts that pertain to the statements that they make in their offering statements.  The question is, was there a duty to disclose if there was no positive affirmative statements in the registration statement on this issue of Tuya's customer feedback and the importance of it?  They say their success depends in part on it.  Maybe then they wouldn't —— the "knowable" terminology may apply, and maybe it would be a different issue.  But here, they made up an affirmative statement, and the securities laws impose a duty on Tuya to investigate as to whether there were facts, there were fake reviews going on.  They talked about the importance to their success of customer reviews.  And they had a duty to

O29HLiaO

investigate that, and it shouldn't be on investors to bear the brunt of that when safety detectives ultimately found out about it, and it was disclosed months after.

In addition, defendants violated Item 105 by failing to disclose the risks to Tuya's sales revenue and prospects of its customers ongoing systematic practice of violating Amazon's policies prohibiting fake review.  Several courts in the Second Circuit, district courts in the Second Circuit, have held that Item 105 does not have a knowledge requirement.

THE COURT:  But then how can you read the rest of Item 105?  How is it possible to concisely explain how a risk affects the registrant or the securities being offered if that risk is not known?  The various provisions in Item 105 just don't make sense if there isn't a knowledge requirement.

MR. ELLMAN:  Well, it could be a question of whether there is an actual knowledge requirement as opposed to a foreseeability requirement.  And as I mentioned earlier, the risk of fake review schemes was known by Tuya, including its three cofounders who previously worked at Alibaba immediately prior to founding Tuya in 2014, as well as the industry publications that reported on the proliferation of fake reviews in the Chinese e-commerce space.

THE COURT:  But there's no allegation that any of Tuya's customers were implicated or mentioned in any of those news reports or even involved with the Alibaba fake review

O29HLiaO

scheme, to the extent that's alleged.

MR. ELLMAN:  That's correct.

THE COURT:  Are you also proceeding under Item 303 still?

MR. ELLMAN:  Yes, we are.  We believe that the knowledge requirement of Item 303 is met by the reports in the —— within the industry about proliferation of the fake reviews.

THE COURT:  And Item 303 is an actual knowledge requirement, right?  I think the Second Circuit has said that in the *Indiana Public Retirement System*.

MR. ELLMAN:  Yes, that is not as strong an argument as the 105.

THE COURT:  Yes.

MR. ELLMAN:  Also mentioned that the omitted information was material.  Defendants do not challenge the materiality of the allegedly omitted information, except on the grounds that it was already purportedly disclosed to the market, but we address that —— we argued the seemingly truth-on-the-market argument fails.  We briefed that in our opposition at page 16 to 18.

But just to say that the omitted facts concerning Tuya's customers' fake review practices were material because the Chinese e-commerce business was material to Tuya.  Indeed, 30 percent of devices powered by Tuya were sold by China-based cross-border e-commerce merchants, and the loss of the affected

customers impacted Tuya's second half 2021 revenues by a substantial 10 percent.  Also, analysts lowered their forecasts based on the impact that Tuya's customers' Amazon ban had on the company.  And of course, when defendants disclosed the impact of the Amazon ban on Tuya's business in August of 2021, this caused Tuya's stock price to fall over 30 percent over two trading days, which shows the materiality of the information.

I have nothing further unless —

THE COURT:  Let me just ask you a couple of questions to make sure I didn't miss anything.

I don't see a response in our opposition brief to the defendants' argument regarding NPS, the net promoter score, I think that stands for.  I assume you're not pursuing that theory for Section 11 liability in light of the arguments made on that front?

MR. ELLMAN:  That's correct, your Honor.

THE COURT:  What about the Section 15 claim against defendant Immelt?  Are you pursuing a Section 11 claim against that individual, because I didn't see — and I apologize if I missed it — but I didn't see any arguments responding to the defendants' argument that the complaint did not allege sufficient facts to establish that individual's control.

MR. ELLMAN:  We respond to that point on page 25 of our opposition in footnote 16.

THE COURT:  I see.  Let me see here.

O29HLiaO

MR. ELLMAN:  We argued that whether a person is ——
this is a quote from *In re Scottish Re Group*:  "Whether a
person is controlling person is a fact-intensive inquiry and
generally should not be resolved in a motion to dismiss."

THE COURT:  Thank you very much.

MR. ELLMAN:  Thank you.

MR. POLUBINSKI:  Your Honor, if I may, just a few
additional points.

THE COURT:  You may, please.

MR. POLUBINSKI:  Great.  Thank you.

