UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
XIAOMENG LIAN, *individually and on behalf of all*                 :
*others similarly situated*,                                        :
                                                                   :
                                        Plaintiff,                 :
                                                                   :
                    -v-                                             :        22 Civ. 6792 (JPC)
                                                                   :
TUYA INC., *et al.*,                                               :        OPINION AND ORDER
                                                                   :
                                        Defendants.                :
                                                                   :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Lead Plaintiffs Kyle Nelson and Jiyi Qiu, along with Plaintiff Xiaomeng Lian (collectively, "Plaintiffs"), bring this action alleging violations of the Securities Act of 1933 (the "Securities Act") in connection with Defendant Tuya, Inc.'s ("Tuya" or the "Company") March 2021 initial public offering ("IPO") of American Depositary Shares ("ADSs"). Plaintiffs allege that Tuya violated Section 11 of the Securities Act, 15 U.S.C. § 77k, along with two classes of Defendants: (1) various individuals involved in the IPO, namely, Xueji (Jerry) Wang, Liaohan (Leo) Chen, Yi (Alex) Yang, Yao (Jessie) Liu, Scott Sandell, Carmen Chang, Jeff Immelt, Qing Gao, and Jing Hong (collectively, the "Individual Defendants"); and (2) three of the IPO's underwriters, namely, Morgan Stanley & Co., LLC ("Morgan Stanley"), BofA Securities, Inc. ("BofA"), and China International Capital Corporation Hong Kong Securities Limited ("CICC") (collectively, the "Underwriter Defendants"). Plaintiffs also bring claims under Section 15 of the Securities Act, 15 U.S.C. § 77o, for control person liability against the Individual Defendants.

Pending before the Court is a motion to dismiss the Amended Complaint, in which all Defendants join.  For the reasons that follow, the Court grants the motion in part and denies it in part.

## I.  Background

### A.  Facts[1]

#### 1.  Tuya and the Fake Review Scheme

Tuya is a China-based company founded in 2014 by Wang, Chen, and Yang.  Dkt. 56 ("Am. Compl.") ¶¶ 3, 44.  At the time of the IPO, Wang was Tuya's Chief Executive Officer, Chen served as the Company's President, and Yang was its Chief Operation Officer.  *Id.* ¶¶ 29-31.  All three had previously worked at Alibaba, a Chinese e-commerce platform.  *Id.* ¶¶ 3, 29-31.  Tuya "is incorporated in the Cayman Islands and headquartered in Zhejiang Province, China"; it also operates in the United States, India, Germany, and Japan.  *Id.* ¶¶ 28, 44.  As alleged in the Amended Complaint, "Tuya's business is centered around its Tuya [Internet of Things ('IoT')] Cloud platform."  *Id.* ¶ 45.  Tuya's "core business"—from which the "vast majority of [its] revenue is derived"—is Platform-as-a-Service ("PaaS").  *Id.* ¶¶ 2, 45, 47.  "The Company's proprietary products and services enable so-called 'smart devices,' *e.g.*, household items and appliances connected to the internet, to communicate and interact with end users and online information and services."  *Id.* ¶ 45.  Tuya's customers, which include brands, original equipment manufacturers,

---

[1] Except where expressly noted otherwise, the following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint and the documents incorporated therein by reference.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that on a motion to dismiss courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

industry operators, and system integrators, span the "smart home, smart business, healthcare, education and agriculture" industries.  *Id.* ¶ 46.  Consequently, "Tuya's IoT PaaS is deployed in a wide variety of smart products, including Bluetooth handsets, home appliances, kitchen appliances, lighting, security cameras, scooters, watches, and sports and health products such as treadmills and rowing machines."  *Id.* ¶ 48.  Tuya charges these customers "a one-time fee per 'deployment,'" which "refers to one device on which Tuya's IoT PaaS is deployed."  *Id.* ¶ 47.[2]

The Amended Complaint alleges that a "material percentage" of Tuya's customers use e-commerce platforms to sell their wares.  *Id.* ¶ 52.  In 2021, the year of the IPO, "30% of devices powered by Tuya were sold by Chinese cross-border e-commerce merchants."  *Id.*  Plaintiffs allege that customer reviews of products are generally "crucial to the success of a merchant's business" on e-commerce platforms, pointing to articles and academic studies supporting this proposition. *Id.* ¶ 53.  Plaintiffs also extensively describe the proliferation of fraudulent customer review-related practices on e-commerce platforms, including a technique called "brushing" that started on Chinese e-commerce websites as early as 2013.  *Id.* ¶ 56.  "Brushing consists of third-party sellers on e-commerce websites duplicating the accounts of actual customers and using their names and addresses to send them products that they did not actually buy; the sellers then use the fake accounts to write positive reviews."  *Id.*; *see id.* ("Often the 'brushers' send cheap, lightweight items that cost less to ship as opposed to the products for which they write the fake reviews."). The Amended Complaint cites news articles and academic studies documenting the occurrence of this practice on Chinese e-commerce platforms.  *Id.* ¶¶ 57-58.

---

[2] As alleged, in 2020, Tuya's IoT PaaS segment comprised 84% of its revenue, its smart device distribution comprised 12% of its revenue, and its Software-as-a-Service and other offerings comprised 3.4% of its revenue.  Am. Compl. ¶¶ 47, 50, 51.

Plaintiffs allege that these practices were initially not as prevalent on e-commerce platforms commonly used in the United States, like Amazon, but the practice eventually emerged. *Id.* ¶ 8. Amazon banned "incentivized reviews" in October 2016; prior to that, sellers on Amazon could "provide free or heavily discounted products to customers in exchange for product reviews, as long as the reviewer disclosed that they received the product for free or at a discount." *Id.* ¶ 54. Nevertheless, even after the ban, "Amazon merchants found workarounds," including brushing.[3] *Id.* ¶ 55. Plaintiffs cite news reports on an uptick in falsified reviews on Amazon by 2019 and further allege that Amazon merchants' use of these practices accelerated after the onset of the COVID-19 pandemic in 2020. *Id.* ¶¶ 60-62. News reports indicate that these practices were especially common among merchants based in China. *Id.* ¶¶ 63-64.

On May 6, 2021, a cybersecurity organization named Safety Detectives published a report (the "Safety Detectives Report") that uncovered a widescale fake review scheme "potentially implicating more than 200,000 people" based on the organization's gaining access to "a data server likely located in China." *Id.* ¶ 78. The report did not identify any particular vendors. *Id.* "In the ensuing days, Amazon suspended the accounts of numerous major Chinese merchants, including significant customers of Tuya." *Id.* ¶ 79; *see id.* ¶¶ 82-85. By September 2021, Amazon had banned 600 Chinese brands, causing an estimated $15.4 billion of losses to Chinese cross-border e-commerce businesses. *Id.* ¶ 17. Based partly on the fact that several Tuya customers' products had "suddenly become unavailable on Amazon" shortly after the publication of the Safety Detectives Report, Plaintiffs surmise that "a material percentage of [Tuya's] e-commerce

---

[3] Another "workaround" was for sellers on Amazon to offer rebates for positive reviews. Am. Compl. ¶ 55. "In April 2018, Amazon deactivated a number of accounts for customers that were allegedly using the platform for improper commercial purposes, such as accepting rebates in exchange for positive reviews." *Id.* ¶ 59.

customers were engaged in fake review practices in violation of Amazon's policies" at the time of the March 2021 IPO (hereinafter the "Fake Review Scheme"). *Id.* ¶¶ 11, 79; *accord id.* ¶ 131.

