UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| XIAOMENG LIAN, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  - against -<br><br>TUYA INC., XUEJI (JERRY) WANG, LIAOHAN (LEO) CHEN, YI (ALEX) YANG, YAO (JESSIE) LIU, SCOTT SANDELL, CARMEN CHANG, JEFF IMMELT, QING GAO, JING HONG, MORGAN STANLEY & CO. LLC, BofA SECURITIES, INC., and CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED,<br><br>    Defendants. | Civil Action No. 1:22-cv-06792-JPC-RFT |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR JUDGMENT ON THE PLEADINGS

| | |
|---|---|
| DAVIS POLK & WARDWELL LLP | ROPES & GRAY LLP |
| 450 Lexington Avenue<br>New York, NY 10017<br>Tel: (212) 450-4000 | 1211 Avenue of the Americas<br>New York, NY 10036<br>Tel: (212) 596-9000 |
| *Attorneys for Defendants Tuya, Inc., Xueji (Jerry) Wang, Liaohan (Leo) Chen, Yi (Alex) Yang, Yao (Jessie) Liu, Scott Sandell, Carmen Chang, Jeff Immelt, Qing Gao, and Jing Hong* | *Attorneys for Defendants Morgan Stanley & Co. LLC, BofA Securities, Inc., and China International Capital Corporation Hong Kong Securities Limited* |

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND .............................................................................................3

      A.    Tuya's Business and the IPO .....................................................................3

      B.    The May 2021 Publication of the Safety Detectives Report.......................4

      C.    Amazon's Suspensions and Tuya's Subsequent Performance....................5

PROCEDURAL HISTORY.................................................................................................7

LEGAL STANDARD..........................................................................................................8

ARGUMENT .......................................................................................................................9

    I.    PLAINTIFFS DO NOT AND CANNOT ALLEGE THAT DISCLOSURE OF THE ALLEGED "FAKE REVIEW SCHEME" WAS NECESSARY TO PREVENT ANY STATEMENT FROM BEING MISLEADING .................10

      A.    Category 1: Statements Regarding Tuya's Relationship with Its Customers (AC ¶¶ 125-127, 129, 149) .......................................................11

      B.    Category 2: Statements Discussing Tuya's Ability to Gain New Customers and Increase Adoption of Its Products and Services (AC ¶¶ 138, 144).......................................................................................13

      C.    Category 3: Statements Attributing Tuya's Success to Reasons Other Than Its Customers' Alleged Involvement in the Fake Review Scheme (AC ¶¶ 125, 127, 129, 136, 140, 142, 144, 146, 147) ........................................................................................................14

      D.    Category 4: Statements Discussing Tuya's Sales and Marketing Efforts (AC ¶¶ 151, 153)..........................................................................17

      E.    Category 5: Statements Describing the Risks That Tuya's Products May Receive Negative or Insufficiently Positive Reviews (AC ¶ 132) ....................................................................................................19

    II.    THERE WAS NO DUTY TO DISCLOSE THE ALLEGEDLY OMITTED INFORMATION BECAUSE IT WAS UNKNOWABLE AS A GENERAL MATTER.......................................................................................20

A.     It Was Not Knowable as a General Matter at the Time of the IPO
That Tuya Customers Were Involved in an Alleged Fake Review
Scheme ...................................................................................................20

B.     Creating a Duty to Disclose Information Potentially Discoverable
Only by Investigative Experts Would Be a Significant Shift in
Securities Laws ......................................................................................25

CONCLUSION ..................................................................................................................25

**TABLE OF AUTHORITIES**

C<small>ASES</small>

P<small>AGE</small>(<small>S</small>)

*Chen v. Missfresh Ltd.*,
   No. 22-CV-9836 (JSR), 2023 WL 7289750 (S.D.N.Y. Nov. 6, 2023) .................. 10, 15, 18, 20

*Derisme v. Hunt Leibert Jacobson, PC*,
   No. 3:10CV244 (MRK), 2010 WL 3417857 (D. Conn. Aug. 26, 2010) .................................. 8

*Diehl v. Omega Protein Corp.*,
   339 F. Supp. 3d 153 (S.D.N.Y. 2018) ...................................................................................... 17

*Easton Rae, LLC v. Violet Grey, Inc.*,
   No. 21-CV-6234 (JPO), 2023 WL 2691459 (S.D.N.Y. Mar. 29, 2023) ................................... 8

*In re Express Scripts Holding Co. Sec. Litig.*,
   No. 16 CIV. 3338 (ER), 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ................................... 12

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008) ............................................... 10, 12, 13, 16, 19

*Gayle v. Pfizer Inc.*,
   452 F. Supp. 3d 78 (S.D.N.Y. 2020) ........................................................................................ 25

*In re Gen. Elec. Co. Sec. Litig.*,
   856 F. Supp. 2d 645 (S.D.N.Y. 2012) ................................................................................... 8, 9

*Gutman v. Lizhi*,
   633 F. Supp. 3d 681 (E.D.N.Y. 2022) .............................................................................. 20, 23

*Harris v. AmTrust Fin. Servs., Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015) ....................................................................................... 9

*Hutchison v. Deutsche Bank Sec. Inc.*,
   647 F.3d 479 (2d Cir. 2011) .................................................................................................... 25

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012) ........................................................................ 10, 14, 18

*Lively v. WAFRA Inv. Advisory Grp., Inc.*,
   6 F.4th 293 (2d Cir. 2021) .................................................................................................. 8, 21

*Loc. #817 IBT Pension Fund v. XPO Logistics, Inc.*,
   2022 WL 2358414 (2d Cir. June 30, 2022) ............................................................................ 13

*Marcu v. Cheetah Mobile Inc.*,
No. 18-CV-11184 (JMF), 2020 WL 4016645 (S.D.N.Y. July 16, 2020) ............................... 17

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
No. 19 CIV. 7536 (NRB), 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021)........................ 15, 16

*Mexico Infrastructure Fin., LLC v. Corp. of Hamilton*,
No. 17-CV-6424 (VSB), 2020 WL 4572679 (S.D.N.Y. Aug. 7, 2020).................................... 8

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)................................................................................ *passim*

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
563 F. Supp. 3d 259 (S.D.N.Y. 2021)................................................................... 15

*In re PetroChina Co. Ltd. Sec. Litig.,*
120 F. Supp. 3d 340 (S.D.N.Y. 2015)............................................................... 10, 14

*Rudman v. CHC Grp. LTD*,
217 F. Supp. 3d 718 (S.D.N.Y. 2016).................................................................... 13

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)..................................................................... 25

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019).................................................................... 16

*Schoenhaut v. Am. Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997)....................................................................... 12

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)............................................................................. 13, 19

*Wandel v. Gao*,
590 F. Supp. 3d. 630 (S.D.N.Y. 2022)............................................................... 22, 24

*Winter v. Stronghold Digital Mining, Inc.,*
2023 WL 5152177 (S.D.N.Y. Aug. 10, 2023) .............................................. 21, 22, 23

iv

STATUTES & RULES

17 C.F.R. § 229.105 ............................................................................................................ 19

Fed. R. Civ. P. 12 ...................................................................................................... 1, 8, 25

OTHER AUTHORITIES

*5C Charles Alan Wright & Arthur R. Miller*, Fed. Prac. & Proc. § 1367 (3d ed. 1998) ................ 8

Defendants[1] respectfully submit this memorandum of law in support of their motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

On March 5, 2024, the Court granted in part and denied in part Defendants' motion to dismiss this federal securities action (Dkt. 122) (the "Order").  In the Order, the Court identified two distinct legal grounds for dismissal of the remainder of the case but did not address them at that time, concluding that they had not been sufficiently raised in Defendants' moving brief.  The instant motion now squarely raises both grounds.  As set forth below, they each provide an independent basis to grant judgment on the pleadings for Defendants.

