UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

XIAOMENG LIAN, Individually and on
Behalf of All Others Similarly Situated,

                        Plaintiff,

        vs.

TUYA INC., XUEJI (JERRY) WANG,
LIAOHAN (LEO) CHEN, YI (ALEX) YANG,
YAO (JESSIE) LIU, SCOTT SANDELL,
CARMEN CHANG, JEFF IMMELT, QING
GAO, JING HONG, MORGAN STANLEY &
CO. LLC, BofA SECURITIES, INC., CHINA
INTERNATIONAL CAPITAL
CORPORATION HONG KONG
SECURITIES LIMITED,

                    Defendants.

———————————————————————— x

: Civil Action No. 1:22-cv-06792-JPC-RFT

: CLASS ACTION

: **LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................3

        A.      Prior to the IPO, Fake Product Reviews Proliferated on E-Commerce Sites ..........3

        B.      Tuya Issued Material Misstatements in the Registration Statement .......................4

        C.      Safety Detectives Learned of the Fake Review Scheme Prior to the IPO ..............5

        D.      Investors Learn that a Material Percentage of Tuya's E-Commerce
                Customers Were Engaged in Fake Review Practices at the Time of the
                IPO ......................................................................................................................6

III.    PROCEDURAL HISTORY.....................................................................................7

IV.     ARGUMENT ........................................................................................................9

        A.      Legal Standards...................................................................................................9

        B.      The Court Already Ruled that the Risk Disclosures Are Actionable ...................11

        C.      The Fake Review Scheme Was Knowable as a General Matter............................14

        D.      Category 1-4 Statements Are Actionable .............................................................17

                1.      Statements Touting Tuya's Deep Relationships with Its Customers.........17

                2.      Statements Discussing Tuya's Ability to Gain New Customers and
                        Increase Adoption of Its Products and Services ......................................19

                3.      Statements Attributing Tuya's Success to Reasons Other than Its
                        Customers' Fake Review Practices..........................................................21

                4.      Statements Touting Tuya's Sales and Marketing Efforts .........................24

V.      CONCLUSION....................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Aviles v. S&P Glob., Inc.*,
2020 WL 1689405
(S.D.N.Y. Apr. 6, 2020)..............................................................................................................9

*Chen v. Missfresh Ltd.*,
2023 WL 7289750
(S.D.N.Y. Nov. 6, 2023) ..................................................................................... *passim*

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020).....................................................................................22

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)......................................................................................21

*Derisme v. Hunt Leibert Jacobson, PC*,
2010 WL 3417857
(D. Conn. Aug. 26, 2010) ......................................................................................................10

*Diehl v. Omega Protein Corp.*,
339 F. Supp. 3d 153 (S.D.N.Y. 2018).....................................................................................24

*Drapkin v. Mafco Consol. Grp., Inc.*,
818 F. Supp. 2d 678 (S.D.N.Y. 2011).....................................................................................10

*Gutman v. Lizhi Inc.*,
633 F. Supp. 3d 681 (E.D.N.Y. 2022) ................................................................2, 8, 15, 16

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002).....................................................................................................9

*Hayden v. Paterson*,
594 F.3d 150 (2d Cir. 2010).....................................................................................................9

*Hunt v. Alliance North American Government Income Trust, Inc.*,
159 F.3d 723 (2d Cir. 1998)..............................................................................................11, 12

*Hutchison v. CBRE Realty Fin., Inc.*,
638 F. Supp. 2d 265 (D. Conn. 2009), *aff'd on other grounds sub nom. Hutchison v.
Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir. 2011)...........................................................12

**Page**

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
2023 WL 2601472
(S.D.N.Y. Mar. 22, 2023) ...................................................................................24, 25

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010).......................................................................10

*In re Avon Sec. Litig.*,
2019 WL 6115349
(S.D.N.Y. Nov. 18, 2019) ..........................................................................................18

*In re CannaVest Corp. Sec. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018)........................................................................14

*In re Dentsply Sirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ..................................................21, 22, 23, 24

*In re Express Scripts Holding Co. Securities Litigation*,
2017 WL 3278930
(S.D.N.Y. Aug. 1, 2017) ......................................................................................18, 19

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)........................................................................12

*In re FBR Inc. Securities Litigation*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008).......................................................................23

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
643 F. Supp. 2d 562 (S.D.N.Y. 2009).......................................................................25

*In re Grab Holdings Sec. Litig.*,
2024 WL 1076277
(S.D.N.Y. Mar. 12, 2024) ..........................................................................................22

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012).......................................................13, 24, 25

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)..................................................................13, 14, 17, 18

*In re Omega Healthcare Investors, Inc. Securities Litigation*,
563 F. Supp. 3d 259 (S.D.N.Y. 2021)........................................................................23

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889
(S.D.N.Y. Nov. 26, 2018) ..........................................................................................25

**Page**

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)..................................................................................10, 18

*Johnson v. Holder*,
564 F.3d 95 (2d Cir. 2009)............................................................................................10

*Local #817 IBT Pension Fund v. XPO Logistics, Inc.*,
2022 WL 2358414
(2d Cir. June 30, 2022) ................................................................................................19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)..........................................................................................25

*Marcu v. Cheetah Mobile Inc.*,
2020 WL 4016645
(S.D.N.Y. July 16, 2020) ..............................................................................................24

*McKenna v. Smart Techs., Inc.*,
2012 WL 1131935
(S.D.N.Y. Apr. 3, 2012)................................................................................................22

*Menora Mivtachim Insurance Ltd. v. International Flavors & Fragrances Inc.*,
2021 WL 1199035
(S.D.N.Y. Mar. 30, 2021) ............................................................................................23

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014)..........................................................................................12

*MTR Gaming Grp., Inc. v. Arneault*,
2015 WL 136563
(W.D. Pa. Jan. 9, 2015).............................................................................................9, 10

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)..........................................................................................10

*Plumbers & Pipefitters National Pension Fund v. Davis*,
2020 WL 1877821
(S.D.N.Y. Apr. 14, 2020)...................................................................................... *passim*

*Rudman v. CHC Group Ltd.*,
217 F. Supp. 3d 718 (S.D.N.Y. 2016)..........................................................................19

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019)..........................................................................24

*Schoenhaut v. American Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997) ..............................................................................19

**Page**

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..................................................................................19

*U.S. v. Quintieri*,
  306 F.3d 1217 (2d Cir. 2002)..........................................................................10, 12

*Universal Health Servs., Inc. v. U.S.*,
  579 U.S. 176 (2016)................................................................................................13

*Wandel v. Gao*,
  590 F. Supp. 3d 630 (S.D.N.Y. 2022)..........................................................8, 15, 16

*Winter v. Stronghold Digit. Mining, Inc.*,
  2023 WL 5152177
  (S.D.N.Y. Aug. 10, 2023) ...............................................................2, 8, 15, 16

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
  §77l .................................................................................................................1, 10
  §77o.........................................................................................................................1
  §78j(b)...................................................................................................................24

Financial Accounting Standards Codification
  §855.......................................................................................................................23

Local Civil Rules
  Rule 6.3 .................................................................................................................11

Federal Rules of Civil Procedure
  Rule 9(b) ...........................................................................................................23, 24
  Rule 12(b)(6)................................................................................................. *passim*
  Rule 12(c)...................................................................................................1, 2, 9, 10

Private Securities Litigation Reform Act.....................................................................24