So, your Honor, maybe to start with that last point,
the more administrative one about Mr. Immelt, the argument that
we made was that plaintiffs had not sufficiently alleged that
Mr. Immelt controlled any of the primary violators.  That was
for purposes of the control person claim.  But the arguments as
to Mr. Immelt and to everybody else are the same for
Section 11.

In terms of some of the points that Mr. Ellman made,
I'll just try to cover a couple of them quickly, in addition to
any questions your Honor might have.  The first that I'd like
to address is that Mr. Ellman suggested that information
doesn't need to even be knowable in order to trigger a duty to
disclose for purposes of Section 11.  Respectfully suggest
that's inconsistent with the case law here.  It also would end
up making issuers insurers against any possible losses, even

O29HLiaO

unknowable losses that arise from losses in value of their securities.

THE COURT:  It does get tricky, though, the question of knowable to whom, right?  The fake review scheme obviously was knowable to the people engaged in the fake review scheme. It was knowable to safety detectives, but only because there was a data leak.  So there was some degree of illicit conduct involved there.

To whom must it be knowable?

MR. POLUBINSKI:  Your Honor, what I would say on that is two things:  The first is the question is whether it is reasonably knowable to the issuer, and here, for all of the reasons we discussed both in our briefs and in the argument, this information was not reasonably knowable to Tuya, even if safety detectives happened to discover it by virtue of hacked or stolen information, essentially.

But the other point I'd make is a more basic one, which is, again, that's an issue that doesn't actually need to be addressed or decided for purposes of this motion, and the reason for that is the plaintiffs have failed to allege a duty to disclose.  And on that point, I confess I didn't understand, I still don't understand, the plaintiffs to be alleging that there is any actual misstatement in the registration statement. My understanding, at least of the way Mr. Ellman described it, is what he's alleging and what plaintiffs are alleging is an

omission, but none of the statements at issue there are actually misleading by omission.

We could walk through the paragraphs if you wish.  I think that they're fairly clear that they're talking about customers — "they," meaning Tuya — are talking about customers, not end users most of the time.  But I think we can also cut through it more easily than that just by looking at what the standard is for alleging a material omission.

Responding specifically to the *Vivendi* language that Mr. Ellman quoted, *Missfresh* includes a helpful discussion on that at page *10 of the opinion.  The Court wrote:  "While it is often suggested that once a company speaks on an issue or topic, there's a duty to tell the whole truth, the mere reference to a topic does not require disclosure of the entire corpus of the company's knowledge relating to it."  That's quoting from the *Morgan Stanley* case in the Second Circuit from 2010.

Respectfully, I'd suggest that that's what plaintiffs are requiring here.  That's what they're suggesting, is that because Tuya has spoken about its deep customer relationships that suddenly everything about its customers needs to be disclosed.  That's not the standard.  And what the standard is is, again, what I quoted from *Missfresh* before, which is that the question is whether — I'm going to try to get the exact language right — whether an affirmative statement misleadingly

O29HLiaO

suggested that the subsequently identified information did not exist.  And respectfully again, the plaintiffs have not sufficiently alleged that here.

Finally, I think on Item 105, which sounds like it's the one remaining Regulation S-K violation that the plaintiffs are pursuing here, the question is whether there was a risk disclosed.  For all of the reasons that we discussed previously, it's hard to read that regulation without importing a knowledge requirement the way that the circuit courts have done and the overwhelming majority of the courts have, and there was clearly no knowledge here.  Knowledge of generalized —— in general press about the fact that there are fake reviews out there in general, not specifically tied to Tuya's customers, is insufficient to allege any risk that needed to be disclosed on Tuya's part.

So unless your Honor has any further questions, again, we respectfully ask that the motion be granted and the case dismissed with prejudice.

THE COURT:  Thank you.  Thank you all for excellent argument and briefing and addressing my questions.

Can I assume the parties will request a transcript of today's proceeding?

MR. POLUBINSKI:  Please.

THE COURT:  Great.  So I'll ask you to please order that after the proceeding so we have the transcript, and I hope

O29HLiaO

to issue the decision in the near future after I get to review that transcript one more time.

Are there any other matters we should address?

Anything further from the plaintiffs, Mr. Ellman?

MR. ELLMAN:  No, your Honor.

THE COURT:  And Mr. Polubinski or Mr. Weiner, anything from the defendants?

MR. POLUBINSKI:  Nothing from us, your Honor.  Thank you.

MR. WEINER:  Nothing from us.

THE COURT:  Thank you.  I hope everyone has a good weekend.  Take care.

(Adjourned)