### 2. The IPO

Tuya initially offered 43.6 million ADSs for sale at a price of $21 per ADS in its March 2021 IPO. *Id.* ¶ 77.[4] Each ADS is equivalent to "one Class A ordinary share of the Company." *Id.* ¶ 28. Tuya filed a registration statement on a Form F-1[5] on February 26, 2021 (the "February 26, 2021 F-1"). *Id.* ¶ 67.[6] The Company amended the form twice—on March 12 and 16, 2021 (the "March 12, 2021 F-1" and "March 16, 2021 F-1")—and the Form was declared effective on March 17, 2021. *Id.* The Company filed a Prospectus on March 19, 2021. *Id.* These documents collectively comprise the "Registration Statement." *Id.* at 3 n.3. "Tuya raised $946.6 million in gross proceeds in its IPO, which was the largest IPO of a Chinese technology company to list in the [United States] that year." *Id.* ¶ 77.

The Amended Complaint details the involvement of each of the named Individual Defendants in Tuya around the time of the IPO, in addition to the three founders mentioned above. Liu became Tuya's Chief Financial Officer in May 2019 and was named as a director "immediately upon the effectiveness of the Company's Registration Statement." *Id.* ¶ 32. Like Liu, Immelt, Gao, and Hong also became directors of Tuya after the Registration Statement was declared

---

[4] The Amended Complaint also alleges: "On April 20, 2021, the Underwriter Defendants exercised their over-allotment option to purchase an additional 1,486,479 ADSs at the price of $21 per ADS." Am. Compl. ¶ 77.

[5] A Form F-1 is used to register under the Securities Act securities of a foreign private issuer, as defined by 17 C.F.R. § 230.405, when no other form is authorized or prescribed. *See* https://www.sec.gov/files/2017-03/formf-1.pdf (last visited Mar. 3, 2024).

[6] Complete versions of the Company's Securities and Exchange Commission ("SEC") filings can be accessed by searching for Tuya in the SEC's filings database, available at https://www.sec.gov/edgar/search/. Each filing discussed herein is incorporated by reference into the Amended Complaint and is subject to judicial notice. *See ATSI Commc'ns*, 493 F.3d at 98.

effective.  *Id.* ¶¶ 35-37.  Gao had additionally "served as an observer on Tuya's Board of Directors since August 2017."  *Id.* ¶ 36.  Sandell was a director of the Company from December 2014 to August 2017 and again from April 2018 onward.  *Id.* ¶ 33.  Chang had been a Tuya director since December 2014.  *Id.* ¶ 34.  Several investment banks also served as underwriters for the IPO, three of which are named as Defendants: Morgan Stanley, BofA, and CICC, *i.e.*, the Underwriter Defendants.  *See id.* ¶¶ 39-43.

Broadly speaking, Plaintiffs fault Tuya's Registration Statement for failing to disclose the Fake Review Scheme.  As the Amended Complaint summarizes,

> Tuya touted its sales and marketing efforts, its deep relationships with its customers, and its ability to gain new customers and increase adoption of its products and services, but did not disclose that a material percentage of its e-commerce customers were engaged in fake review practices in violation of Amazon's policies, and as such, there was a substantial risk that Amazon would ban these customers and cause significant harm to Tuya's sales and prospects.

*Id.* ¶ 11.  Lead Plaintiffs argue that the "failure to disclose these facts rendered false and misleading the following categories of statements in Tuya's Registration Statement":

> (1) statements touting Tuya's deep relationships with its customers ([Am. Compl.] ¶¶ 125-127, 129, 149); (2) statements discussing Tuya's ability to gain new customers and increase adoption of its products and services ([*id.*] ¶¶ 138, 144); (3) statements attributing Tuya's success to reasons other than its customers' fake-review practices ([*id.*] ¶¶ 125, 127, 129, 140, 142, 144, 146-147); (4) statements touting Tuya's sales and marketing efforts ([*id.*] ¶¶ 151, 153); and (5) purported risk warnings describing potential risks of receiving negative reviews of its products and not receiving sufficiently positive reviews of its products ([*id.*] ¶ 132).

Dkt. 66 ("Opposition") at 11-12.

### 3.  Fallout

Tuya's fiscal condition deteriorated after the release of the May 2021 Safety Detectives Report and the ensuing Amazon bans.  In an August 18, 2021 press release, Tuya disclosed financial results reflecting losses in the second quarter of 2021, as well as an outlook for the third

quarter that allegedly "disappointed analysts." Am. Compl. ¶ 88.[7] Liu commented on an earnings call held the same day that the Company's "customers face a series of challenges, including Amazon's strict execution of seller policy," which Plaintiffs contend was a reference to Amazon's having "banned cross-border e-commerce stores." *Id.* ¶ 90. Tuya's ADS price, which had closed at $15.00 per ADS on August 17, 2021, dropped to $10.41 over the following two days. *Id.* ¶ 16; https://www.nasdaq.com/market-activity/stocks/tuya/historical.[8]

This trend continued in subsequent months. Plaintiffs characterize the Company's third quarter of 2021 financial results as "disappointing" and allege that Tuya "cit[ed] the impact of 'Amazon store closures'" in announcing those results. Am. Compl. ¶ 18. The Company's fourth quarter of 2021 and first quarter of 2022 results reflected much the same. *Id.* ¶¶ 19, 21. By June 15, 2022, Tuya's ADS price had fallen to $2.42 per share. *Id.* ¶ 21. Plaintiffs allege that "Tuya's ADSs never recovered." *Id.*

### 4. Class Allegations

Plaintiffs bring this action on behalf of a purported class "consisting of all individuals and entities that purchased or acquired Tuya ADSs pursuant and/or traceable to the Company's false and misleading IPO Registration Statement." *Id.* ¶ 155. Lead Plaintiffs Nelson and Qiu both allege

---

[7] The August 18, 2021 press release disclosed:

(1) Tuya's loss from operations was $41.5 million for the quarter, compared to a loss of $15.6 million for the same period of 2020; (2) net loss was $38.1 million for the quarter, compared to $14.7 million in the same period of 2020; (3) net margin was negative 45% for the quarter, compared to negative 38% for the same period of 2020; and (4) operating margin was negative 49% for the quarter, compared to 40.1% for the same period of 2020.

Am. Compl. ¶ 88. The press release further stated that the Company expected its revenue for the third quarter of 2021 "to be in a range of just $83 million to $86 million." *Id.*

[8] The Court "may take judicial notice of well-publicized stock prices." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

that they "purchased or acquired Tuya ADSs pursuant or traceable to the Company's Registration Statement issued in connection with the Company's IPO, and [were] damaged thereby."  *Id.* ¶¶ 26-27.  Nelson bought 25,000 Tuya ADSs between March 18, 2021 and April 21, 2022 for $265,379.87, Dkt. 32-3 at 2 (summary chart prepared by counsel); Dkt. 32-2 at 2-3 (Nelson certification), and Qiu bought 31,560 Tuya ADSs between March 18, 2021 and October 29, 2021 for $369,737.85, Dkt. 32-3 at 2 (summary chart prepared by counsel); Dkt. 32-2 at 4-5 (Qiu certification).