This case arises out of the March 18, 2021, initial public offering ("IPO") of Tuya, Inc., a China-based software company.  Plaintiffs bring claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), alleging that certain statements in Tuya's IPO Registration Statement were misleading by omission because Defendants did not discover and disclose that some of Tuya's third-party customers were—unbeknownst to Tuya—violating the e-commerce site Amazon's policies against fake product reviews.  Plaintiffs allege that, after Tuya's IPO, Safety Detectives—a third-party cybersecurity organization—published a report relating to fake reviews in the industry; that Amazon later suspended certain Tuya customers; and that Tuya's business later suffered.  Plaintiffs do not allege that Tuya was involved in or even aware at the time of the IPO of *any* of the underlying alleged misconduct.  Nevertheless, Plaintiffs seek to hold Defendants liable for not uncovering and disclosing this surreptitious third-party conduct.  Plaintiffs' theory fails for the two reasons identified in the Order.

---

[1] Defendants are Tuya, Inc. ("Tuya"), Xueji (Jerry) Wang, Liaohan (Leo) Chen, Yi (Alex) Yang, Yao (Jessie) Liu, Scott Sandell, Carmen Chang, Jeff Immelt, Qing Gao, Jing Hong, Morgan Stanley & Co. LLC, BofA Securities, Inc., and China International Capital Corporation Hong Kong Securities Limited.   Unless otherwise noted, internal quotation marks, citations, and alterations are omitted and emphasis is added throughout this memorandum.

*First*, Plaintiffs have failed to allege any legal duty to disclose the sole alleged omission in the case: the alleged "Fake Review Scheme." As set forth in the Order, to plead a duty to disclose under Section 11, Plaintiffs must plausibly allege that the omitted information was "necessary to prevent existing disclosures from being misleading." (Order at 9.) But Plaintiffs have failed to identify any statement rendered misleading by omission of the Fake Review Scheme. Plaintiffs contend that references in the Registration Statement to customers, financial results, and other general topics gave rise to a duty to disclose, but the mere reference to a topic does not create "a generalized duty . . . to disclose the entire corpus" of related information. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010). Indeed, the statements at issue did not address the propriety of Tuya's third-party customers' marketing strategies at all, much less assure investors—explicitly or implicitly—that all of Tuya's customers (or its customers' customers) were in compliance with Amazon's policies, or not involved in fake review schemes.

*Second*, Tuya had no duty to disclose the alleged "Fake Review Scheme" because it was not just unknown to Tuya, but *unknowable as a general matter*. As the Order made clear, Section 11 requires "that the omitted fact be knowable" to give rise to a duty to disclose. (Order at 21.) Plaintiffs do not—and cannot—allege that the Fake Review Scheme, as the Amended Complaint defines it, was generally knowable at the time of the IPO. At most, Plaintiffs contend that at the time of the IPO, Safety Detectives had obtained *some* unspecified information via a data leak from a third-party server, suggesting that *some* unspecified vendors were engaging in fake product reviews. But that generalized allegation does not support an inference that the alleged "Fake Review Scheme"—*i.e.*, that "a *material* percentage of *Tuya's* e-commerce customers were engaged in fake review practices *in violation of Amazon's policies*" (Order at 4–

2

5)—was generally knowable. It was not, as confirmed by the cases the Court cited in its Order. This is an additional, independent basis for judgment on the pleadings.

## FACTUAL BACKGROUND

### A. Tuya's Business and the IPO

Tuya provides a cloud-based network—known as the Internet of Things ("IoT")—through which electronic devices can connect and interact with each other. (Amended Complaint ("AC") ¶ 45.) IoT is the technology behind "smart" devices such as lights and appliances that can be controlled remotely (*e.g.*, through a smartphone or voice commands). (*See* Ex. 1 (Registration Statement ("Reg. St.")) at 122.)

Tuya's customers—mainly brands, original equipment manufacturers ("OEMs"), industry operators and system integrators (AC ¶ 46)—sell products containing Tuya's software (*id*. ¶¶ 5, 52). These customers are third parties, unaffiliated with Tuya. And these Tuya customers have their own customers, who buy smart devices incorporating Tuya's technology that eventually make their way to "end users" (consumers). (*See, e.g.*, *id*. ¶¶ 5, 52; *see also id.* ¶¶ 13–14 (identifying alleged Tuya customers and their products).) As alleged in the Amended Complaint, "30% of sales of products powered by Tuya were generated by China's cross-border e-commerce brands." (*See, e.g.*, *id*. ¶¶ 5, 52, 92). The Amended Complaint does not allege the portion of the 30% of end products incorporating Tuya's technology sold on Amazon, as compared to other e-commerce platforms.

On March 18, 2021, Tuya held an IPO of approximately 43.6 million American Depositary Shares at $21 per share. The IPO was conducted pursuant to a Registration Statement, which described Tuya's business and growth prospects as well as the relevant risk factors that could limit the company's future growth. Tuya warned investors, for example, that it had "a history of net loss," that it "may not be able to achieve or sustain profitability in the

3

future" (Reg. St. at 33), and that "negative publicity" and "customer complaints" could harm its ability to "attract and retain customers and end users" (*id*. at 41).

But the Registration Statement made no representations about Tuya's third-party customers' independent marketing practices, and offered no assurances about their propriety. The Registration Statement also said literally nothing about Amazon's seller policies, much less anything about Tuya's customers' compliance with such policies (or lack thereof). The Registration Statement was wholly silent on the number of Tuya's customers selling end products on Amazon. In short, Tuya gave investors no reason to believe that it monitored or vouched for the independent sales practices of its customers or any other third party.

### B. The May 2021 Publication of the Safety Detectives Report

On May 6, 2021, two months after Tuya's IPO, Safety Detectives[2] released a report stating that on March 1, 2021, it obtained access to a leaked "ElasticSearch"[3] database containing over 13 million records totaling seven gigabytes of data. (AC ¶ 78; Ex. 2 (Safety Detectives, *Amazon Fake Reviews Scam Exposed in Data Breach* (May 6, 2021) ("Safety Detectives Report" or the "Report")) at 1.) The server remained unsecured for only five days, before being re-secured on March 6, 2021. (Safety Detectives Report at 5.) According to the Report, the data leak contained records of instances in which certain Amazon vendors paid participants to leave positive reviews of their products, using PayPal so that Amazon could not track their wrongdoing. (AC ¶ 78; Safety Detectives Report at 1.) The Report did not identify the participants or vendors at issue and noted that it was "unclear who owns the database" but surmised that the server "appeared to be located in China." (Safety Detectives Report at 4–5; *see*

---

[2] Safety Detectives operates "the world's largest cybersecurity review website" with a "web mapping project" that has "brought multiple high-profile vulnerabilities and data leaks to light." (Safety Detectives Report at 13.)

[3] ElasticSearch is a distributed search and analytics engine. *See generally* https://www.elastic.co/elasticsearch.