Lead Plaintiffs Kyle Nelson and Jiyi Qiu ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (ECF No. 137, "Br.").[1]

## I.    INTRODUCTION

The Complaint alleges that, at the time of Tuya's IPO, a material percentage of Tuya's e-commerce customers were engaged in fake review practices in violation of Amazon's policies (the "Fake Review Scheme"), rendering five categories of statements in the Registration Statement materially false and misleading pursuant to §§11 and 15 of the Securities Act.  On March 5, 2024, the Court largely denied Defendants' Rule 12(b)(6) motion to dismiss.  *See* Opinion and Order (ECF No. 122, "Opinion" or "Op.").  After a thorough analysis of Defendants' risk disclosures—including those that Plaintiffs alleged were themselves materially misleading because they stated, *inter alia*, that Tuya's success depended on its ability to generate positive customer feedback, even though much of the positive customer feedback it received was fraudulently generated—the Court ruled that the risk disclosures "plausibly gloss[ed] over the relevant risk, focus[ed] investors' attention elsewhere, and thereby le[d] them down some primrose path."  *Id*. at 29.  While Defendants now half-heartedly protest in a footnote that the Court did not reach the falsity of those statements, the Opinion flatly contradicts their contention.  In fact, while the Opinion found that Defendants had waived argument concerning four other categories of misstatements, it specifically stated they did not waive arguments concerning the risk disclosure statements.  *Id*. at 23.

---

[1] All "¶" citations are to the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 56, "Complaint"), brought on behalf of a class of investors who purchased Tuya, Inc. ("Tuya" or the "Company") American Depositary Shares ("ADS") pursuant or traceable to the Company's initial public offering ("IPO"). Emphasis is added unless otherwise specified, and internal citations and quotations are omitted unless otherwise noted. Capitalized terms not defined herein have the meanings ascribed to them in the Complaint.

Defendants are: (1) Tuya; (2) CEO Xueji (Jerry) Wang, President and director Liaohan (Leo) Chen, COO and director Yi (Alex) Yang, CFO and director Yao (Jessie) Liu, director Scott Sandell, director Carmen Chang, director Jeff Immelt, director Qing Gao, and director Jim Hong (collectively, the "Individual Defendants"); and (3) Morgan Stanley & Co. LLC, BofA Securities, Inc., and China International Capital Corporation Hong Kong Securities Limited (collectively, the "Underwriter Defendants"). ¶¶28-43.

Unhappy with the Court's ruling on their Rule 12(b)(6) motion, Defendants filed a Rule 12(c) motion. As it pertains to the risk disclosures, the Rule 12(c) motion seeks to re-litigate issues that Defendants already lost, making it nothing more than an untimely motion for reconsideration. Regardless, just as the Court already found the risk disclosures actionable, the motion should again be denied as to these statements.

Defendants' Rule 12(c) motion raises another argument that the Court found they had waived at the motion to dismiss stage, namely, that at the time of the IPO, "the Fake Review Scheme was unknowable as a general matter, as in *Gutman* [*v. Lizhi Inc.*, 633 F. Supp. 3d 681 (E.D.N.Y. 2022)]." Op. at 22. The Court noted, however, that "the existence of the Fake Review Scheme became knowable to at least Safety Detectives," a cybersecurity organization, "prior to the IPO[.]" *Id*. at 23. In the §11 context, knowability means "whether the relevant event had already transpired at the time of the offering." *Winter v. Stronghold Digit. Mining, Inc.*, 2023 WL 5152177, at *7 (S.D.N.Y. Aug. 10, 2023). Defendants ignore the knowability standard. Moreover, this case could not be further from the facts of *Gutman*, which involved the knowability of the public-health risks that COVID-19 ("Covid") posed as of mid-January 2020, when the virus consisted of only a few dozen cases, not yet a ruinous pandemic. Here, at the time of Tuya's IPO, a material number of Tuya's customers had ***already*** engaged in the Fake Review Scheme for a significant amount of time, and this was discovered by Safety Detectives ***prior to the IPO***. Thus, the Fake Review Scheme "had already transpired at the time of the offering" and was therefore knowable. Defendants' challenges to the four other categories of alleged misstatements likewise fail.

Accordingly, Defendants' motion should be denied in its entirety.

- 2 -

## II.    STATEMENT OF FACTS[2]

### A.    Prior to the IPO, Fake Product Reviews Proliferated on E-Commerce Sites

Tuya primarily offers an "Internet of Things" ("IoT") cloud platform to its customers. ¶2. Tuya's products and services enable smart devices, such as household items connected to the internet, to communicate and interact with end users and online information and services. ¶45. Tuya and a material percentage of its customers rely on e-commerce platforms such as Amazon to sell products and services. ¶52. In 2021, 30% of Tuya's product sales were generated by China-based cross-border e-commerce merchants. ¶¶52, 92.

Product reviews are essential to the success of a merchant's business on e-commerce platforms. ¶53. For example, a 2017 study found it is 270% more likely that a consumer will buy a product with five reviews than a product with zero reviews. *Id*. A 2020 study found that 56% of U.S. e-commerce shoppers rely on reviews when deciding whether to make a purchase. *Id*. Accordingly, brands constantly seek out ways to get positive reviews for their products. *Id*.

Amazon previously allowed brands to offer free or highly discounted products to customers in exchange for reviews but banned this practice in 2016. ¶54. To circumvent the ban on incentivized reviews, Amazon merchants utilized other practices such as rebates and "brushing" to continue receiving product reviews.[3] ¶55. In 2018, Amazon deactivated accounts that were accepting rebates in exchange for positive reviews. ¶59. A 2019 report described how Amazon had been "flooded by fake five-star reviews"; up to 90% of Amazon reviews were unverified in some product categories. ¶60. Brushing had an immense impact on Amazon customers in the U.S. throughout 2019, and Amazon claimed to have spent over $500 million to reduce fraud and abuse on its platform. *Id*. Nevertheless, improper practices on Amazon continued, with an increase in

---

[2] The factual record has not changed since the Court decided Defendants' Rule 12(b)(6) motion. Magistrate Judge Tarnofsky stayed discovery pending resolution of the instant motion. ECF No. 142.

[3] Brushing is a practice whereby merchants duplicate customer accounts and use the customers' contact information to send them products they never bought. ¶56.

brushing reported during the Covid pandemic.  ¶¶61-62.  And though Amazon continued deleting fake reviews, sellers reaped the benefits in ratings, reviews, and sales.  ¶63.

  **B.  Tuya Issued Material Misstatements in the Registration Statement**

  On February 26, 2021, Tuya filed a Registration Statement with the SEC for its IPO, which became effective on March 17, 2021.  ¶67.  Despite the Company's history of large losses, substantial indebtedness, limited cash, and a limited ability to generate revenue, the Registration Statement touted Tuya's rapid growth and success.  ¶68.

  At the time of the IPO, however, several significant Tuya customers were employing fake review practices.  ¶¶78-87.  The Registration Statement misleadingly stated that "[o]ur success depends, in part, on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing and potential customers and end users seek and share information."  ¶132.  Unbeknownst to investors, Tuya's customers had engaged in and were then engaging in extensive fake review practices designed to generate artificial positive customer feedback.  ¶73.  Thus, Defendants' success actually depended, in part, on their ability to generate *artificially positive* customer feedback.  ¶133.