### B. Procedural History

Lian filed the original Complaint in this action on August 9, 2022.  Dkt. 1.  The Court appointed Nelson and Qiu as Lead Plaintiffs on December 22, 2022.  Dkt. 45.  Plaintiffs then filed the Amended Complaint on March 2, 2023.  Their first cause of action alleges a violation of Section 11 of the Securities Act against all Defendants, Am. Compl. ¶¶ 162-170, and their second cause of action alleges a violation of Section 15 of the Securities Act against the Individual Defendants, *id.* ¶¶ 171-178.  Defendants Tuya, Sandell, Chang, Immelt, Morgan Stanley, and BofA filed the instant motion to dismiss on May 1, 2023.  Dkts. 63, 64 ("Motion").  Defendants CICC, Liu, Gao, Hong, Wang, and Chen all subsequently joined in this motion.  Dkts. 84 (CICC), 92 (Liu), 103 (Gao & Hong), 114 (Wang & Chen).  Lead Plaintiffs filed their opposition on June 30, 2023, Dkt. 66, and Defendants replied on August 14, 2023, Dkt. 85 ("Reply").[9]

The Court held oral argument on the motion on February 9, 2024.  Dkt. 120 ("Tr.").

---

[9] CICC originally brought a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), Dkt. 84, but later withdrew that motion, Dkt. 117.

## II.  Standard of Review

Defendants' collectively challenge Plaintiffs' Section 11 claim under Federal Rule of Civil Procedure 12(b)(6).  To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* These "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

## III.  Discussion

"Section 11 [of the Securities Act of 1933] imposes strict liability on issuers and signatories, and negligence liability on underwriters, '[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.* ("*Ikanos*"), 681 F.3d 114, 120 (2d Cir. 2012) (quoting 15 U.S.C. § 77k(a)) (second alteration in original).  "Th[is] provision[] place[s] a relatively minimal burden on a plaintiff." *Id.* (internal quotation marks omitted).  "Neither scienter, reliance, nor loss causation is an element of" a Section 11 claim, nor

do the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to non-fraud claims. *Id.*[10]

Defendants' motion to dismiss in large part concerns the disclosure duties on which Plaintiffs' allegations are predicated.  Section 11 provides "three bases for liability . . . (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Lozada v. TaskUs, Inc.*, No. 22 Civ. 1479 (JPC), 2024 WL 68571, at *10 (S.D.N.Y. Jan. 5, 2024) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011)).  Broadly speaking, the Court discerns that the Amended Complaint alleges two sources of Tuya's obligation to disclose the Fake Review Scheme: (1) two SEC regulations and (2) five categories of statements in the Registration Statement.  *See* Opposition at 11-12 (describing the five categories of statements for which Plaintiffs allege material omissions), 21-23 (discussing legal disclosure obligations under Items 105 and 303 of SEC Regulation S-K).[11]  The Court will discuss each in turn.

---

[10] To that end, "[i]n the Second Circuit, when 'the wording and imputations of the complaint are classically associated with fraud,' Plaintiffs must meet the pleading standard of Rule 9(b)." *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 567 (S.D.N.Y. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004)).  Defendants do not appear to argue that Rule 9(b) should apply, and the Court agrees.  While Plaintiffs' decision to "disclaim[] fraud does not [automatically] preclude the applicability of . . . Rule 9(b)," *id.*, the Amended Complaint's allegations do not appear to sound in fraud; indeed, and as discussed below, much of the parties' disagreement with regard to Defendants' motion to dismiss concerns an issuer's obligations to disclose items of which it was not aware.  *Cf. Rombach*, 355 F.3d at 178 (determining that claims concerning "the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus" sounded in negligence); *see also* Am. Compl. ¶ 164 ("This claim does not allege, and does not intend to allege, fraud or fraudulent intent . . . .  This claim is based solely on strict liability and negligence.").  Rule 9(b)'s heightened pleading requirements therefore do not apply.

[11] Lead Plaintiffs and Defendants disagreed at oral argument over whether this is a "pure omissions" case, but they appeared to use the term slightly differently.  Defendants argued that

### A. Legal Disclosure Obligations

Plaintiffs allege that Defendants' disclosures ran afoul of two regulations promulgated by the SEC, which are known as Item 303 and Item 105.

#### 1. Item 303

"Item 303 of Regulation S-K imposes disclosure requirements on companies filing SEC-mandated reports," including registration statements. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *see Litwin*, 634 F.3d at 716 (applying Item 303 to registration statements). The regulation in relevant part requires registrants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Plaintiffs allege that the Fake Review Scheme was a "known trend[] or

---

Plaintiffs' case is a "pure omissions case . . . [because] [P]laintiffs do not allege that anything in Tuya's registration statement was affirmatively false." Tr. at 4:25-5:3. Lead Plaintiffs, however, asserted that Defendants were incorrect to "argue that this is a pure omissions case" and generally pointed to the Amended Complaint's allegations concerning specific statements in the Registration Statement. *Id.* at 19:12-20:13; *see also id.* at 29:21-24 ("[H]ere, [Tuya] made [] an affirmative statement, and the securities laws impose a duty on Tuya to investigate as to whether there were . . . fake reviews going on."). This case may just be the latest to demonstrate that drawing a sharp line between misrepresentations and omissions is no easy task. As the Second Circuit has noted in the class certification context, "the labels 'misrepresentation' and 'omission' [can be] of little help because in many instances, an omission to state a material fact relates back to an earlier statement, and if it is reasonable to think that that prior statement still stands, then the omission may also be termed a misrepresentation." *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017) (internal quotation marks omitted). In any case, whether framed as a misrepresentation or an omission, there can be little doubt that—apart from the two SEC regulations—the Amended Complaint's allegations derive Tuya's duty to disclose from the Company's statements in the Registration Statement. Indeed, Defendants' argument that "[t]he federal securities laws 'do not create an affirmative duty to disclose any and all material information,'" *Chen v. Missfresh Ltd.*, No. 22 Civ. 9836 (JSR), 2023 WL 7289750, at *10 (S.D.N.Y. Nov. 6, 2023) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)), is still only availing if they can show that the two SEC regulations and the statements in the Registration Statement that Plaintiffs cite in the Amended Complaint do not create a duty to disclose. *See* Tr. at 5:25-6:2. The parties thus appear much closer in their respective understandings of the Amended Complaint than their arguments might suggest.

uncertaint[y] likely to have a material unfavorable impact on Tuya's business, sales, revenues, and prospects," Am. Compl. ¶ 121, and consequently, Tuya's failure to disclose it in the Registration Statement "violated Item 303[,] . . . [since] Tuya knew or should have known of [the Fake Review Scheme]," *id.* ¶ 134.

The central question with respect to this aspect of Plaintiffs' claims is whether the Fake Review Scheme was a *known* trend or uncertainty, as expressly required by Item 303. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC. It is not enough that it should have known of the existing trend, event, or uncertainty."). This "require[s] allegations of specific facts from which [a court] could draw the 'plausible inference' that defendants had actual knowledge of the trends or uncertainties at the time the registration statement was issued." *Medina v. Tremor Video, Inc.*, 640 F. App'x 45, 48 (2d Cir. 2016) (citing, *inter alia*, *Ikanos*, 681 F.3d at 121).