*also* AC ¶ 78.)  Plaintiffs do not allege, and the Report does not state, that the leaked data accessed by Safety Detectives implicated Tuya or any Tuya customer.

At the time of the IPO, Tuya was not aware that any of its customers was involved in fake reviews, much less in substantial numbers, and, as the Court's Order confirms, the Complaint does not allege otherwise.  (Order at 19 ("Plaintiffs[] fail[] to adequately plead facts that could give rise to a plausible inference of actual knowledge of the Fake Review Scheme[.]").)  There is likewise no allegation that any Defendant knew of the conduct addressed in the Safety Detectives Report until after the Report was published, weeks after the IPO.

### C.  Amazon's Suspensions and Tuya's Subsequent Performance

Plaintiffs allege that after Tuya's IPO, in spring 2021, Amazon suspended the accounts of "numerous major Chinese merchants, including significant customers of Tuya."  (AC ¶ 79; *see also id*. ¶¶ 82–85 (purporting to identify Tuya customers operating on Amazon who were banned from the e-commerce platform).)  The Amended Complaint alleges that Amazon had removed fake reviews from its platform prior to the spring 2021 wave of bans (*id*. ¶¶ 62, 63) and had even banned vendors for violating its review policies in the past (*id*. ¶ 59).  None of those past actions is alleged to have implicated Tuya or any of its customers.  But the Amended Complaint alleges that, as reported by *TechCrunch* at the time, the scale of the spring 2021 wave of bans was "unprecedented."  (*Id*. ¶ 81 (quoting Ex. 3 (Rita Liao, *Prime today, gone tomorrow: Chinese products get pulled from Amazon*, TechCrunch (May 11, 2021)) at 2).)

Plaintiffs identify four vendors that they allege Amazon suspended after Tuya's IPO: Aukey Technology Co. Ltd. ("Aukey"); VanTop; Apeman; and Zebao.  (AC ¶¶ 82–85.) Although Plaintiffs contend that all four were Tuya customers, none was mentioned in Tuya's Registration Statement.  Nor was any of the four mentioned in the Safety Detectives Report, and Plaintiffs do not allege that the leaked data relates to these vendors.  The Amended Complaint

likewise does not allege that any of the four was suspended *because of* the Report or on the basis of data cited therein.

Once Tuya became aware that Amazon had suspended certain of its customers, it promptly disclosed this information during a September 18, 2021 earnings call.  (AC ¶ 90.) Regardless of any impact these bans may have had, Tuya exceeded its own and analysts' revenue guidance in Q2 2021.  (*See* Ex. 4 (Morgan Stanley Report (Aug. 18, 2021)) at 1 (noting that Tuya's "2Q21 total revenue . . . beat[] [Morgan Stanley] and the company's high end guidance by 5%"); Ex. 5 (BofA Securities Report (Aug. 18, 2021)) at 1 (similar).)  Tuya continued to meet or exceed its own and analysts' revenue guidance thereafter.[4]

Despite meeting or exceeding revenue guidance, Tuya's stock price declined between August 2021 and June 2022.  (AC ¶¶ 16–21.)  Analysts attributed this decline to a variety of factors, including "global inflation[]and supply chain disruptions" and "Covid-19 resurgence in China."  (*See* Ex. 8 (Morgan Stanley Report (March 15, 2022) at 1; *see also, e.g.*, Ex. 10 (Morgan Stanley Report (Nov. 9, 2021)) at 1 (citing "global Covid-19 dynamics, global supply-chain disruptions, and China's regulations on education, technology, and financial segments"); Ex. 11 (Huatai Financial Holdings Report (Apr. 15, 2022)) at 1, 3 (citing "inflation, shipping costs and capacity, and geopolitical conflicts" in Ukraine).)  Nevertheless, Plaintiffs attribute this months-long decline solely to the Fake Review Scheme.  (Order at 6–7.)

---

[4] Morgan Stanley's August 18, 2021 report, for instance, noted that Tuya's Q2 2021 revenue "beat" Morgan Stanley's and Tuya's own high-end revenue guidance.  (*See* Ex. 4 (Morgan Stanley Report (Aug. 18, 2021)) at 1.) In addition to approaching "the high end of [Tuya's] guidance" in Q3 2021 (*see* Ex. 6 (Q3 Earnings Call Transcript (Nov. 23, 2021)) at 6), Tuya's Q4 2021 revenue met Tuya's and *exceeded* Morgan Stanley's guidance (*see* Ex. 7 (Q4 2021 Earnings Call Transcript (Mar. 15, 2022)) at 5; *see also* Ex. 8 (Morgan Stanley Report (Mar. 15, 2022)) at 2.)  Finally, Tuya's Q1 2022 revenue "exceed[ed] the high-end" of its previous guidance range once again.  (*See* Ex. 9 (Q1 2022 Earnings Call Transcript (June 14, 2022)) at 3.)

**PROCEDURAL HISTORY**

The Amended Complaint alleges two sources of Tuya's duty to disclose the Fake Review Scheme: (1) two SEC regulations, and (2) five categories of statements in Tuya's Registration Statement.  (Order at 10.)  Defendants moved to dismiss, and on March 5, 2024, the Court granted the motion in part and denied it in part.

The Court held that Plaintiffs had not alleged that Defendants had actual knowledge of the Fake Review Scheme.  Accordingly, the Court dismissed claims that Tuya's nondisclosure of the Fake Review Scheme violated Items 303 and 105 of SEC Regulation S-K, which respectively require disclosure of a "*known* trend or uncertainty" or a "risk[] known to the issuer."  (Order at 11–19.)[5]  The Court, however, declined to dismiss Plaintiffs' claim that the nondisclosure of the Fake Review Scheme rendered various statements in Tuya's Registration Statement misleading, concluding that a plaintiff need not plead that an issuer knew or should have known an omitted fact to state a Section 11 claim.[6]  (*Id.* at 20–21.)

In the Order, the Court identified—but expressly did not address—two other potential bases for dismissal.  *First*, concluding that Defendants' arguments on this issue were raised only in their reply brief, the Court declined to consider whether the omission of the Fake Review Scheme rendered any actual statement in the Registration Statement misleading.  (*Id*. at 23.) *Second*, the Court held that, although a plaintiff need not plead a fact is known or knowable *to the issuer*, the plaintiff must plead that "the omitted fact be knowable" as a *general matter*.  (*Id.* at 21.)  But because the Court concluded that Defendants had not sufficiently raised this

---

[5] The Court also dismissed claims premised on Tuya's disclosures regarding its Net Promoter Score (*id*. at 24), and control person claims against Jeff Immelt under Section 15 of the Securities Act (*id*. at 29–31).

[6] The Court noted that "[a] spate of courts," including the Fifth Circuit, have held that a fact must be affirmatively *known* by the issuer to support a Section 11 claim, but the Court declined to follow those courts.  (*Id.* at 20-21.)

argument, it did not consider whether Plaintiffs had sufficiently pled that the allegedly omitted information here was knowable as a general matter.  (*Id*. at 22–23.)

On April 25, 2024, Defendants filed answers to the Amended Complaint.  (Dkts. 133, 134.)  Pursuant to the Court's April 15 Order (Dkt. 132), this motion follows.

## LEGAL STANDARD

Rule 12(c) permits a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed"—*i.e.*, after "both the complaint and the answer to the complaint" have been filed—"but early enough not to delay trial."  *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021)).