  Defendants also misleadingly warned of purportedly future risks that may harm Tuya's business, including: (1) that they "may receive complaints from our customers and end users on our products and services, pricing and customer support. . . .  If actions we take or changes we make to our products and services or platform upset these customers and end users, their online commentary could negatively affect our brand and reputation"; and (2) "independent industry analysts often provide reviews of our products and competing products and services, which may significantly influence the perception of our products and services.  If these reviews are negative or not as strong as reviews of our competitors' products and services, our brand may be harmed."  ¶132.  These purported risk disclosures conveyed the misleading impression that Tuya was faced with the risk of

*negative* customer reviews or the *inability* to achieve positive customer reviews, whereas Tuya actually faced the risk of *fraudulently positive* customer reviews.  ¶133.

Additionally, Tuya claimed that an increase in brand awareness was due to "word-of-mouth referrals," but failed to disclose that the brand awareness was promoted by fake review practices.[4] ¶70.  The Registration Statement also listed Tuya's growth strategies, but failed to disclose that a material percentage of its customers' sales were the result of fake review tactics.  ¶72.

### C.    Safety Detectives Learned of the Fake Review Scheme Prior to the IPO

Meanwhile, on March 1, 2021—approximately three weeks before the IPO—Safety Detectives discovered a data server presumably located in China that contained 7 GB of data and over 13 million records that appeared to be linked to a widespread fake review scam, potentially implicating more than 200,000 people in unethical activities.  ¶¶13, 78.  The information found on the server included contact details for people providing fake reviews, as well as Amazon vendors. ¶78.  The information outlined a common procedure by which Amazon vendors sent reviewers a list of products for which they wanted five-star reviews; the people providing the fake reviews would then buy the products, leave a five-star review on Amazon a few days after receiving the products, and then the vendor would issue a refund for the purchased products to the reviewers through PayPal and allow them to keep the products.  *Id*.  It appeared that the scam leaked information from citizens of the U.S. and Europe at a minimum.  *Id*.

These fake review practices were ongoing for months, if not years, prior to the IPO.  *See id*. After Safety Detectives published its report on May 6, 2021 (the "Safety Detectives Report"), Amazon suspended the accounts of numerous China-based merchants, including many of Tuya's significant customers, such as Aukey, VanTop, Apeman, and Zebao.  ¶¶79-85.  On May 11, 2021,

---

[4] Defendants touted the "Powered by Tuya" concept to increase brand awareness among Tuya's end users.  ¶¶129-130, 151.  Certain finished products had a "Powered by Tuya" label on them, indicating to customers that those products were also Tuya's.  *Id*.  It is reasonable to infer that users of products with Tuya technology knew that Tuya was integrally involved in creating the product.

TechCrunch reported that "several top Chinese sellers disappeared from Amazon over the past few days. At least eleven accounts that originate from Greater China were suspended . . . TechCrunch has reached out to Mpower and Aukey, whose Amazon stores are gone and were two of the most successful brands native to the American marketplace. In total, the suspended accounts contribute over a billion dollars in gross merchandise value (GMV) to Amazon." ¶80. According to PC Mag, "the timing certainly suggests the removal" from Amazon was in response to the discovery of the sellers' fake reviews. ¶79.

On July 9, 2021, Verdict reported that Amazon had "closed 340 online stores of one of its largest Chinese retailers in the first half of this year" as it cracked down against paid reviews and other violations of its terms of use. ¶87. Subsequently, Amazon banned hundreds of Chinese brands across thousands of sellers' accounts. *Id*. Amazon stated that these sellers knowingly, repeatedly, and significantly violated its seller policies, particularly its policies around review abuse. *Id*. As a result of the suspensions, Tuya's customers suffered significant financial harm. ¶¶82-85.

Based partly on the fact that several Tuya customers' products had suddenly become unavailable on Amazon shortly after the publication of the Safety Detectives Report, Plaintiffs allege that a material percentage of Tuya's e-commerce customers were engaged in the Fake Review Scheme. ¶¶11, 79, 131; *see also* Op. at 4-5.

**D.      Investors Learn that a Material Percentage of Tuya's E-Commerce Customers Were Engaged in Fake Review Practices at the Time of the IPO**

On August 18, 2021, Tuya issued its Q2 2021 results, disclosing a $41.5 million loss from operations, a $38.1 million net loss for the quarter, and a projection of disappointing results for the following quarter. ¶¶16, 18, 88. Defendant Liu blamed Tuya's lower revenue forecast on its customers' challenges with Amazon, stating, "***our customers face a series of challenges, including Amazon's strict execution of seller policy***." ¶90.

- 6 -

Analysts reacted negatively to Tuya's third quarter forecast. Morgan Stanley lowered its guidance by 6%, citing headwinds on cross-border e-commerce merchants, and BofA Global Research lowered its revenue guidance for Tuya due partly to Amazon's imposition of a stricter seller policy. ¶¶93-94. The same day, Tuya's ADS price declined 19%; the next day, it dropped another 16.7%, for a two-day decline of 30.6%. ¶95.

The impact of the fake review practices continued to materialize on November 22, 2021, when Defendant Wang revealed that Amazon's ban was still having a negative effect on Tuya, stating: "[t]he third quarter of 2021 was a challenging quarter for the industry," with "Amazon store closures" a leading challenge. ¶99. On this news, Tuya's ADS price declined 7.6%. ¶101.

On March 14, 2022, Tuya reported disappointing earnings for Q4 2021. ¶103. Wang tried to emphasize that the Amazon ban's effect on Tuya's business was in the past, stating: "certain e-commerce customers affected by store closures in the third quarter are also showing signs of recovery." ¶104. The next day, however, Morgan Stanley wrote that Tuya's "sequential slowdown mainly reflects the lasting effect of store closure at Amazon.com, global inflation, and supply chain disruptions," and reduced its revenue forecast for Tuya for 2022-2024. ¶107. The same day, Tuya's ADS price fell 9.5%. ¶106.

Tuya's downward spiral continued on June 14, 2022, when the Company announced its Q1 2022 results. ¶108. Tuya admitted that it experienced "a slowdown in the U.S. and Europe"—the two regions targeted in the Fake Review Scheme. ¶21. Tuya's ADS price fell 18% the next day, and has never recovered. ¶¶112-113.

### III.    PROCEDURAL HISTORY

The Court largely sustained the Complaint. In pertinent part, the Court held that "Section 11 does not have a requirement that the omitted fact be known, or should have been known, by issuers. . . . Rather, what is required is that the omitted fact be knowable." Op. at 21. The Court

explained that "whether a fact was 'knowable' at the time of a securities offering is not the same as whether *a defendant* 'knew,' or 'should have known' of that fact." *Id*. at 21-22 (quoting *Winter*, 2023 WL 5152177, at *7) (emphasis in Opinion).

In discussing the concept of "knowability," the Court highlighted two cases, *Wandel v. Gao*, 590 F. Supp. 3d 630 (S.D.N.Y. 2022), and *Gutman*. *See* Op. at 22. Both of those cases involved IPOs of China-based companies that took place on January 17, 2020, when "the risk of COVID-19 was neither known nor knowable" because the IPOs "predated the widespread outbreak of COVID-19." *Id*. (quoting *Wandel*, 590 F. Supp. 3d at 641, and discussing *Gutman*, 633 F. Supp. 3d at 684, 688-89). Because the Court could not "discern a developed argument in Defendants' moving brief to the effect that the Fake Review Scheme was unknowable as a general matter, as in *Gutman*," it deemed such argument waived. *Id*. at 22-23. The Court noted, however, "as Defendants themselves acknowledged at oral argument, the existence of the Fake Review Scheme became knowable to at least Safety Detectives prior to the IPO[.]" *Id*. at 23.