Lead Plaintiffs argue that they "satisfy the knowledge requirement of Item 303 based on the [Amended Complaint]'s allegations of public reports of fake-news practices among e-commerce companies, especially those based in China." Opposition at 22. To support this theory, the Amended Complaint mentions a smattering of news articles and studies that detailed the prevalence of fake reviews on e-commerce platforms, including a 2015 *Wall Street Journal* article that reported on hundreds of millions of fake transactions on a Chinese e-commerce site, a 2020 research paper that "found that . . . 84% of sellers benefitting from fake reviews were located in China," and a 2020 *Financial Times* article that "stated that Amazon had delete[d] 20,000 reviews after evidence of profits for posts . . . [where] overwhelmingly, those products were from little-known Chinese brands." Am. Compl. ¶¶ 57, 63, 64. The Amended Complaint alleges that a

12

combination of Tuya's "'close relationship' with its brand customers"—as the Company touted in its Registration Statement—and the fact that "about 30% of sales powered by Tuya devices in 2021 were generated by its China-based cross-border e-commerce brand customers" lead to the inference that Tuya knew of the Fake Review Scheme. *Id.* ¶ 121.

The Court disagrees. The public report-based allegations in the Amended Complaint fall short of establishing a violation of Item 303. In *Ikanos*, for instance, the Second Circuit held that the plaintiffs had sufficiently alleged actual knowledge for Item 303 purposes where, *inter alia*, the defendant had "receiv[ed] an increasing number of calls [about the defects in question] from . . . customers [who] accounted for 72% of [the defendant's] revenues." *Ikanos*, 681 F.3d at 121. The Circuit later distinguished *Ikanos* in *Medina*. There, while the public records at issue may have shown the existence of the trend in question, the plaintiffs "offer[ed] no similar specific factual allegations" to support actual knowledge. *Medina*, 640 F. App'x at 48-49. The fact that a defendant either received or was required to receive targeted communication about the alleged trend or uncertainty also can create a plausible inference of actual knowledge. *See Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 486 (2d Cir. 2011) ("[B]ecause the Intercreditor Agreement required Freemont to disclose potential default events to CBRE, a plausible inference may be drawn that CBRE was aware of the cost overruns and was thereby aware of an existing trend, event or uncertainty under Item 303."); *see also Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 644 (S.D.N.Y. 2017) ("The Deloitte news alert was a targeted e-mail sent to the Defendants that would have informed them about the [relevant] tax change.").

Plaintiffs' allegations pale in comparison to those at issue in *Ikanos*; indeed, they appear even weaker than those the Second Circuit found insufficient in *Medina*. In *Medina*, where the alleged omission involved the failure to disclose that two television networks had not yet

purchased upfront advertisements, the public information concerned those very two networks.  *See Medina*, 640 F. App'x at 48 ("[P]laintiffs allege that publicly available information made it 'apparent' that two out of five major television networks, as of the date of defendants' Registration Statement, were two weeks later in closing their upfronts than they had been the prior year."); *Medina v. Tremor Video, Inc.*, No. 13 Civ. 8364 (PAC), 2015 WL 1000011, at *1 (S.D.N.Y. Mar. 5, 2015) ("Plaintiffs' claims focus [in part] on . . . [the fact] that two television networks— NBCUniversal and ABC—had not yet purchased their upfront advertisements by Defendants' IPO and were, therefore, two weeks behind their 2012 purchasing schedule . . . .").  The allegations in *Ikanos* similarly specifically concerned the defendant's own customers and actual communications received directly by the defendant.  Here, by contrast, at no point do Plaintiffs link the public reports with any specific Tuya customers; the reports variously concern the widespread nature of fake reviews perpetrated by Chinese companies on both Chinese e-commerce platforms and Amazon, but the Amended Complaint does not allege that any Tuya customers were reported to have been involved.  *See* Am. Compl. ¶¶ 57-58 (widespread practice in China); *id.* ¶¶ 59-62, 65- 66 (widespread on Amazon); *id.* ¶¶ 63-64 (widespread on Amazon by Chinese sellers).  And Lead Plaintiffs concede as much themselves.  *See* Opposition at 18 ("[T]he public news reports cited in the [Amended Complaint] mention neither Tuya nor its customers at all.").  To be sure, Lead Plaintiffs correctly point to a decision from this District in which the court sustained an inference of actual knowledge when "multiple public reports cited in the Amended Complaint" detailed the trend in question.  *Panther Partners Inc. v. Jianpu Tech. Inc.* ("*Jianpu*"), No. 18 Civ. 9848 (PGG), 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020) (cleaned up); *see* Opposition at 22.  But the reports to which Plaintiffs cite, unlike those in *Jianpu*, do not contain an equivalent statistic that would allow the Court to infer that fake review practices were so widespread as to make it likely

or even plausible as a statistical matter that Tuya's customers were engaged in these practices. *Jianpu*, 2020 WL 5757628, at *8 ("[A public] report makes plausible Plaintiff's allegation that—in a market where 75% to 90% of the participants are violating the Interim Measures—many of the 746 financial services providers operating on Jianpu's platform were also violating the Interim Measures.").[12]

As noted, Plaintiffs argue that the combination of Tuya's purportedly close relationship with its customers and the fact that "30% of sales of powered by Tuya devices in 2021 were generated by its China-based cross-border e-commerce brand customers" suffice to link these general public reports to specific knowledge about Tuya's customers' wrongdoings.  But, as a judge in this District noted in the context of Section 11's purchaser-knowledge defense—which similarly entails a showing of actual knowledge—"[e]vidence of publicly available information may be circumstantial evidence that an individual was aware of that information, but generalized public information does not necessarily create an inference of particular knowledge."  *Fed. Hous. Fin. Agency v. UBS Ams. Inc.*, No. 11 Civ. 5201 (DLC), 2013 WL 3284118, at *16 (S.D.N.Y. June 28, 2013).  In other words, public reports about broader trends in the e-commerce industry fail to raise the inference of actual knowledge of Tuya's "customers' systematic violations of Amazon's policies"—a much more specific allegation—beyond a speculative level.  Am. Compl. ¶ 121.

Plaintiffs also suggest that Defendants' possessed knowledge on account of Tuya's founders' former employment with Alibaba, alleging that Alibaba is a "Chinese e-commerce

---

[12] To be clear, Plaintiffs' allegations that "84% of sellers benefitting from fake reviews were located in China," Am. Compl. ¶ 63, and that the overwhelming majority of the 20,000 Amazon reviews deleted in September 2020 "were from little-known Chinese brands," *id.* ¶ 64, are not equivalent to the statistic at issue in *Jianpu*.  These statistics illustrate the high proportion of Chinese companies or individuals among those engaged in fake review schemes; they do not shed light on the prevalence of fake reviews in the overall market.

platform where various fraudulent schemes proliferated, including the sale of counterfeit goods and fake customer reviews," *id.* ¶ 3, and that "Alibaba's Vice President disclosed that in 2013 alone, his conservative estimate was that 1.2 million sellers on Alibaba's main shopping site had faked 500 million transactions," *id.* ¶ 7. Lead Plaintiffs elaborated at oral argument that this background made it "foreseeable that in the China e-commerce space there was a risk that was known that fake review practices proliferated on these platforms." Tr. at 26:3-5. But even if the Court were to credit this Alibaba-based theory, it alone would not allow for a plausible inference of actual knowledge of schemes *at Tuya*. Indeed, the Amended Complaint does not even allege that any of these Individual Defendants were in positions at Alibaba where they encountered or otherwise dealt with fake reviews, nor does it detail how they were specially equipped to detect fake reviews among Tuya's customers by virtue of their former employment.