A Rule 12(c) motion is a well-established means of raising dispositive legal arguments, whether or not those arguments had been raised in a prior motion to dismiss.  Indeed, defendants may "bring successive motions challenging the sufficiency of a claim, the first under 12(b)(6) and the second, after the Answer has been filed, under Rule 12(c)."  *Mexico Infrastructure Fin., LLC v. Corp. of Hamilton*, No. 17-CV-6424 (VSB), 2020 WL 4572679, at *2 n.1 (S.D.N.Y. Aug. 7, 2020).  A defendant may even raise "the same argument in a Rule 12(c) motion for judgment on the pleadings" that it advanced unsuccessfully in a Rule 12(b)(6) motion.  *Derisme v. Hunt Leibert Jacobson*, PC, No. 3:10CV244 MRK, 2010 WL 3417857, at *5 (D. Conn. Aug. 26, 2010); *accord 5C Charles Alan Wright & Arthur R. Miller*, Fed. Prac. & Proc. Civ. § 1385 (3d ed. 2021).  Likewise, a defendant may "raise a 12(b)(6) defense that [was] omitted from an earlier Rule 12 motion by motion under Rule 12(c)."  *Easton Rae, LLC v. Violet Grey, Inc.*, No. 21-CV-6234 (JPO), 2023 WL 2691459, at *4 (S.D.N.Y. Mar. 29, 2023).

The legal standard for a Rule 12(c) motion is identical to the standard on a Rule 12(b)(6) motion.  *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 652 (S.D.N.Y. 2012).  To survive a motion pursuant to Rule 12(c), "a complaint must contain sufficient factual matter, accepted as

8

true, to state a claim to relief that is plausible on its face." *Id.*; *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 169–70 (S.D.N.Y. 2015) ("[A] complaint must still allege a false or misleading statement or omission in more than conclusory terms.").

In this Motion, Defendants do not seek reconsideration of any of the Court's rulings in the Order.[7]  Rather, Defendants raise arguments that the Court's Order expressly did *not* reach.

**ARGUMENT**

To state a claim under Section 11 of the Securities Act, Plaintiffs must allege that a "part of [Tuya's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." (Order at 9.)  Plaintiffs' Amended Complaint "alleges two sources of Tuya's obligation to disclose the Fake Review Scheme: (1) two SEC regulations and (2) five categories of statements in the Registration Statement."[8] (*Id.* at 10.)  The Court has already rejected the first, and Plaintiffs declined the Court's invitation to amend. (*Id.* at 11–19, 31–32.)  Plaintiffs are thus left with one route to allege a duty to disclose:  that disclosure of the Fake Review Scheme is "necessary to prevent existing disclosures"— *i.e.*, the five categories of statements in the Registration Statement (*id.* at 10)— from being misleading. *See Morgan Stanley Info. Fund*, 592 F.3d at 360.

Plaintiffs fail to plead a duty to disclose for two reasons. *First*, none of the statements

---

[7] Defendants do, however, respectfully reserve all other rights with respect to the Order.

[8] Plaintiffs must allege a viable duty to disclose even if some subset of the challenged statements in the Amended Complaint are considered misstatements, rather than omissions, as Plaintiffs claim. As the Court noted in the Order, "whether framed as a misrepresentation or an omission, there can be little doubt that—apart from the two SEC regulations—the Amended Complaint's allegations derive Tuya's duty to disclose from the Company's statements in the Registration Statement," and Defendants' argument for dismissal is "availing if they can show that the two SEC regulations and the statements in the Registration Statement that Plaintiffs cite in the Amended Complaint do not create a duty to disclose." (Order at 10 n.11.)

Plaintiffs challenge misleadingly implied that the omitted information—the Fake Review Scheme—*did not exist*. *Second*, the Fake Review Scheme was unknowable as a general matter prior to Tuya's IPO. Each of these reasons independently warrants judgment on the pleadings.

**I.   Plaintiffs Do Not and Cannot Allege That Disclosure of the Alleged "Fake Review Scheme" Was Necessary to Prevent Any Statement from Being Misleading**

As the Court explained, Plaintiffs here must allege that disclosure of the Fake Review Scheme was "*necessary* to prevent existing disclosures from being misleading." (Order at 10.) Although an issuer's disclosures "must be complete and accurate," mere reference to a topic does not "trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge" regarding that topic. *Morgan Stanley Info. Fund.*, 592 F.3d at 366. Rather, an affirmative statement is misleading by omission only if it "misleadingly suggested that the subsequently-identified [information] *did not exist*." *Chen v. Missfresh Ltd.*, No. 22-CV-9836 (JSR), 2023 WL 7289750, at *12 (S.D.N.Y. Nov. 6, 2023) (emphasis in original).[9] Thus, for example, when an issuer describes a policy or practice, it does not create a duty to disclose noncompliance with that policy or practice. *See, e.g., In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 360 (S.D.N.Y. 2015) (disclosures that defendants were subject to codes of ethics not misleading because they did not state or imply that defendant's officers were abiding by these codes), *aff'd* 644 F. App'x 13 (2d Cir. 2016).

---

[9] *See also, e.g., In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (challenged statements "would not suggest to a reasonable investor that ESI does *not* use a quota system for its recruiters, or that its recruiters do *not* use a script or employ hyper-aggressive sales tactics" and therefore "d[id] not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring"); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 358 (S.D.N.Y. 2008) (statements about its business success not made misleading by nondisclosure of alleged insider trading scheme absent "specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs *was not occurring*"). While *ITT* and *FBR* involved claims under the Securities Exchange Act of 1934, the relevant analysis did not turn on the heightened pleading standard applicable to such claims, but on the principle that (absent any applicable statute or regulation) a duty to disclose arises only when the omission renders an affirmative statement misleading. That principle is equally applicable to Securities Act claims. *Morgan Stanley Info. Fund*, 592 F.3d at 365–66.

10

Plaintiffs claim that "Defendants' failure to disclose the Fake Review Scheme rendered five categories of statements in the Registration Statement false and misleading." (Order at 19.) But Tuya's Registration Statement said nothing at all, explicitly or implicitly, about Tuya's third-party customers' independent marketing practices. None of the five categories of statements Plaintiffs challenge offered any assurance that Tuya's customers *were* in compliance with Amazon's policies. None suggested that Tuya's customers were *not* involved in fake review schemes. None made *any* representations about the propriety or effectiveness of Tuya's *customers'* independent marketing practices. And finally, none made *any* representations about the quantity of Tuya's customers' sales that took place on Amazon. Because none of the challenged statements suggested that the Fake Review Scheme *did not exist*, none triggered a duty to disclose it.

### A. Category 1: Statements Regarding Tuya's Relationship with Its Customers (AC ¶¶ 125-127, 129, 149)

Plaintiffs contend that the alleged omission of the Fake Review Scheme rendered misleading certain highly generalized statements about Tuya's relationships with its customers. Those statements include the number of Tuya's customers (AC ¶ 125); Tuya's practice of "help[ing] our customers succeed and benefit[ing] from their growth," including by "increas[ing] sales volume of products already powered by Tuya" (*id*. ¶ 127, 129); its "thriving ecosystem of brands, OEMs, developers, partners and end users" (*id*. ¶ 126); its efforts to "deepen our relationship with existing customers" and "acquire new customers" (*id*. ¶ 129); and its provision of distribution services for certain customers (*id*. ¶ 149).