The Court found that Plaintiffs adequately alleged that Defendants made actionable misstatements in the Registration Statement concerning Tuya's risk warnings (Category 5 statements), and waived arguments concerning statements in Categories 1 through 4.[5] *See id*. (finding that although Defendants "raise[d] a number of reasons to question whether their failure to mention the Fake Review Scheme rendered misleading the five aforementioned categories of statements," with the exception of only two—"the Net Promoter Score and the risk warnings— Defendants relegated these arguments to their Reply"). The Court thoroughly analyzed the risk disclosures, *see id*. at 26-29, including those which Plaintiffs alleged were themselves misleading.

---

[5] The five categories of alleged misstatements in the Registration Statement are: (1) statements touting Tuya's deep relationships with its customers (¶¶125-127, 129, 149); (2) statements discussing Tuya's ability to gain new customers and increase adoption of its products and services (¶¶138, 144); (3) statements attributing Tuya's success to reasons other than its customers' fake review practices (¶¶125, 127, 129, 140, 142, 144, 146-147); (4) statements touting Tuya's sales and marketing efforts (¶¶151, 153); and (5) purported risk warnings describing potential risks of receiving negative reviews of its products and not receiving sufficiently positive reviews of its products (¶132). *See also* Op. at 19.

*See id*. at 27.  The Court concluded that "the risk disclosures highlighted by Defendants cannot inoculate them from Section 11 liability premised on the Fake Review Scheme at this stage." *Id*.

The Court also concluded that "Plaintiffs' allegations allow for the reasonable conclusion that Tuya investors were simply warned about the wrong—or at least an orthogonal—risk related to fake customer reviews.  Nor is the Court particularly persuaded by the proposition that the Registration Statement's more general warnings about customer loss can make up for that mismatch." *Id*. at 29.  In finding Defendants' specific risk disclosures regarding customer reviews misled investors, the Court held that, "[v]iewed in their totality, and drawing all inferences in Plaintiffs' favor, the Registration Statement's risk disclosures plausibly 'gloss[ed] over the relevant risk, focus[ed] investors' attention elsewhere, and thereby le[d] them down some primrose path.'" *Id*. (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 360 (2d Cir. 2002)).

## IV.   ARGUMENT

### A.   Legal Standards

In deciding a Rule 12(c) motion, courts "employ[ ] the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6)."  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  Therefore, when a defendant brings a Rule 12(c) motion on the same factual record and legal basis as a previously denied Rule 12(b)(6) motion, courts employ the standard for a motion for reconsideration.  *See Aviles v. S&P Glob., Inc.*, 2020 WL 1689405, at *3 (S.D.N.Y. Apr. 6, 2020) ("a Rule 12(c) motion for judgment on the pleadings that challenges the sufficiency of a complaint on the same ground as an already-denied Rule 12(b)(6) motion to dismiss should meet an identical fate," and applying the reconsideration standard); *MTR Gaming Grp., Inc. v. Arneault*, 2015 WL 136563, at *7, *9 (W.D. Pa. Jan. 9, 2015) (Rule 12(c) motion based on "virtually all of the same arguments" and "essentially the same record" as previous Rule 12(b)(6) motion was "functionally

akin to a motion for reconsideration").[6]  A motion for reconsideration is properly granted "only if there is a showing of: (1) an intervening change in controlling law; (2) the availability of new evidence or (3) a need to correct a clear error or prevent manifest injustice."  *Drapkin v. Mafco Consol. Grp., Inc.*, 818 F. Supp. 2d 678, 696 (S.D.N.Y. 2011).  None of these bases applies here, nor do Defendants claim they do.

The law of the case doctrine also applies to Defendants' motion.  The law of the case doctrine posits that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case . . . unless cogent and compelling reasons militate otherwise."  *U.S. v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).  Departure from law of the case is only appropriate under the same three grounds as a motion for reconsideration.  *See Johnson v. Holder*, 564 F.3d 95, 99-100 (2d Cir. 2009).  Again, none of which applies here.

To plead a claim under §11, a plaintiff need only allege: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading" in a registration statement or prospectus.  *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013).  "It is well-established . . . that once a company speaks on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016); *see also In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 277 (S.D.N.Y. 2010) (because offering documents described defendant's "underwriting standards in positive terms, [they] plac[ed] the subject 'in play' so that failure to disclose a lowering of those

---

[6]  Defendants contend they "may even raise 'the same argument in a Rule 12(c) motion for judgment on the pleadings' that [they] advanced in a Rule 12(b)(6) motion."  Br. at 8 (quoting *Derisme v. Hunt Leibert Jacobson, PC*, 2010 WL 3417857, at *5 (D. Conn. Aug. 26, 2010)).  In *Derisme*, the court had not ruled on the argument originally raised in the Rule 12(b)(6) motion, and so the defendants were permitted to raise it again in their Rule 12(c) motion—unlike here with respect to the risk disclosure statements that the Court has already found actionable.

standards would be misleading").

**B.    The Court Already Ruled that the Risk Disclosures Are Actionable**

Defendants claim that "the Court declined to consider whether the omission of the Fake Review Scheme rendered any actual statement in the Registration Statement misleading." Br. at 7. This is demonstrably false. The Court did not find that Defendants waived arguments against the risk disclosure statements. To the contrary, those statements were analyzed and sustained by the Court. *See* Op. at 23 ("To be sure, Defendants raise a number of reasons to question whether their failure to mention the Fake Review Scheme rendered misleading the five aforementioned categories of statements. . . . ***But, with two exceptions discussed below—i.e., the Net Promoter Score and the risk warnings***—Defendants relegated these arguments to their Reply."); *see also id*. at 26-29. Thus, the motion belatedly seeks to reconsider the Court's well-reasoned decision.[7]

In a footnote, Defendants argue that the Court did not hold the Registration Statement's risk disclosures actionable. *See* Br. at 20 n.17. According to them, "the Court did not separately consider whether the risk disclosures were themselves misleading due to nondisclosure of the Fake Review Scheme, which Plaintiffs contend had already transpired at the time of the IPO." *Id*. The Opinion belies their argument. First, the Court expressly stated that Defendants did not waive arguments about the risk warnings. *See* Op. at 23. Second, the Court quoted the specific risk disclosure statements related to customer reviews that Plaintiffs alleged were misleading. *See id*. at 27. The Court then held that Tuya's risk disclosures "plausibly 'glossed over the relevant risk, focused investors' attention elsewhere, and thereby led them down some primrose path.'" *Id*. at 29. The "plausible" language is characteristically used by courts to describe an actionable misstatement, and shows that the Court ruled on the actionability of the risk statements.

Third, the Court compared this case to *Hunt v. Alliance North American Government Income*

---

[7] A timely motion to reconsider the Opinion would have been due on March 19, 2024. *See* Local Civ. R. 6.3.

- 11 -

*Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998). In *Hunt*, "[t]he prospectuses warned that the Fund's hedging maneuvers might fail, not that the Fund would have no opportunity to use hedging maneuvers" in the first place." Op. at 28 (quoting *Hunt*, 159 F.3d at 729). The Court faulted Tuya's risk disclosures related to fake customer reviews, finding as follows:

> Similar to *Hunt*, Plaintiffs' allegations allow for the reasonable conclusion that Tuya investors were simply warned about the wrong—or at least an orthogonal—risk ***related to fake customer reviews***. . . . The combination of the Registration Statement's general disclosures about customer loss ***and its specific disclosures about the potential impact of negative publicity on Tuya's ability to retain customers*** did not "put a reasonable investor on notice of the risk" of the Fake Review Schemes: ***a reasonable investor reviewing the Registration Statements for customer review-related risks likely would have placed more emphasis on the specific disclosures than the more general ones***.