In light of the foregoing, Plaintiffs have failed to allege a violation of Item 303, and the Court thus dismisses the Section 11 claim inasmuch as it is predicated thereon.[13]

### 2. Item 105

Defendants bring a similar challenge to Plaintiffs' Section 11 claim as predicated on Item 105 of Regulation S-K. While Item 303 focuses on trends, Item 105 addresses risk factors, directing, in relevant part:

(a) Where appropriate, provide under the caption "Risk Factors" a discussion of the material factors that make an investment in the registrant or offering speculative or risky. The discussion must be organized logically with relevant headings and each risk factor should be set forth under a subcaption that adequately describes the risk. The presentation of risks that could apply generally to any registrant or any offering is discouraged, but to the extent generic risk factors are presented, disclose them at the end of the risk factor section under the caption "General Risk Factors."

---

[13] Given this conclusion, the Court need not delve into the parties' dispute over whether Item 303 applies to Form F-1 in the first place. *Compare* Motion at 21 n.8 *with* Opposition at 22 n.11.

(b) Concisely explain how each risk affects the registrant or the securities being
offered. . . .

17 C.F.R. § 229.105.  Thus, Item 105 requires, "[w]here appropriate," an issuer to discuss "the
material factors that make an investment in the registrant or offering speculative or risky," setting
forth each risk factor "under a subcaption" and "[c]oncisely explain[ing] how each risk affects the
registrant or the securities being offered." *Id.*

Much like their Item 303-based theory, Plaintiffs assert that Tuya violated this regulation
by "fail[ing] to adequately disclose, and in fact, . . . not disclos[ing] at all, in the 'Risk Factors'
section of the Registration Statement, the risks to Tuya's sales, revenue, and prospects" posed by
the Fake Review Scheme.  Am. Compl. ¶ 123.  And as in their argument for Item 303, Defendants
argue that such a claim fails because a violation of Item 105 also requires actual knowledge.  *See*
Motion at 20-21.  Lead Plaintiffs disagree that compliance with Item 105 contemplates actual
knowledge of a risk, pointing to the lack of explicit, knowledge-related language in the regulation.
*See* Opposition at 22.

Most courts that have confronted this question have concluded that Item 105 does impose
a knowledge requirement and, thus, the regulation requires disclosure of only risks known to the
issuer.  *See Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 713 (3d Cir. 2020) ("[A] cause of
action for failing to disclose a material risk naturally requires an allegation that a known risk factor
existed at the time of the offering."); *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 103
(1st Cir. 2013) ("[A] complaint alleging omissions of Item 503 risks[14] needs to allege sufficient
facts  to  infer  that  a  registrant  knew,  as  of  the  time  of  an  offering,  that . . . a  risk  factor

---

[14] "[O]n March 20, 2019, the SEC adopted amendments to certain disclosure requirements
in Regulation S-K, moving what was previously Item 503 to Item 105." *Willard v. UP Fintech
Holding Ltd.*, 527 F. Supp. 3d 609, 618 n.4 (S.D.N.Y. 2021) (internal quotation marks omitted).

existed . . . ."); *Wandel v. Jing Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022) ("To state a claim under Item 105, an issuer must know, at the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business."). *But see Gutman v. Lizhi*, 633 F. Supp. 3d 681, 690 (E.D.N.Y. 2022) ("Plaintiff is correct that Item 105 does not require a plaintiff to plead actual knowledge . . . ."); *Jianpu*, 2020 WL 5757628, at *10 ("Moreover, because Item 503 requires a discussion of the most significant factors that make the offering speculative or risky, courts typically analyze the sufficiency of Item 503 disclosures with the familiar materiality standard.  In sum, Plaintiff need not allege Defendants' knowledge in order to plead an Item 503 violation." (cleaned up)).

This Court finds the majority view consistent with the text of the regulation and joins those courts in concluding that an issuer must know of the relevant risk factor to be held liable for a violation of Item 105.  To start, the language of Item 105 begins with the caveat that disclosure is only required "[w]here appropriate," suggesting that not all risks must be disclosed.  17 C.F.R. § 229.105(a).  Further, Item 105 obligates an issuer to identify specific factors "that make an investment in the registrant or offering speculative or risky" and relieves an issuer from disclosing "generic risk factors," which suggests that the issuer would need to appreciate details of the risk factor and be in a position to distinguish risk factors that fall under the regulation from those that do not.  *Id.*  This obviously would require some knowledge of the risk factor on the part of the issuer.  Further, the notion that a regulation that requires an issuer to "[c]oncisely explain how each risk affect the registrant or the securities being offered," would encompass disclosure of unknown risks strains credulity.  *Id.* § 229.105(b).  Indeed, how could an issuer explain the effects of a risk of which it does not know?  And going back to the start of the regulation's text, how could it be "appropriate" to require disclosure under such circumstances?  Thus, the imposition of a

knowledge requirement for an Item 105 violation is perfectly logical and consonant with the text of the regulation.

In light of that conclusion, Plaintiffs' failure to adequately plead facts that could give rise to a plausible inference of actual knowledge of the Fake Review Scheme proves equally fatal to their Item 105 theory as it does to the Item 303 theory. The Court thus grants Defendants' motion to dismiss Plaintiffs' Section 11 claim insofar as it is predicated on a violation of Item 105.

## B. Statements in the Registration Statement

As noted above, Plaintiffs also allege that Defendants' failure to disclose the Fake Review Scheme rendered five categories of statements in the Registration Statement false and misleading:

> (1) statements touting Tuya's deep relationships with its customers ([Am. Compl.] ¶¶ 125-127, 129, 149); (2) statements discussing Tuya's ability to gain new customers and increase adoption of its products and services ([*id.*] ¶¶ 138, 144); (3) statements attributing Tuya's success to reasons other than its customers' fake-review practices ([*id.*] ¶¶ 125, 127, 129, 140, 142, 144, 146-147); (4) statements touting Tuya's sales and marketing efforts ([*id.*] ¶¶ 151, 153); and (5) purported risk warnings describing potential risks of receiving negative reviews of its products and not receiving sufficiently positive reviews of its products ([*id.*] ¶ 132).

Opposition at 11-12. The Court proceeds to discuss Defendants' challenges to Plaintiffs' assertions.

### 1. Tuya's Knowledge of the Fake Review Scheme

Defendants' primary argument is that Tuya had no obligation to disclose the Fake Review Scheme. According to them, "[a] cognizable Section 11 claim exists only when the allegedly undisclosed information 'both existed and w[as] known or knowable' *to the issuer* 'at the time of the offering,'" yet the Amended Complaint fails to plausibly allege so. Motion at 11 (emphasis added) (quoting *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014), *aff'd*, 605 F.