But none of these statements suggests that the Fake Review Scheme did not exist. The mere mention of an issuer's customers does not trigger a duty to disclose "the entire corpus" of available information about them. *See Morgan Stanley Info. Fund.*, 592 F.3d at 366.

11

This is true even where the connection between the alleged omission and the misleading disclosure is much closer than here.  For example, an issuer's positive statements about its "great" relationship with its "largest customer" did not trigger a duty to disclose the risk of possible customer loss—even though the relevant customer had served multiple notices of breach against the issuer.  *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 CIV. 3338 (ER), 2017 WL 3278930, at *2, *13 (S.D.N.Y. Aug. 1, 2017).   Likewise, disclosures identifying the issuer's largest customer were not rendered misleading by the nondisclosure of the fact that sales to that customer were decreasing, because, among other reasons, the prospectus "did not list the current volume of sales to [the customer] or predict future sales levels" or even "suggest that [the customer]—or any other customer—would remain a customer, let alone a large one." *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997).  Therefore, even where there was at least some connection between the affirmative statement (about the issuer's relationship with or sales to a customer) and the allegedly omitted information (that the relationship was imperiled or sales were declining), those affirmative statements about the customers still did not trigger a duty to disclose specific risks relating to those customers.

The generalized statements about Tuya's customers have a much more attenuated relationship to the allegedly omitted information than in *Express Scripts* and *Schoenhaut*.  Tuya's disclosures about, *e.g.*, its "thriving ecosystem" of customers and brands and plans to "deepen [its] relationship[s]" offered no assurances about its customers' marketing practices, much less about their compliance with Amazon's policies or the frequency with which they sold products on Amazon.[10]  These statements in no way suggest that "the undisclosed improper activity

---

[10] Tuya's statement that it "work[s] closely with the brands to plan, design, develop and market their smart devices" (AC ¶ 49)—which Plaintiffs do not claim was misleading by omission in any event—similarly would not be understood by a reasonable investor to offer any broader assurance about customers' marketing practices generally, (….continued)

12

alleged by plaintiffs *was not occurring*."   *FBR*, 544 F. Supp. 2d at 358.  Thus, the statements did not trigger a duty to disclose unknown alleged misconduct by Tuya's third-party customers.

In any event, generalized positive statements like those in this category (Category 1, *see, e.g.*, AC ¶¶ 126, 129), are puffery and nonactionable for that reason alone.  *See Rudman v. CHC Grp. LTD*, 217 F. Supp. 3d 718, 728 (S.D.N.Y. 2016) (issuer's disclosures about "strong relationships with its customers" are "no more than puffery which does not give rise to securities violations"); *see also Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016) ("mere statements of confidence" would not have led a "reasonable investor" to infer that issuer had *not* been in dialogue with FDA regarding drug testing deficiencies); *Loc. #817 IBT Pension Fund v. XPO Logistics, Inc.*, No. 21-986, 2022 WL 2358414, at *2 (2d Cir. June 30, 2022) (statements about "diversity" of customer base and "broad-based growth" of business are nonactionable puffery).

### B.  Category 2: Statements Discussing Tuya's Ability to Gain New Customers and Increase Adoption of Its Products and Services (AC ¶¶ 138, 144)

Plaintiffs also claim that omission of the Fake Review Scheme rendered misleading certain statements discussing Tuya's ability to win customers and grow its business.  These include (i) a statement regarding Tuya's efforts to expand its customer base, including by "generating word of mouth referrals that not only attract more brands, developers and partners, but also lead to growing end user demand" (*see* AC ¶ 138), and (ii) a disclosure referencing Tuya's overall business growth and increased number of customers in explaining Tuya's operating activities (*see* AC ¶ 144).[11]

---

much less to suggest or imply that customers' marketing practices were in compliance with all potentially applicable rules, including Amazon's seller policies.

[11] To the extent Plaintiffs attempt to suggest that Tuya put the source of its success at issue by disclosing certain increased financial metrics "driven by our overall business growth and increased number of customers" (AC ¶ 144), this fails for the reasons discussed as to Category 3, *infra*.

But these disclosures imply nothing about Tuya's customers' compliance with third-party seller policies or otherwise imply the nonexistence of the alleged Fake Review Scheme. They address *Tuya's* strategies to increase its customer base, not its *customers'* independent strategies for marketing and increasing sales to end users. While the disclosure referenced at Paragraph 138 noted that *Tuya's* strategies may lead to growing end user demand, the disclosure said nothing about *Tuya's customers'* independent strategies for marketing to end users. In suggesting otherwise, Plaintiffs attempt to conflate Tuya's customers—mainly brands, OEMs, industry operators and system integrators (AC ¶ 46)—with end users of those customers' products. But the disclosures themselves are clear that these categories are distinct. (*See* AC ¶ 138 (describing how customers can use Tuya's platform to "ensure consistent, high quality IoT experience for *their end users*").)

Moreover, even assuming *arguendo* that these statements related to marketing to end users, neither statement implies anything about Tuya's customers' strategies for doing so, about their compliance with Amazon's policies, or even about the portion of their sales that took place on Amazon. Because there is "no direct connection" between the challenged disclosures and the omitted information, the disclosures do not "suggest that the [alleged] undisclosed improper activity . . . was not occurring." *ITT Educ. Servs.*, 859 F. Supp. 2d at 579.[12]

### C. Category 3: Statements Attributing Tuya's Success to Reasons Other Than Its Customers' Alleged Involvement in the Fake Review Scheme (AC ¶¶ 125, 127, 129, 136, 140, 142, 144, 146, 147)

Plaintiffs further allege that positive statements about Tuya's business were misleading

---

[12] Even if the Registration Statement had stated that some of Tuya's customers were subject to Amazon's policies—which it did not—this would not, in itself, generate a duty to disclose the Fake Review Scheme. A statement merely noting applicable laws and codes of conduct does not create a duty to disclose noncompliance. *See PetroChina*, 120 F. Supp. 3d at 360.

.

because Plaintiffs claim some of these statements attributed Tuya's success to factors other than the alleged Fake Review Scheme.  The statements Plaintiffs identify include (i) statements about Tuya's strengths and how it expected these strengths to help the company reach its goals (*e.g.*, "We help our customers succeed" (AC ¶ 127), "We grow with our customers" (*id*. ¶ 129)); (ii) statements about specific metrics (*e.g.*, number of customers (*id*. ¶ 125), number of smart devices powered (*id*.), revenues generated from IoT Platform as a Service (*id*. ¶ 140), increased accounts receivable (*id*. ¶ 144), dollar-based net expansion rate (*id*. ¶ 136)); (iii) statements about reasons for an increase in the value of Tuya's shares, including "organic growth of our business" and "increased business and revenue expectation" in light of past growth and increased market acceptance of Tuya's products (*id*. ¶¶ 146–47)); and (iv) the statement that Tuya's revenue depends on its customer purchase patterns and may fluctuate (*id*. ¶ 142).

Again, none of this panoply of statements offered any assurance about third-party customer behavior.  Many of these disclosures contain historical data, the accuracy of which is not challenged (*id*. ¶¶ 125, 127, 140, 144); such disclosures cannot give rise to violations of the securities laws.  *See, e.g., In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 277 (S.D.N.Y. 2021) (collecting cases).  But, more broadly, none of these statements suggests or implies anything about Tuya's customers' marketing practices, or their compliance with Amazon's policies or volume of sales on Amazon, let alone that the Fake Review Scheme "*did not exist*." *Missfresh*, 2023 WL 7289750, at *12 (emphasis in original).