*Id*. at 29.

In sum, the Court has already ruled that the risk disclosures are actionable. As such, since there has been no intervening change in controlling law, new evidence, or clear error, the law of the case doctrine applies, further supporting denial of the motion. *Quintieri*, 306 F.3d at 1225.

Even if the Court did not rule on the actionability of the risk disclosures (and it did), those statements were materially false and misleading at the time of the IPO. "Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." *In re Facebook, Inc., IPO Sec. & Derivative Litig*., 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013). "[T]he failure to disclose then-ongoing" problems can "cause a reasonable investor to make an overly optimistic assessment of the risk." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014). "[P]laintiffs need not plead that the defendants knew or should have known [of the undisclosed risk] in order to state a claim for failure to disclose that risk in [the defendant's] offering statements." *Hutchison v. CBRE Realty Fin., Inc.*, 638 F. Supp. 2d 265, 274-75 (D. Conn. 2009), *aff'd on other grounds sub nom. Hutchison v. Deutsche Bank Sec. Inc*., 647 F.3d 479 (2d Cir. 2011).

- 12 -

Defendants argue that "an affirmative statement is misleading by omission only if it 'misleadingly suggested that the subsequently-identified [information] *did not exist*.'" Br. at 10 (quoting *Chen v. Missfresh Ltd.*, 2023 WL 7289750, at *12 (S.D.N.Y. Nov. 6, 2023)) (emphasis in original). That, however, is not the standard by which to determine whether a statement is misleading. Indeed, as Defendants know, the *Chen* court also stated: "The test remains whether, upon 'examination of defendants' representations, taken together and in context,' the affirmative statements that were made are misleading." 2023 WL 7289750, at *10 (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010)); *see also Universal Health Servs., Inc. v. U.S.*, 579 U.S. 176, 188 (2016) ("half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations"). In any case, Plaintiffs meet the standard advanced by Defendants.

Tuya's risk disclosures are actionable because, at the time of the IPO, several significant Tuya customers were engaged in widespread fake review practices. ¶¶78-87. Tuya misleadingly stated in the Registration Statement: "Our success depends, in part, on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing and potential customers and end users seek and share information." ¶132. This statement suggested that "the undisclosed improper activity alleged by Plaintiff[s] was not occurring." Br. at 18 (quoting *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012)). Unbeknownst to investors, Tuya's customers had engaged in and were then engaging in extensive fake review practices designed to generate artificial positive customer feedback. ¶73. Thus, Tuya's success actually depended, in part, on its ability to generate ***artificially positive*** customer feedback. Tuya failed to disclose this material fact.

This case is akin to *Plumbers & Pipefitters National Pension Fund v. Davis*, 2020 WL

- 13 -

1877821 (S.D.N.Y. Apr. 14, 2020) ("*Davis*").  In *Davis*, the defendants told investors that customers were making positive comments about the company's products.  *See id*. at \*9.  The plaintiffs alleged that, in fact, customers were expressing dissatisfaction with the company's products.  *See id*.  The court found the statements actionable, reasoning, in part, that "Defendants' statements that they were receiving positive feedback from customers were specific, factual statements, and [plaintiff] has plausibly pleaded that these statements were false when made.  These statements were also material.  If [the company] was receiving positive feedback from its customers, a reasonable investor may have concluded that [the company] was a more attractive investment opportunity." *Id*.

Defendants argue that Plaintiffs' allegation "amounts to little more than an assertion that Tuya's disclosures about reviews 'trigger[ed] a generalized duty requiring [Tuya] to disclose the entire corpus' of information on that topic."  Br. at 19 (quoting *Morgan Stanley*, 592 F.3d at 366).  Not so.  Plaintiffs take issue with Defendants' half-truths about customer feedback, which suggested to investors that the Fake Review Scheme was not occurring.

Additionally, Defendants never address the issue of whether the risk of the Fake Review Scheme had already transpired by the time of the IPO, even though the Court expressly stated that it had not reached that point.  *See* Op. at 29 n.17.  Thus, Defendants have waived this argument.  *See id*. at 22-23 ("the Court will not consider arguments raised for the first time in a reply brief").  Nevertheless, Plaintiffs adequately allege that the risk of the Fake Review Scheme had already transpired at the time of the IPO because Safety Detectives obtained access to the data server weeks before, and it is reasonable to infer that the Fake Review Scheme was ongoing for a significant amount of time prior to its discovery.  ¶78; *see In re CannaVest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 235 (S.D.N.Y. 2018) (court must "draw all reasonable inferences in favor of the plaintiff").

### C.    The Fake Review Scheme Was Knowable as a General Matter

Defendants argue that Tuya had no duty to disclose the Fake Review Scheme because it was

- 14 -

not just unknown to Tuya, but unknowable as a general matter.  *See* Br. at 2.  In *Winter*, Judge Abrams explained knowability to mean "whether the relevant event had already transpired at the time of the offering."  2023 WL 5152177, at *7; *see also Chen*, 2023 WL 7289750, at *9 (quoting *Winter*).  Defendants ignore this legal standard.

Defendants continue to incorrectly premise their argument on whether they should have known of the Fake Review Scheme.  *See, e.g.*, Br. at 22 ("***Because the knowledge of—and specialized nonpublic information available to—a cybersecurity expert does not equate to general knowledge***, even if the data Safety Detectives accessed implicated Tuya customers, the alleged Fake Review Scheme was not 'knowable as a general matter.'").  The relevant question is did the Fake Review Scheme exist at the time of the IPO?  The answer is unequivocally yes.

In the Opinion, the Court discussed general knowability in the context of two cases concerning risk disclosures regarding Covid.  *See* Op. at 22 (discussing *Wandel* and *Gutman*).  In *Wandel* and *Gutman*, the risk of Covid was neither known nor knowable at the time of the defendants' IPOs on January 17, 2020 because the IPOs "predated the widespread outbreak of COVID-19."  *Id*. (quoting *Wandel*, 590 F. Supp. 3d at 641); *see also id*. ("the risk of COVID-19 was [generally] neither known nor knowable by the start of the IPO") (quoting *Gutman*, 633 F. Supp. 3d at 684, 688-89).  The *Wandel* court held:

> The fact that the outbreak escalated rapidly after January 17 is irrelevant unless that escalation had already "transpired" or "was a near certainty" by that point.  In fact, no such escalation had occurred by January 17.  To the contrary, the risk of COVID-19 was neither known nor knowable to [defendant] by the start of the IPO.  ***By that date, health officials had identified 41 cases of viral infection—a statistic that "appeared unremarkable at the time." . . . Nor had any human-to-human transmission been confirmed***.  It is therefore only with hindsight that Plaintiffs can allege that [defendant] failed to discuss the possibility that a few dozen cases of a respiratory illness would explode into a ruinous pandemic.