App'x 52 (2d Cir. 2015)).[15]  Lead Plaintiffs retort that, as a strict-liability statute for issuers, "Plaintiffs are not required to plead that Tuya could have or should have known of the omitted material facts that existed at the time of the IPO."  Opposition at 14.

As the parties seem to acknowledge, district courts in this Circuit have split on the level, if any, of knowledge of the omitted information on the part of an issuer that is required for a Section 11 omissions claim.[16]  Opposition at 14-16; Reply at 3-4 & n.3.  A spate of courts, as in the *Scott* case cited above, have concluded that a plaintiff must "prove that a defendant securities issuer knew of a material omitted fact in order to be liable for that material omission under section 11." *Hutchison*, 638 F. Supp. 2d at 273 (collecting cases).  The Fifth Circuit has held much the same. *See Krim v. BancTexas Grp.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (holding that an "essential element[]" of a Section 11 claim is "that the information allegedly omitted from the prospectus was known to the issuer at the time the prospectus was distributed"); *see Truk Int'l Fund LP v. Wehlmann*, 737 F. Supp. 2d 611, 621 (N.D. Tex. 2009) ("Whether knowledge by the issuer of a material omitted fact is an element of such a claim has been a subject of disagreement among the courts."), *aff'd*, 389 F. App'x 354 (5th Cir. 2010).  On the other hand, "numerous district courts in

_____

[15] Defendants appeared to concede at oral argument that "Section 11 does not require the issuer to have known" of the omission.  Tr. at 14:18-19, 16:21-23.  But it remains unclear whether that concession extended to the question of whether the omission must be *knowable to the issuer*, *id.* at 16:9-13, so the Court proceeds to address this question.  *See also id.* at 34:11-16 (Defendants' counsel focusing on "whether [the omission] is reasonably knowable to the issuer").

[16] While Defendants cite cases in support of their argument that have been affirmed by the Second Circuit, the Court does not take Defendants to argue that the Second Circuit has ever explicitly endorsed such an approach.  *See* Motion at 11-12 (citing *Panther Partners v. Ikanos Comm'cns*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008), *aff'd in relevant part*, 347 F. App'x 617 (2d Cir. 2009), and *In re ProShares Tr. Sec. Litig.*, 889 F. Supp. 2d 644, 656 (S.D.N.Y. 2012), *aff'd*, 728 F.3d 96 (2d Cir. 2013)).  It also bears mention that the Circuit affirmed *Hutchison v. CBRE Realty Finance, Inc.*, where the district court concluded that "securities issuers do appear to be subject to strict liability with regard to material misstatements and omissions, regardless of whether the material omitted facts were known or knowable or not."  638 F. Supp. 2d 265, 274 (D. Conn. 2009), *aff'd*, 647 F.3d 479 (2d Cir. 2011).

this Circuit have explained that plaintiffs are not required to allege that defendants in Section 11 and Section 12 claims knew, or should have known, of any material omitted facts or misstatements at the pleading stage." *Winter v. Stronghold Digit. Mining, Inc.*, No. 22 Civ. 3088 (RA), 2023 WL 5152177, at *7 (S.D.N.Y. Aug. 10, 2023) (collecting cases).

In line with the latter group of cases, the Court concludes that Section 11 does not have a requirement that the omitted fact be known, or should have been known, by issuers. The text of Section 11 imposes no such requirement. 15 U.S.C. § 77(k)(a) (creating liability "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading"); *see Ikanos*, 681 F.3d at 120 ("Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters . . . ."). Indeed, to require a showing of actual knowledge by an issuer (or that the issuer should have known) would be difficult to square with the Supreme Court's holding that, "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case[, since l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *cf. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) (noting in the Section 11 context that, were a corporate executive to state that "[t]he TVs we manufacture have the highest resolution available on the market," such a statement "would be an untrue statement of fact [for Section 11 purposes] if a competitor had introduced a higher resolution TV a month before—even assuming the [executive] had not yet learned of the new product"). Rather, what is required is that the omitted fact be knowable. As the Honorable Ronnie Abrams explained in *Winter*, "whether a fact was 'knowable' at the time of a securities

21

offering is not the same as whether *a defendant* 'knew,' or 'should have known' of that fact." 2023 WL 5152177, at \*7 (emphasis added). Indeed, Defendants cite several cases that Judge Abrams addressed in *Winter* and "do not support the pleading requirement they propose." *Id.* (discussing *Wandel*, cited at page 14 of Defendants' Motion, for the proposition that "'the risk of COVID-19 was neither known nor knowable' at the time of the defendants' IPO on January 17, 2020, which predated the widespread outbreak of COVID-19" (quoting *Wandel*, 590 F. Supp. 3d at 641), and *Scott*, also cited at page 16 of Defendants' Motion, for the proposition that "the allegations in the complaint 'reflect[ed] public knowledge' of the alleged material omission" (quoting *Scott*, 46 F. Supp. 3d at 394)); *see also Gutman*, 633 F. Supp. 3d at 684, 688-89 (a case cited at page 16 of Defendants' Motion in which the court, much like in *Wandel*, determined that there could be no Item 303 violation related to COVID-19 for a January 2020 IPO when "the risk of COVID-19 was [generally] neither known nor knowable by the start of the IPO" (internal quotation marks omitted)).

The Court cannot discern a developed argument in Defendants' moving brief to the effect that the Fake Review Scheme was unknowable as a general matter, as in *Gutman*. To be sure, Defendants point to the fact that Amazon itself "was unable to identify the fake-review scheme prior to publication of the Safety Detectives Report in May 2021," Motion at 12, and at times omit the "issuer" component of their knowability argument, *see, e.g.*, *id.* at 16; *see also Ikanos*, 681 F.3d at 120 (explaining that "Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters"). But the mere mention of these facts and the very occasional shift away from issuer-specific knowability—to the extent that Defendants meant to develop a general lack of knowability-based argument in the first place—do not defeat the maxim that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived," *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (internal quotation marks omitted), particularly given Defendants' repeated and consistent emphasis on the Amended Complaint's failure to allege that *Tuya* did know or could have known of the Fake Review Scheme.   And indeed, as Defendants themselves acknowledged at oral argument, the existence of the Fake Review Scheme became knowable to at least Safety Detectives prior to the IPO, on March 1, 2021, when that organization obtained access to a data server in China with 7 gigabytes of data and over 13 million records apparently linked to the Fake Review Scheme.  Tr. at 12:18-19; *see* Am. Compl. ¶ 78.

To be sure, Defendants raise a number of reasons to question whether their failure to mention the Fake Review Scheme rendered misleading the five aforementioned categories of statements. *See* Reply at 5-8.  But, with two exceptions discussed below—*i.e.*, the Net Promoter Score and the risk warnings—Defendants relegated these arguments to their Reply.  While they characterize this shift as a sort of "crystal[yzation] in the course of the briefing," Tr. at 15:13-14, plainly stated, "the Court will not consider arguments raised for the first time in a reply brief," *Nobel Ins. Co. v. City of New York*, No. 00 Civ. 1328 (KMK), 2006 WL 2848121, at *16 (S.D.N.Y. Sept. 29, 2006) (internal quotation marks and alterations omitted).   Therefore, for the instant motion, and aside from the arguments addressed below, the Court is left to contend with Defendants' argument that the Amended Complaint should be dismissed for its "fail[ure] to allege 'why or how' Tuya could or should have known information in the possession and control of third parties."  Motion at 13.  Given the Court's determination that this argument is unavailing, the Court will not grant Defendants' motion to dismiss on that basis.