In their opposition to the motion to dismiss, Plaintiffs attempted to invoke the principle that "statements attributing a company's financial success to legitimate sources may be actionable when they omit that improper or illegal business practices materially contributed to that success." *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19 CIV. 7536

15

(NRB), 2021 WL 1199035, at *17 (S.D.N.Y. Mar. 30, 2021), *aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022).

As a threshold matter, this principle applies only where a company fails to disclose that its *own* "use of improper or illegal business practices" is a material source of its success. *Schiro v. Cemex*, *S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296 (S.D.N.Y. 2019). It provides no basis to require issuers to discern and disclose when wholly *unknown* improper or illegal practices by *independent third parties* may contribute to the issuer's success.[13]

And in any event, "omissions in this context are only actionable when the factors" referenced as contributors to the issuer's success "are specific and share *at least a reasonably close connection to the omitted conduct*." *Menora Mivtachim*, 2021 WL 1199035, at *17 (finding that statements "attributing [defendant's] overall financial performance to factors like organic growth, acquisitions, and macroeconomic trends" did not trigger duty to disclose its allegedly improper payments in Russia and Ukraine); *see also FBR*, 544 F. Supp. 2d at 358 (finding defendant's statements about its business success not made misleading by nondisclosure of alleged insider trading scheme, because, among other reasons, defendants made no "specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs *was not occurring*"). That connection is absent here. The challenged statements said nothing about Tuya's customers' relationships with Amazon or about those customers' compliance with Amazon's policies.

Moreover, even if the required "reasonably close connection" were present, Plaintiffs' theory would still fail because Plaintiffs do not adequately plead that the Fake Review Scheme *did*, in fact, contribute materially to Tuya's success. The Amended Complaint merely repeats

---

[13] Indeed, such a rule would have concerning consequences. *See* Point II.B., *infra*.

that Tuya achieved various financial metrics "at least in significant part . . . due to said violations of Amazon's policies."  (AC ¶¶ 128, 131, 137, 141.)  But "conclusory allegations" that an issuer "significantly benefited from" purported wrongdoing are insufficient.  *See Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 166 (S.D.N.Y. 2018).[14]  Plaintiffs' assertion that "30% of sales of products powered by Tuya were generated by China's cross-border e-commerce brands" (*see, e.g.*, AC ¶¶ 5, 52, 92) also does not suffice.  Plaintiffs provide no basis to infer that any significant portion of the "e-commerce brands" were engaged in the Fake Review Scheme, nor do they allege the proportion of those brands' sales on Amazon, as opposed to other e-commerce outlets.

Finally, finding a duty to disclose the Fake Review Scheme based on Tuya's general statements regarding its strengths would stretch the duty to disclose beyond its "logical breaking point," *Morgan Stanley Info. Fund*, 592 F.3d at 366.  Such an outcome would mean that *any* positive statement about an issuer's business would put the legality of the source of its success at issue, even if completely external to the company.  This is not the law.  *See id.*

### D.  Category 4: Statements Discussing Tuya's Sales and Marketing Efforts (AC ¶¶ 151, 153)

Plaintiffs also contend that Tuya's statements about *its* sales and marketing efforts were rendered misleading because they did not also identify the unknown alleged Fake Review Scheme by *third parties*.  Plaintiffs challenge Tuya's statements about its efforts to "generate sales" and its "belie[f]" that it had a competitive advantage because of, *inter alia*, its "brand awareness and reputation" and its "sales and marketing efforts." (AC ¶¶ 151, 153.)

---

[14] Even if Plaintiffs had alleged in more than conclusory terms that the alleged Fake Review Scheme contributed to Tuya's success, this would still be insufficient, because Tuya's disclosures did not "explicitly or implicitly, rule out other factors playing a role in generating" its results.  *Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645 at *5 (S.D.N.Y. July 16, 2020) (finding that disclosures explaining the "drivers of revenues and profits from mobile apps" were not rendered misleading by omission of alleged ad fraud as a driver).

17

But these statements, like the others discussed above, imply nothing about *third-party* conduct or suggest that the Fake Review Scheme "*did not exist*." *Missfresh*, 2023 WL 7289750 at \*12 (emphasis in original). These statements do not discuss Tuya's customers' compliance with Amazon's policies or volume of sales on Amazon at all. Instead, these statements discuss only Tuya's *own* "sales and marketing efforts" (AC ¶ 153), and its *own* efforts to generate sales from its *own* customers, including by "brand marketing through industry conferences and events" and "developer outreach via code sharing platforms" (*id*. ¶ 151).[15]

*ITT* is instructive. There, the court found that the defendants' statements attributing increased revenue to effective marketing and better-trained recruiters were not misleading by the nondisclosure of allegedly "predatory recruitment practices." 859 F. Supp. 2d at 579. The challenged statements "would not suggest to a reasonable investor that [the defendant company] does *not* use a quota system for its recruiters, or that its recruiters do *not* use a script or employ hyper-aggressive sales tactics" and therefore "*d[id] not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring*." *Id*. The court's reasoning in *ITT* applies even more strongly here. In *ITT*, *both* the affirmative statements *and* the alleged omissions implicated the company's own sales practices. Here, by contrast, Tuya was entirely silent on the actual subject of the alleged omissions—its *customers'* sales and marketing practices. Even more obviously than in *ITT*, the Registration Statement here never suggested "that the undisclosed improper activity alleged by Plaintiff was not occurring." *Id.*

Finally, these statements (particularly the statement at AC ¶ 153) are "statements of

---

[15] At oral argument on the Motion to Dismiss, Plaintiffs' counsel contended that the reference to "customers" in this paragraph somehow encompassed end users who purchase products containing Tuya's technology. But the plain text of the Registration Statement consistently uses the term "customers" to refer only to companies whose products contain Tuya's technology. In any case, even if Plaintiffs' baseless suggestion were true, these disclosures address *Tuya's* efforts to sell and market products to customers—not the independent sales and marketing efforts of its third-party customers. No reasonable investor would draw any inference on the latter topic from these disclosures.

confidence" and "subjective optimism" from which no reasonable investor would have drawn any inference about Tuya's customers' sales practices. *See Tongue*, 816 F.3d at 213.

### E. Category 5: Statements Describing the Risks That Tuya's Products May Receive Negative or Insufficiently Positive Reviews (AC ¶ 132)

Finally, Plaintiffs contend that Tuya's statements disclosing the risks posed to its business by negative (or insufficiently positive) reviews of *Tuya's products* were rendered misleading by omission of information related to *its customers'* compliance with Amazon's policies. Plaintiffs challenge Tuya's statements that "negative publicity" or "independent industry analyst" reviews that are "negative or not as strong as reviews of our competitors' products" could adversely affect its business. (AC ¶ 132.) Plaintiffs also claim that these statements were misleading because they disclosed the risk of "*negative* customer reviews," when "Tuya was faced with the risk of *fraudulently positive* customer reviews." (*Id*. ¶ 133.)

None of these statements, however, offered assurances directly or indirectly about Tuya's customers' marketing practices. Plaintiffs' contention amounts to little more than an assertion that Tuya's disclosures about reviews "trigger[ed] a generalized duty requiring [Tuya] to disclose the entire corpus" of information on that topic. *Morgan Stanley Info. Fund*, 592 F.3d at 366. That is again not the law. *Id*. An issuer's affirmative disclosure of one risk does not, without more, suggest that the company faces *no other risks* implicating the same general subject matter.[16] *See, e.g.*, *FBR*, 544 F. Supp. 2d at 359–60.