590 F. Supp. 3d at 641.

The difference between *Wandel* and *Gutman*, on the one hand, and Tuya on the other, is

stark: unlike the uncertain risks posed by a few dozen cases of a respiratory illness in mid-January 2020, at the time of Tuya's IPO, a material number of Tuya's customers had *already* engaged in the Fake Review Scheme for a significant amount of time, and Safety Detectives discovered this ***prior to the IPO***. Defendants' attempt to downplay the import of what Safety Detectives had discovered does not help them, *see* Br. at 24 n.19, as the critical fact revealed by Safety Detectives' discovery is that the Fake Review Scheme was ongoing and thus knowable prior to the IPO.

Importantly, the *Wandel* court did not analyze whether the larger societal and economic impact of the Covid pandemic had transpired at the time of the IPO; it instead analyzed whether the risk of the outbreak escalating had transpired at that time. Similarly, the relevant undisclosed risk here was the existence of the Fake Review Scheme itself and not the fallout from the undisclosed risk (the Amazon crackdown and its resulting impact on Tuya). *Cf. id.* (arguing that "Plaintiffs do not allege that it was knowable at the time of the IPO that Amazon would take the unprecedented step of banning Tuya's customers in numbers sufficient to impact its business"). The Amazon crackdown was a consequence of the scheme, which even Defendants do not dispute was ongoing at the time of the IPO. Thus, unlike *Wandel* and *Gutman*, it is not with hindsight that Plaintiffs allege a material omission. *See Winter*, 2023 WL 5152177, at *7 ("[C]ourts considering [§11 claims] inquire into the truth of a statement made in the registration statement ***as judged by the facts as they existed when the registration statement became effective***."). Thus, the case does not rise and fall on Safety Detectives' discovery of the Fake Review Scheme. Instead, the relevant fact is that the Fake Review Scheme "had already transpired at the time of the offering." *Id*.

Defendants contend that creating a duty to disclose information potentially discoverable only by investigative experts would be a significant shift in securities laws. *See* Br. at 25. They argue that, "[f]aced with the impossibility of discovering third-party misconduct without themselves

- 16 -

violating the law, issuers would be incented to include endless risk disclosures concerning third-party behavior and other unknowable facts, solely as a precautionary measure.  This in turn would result in those disclosures becoming so lengthy as to be meaningless." *Id*.  This is a red herring. Had Defendants remained silent about the importance of, and risks related to, customer reviews, they would have had no duty to disclose the Fake Review Scheme at all.  *See Morgan Stanley*, 592 F.3d at 366 ("[W]hen an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate.").  Having made statements regarding customer reviews that suggested the Fake Review Scheme was not occurring, Defendants brought a disclosure obligation upon themselves.

Defendants state that none of the four Tuya vendors that Amazon allegedly suspended were mentioned in the Safety Detectives Report, and that Plaintiffs do not allege that the leaked data relates to these vendors or that any of these vendors were suspended because of the Report or the data cited therein.  *See* Br. at 5-6.  Yet Tuya admitted that its customers were negatively affected by the Amazon ban.  *See* ¶¶90-91, 104, 110.  They cannot have it both ways.  It is reasonable to infer that Amazon banned these customers due to their participation in the Fake Review Scheme.  *See* Op. at 4-5 (citing ¶¶11, 79, 131).

**D.    Category 1-4 Statements Are Actionable**

**1.    Statements Touting Tuya's Deep Relationships with Its Customers**

Plaintiffs have adequately alleged additional misleading statements in the Registration Statement.  Defendants stated: "We strive to acquire new customers to grow our customer base. . . . We will also enhance our sales and marketing efforts to attract new customers to try out our products and services and accelerate their adoption of our platform."  ¶129.  While Defendants mentioned sales and marketing efforts as a tactic to attract new customers, they omitted to tell investors that their customers were then-engaging in a widespread and systematic Fake Review Scheme to attract

new customers to buy products and thus increase Tuya's sales and revenue.

Further, Defendants touted the "Powered by Tuya" concept as a method to "increase brand awareness among the end users." ¶129. As another method to increase sales, Defendants stated that "[g]rowing mind share[8] among the end users will attract more business customers and developers to our platform." *Id*. Once Defendants spoke about their methods for increasing brand awareness and enhancing sales and marketing efforts to attract new customers, they triggered a duty to disclose the Fake Review Scheme. *See Vivendi*, 838 F.3d at 258. Defendants' failure to disclose the Fake Review Scheme rendered statements touting Tuya's deep relationships with its customers materially misleading. *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *14 (S.D.N.Y. Nov. 18, 2019) ("Therefore, each time Defendants touted their recruitment efforts . . . without revealing their new, aggressive hiring strategy, they were concealing material information from the market.").

Defendants incorrectly argue that none of the statements suggests that the Fake Review Scheme did not exist, and the mere mention of Tuya's customers does not trigger a duty to disclose everything about them. *See* Br. at 11. "The test remains whether, upon examination of defendants' representations, taken together and in context, the affirmative statements that were made are misleading." *Chen*, 2023 WL 7289750, at *10. Defendants' statements touting their "aim to increase brand awareness among the end users by promoting the 'Powered by Tuya' concept" (¶129) were misleading because they omitted the scheme, which similarly increased brand awareness among end users who relied on fraudulently positive reviews to purchase devices powered by Tuya.[9]

---

[8] Mind share "is a marketing term that describes the amount of consumer awareness or popularity surrounding a particular product, idea, or company." https://www.investopedia.com/terms/m/mindshare.asp.

[9] Defendants' cases do not help them. *See* Br. at 11-12. In *Morgan Stanley*, the court held that the plaintiffs' allegations about the relationship between brokers and internal researchers did not suggest "that there was anything untoward" and "there [were] no allegations that the internal problems at MS & Co. directly affected the manner in which the Funds' managers approached investment decisions." 592 F.3d at 364. Further, "the affiliation between MS & Co. and the Funds was disclosed in the Offering Documents." *Id*. In *In re Express Scripts Holding Co. Securities Litigation*, 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017), defendants' statements were not actionable because they did in fact disclose that they were in ongoing negotiations with their largest customer regarding a breach of contract dispute, and the court held

These statements are not puffery.  *Cf.* Br. at 13.  Whether a representation is puffery is context-dependent, and "more definite statements about a company's business practices may invoke reasonable reliance by investors, particularly if the statements relate to aspects of a company's brand or reputation that are touted as sources of its success."  *Davis*, 2020 WL 1877821, at \*10 (finding defendants' statements about company's brand were not puffery).  Such is the case here, where Defendants made numerous statements about Tuya's brand to investors—with a specific focus on "expand[ing] brand awareness" as a source for its success.  ¶129.

Defendants' cases are inapt.  *See* Br. at 13.  In *Rudman v. CHC Group Ltd.*, the court deemed disclosures about strong customer relationships puffery because the company's nonpayment of fees on its contract during a suspension period were unrelated to its relationship with its customers, and the plaintiffs conceded that the company resumed payments when the suspension period was over.  *See* 217 F. Supp. 3d 718, 728 (S.D.N.Y. 2016).  In *Tongue v. Sanofi*, the court held that the FDA's critique of Sanofi's testing methods did not conflict with defendants' statements about feeling "relaxed" or "satisfied."  816 F.3d 199, 213 (2d Cir. 2016).  And in *Local #817 IBT Pension Fund v. XPO Logistics, Inc.*, plaintiffs conceded that defendants' statements were truthful.  2022 WL 2358414, at \*2 (2d Cir. June 30, 2022).