## 2.  Net Promoter Score

As noted above, Tuya did advance two other arguments related to the misstatements.  The first concerns the Amended Complaint's allegation of deficient disclosures related to Tuya's Net Promoter Score ("NPS").  The Registration Statement declared that

> In January 2021, we achieved a[n] . . . [NPS] of 75, which indicated a high degree of satisfaction for our products and services among our customers.  NPS measures the willingness of customers to recommend a company's products or services to other potential customers, and is viewed as a proxy for measuring customers' loyalty and satisfaction with a company's product or service.

February 26, 2021 F-1 at 142; March 12, 2021 F-1 at 143; *see* Am. Compl. ¶¶ 73, 130.  In line with their other allegations, Plaintiffs claim that these disclosures were misleading because they failed to mention the existence of the Fake Review Scheme.  Am. Compl. ¶¶ 74, 131.  Plaintiffs also allege that two analyst reports cited the NPS figure in painting a positive image of Tuya.  *See id.* ¶¶ 75-76.  Defendants contend that Plaintiffs have "misconstrue[d] Tuya's disclosure," since "[t]he Registration Statement makes clear that the NPS does not measure the perception of Tuya by *end users* (i.e., Amazon customers, among others), but rather is based on the perception of Tuya's own *direct customers*."  Motion at 15.

Lead Plaintiffs did not respond to this argument in their Opposition; indeed, their brief does not even mention Tuya's NPS.  "At the motion to dismiss stage, a plaintiff abandons a claim by failing to respond to defendant's arguments in support of dismissing that claim."  *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 585 F. Supp. 3d 405, 423 (S.D.N.Y. 2022).  Perhaps more importantly, Lead Plaintiffs also confirmed at oral argument that they are no longer pursuing this theory.  *See* Tr. at 32:11-16.  The Court therefore grants Defendants' motion to dismiss the Section 11 claim to the extent it is predicated on the NPS-related statements.

### 3.  Public Knowledge of Fake Review Schemes

Defendants also claim that "the existence of fake-review schemes and Amazon's ability to crack down on vendors on its platform . . . were widely known to the public before the IPO," citing the press reports discussed above, Motion at 17, and that "[a]ccordingly, Tuya had no duty to disclose this information," *id.* at 18.  *See supra* III.A.1.  Despite the parties' ample briefing on the subject, there appears to be no genuine dispute as to this point.  Plaintiffs do not appear to contend that Tuya needed to disclose this general information; indeed, Lead Plaintiffs reiterate in their Opposition that "[a]lthough the market may have known generally about fake reviews on Amazon, [their objection is to the fact that] Tuya did not disclose in the Registration Statement that a material portion of its revenue came from China-based e-commerce merchants or from Amazon, or that there was at least a substantial risk that significant customers of Tuya were engaged in fake-review practices."  Opposition at 17.  And while Lead Plaintiffs object to what they construe as Defendants' attempts at a truth-on-the-market defense, *id.* at 16-18—namely, the proposition that "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market," *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 409 (S.D.N.Y. 2020) (quoting *Ganino*, 228 F.3d at 167)—Defendants explicitly disavow such a defense in their Reply, *see* Reply at 8 (noting that they "do not, of course, argue that the alleged involvement of some of Tuya's customers in fake-review schemes on Amazon was generally known to the public").  Given these clarifications, it does not appear as if there is any genuine dispute for the Court to resolve related to Defendants' public knowledge argument, nor any related basis on which to grant Defendants' motion to dismiss.

### 4. Risk Warnings

Finally, Defendants argue that "the Registration Statement included ample warnings to investors regarding risks posed by losses of Tuya's customers," thereby foreclosing Section 11 liability. Motion at 18. Defendants' argument gestures to the maxim that "[w]hen a registration statement warns of the exact risk that later materialized, a Section 11 claim will not lie as a matter of law." *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 411 (S.D.N.Y. 2020) (internal quotation marks omitted). "[C]ourts analyze such cautionary language along with the 'allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled.'" *Winter*, 2023 WL 5152177, at *9 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).

Defendants point to two particular risk disclosures in the Registration Statement, both of which relate to the possibility of the Company's loss of customers:

> [T]he loss of customers or reductions in the end users' usage levels may have a negative impact on our business, results of operations, and financial condition. Our customers may cease, or reduce their usage of our products and services due to a variety of reasons or factors . . . that are outside our or our customers' control.

February 26, 2021 F-1 at 24; March 12, 2021 F-1 at 24; *see* Motion at 18.

> We generate a significant portion of our revenues from a limited number of major customers and any loss of business from these customers could have a negative impact on our revenues and harm our business. . . . Many factors not within our control could cause the loss of, or reduction in, business or revenues from any customer, and these factors are not predictable.

February 26, 2021 F-1 at 32; March 12, 2021 F-1 at 33; *see* Motion at 18-19. Defendants also contend that one such risk out of their control that was disclosed was negative publicity: "Adverse publicity (whether or not justified) relating to events or activities attributed to us, members of our workforce, agents or third parties we rely on, may tarnish our reputation and reduce the value of our brand." February 26, 2021 F-1 at 36; March 12, 2021 F-1 at 36; *see* Motion at 4-5. They

argue that "Amazon's ban of Tuya's alleged customers based on their purported practice of manipulating end-user reviews was certainly 'not within [Tuya's] control,' as Tuya did not know about it and had no influence over it."  Motion at 19.

Lead Plaintiffs retort principally by pointing to another risk disclosure, which the Amended Complaint alleges was misleading:

> Our success depends, in part, on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing and potential customers and end users seek and share information.  If actions we take or changes we make to our products and services or platform upset these customers and end users, their online commentary could negatively affect our brand and reputation.  Complaints or negative publicity about us, our products and services or platform could materially and adversely impact our ability to attract and retain customers and end users, our business, results of operations and financial condition.

February 26, 2021 F-1 at 41; March 12, 2021 F-1 at 41; *see* Opposition at 19; Am. Compl. ¶ 132. Lead Plaintiffs argue that "[t]hese purported risk disclosures conveyed the misleading impression that, *inter alia*, Tuya was faced with the risk of negative customer reviews or the *inability* to achieve positive customer reviews, whereas, to the contrary, Tuya was actually faced with the risk of *fraudulently positive* customer reviews."  Opposition at 19.  They further assert that the risk disclosures highlighted by Defendants "are generic and inadequate, as a heightened risk of losing customers due to their fake-review practices had already materialized at the time the Registration Statement was filed."  *Id.* at 20; *see Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

The Court ultimately concludes that the risk disclosures highlighted by Defendants cannot inoculate them from Section 11 liability premised on the Fake Review Scheme at this stage.  Most fundamentally, the risk disclosures Defendants highlight do not "pertain[] to the specific risk that was realized."  *Banerjee v. Zhangmen Educ., Inc.*, No. 21 Civ. 9634 (JPO), 2023 WL 2711279, at *8 (S.D.N.Y. Mar. 30, 2023) (internal quotation marks omitted); *see also Halperin*, 295 F.3d at