*Missfresh* is particularly illustrative. In that case, there was "nothing misleading about [the company] disclosing one weakness in its internal controls" while not disclosing specific

---

[16] Indeed, were the rule otherwise, the specific requirements of Item 105 would be meaningless; issuers would be well advised to disclose even minor or remote risks touching on the same subject matters as the specific "material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. If they did not, and one of these minor risks unexpectedly materialized, the company would risk being found liable for having implied that the risk did not exist.

"internal control deficiencies later identified." 2023 WL 7289750 at *12. Far from suggesting to investors that these deficiencies *did not exist*, the affirmative disclosure of a related risk "suggested caution rather than confidence" on the general subject of internal controls. *Id*. So too here. While Tuya "plainly did not" disclose the Fake Review Scheme (because Tuya did not know and could not have known about it), the Registration Statement did not leave investors with a misleading impression regarding its existence.[17]

## II.    There Was No Duty to Disclose the Allegedly Omitted Information Because It Was Unknowable as a General Matter

Even if Plaintiffs could identify something in the Registration Statement that was misleading by omission, judgment on the pleadings would be required for an additional, independent reason: The allegedly omitted information was not knowable as a general matter. The Court's Order concluded that, while "Section 11 does not have a requirement that the omitted fact be known, or should have been known, by issuers," the statute *does* require "that the omitted fact be knowable." (Order at 21.) A plaintiff cannot plead a Section 11 claim if the allegedly omitted information "was unknowable as a general matter" at the time of the IPO, "as in *Gutman* [*v. Lizhi*, 633 F. Supp. 3d 681 (E.D.N.Y. 2022)]." (Order at 22.)

### A.  It Was Not Knowable as a General Matter at the Time of the IPO That Tuya Customers Were Involved in an Alleged Fake Review Scheme

The pleadings make clear that the alleged Fake Review Scheme was unknowable as a

---

[17] The Court did not hold the Registration Statement's risk disclosures "actionable," as Plaintiffs contend in their response to Defendants' pre-motion letter. (Dkt. 130 at 2.) Plaintiffs cite to pages 26–29 of the Order, which addressed Defendants' argument that Tuya warned investors of the "exact risk that later materialized." (Order at 26 (citation omitted).) While the Court held that these risk disclosures did not "put a reasonable investor on notice of the risk of the Fake Review Scheme" (*id*. at 29), the Court did not separately consider whether the risk disclosures were themselves misleading due to nondisclosure of the Fake Review Scheme, which Plaintiffs contend had already transpired at the time of the IPO (*id*. at 29 n.17).

20

general matter at the time of the IPO.[18]  Plaintiffs do not allege that "any Tuya customers were reported to have been involved" in any fake review schemes uncovered prior to the IPO, and their allegations offer no basis to conclude that it was "likely or even plausible as a statistical matter that Tuya's customers were engaging in these practices."  (Order at 14–15.)  The only pre-IPO event relied on by Plaintiffs is that on March 1, 2021—less than three weeks prior to Tuya's IPO—Safety Detectives claims it identified "data leaked" from a private server that was ordinarily secured, but suffered a temporary "data breach."  (AC ¶ 13.)  That data—according to the Safety Detectives Report released two months later, after the IPO—reflected that certain unnamed parties were paying individuals to leave positive reviews on Amazon in exchange for cash.  According to the Safety Detectives Report, the payments were made through PayPal to avoid detection by Amazon.  (*Id.* ¶¶ 13, 78; *see also* Safety Detectives Report at 2, 4.)

Plaintiffs thus allege, at most, that Safety Detectives accessed some leaked data implicating some unspecified vendors in fake review schemes on Amazon.  But neither Plaintiffs nor the Safety Detectives Report claim that the leaked data identified or even implicated any Tuya customer, let alone that it implicated a "material percentage of Tuya's China-based customers" in violations of Amazon's fake-review policies.  (*See, e.g.*, AC ¶¶ 128, 131 (alleging the Registration Statement omitted this information); *see generally* Safety Detectives Report.)  Instead, Plaintiffs allege only that certain Tuya customers were banned by Amazon *after* the Safety Detectives Report was published, also *after* the IPO.  (AC ¶¶ 79, 82–85.)  These bare

---

[18] Contrary to Plaintiffs' assertion in response to Defendants' pre-motion letter, this is not a "question of fact that cannot be resolved on a Rule 12(c) motion."  (Dkt. 130 at 2.)  As explained in *Winter v. Stronghold Digital Mining, Inc.* and elsewhere, courts routinely dismiss Section 11 cases when—as here—plaintiffs' complaint fails to plead that the allegedly omitted information was knowable at the time of the issuer's IPO.  No. 22-CV-3088 (RA), 2023 WL 5152177, at *7 (S.D.N.Y. Aug. 10, 2023).  The case Plaintiffs cite in their letter response, *Lively v. WAFRA Investment Advisory Group, Inc.*, is distinguishable: there, the district court had improperly drawn factual inferences based on materials *external* to plaintiffs' complaint in granting defendants' motion for judgment on the pleadings.  6 F.4th at 305.  Defendants do not ask the Court to do so here.

21

assertions fail to plead that the alleged Fake Review Scheme was knowable as a general matter *at the time of Tuya's IPO*.

And even if Plaintiffs had plausibly alleged that the purloined data implicated Tuya customers (which they have not), the fact that Safety Detectives accessed otherwise nonpublic data through a pre-IPO "data breach" does not make the Fake Review Scheme knowable as a general matter at the time of the IPO. The relevant data was identified only because Safety Detectives—a "cybersecurity team" with the mission of "help[ing] the online community defend itself against cyber threats" through a "web mapping project"—stumbled on a temporary breach of an ordinarily secured data server, which was re-secured a few days later. (Safety Detectives Report at 13–14; AC ¶ 78.) Because the knowledge of—and specialized nonpublic information available to—a cybersecurity expert does not equate to general knowledge, even if the data Safety Detectives accessed implicated Tuya customers, the alleged Fake Review Scheme was not "knowable as a general matter."

*Winter v. Stronghold Digital Mining, Inc.* supports this conclusion. In *Winter*, the court explained that "whether a fact was 'knowable' at the time of a securities offering is not the same as whether a defendant 'knew,' or 'should have known' of that fact." 2023 WL 5152177, at *7. The relevant inquiry is whether "a defendant *could have known* of an alleged misstatement or omission—*i.e.*, whether the relevant event had already transpired at the time of the offering." *Id*. To illustrate when a defendant "could have known" of a relevant event, the court discussed *Wandel v. Gao*, 590 F. Supp. 630 (S.D.N.Y. 2022), which addressed whether defendants had a duty to disclose risks related to COVID-19 in connection with a mid-January 2020 IPO. *Winter*, 2023 WL 5152177 at *7. Even though a "few dozen cases" of COVID-19 had been diagnosed at the time of the IPO, *Wandel* concluded that "the risk of COVID-19 was neither known nor

22

knowable at the time of the defendants' IPO." *Id.* As explained in *Winter*, it was "only with hindsight that the [*Wandel*] plaintiffs could allege that the defendants failed to discuss the possibility that a few dozen cases of respiratory illness would explode into a ruinous pandemic." *Id.*