### 2. Statements Discussing Tuya's Ability to Gain New Customers and Increase Adoption of Its Products and Services

Defendants' statements about acquiring new customers and business growth are actionable. The Registration Statement specifically discussed increased customer usage, and stated that "[a]s this trend continues over time, our brand awareness also increases, generating word-of-mouth referrals that not only attract more brands, developers and partners, but also lead to growing end user demand,

---

that statements about negotiations "which lack a definite outcome, are not actionable."  *Id*. at \*13.  The Fake Review Scheme, unlike *Express Scripts*, was not "merely speculative," *id*. at \*11; rather, it was ongoing at the time of the IPO. In *Schoenhaut v. American Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997), unlike here, defendants' statements were not actionable because the Prospectus warned of the precise risk that occurred.

better user insights and a more vibrant IoT ecosystem." ¶138.  Tuya's Registration Statement also stated, "[w]e are intensely focused on growing our customer base.  We continue to invest in our sales and marketing efforts and developer community outreach, which are critical to driving customer acquisition."  *Id*.  Defendants further touted Tuya's positive "business growth" and "increased number of customers." ¶144.  These statements were materially misleading because they failed to disclose the Fake Review Scheme that enabled Tuya's customers to increase end-user purchases and brand awareness, and as a result, boost Tuya's growth and sales.

Defendants make much about the distinction between Tuya's strategies to increase its customer base and its customers' strategies for increasing sales to end users.  *See* Br. at 14. However, end users would be reviewing the complete product, and that would include Tuya's smart technology.  The "Powered by Tuya" brand awareness campaign connected Tuya with end users. ¶¶129-130, 151.  Certain finished products would have a "Powered by Tuya" label on them, so those products were Tuya's as well, as far as customers were concerned.  According to the Registration Statement, the "consistent, high quality IoT experience" for end users leads to an "increase in usage" and ultimately "lead[s] to growing end user demand." ¶138.  These statements failed to inform investors that certain of Tuya's customers were engaging in the Fake Review Scheme and growing end-user demand through fraudulently positive product reviews.  These facts are precisely the kind that are material to a reasonable investor.  *See Davis*, 2020 WL 1877821, at \*9 ("If PSG was receiving positive feedback from its customers, a reasonable investor may have concluded that PSG was a more attractive investment opportunity.").

Defendants argue that these statements are not actionable because they do not "impl[y] anything about Tuya's customers' strategies for [marketing to end users], about their compliance with Amazon's policies, or even about the portion of their sales that took place on Amazon." Br. at

14.  But since Defendants cited different strategies for their ultimate goal of growing end-user demand, they had a duty to disclose the Fake Review Scheme, whose purpose was to grow end-user demand.  This case is similar to *Davis*, where the court held that defendants' statements about their strategy to gain market share were "incomplete at best. . . . Because Defendants specifically cited their strategy as a source of their success, they were obligated [] to tell the whole truth with respect to that strategy by disclosing that their sales growth was, at least in part, the result of short-run sales tactics that led to a buildup of inventory at PSG's customers."  2020 WL 1877821, at *9.  Simply because the conduct at issue here involved third parties—as in *Davis*—does not exempt Defendants from disclosing it.  Indeed, Tuya financially benefited from its customers' participation in the Fake Review Scheme.  *See, e.g.*, *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 285-86 n. 11 (E.D.N.Y. 2023) (holding that defendants' statements were actionable because they failed to disclose the conduct of their distributors from whom they benefitted).[10]

### 3.    Statements Attributing Tuya's Success to Reasons Other than Its Customers' Fake Review Practices

Defendants' statements attributing Tuya's success to sources other than the Fake Review Scheme were materially false and misleading because they put the source of Tuya's success at issue without disclosing the Fake Review Scheme.  *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 86 (S.D.N.Y. 2022) ("where a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices").  The Registration Statement specifically focused on the importance of end users to Tuya's success.  For example, Defendants stated, "We aim to increase brand awareness ***among the end users*** by

---

[10]  Defendants argue that "[b]ecause there is 'no direct connection' between the challenged disclosures and the omitted information, the disclosures do not" imply that the Fake Review Scheme was not occurring.  Br. at 14.  Again, Defendants mistakenly attempt to limit the standard for falsity.  *See Chen*, 2023 WL 7289750, at *10 ("The test remains whether, upon examination of defendants' representations, taken together and in context, the affirmative statements that were made are misleading.").

promoting the 'Powered by Tuya' concept. . . . As we introduce more services **directly to end users**, our brand will be increasingly recognized.  **Growing mind share among the end users will attract more business customers** and developers to our platform."  ¶129.

The Registration Statement further attributed "substantial growth" to "demands for smart devices and services."  ¶147.  Defendants put the source of Tuya's success directly at issue when making these statements but failed to disclose that Tuya's customers' fake review practices were key drivers of Tuya's increased brand awareness among end users.  Defendants' failure to disclose the fake review practices rendered their statements misleading.  *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 404-05 (S.D.N.Y. 2020) (finding statements about "maintain[ing]" and "enhanc[ing]" customer relationships actionable under §11).

The Registration Statement further emphasized the importance of end users to Tuya's success, stating, in pertinent part:

> Different from other cloud infrastructure companies or SaaS or PaaS companies in other industries, **our business is deeply integrated with our customers' own businesses, which in turn are affected by the ultimate demands and purchasing power of the end users.  The recovery of the end-user market and customers' own business are positive signals for our business to maintain rapid growth**, which has led to stronger investor confidence in us and our valuation and future performance.

¶147.  Indeed, by discussing their customers' businesses and end users in connection with Tuya's success, Defendants put the Fake Review Scheme "in play" and therefore "had a duty to tell the whole truth."  *In re Grab Holdings Sec. Litig.*, 2024 WL 1076277, at *15 (S.D.N.Y. Mar. 12, 2024).

Defendants argue that "[m]any of the disclosures contain historical data" and are not actionable.  Br. at 15.  Courts, however, are required to "read the offering documents as a whole."  *McKenna v. Smart Techs., Inc.*, 2012 WL 1131935, at *10 (S.D.N.Y. Apr. 3, 2012); *see also Dentsply Sirona*, 665 F. Supp. 3d at 283 (finding statements actionable despite the company's disclosure of accurate historical data).  Defendants' reliance on *Chen* is misplaced.  *See* Br. at 15.  In

that case, when the offering documents were read as a whole, "they unmistakably 'suggested caution (rather than confidence)' about the efficacy of the company's internal controls" and the company disclosed that it identified all existing deficiencies, but made clear that others may exist. 2023 WL 7289750, at *12. Here, by contrast, the Registration Statement did no such thing.[11]

Defendants argue that liability for failing to disclose that a company's success is due to improper business practices only applies when a company fails to disclose its own improper business practices and not that of "independent third parties." Br. at 16. This argument is directly at odds with Tuya's business model, which relies on its customers' businesses and end-user support for financial success: "our business is deeply integrated with our customers' own businesses, which in turn are affected by the ultimate demands and purchasing power of the end users."[12]  ¶147.