359 ("Cautionary language in securities offerings is just about universal. . . .  Plaintiffs may [defeat a motion to dismiss] by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss.").  The Second Circuit's decision in *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), is particularly instructive in that regard.  There, the Circuit reversed a district court's denial of leave to amend where a prospectus for shares in a mutual fund included extensive disclosures about hedging techniques for foreign exchange fluctuations, despite the fact that "Fund managers knew (or recklessly disregarded) that these hedging techniques were not available (because they were too costly)."  *Id.* at 728.  The Circuit held that "[t]he cautionary language contained in the prospectus does not necessarily foreclose liability because it warned investors of a different contingency than that which plaintiffs allege was misrepresented."  *Id.* at 729.  "The prospectuses warned that the Fund's hedging maneuvers might fail, not that the Fund would have no opportunity to use hedging maneuvers" in the first place.  *Id.*  More recently, the Second Circuit reaffirmed in *Meyer v. JinkoSolar Holdings Co.* the similar proposition that "[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."  761 F.3d 245, 251 (2d Cir. 2014).  In contrast, the Second Circuit sustained a dismissal of a securities fraud claim in *Halperin* when offering memoranda "explicitly warned . . . [that] registration [of the securities with the SEC was] not guaranteed," and "the relevant risk was that the stocks might not be registered."  295 F.3d at 359-60.  In *Asay v. Pinduoduo Inc.*, the Second Circuit similarly held that risk disclosures about anti-counterfeiting measures adequately warned of the possibility that such measures could fail when the company stated that "these measures may not always be successful or timely."  No. 20-1423, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021) (summary order).

Similar to *Hunt*, Plaintiffs' allegations allow for the reasonable conclusion that Tuya investors were simply warned about the wrong—or at least an orthogonal—risk related to fake customer reviews.  Nor is the Court particularly persuaded by the proposition that the Registration Statement's more general warnings about customer loss can make up for that mismatch.  The Court's task is to review the Registration Statement's disclosures "taken together and in context." *In re ProShares Tr. Sec. Litig.*, 728 F.3d at 103.  The combination of the Registration Statement's general disclosures about customer loss and its specific disclosures about the potential impact of negative publicity on Tuya's ability to retain customers did not "put a reasonable investor on notice of the risk" of the Fake Review Schemes: a reasonable investor reviewing the Registration Statements for customer review-related risks likely would have placed more emphasis on the specific disclosures than the more general ones.  *Cf. In re Mylan N.V. Sec. Litig.*, No. 16 Civ. 7926 (JPO), 2018 WL 1595985, at *9 (S.D.N.Y. Mar. 28, 2018) ("[T]he more specific the caution, the more likely it is to mislead a reasonable investor.").  Viewed in their totality, and drawing all inferences in Plaintiffs' favor, the Registration Statement's risk disclosures plausibly "gloss[ed] over the relevant risk, focus[ed] investors' attention elsewhere, and thereby le[d] them down some primrose path." *Halperin*, 295 F.3d at 360.  The Court thus will not grant Defendants' motion on the basis of the risk statements.[17]

### C.  Section 15 Claims

Defendants raise one additional challenge to Plaintiffs' Section 15 claims independent of their Section 11 arguments, asserting that the Amended Complaint "contains no allegations suggesting that [Immelt] exercised 'actual control' over Tuya's IPO, other than conclusory

---

[17] In light of this conclusion, the Court need not address Lead Plaintiffs' argument that the risk of the Fake Review Scheme had already transpired by the time of the IPO. *See* Opposition at 19-20.

allegations 'aggregating every individual defendant.'"  Motion at 22 (quoting *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 525 (S.D.N.Y. 2016)).

"To establish a prima facie case for control person liability under section 15 of the Securities Act, plaintiffs must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator."  *Ho*, 887 F. Supp. 2d at 578 (internal quotation marks omitted); *see* 15 U.S.C. § 77o(a) ("Every person who . . . controls any person liable under section[] 77k . . . of this title, shall also be liable jointly and severally with and to the same extent as such controlled person . . . .").  The Second Circuit has defined control for Section 15 purposes "as the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise."  *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011).  "Although determining a person's liability as a control person is a fact-intensive inquiry that generally should not be resolved on a motion to dismiss, the status of defendants as directors, standing alone, is insufficient to establish their control."  *Ho*, 887 F. Supp. 2d at 578 (cleaned up).

The Amended Complaint alleges that Immelt "became a director of Tuya immediately upon the effectiveness of the Company's Registration Statement," "joined [New Enterprise Associates, Inc. ('NEA'), a venture capital firm] in 2018 as a Venture Partner on both the technology and healthcare investing teams," "previously served as Chairman and CEO of GE for 16 years," "w[as] named as [a] director[] of the Company with [his] consent in the Registration Statement," and—along with all the other Individual Defendants—"participated in the solicitation and sale of Tuya ADSs to investors in the IPO for their own benefit and the benefit of Tuya as directors, executive officers, and/or major shareholders of the Company."  Am. Compl. ¶¶ 35, 38.

These allegations do not suffice; "Plaintiffs have not alleged [sufficient] facts that could allow a jury to find that [Immelt] had control over [Tuya]." *Ho*, 887 F. Supp. 2d at 578. As noted above, the mere fact that Immelt became a director does not alone establish control. Immelt's solicitation and sale of Tuya ADSs and his prior employment history have little bearing on his "power to direct or cause the direction of [Tuya's] management and policies," particularly in the absence of any allegations about NEA's relationship to Tuya. *Cf. Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 260 (E.D.N.Y. 2019) (concluding that a complaint failed to adequately allege Section 15 control person liability for an issuer's investment advisor because allegations that the advisor was "responsible for formulating the [issuer's] investment policies . . . without more, fails to allege actual control"). By contrast, the other Individual Defendants are alleged to have controlled a substantial portion of "total voting power of Tuya's voting shares," or were "responsible for Tuya's sales, business development and product operations" by virtue of their positions in the Company. Am. Compl. ¶¶ 29-31. Defendants' motion to dismiss with respect to Section 15 liability for Immelt is therefore granted.

### IV. Leave to Amend

Lastly, the Court grants Lead Plaintiffs' request for leave to amend. *See* Opposition at 25. Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Court will grant Plaintiffs leave to file a second amended complaint, in the event that they believe that they can plead facts related to the deficiencies identified above that would adequately state a claim upon which relief may be granted. Defendants would not be unduly prejudiced by an amendment and are on notice as to the basic circumstances underlying Plaintiffs' claims. The Court emphasizes, however, that Plaintiffs

should amend only if they are able to resolve the pleading deficiencies outlined in this Opinion and Order.

## V.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss for failure to state a claim with respect to Items 303 and 105, Tuya's Net Promoter Score, and the Section 15 claim against Immelt.  Defendants' motion is otherwise denied.  In the event that Plaintiffs decide to file a second amended complaint, they must file it within thirty days of this Opinion and Order. The Clerk of Court is respectfully directed to close Docket Number 63.

SO ORDERED.

Dated: March 5, 2024
       New York, New York                    _____
                                                    JOHN P. CRONAN
                                              United States District Judge