As the Order explained, *Gutman* is also instructive as to when a risk is knowable as a general matter. (Order at 22.) In *Gutman*, the plaintiff alleged that "the Chinese central government and Chinese national media [were] widely reporting for weeks the Covid health crisis in China was an epidemic" prior to the issuer's IPO. 633 F. Supp. 3d at 691. Indeed, by the time of the IPO, the Chinese government had "beg[u]n stationing personnel at airports and train stations across Wuhan," "installed infrared thermometers in airports, railway stations, long-distance bus stations, and ferry terminals," and "activated Level I health emergency response." *Id.* at 685. Nevertheless, the *Gutman* court held that there could be no Item 303 violation because "the risk of COVID-19 was neither known nor knowable by the start of the IPO." *Id.* at 688–89; *see also* Order at 22. Having concluded the risk of COVID-19 was neither known nor knowable in general, the *Gutman* court went on to conclude that the registration statement was not rendered misleading by omission of the "then-ongoing Covid epidemic" because there was no basis to "infer that at the time of the IPO, Defendants knew the risks were significantly greater or more certain" than those disclosed. *Gutman*, 633 F. Supp. 3d at 691. Although this portion of *Gutman* did not distinguish between actual knowledge, imputed knowledge (should have known), or general knowledge (could have known), *Gutman*'s reasoning, like *Wandel*'s, "rested on the conclusion that the risk of COVID-19 was neither known nor knowable." *Winter*, 2023 WL 5152177 at *7 (explaining similar language in *Wandel*).

The principles described in *Winter* and illustrated by *Wandel* and *Gutman* demonstrate

23

that the alleged Fake Review Scheme was not knowable as a general matter at the time of Tuya's

IPO. In *Wandel* and *Gutman*, COVID-19 had been diagnosed and reported *publicly*; even if an

expert (like an epidemiologist) could have connected the dots and foreseen the trajectory of the

disease, the attendant risks were not knowable as a general matter. Here, even if a cybersecurity

expert, like Safety Detectives, was able to identify certain fake reviews from leaked data prior to

Tuya's IPO, that would not render the entire alleged Fake Review Scheme— *i.e.*, that "a

*material* percentage of *Tuya's* e-commerce customers were engaged in fake review practices *in

violation of Amazon's policies*"—knowable as a general matter.[19] If anything, there was less

information available here than in *Wandel* and *Gutman*, where information about COVID-19 had

been *publicly* reported. Here, Safety Detectives did not publicly report anything relating to fake

reviews prior to Tuya's IPO.[20] As in *Wandel*, it was "only with hindsight"—*i.e.*, based on the

*post-IPO* Safety Detectives Report and the *post-IPO* Amazon suspensions—that Plaintiffs allege

that Tuya omitted the alleged Fake Review Scheme. *See Wandel*, 590 F. Supp. 3d at 641. The

alleged Fake Review Scheme was not knowable as a general matter at the time of Tuya's IPO.

Defendants thus had no duty to disclose it.

---

[19] In response to Defendants' pre-motion letter, Plaintiffs attempt to distinguish *Wandel* and *Gutman* on the basis that, at the time of the IPOs in those cases, the risks of COVID were still "uncertain," whereas "at the time of Tuya's IPO, a material number of Tuya's customers had *already* engaged in the Fake Review Scheme for a significant amount of time, and this had even been discovered by Safety Detectives prior to the IPO." (Dkt. 130 at 3.) But that is wrong on many levels. There is no plausible allegation that Safety Detectives had identified that Tuya customers, much less a material percentage of those customers, were involved in the Fake Review Scheme. And even if Safety Detectives had discovered the number of Tuya customers violating Amazon's policies prior to the IPO (which is not alleged in the Amended Complaint), the alleged risk to Tuya was still at least as "uncertain" as in *Wandel* and *Gutman*, because Plaintiffs do not allege that it was knowable at the time of the IPO that Amazon would take the unprecedented step of banning Tuya's customers in numbers sufficient to impact its business. Finally, unlike in *Wandel* and *Gutman*, nothing about the Fake Review Scheme had been reported publicly prior to Tuya's IPO.

[20] As the Court noted at oral argument on Defendants' motion to dismiss, Plaintiffs do not allege any pre-IPO report regarding fake reviews or that any fake reviews at Alibaba involved Tuya customers. (MTD Hr'g Tr. at 30-31.)

24

### B. Creating a Duty to Disclose Information Potentially Discoverable Only by Investigative Experts Would Be a Significant Shift in Securities Laws

If Plaintiffs could state a Section 11 claim merely by alleging that a nonparty had access to nonpublic data that was not available to the issuer before the IPO, issuers would face an impossible standard. They would be required to conduct comprehensive "web mapping" and assume the role of cybersecurity sleuths, covertly investigating their customers and customers' customers to identify business practices that could potentially have negative downstream effects on the issuer. Faced with the impossibility of discovering third-party misconduct without themselves violating the law, issuers would be incented to include endless risk disclosures concerning third-party behavior and other unknowable facts, solely as a precautionary measure. This in turn would result in those disclosures becoming so lengthy as to be meaningless. Such consequences do not follow from the text of Section 11, and they conflict with the well-established principle that issuers "need not be clairvoyant" to comply with the federal securities laws. *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543 (S.D.N.Y. 2015).[21]

## CONCLUSION

For the reasons set forth above, and because any further amendment would be futile,[22] Defendants respectfully request that the Court enter judgment on the pleadings in their favor.

---

[21] Because Plaintiffs fail to allege a violation of Section 11 of the Securities Act, their Section 15 control person claims also "necessarily fail[]." *See, e.g., Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).

[22] *See, e.g., Gayle v. Pfizer Inc.*, 452 F. Supp. 3d 78, 90 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 79 (2d Cir. 2021) (denying leave to amend on futility grounds after granting Rule 12(c) motion).

Dated: April 25, 2024                    Respectfully submitted,
New York, New York


DAVIS POLK & WARDWELL LLP          ROPES & GRAY LLP

*/s/ Edmund Polubinski*                   */s/ Gregg L. Weiner*

Edmund Polubinski                        Gregg L. Weiner
Marie Killmond                           Andrew Todres

450 Lexington Avenue                     1211 Avenue of the Americas
New York, New York 10017                 New York, New York 10036
Tel: (212) 450-4000                      Tel: (212) 596-9000
Email:  edmund.polubinski@davispolk.com  Email:  gregg.weiner@ropesgray.com
    marie.killmond@davispolk.com        andrew.todres@ropesgray.com

Mari Grace                               *Attorneys for Defendants Morgan Stanley &*
Davis Polk & Wardwell LLP                *Co. LLC, BofA Securities, Inc., and China*
901 15th Street, NW                      *International Capital Corporation Hong*
Washington, DC 20005                     *Kong Securities Limited*
Tel: (202) 962-7020
Email:  mari.grace@davispolk.com

Jonathan K. Chang
10/F The Hong Kong Club Building
3A Chater Road
Hong Kong SAR, China
Tel: (852) 2533-3300
Email:  jonathan.chang@davispolk.com

*Attorneys for Defendants Tuya, Inc., Xueji*
*(Jerry) Wang, Liaohan (Leo) Chen, Yi (Alex)*
*Yang, Yao (Jessie) Liu, Scott Sandell, Carmen*
*Chang, Jeff Immelt, Qing Gao, and Jing Hong*

26