*Dentsply Sirona* is on point. In that case, third-party distributors "were engaged in a conspiracy to slow the formation and growth of dental buying groups and block low-priced, rival distributors, who could sell to dental buying groups, enabling the distributors to charge supra-competitive prices and maintain high profit margins." 665 F. Supp. 3d at 285-86. The plaintiff there alleged that defendants' statements about the source of their success were false or misleading because they "attribute[d] growth to certain factors but omit[ted] that a portion of the growth was the result of anticompetitive conduct" by third parties. *Id*. at 285. The court held that the unlawful conduct of the distributors rendered misleading statements attributing its success to factors like

---

[11] *In re Omega Healthcare Investors, Inc. Securities Litigation* is inapt. 563 F. Supp. 3d 259 (S.D.N.Y. 2021). There, the court rejected plaintiffs' allegations that the company's financial statements were misleading pursuant to Accounting Standards Codification §855 because "plaintiffs d[id] not allege that Omega's 2016 financial statements inaccurately reported historical financial data," so "their theory of liability, which [was] premised on those financial statements," was flawed. *Id*. at 277. This is not the case here, where Plaintiffs have alleged various categories of misleading statements (not financial statements) rendering the offering documents as a whole misleading.

[12] Defendants' cases miss the mark. *See* Br. at 16. In *Menora Mivtachim Insurance Ltd. v. International Flavors & Fragrances Inc.* the court found none of the challenged statements "sufficiently material to a reasonable investor[,]" and held that plaintiffs failed to satisfy the Rule 9(b) pleading standard with respect to allegedly illegal transactions, and thus could not state a claim premised on those transactions. 2021 WL 1199035, at *12-*13, *20 (S.D.N.Y. Mar. 30, 2021). *In re FBR Inc. Securities Litigation* is also inapposite; the court held that "while the Complaint alleges the nature of defendants' violation of the securities laws, it does not specify what defendants did, who they did it with, or how what defendants did constituted the alleged violation." 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008).

market growth.  *See id*. at 285 n.11.  Likewise, here, Defendants omitted to disclose the conduct of Tuya's customers, from whose business Tuya directly benefitted.[13]

Moreover, the allegations are not conclusory (*see* Br. at 17) and the Fake Review Scheme contributed materially to Tuya's success, as Defendants have admitted.  *See, e.g.*, ¶99 ("The third quarter of 2021 was a challenging quarter for the industry[,]" citing "Amazon store closures").  China-based cross-border e-commerce merchants accounted for selling 30% of devices powered by Tuya, and losing these customers impacted Tuya's second-half 2021 revenues by 10%.[14]  ¶92.

### 4.    Statements Touting Tuya's Sales and Marketing Efforts

Defendants' statements about Tuya's sales and marketing efforts are likewise actionable.  In the Registration Statement, Defendants claimed that Tuya had an edge over its competitors: "we compete favorably on the basis of . . . brand awareness and reputation [and] sales and marketing efforts[.]"  ¶153.  Defendants continuously put the source of Tuya's success at issue, but failed to disclose that Tuya's customers' participation in the Fake Review Scheme was a source of that success.  Tuya's business model relies on its customers' businesses and the end users' satisfaction to grow and increase revenue.  As such, "having chosen to speak about specific features of its business model," Tuya "had an obligation to ensure its statements were both accurate and complete, even if it lacked an independent duty to discuss the information in the first place."[15]  *In re Alibaba Grp.*

---

[13]  *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283 (S.D.N.Y. 2019), is inapposite.  That case involved an alleged bribery scheme, and although the court ultimately dismissed the case, it did find that defendant's failure to disclose the alleged bribery scheme rendered the company's statements about certain litigation actionable.  *See id.* at 296 ("Because Cemex did not disclose the alleged bribery scheme during this time, the Company's statements about the Colombian expiration-of-property litigation are actionable under §10(b).").

[14]  Defendants' reliance on *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153 (S.D.N.Y. 2018), and *Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645 (S.D.N.Y. July 16, 2020), does not help their argument.  In *Diehl*, plaintiff only made a conclusory allegation about the link between defendants' animal nutrition supply statements and cooperating with a plea deal about water pollution.  339 F. Supp. 3d at 166.  In *Marcu*, defendants did not "put the circumstances surrounding the means by which [the company] generated revenue 'in play'—by, for instance, touting some legitimate competitive advantage[.]" 2020 WL 4016645, at *5.  Here, on the other hand, Defendants touted the "Powered by Tuya" concept as a method to expand brand awareness and attract more business while omitting the Fake Review Scheme.  ¶129.

[15]  Defendants' reliance on *ITT Educational Services* is inapt.  *See* Br. at 14.  In that case, the complaint was so "[v]ague and disorganized" that it failed to meet the Rule 9(b) pleading standard or the PSLRA.  859 F. Supp. 2d at 578.  There,

- 24 -

*Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *10 (S.D.N.Y. Mar. 22, 2023) (finding defendants' disclosures about revenue growth and merchant retention materially false and misleading where they failed to disclose that reliance on merchant exclusivity practices was contributing to growth).[16]

Nor are these statements merely "subjective optimism." Br. at 18-19. "They were not puffery at all; they were purported descriptions of the health of the business." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11-*12 (S.D.N.Y. Nov. 26, 2018) (finding descriptive statements about the health and management of the company's credit portfolio, such as "very stringently managed," "highly disciplined," and "qualified customers," actionable). Here, Tuya was describing how its sales and marketing efforts were stronger than its competitors, and assuring investors of the same—that is not puffery.[17]

## V.     CONCLUSION

For the reasons detailed herein, Plaintiffs respectfully request that the Court deny Defendants' motion for judgment on the pleadings in its entirety. Alternatively, should the Court grant any part of Defendants' motion, Plaintiffs respectfully request leave to amend the Complaint. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).

---

the court found that plaintiff's allegations about unethical practices did "not render [d]efendants' broad statements regarding compliance misleading. The relevant regulations, in fact, do not prohibit or penalize incidents of such behavior." *Id*. at 581.

[16] Defendants criticize Plaintiffs' allegations because the statements in this category "discuss only Tuya's *own* 'sales and marketing efforts' and its *own* efforts to generate sales from its *own* customers[.]" Br. at 18 (emphasis in original). As discussed above, because certain finished products would have a "Powered by Tuya" label on them, Tuya intended customers to view those products as Tuya's as well. *See supra* at 5 n.4, 20. Thus, Tuya was very invested in its customers' efforts to generate sales from end users.

[17] Defendants state that Tuya continued to meet or exceed its own and analysts' revenue guidance after the IPO, and appear to argue that Tuya's stock price declined due to reasons other than the Fake Review Scheme. *See* Br. at 6. It is unclear if Defendants are arguing for dismissal based on negative causation. To the extent they are, they ignore the facts. For example, on August 18, 2021, Tuya reported huge losses and projected disappointing revenue expectations for the third quarter of 2021. ¶88. The reason, according to Defendant Liu, was because "our customers face a series of challenges, including Amazon's strict execution of seller policy," in which Amazon had banned cross-border e-commerce stores. ¶90; *see also* ¶¶92-113. In any case, negative causation is an affirmative defense not to be considered at the pleading stage. *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009).

DATED:  June 10, 2024

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ALAN I. ELLMAN
NATALIE C. BONO

*/s/ Alan I. Ellman*
ALAN I. ELLMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com
nbono@rgrdlaw.com

GLANCY PRONGAY & MURRAY LLP
CASEY E. SADLER (admitted *pro hac vice*)
NATALIE S. PANG (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone:  310/201-9150
310/201-9160 (fax)
csadler@glancylaw.com
npang@glancylaw.com

*Lead Counsel for Lead Plaintiffs Kyle Nelson
and Jiyi Qiu*

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL JR.
Murray House
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632.6000
770/200.3101 (fax)
michaelf@johnsonfistel.com

*Additional Plaintiffs' Counsel*

- 26 -