Case 1:22-cv-06792-JPC-RFT   Document 153   Filed 01/29/25   Page 1 of 38   1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
XIAOMENG LIAN, Individually
and on Behalf of All Others
Similarly Situated,

                 Plaintiffs,

        v.                            22 Civ. 6792 (JPC)

TUYA, INC., et al.,

                                      Oral Argument
                 Defendants.

------------------------------x
                                      New York, N.Y.
                                      January 22, 2025
                                      10:00 a.m.

Before:

                     HON. JOHN P. CRONAN,

                                      District Judge

                       APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys for Plaintiffs
BY:  ALAN IAN ELLMAN
     NATALIE BONO

GLANCY PRONGAY & MURRAY LLP
     Attorney for Plaintiffs
BY:  GREGORY LINKH

DAVIS POLK & WARDWELL LLP
     Attorneys for Defendants
BY:  EDMUND POLUBINSKI III
     MARIE KILLMOND

ROPES & GRAY LLP
     Attorneys for Defendants
BY:  GREGG L. WEINER
     ELANA STERN

(In open court; case called)

DEPUTY CLERK:  Can counsel, starting with the plaintiff, please state your name for the record.

MR. ELLMAN:  Good morning, your Honor.

Alan Ellman from Robbins Geller Rudman & Dowd on behalf of the plaintiffs.

THE COURT:  Good morning, Mr. Ellman.

MS. BONO:  Good morning, your Honor.

Natalie Bono from Robbins Geller Rudman & Dowd.

MR. LINKH:  Good morning, your Honor.

Gregg Linkh from Glancy Prongay & Murray on behalf of plaintiffs.

THE COURT:  Good morning.  Mr. Linkh?

MR. LINKH:  Yes, Linkh.

THE COURT:  Mr. Linkh.

MR. POLUBINSKI:  Good morning, your Honor.

Ted Polubinski from Davis Polk for Tuya and the individual defendants.

THE COURT:  Good morning, Mr. Polubinski.

MR. POLUBINSKI:  Good morning.

MS. KILLMOND:  Good morning, your Honor.

Marie Killmond from Davis Polk as well for Tuya and individual defendants.

MR. WEINER:  Good morning, your Honor.

Gregg Weiner from Ropes & Gray for the underwriter

defendants.

THE COURT:  Good morning, Mr. Weiner.

MR. WEINER:  Good morning.

MS. STERN:  Good morning, your Honor.

Elana Stern from Ropes & Gray on behalf of underwriter defendants.

THE COURT:  Good morning, Ms. Stern as well.

We are here for oral argument.  Back, I guess almost a year ago, back on March 5, I ruled on the defendant's motion to dismiss.  In that ruling, I dismissed certain theories as to Count One, which is the Section 11 count.  Those were theories based on Tuya's net promoter score, and also Items 303 and 105. I also concluded that Tuya's risk disclosures did not inoculate the defendants from liability, and further that the claims should not be dismissed for failure to plead Tuya's actual knowledge of the fake review scheme.  And I dismissed the Section 15 claim as it pertained to one of the defendants, Jeff Immelt.

As I noted in that opinion, there were two arguments I did not reach, which were largely the focus of the defendant's motion for judgment on the pleadings.  One is that none of the statements in the registration statement as identified in the amended complaint were false or misleading.  And, second, that the existence of the fake review scheme was not knowledgeable as a general matter.

I did not pass on those arguments in my opinion in part because I felt they were not at that time properly presented in the defendant's lead motion to dismiss and maybe, among other things, that will be a large focus today.

In terms of argument, I was thinking roughly about 30 minutes per side.  I don't have a timer up here.  I want to make sure everyone is able to say within reason what they need to say, and I also would allow for brief rebuttal.

In terms of splitting up the arguments, how do you anticipate doing so?

MR. POLUBINSKI:  Your Honor, I plan to cover the argument for all of the defendants today.

THE COURT:  Okay.  Well, why don't we begin then with the defendants.  It's your motion, Mr. Polubinski.

MR. POLUBINSKI:  Very good.  Thank you, your Honor.

So again, thank you, your Honor.

Your Honor, judgment should be entered for defendants on the pleadings here because the plaintiffs have failed to allege an actionable omission.  As the Court previously explained, this case turns to whether Tuya's IPO statement should have disclosed the fake review scheme, which is defined at paragraph 11 of the amended complaint.  Fake review scheme, according to the plaintiffs, was that a "material percentage of Tuya's e-commerce customers were engaged in fake review practices in violation of Amazon's policies."

Plaintiffs concede that Tuya did not know that any of its customers, any of the totally independent third parties who were its customers, were engaged in fake reviews at the time of the IPO. Instead, the question is whether Tuya can be held liable under Section 11 for not disclosing information that Tuya concededly did not know and that was in the possession of third parties. And the answer to that question is no for the two independent reasons that, as your Honor noted, were identified but not reached in the motion to dismiss opinion.

The first of those reasons is that plaintiff has failed to disclose or failed to identify, rather, any duty to disclose the fake review scheme because plaintiffs haven't identified any statement in Tuya's registration statement that was misleading by omission. And then the second independent reason is that there's no duty to disclose the fake review scheme because plaintiffs have failed to allege that the fake review scheme, as they defined it in the amended complaint, was knowable as a general matter at the time of Tuya's IPO.

I'll address the first ground first. And just to level it out, I'll cover quickly some of the basic legal principles here which I think are quite straightforward.

As the Court explained in the motion to dismiss order, a duty to disclose exists under Section 11 in only two circumstances: The first is when there's an affirmative legal duty to disclose. And then the second is when disclosure is

necessary to make a statement already made not misleading. The Court already held that plaintiffs have not adequately alleged the first basis, an affirmative duty to disclose, including that there's no duty under Item 303 or Item 105 of Regulation S-K, and your Honor offered plaintiffs an opportunity to amend to address that pleading failure, and plaintiffs declined to accept it.

What that means then is that this case can survive only if disclosure of the fake review scheme was necessary to prevent existing disclosures in Tuya's registration statement from being misleading, and plaintiffs have failed to allege that here.

None of the five categories of allegedly misleading statements was misleading because of the non-disclosure of the alleged fake review scheme. The *Morgan Stanley* Second Circuit opinion provides guidance on how to evaluate whether a statement is misleading by omission. Although defendants have a duty to make complete and accurate disclosures, the Court made clear that mere reference to a topic doesn't trigger a generalized duty to disclose the entire corpus of their knowledge on that topic.

So the question is then when an issuer's affirmative statement gives rise to disclose more. And the test in thinking about that was distilled quite succinctly by Judge Rakoff in the *Missfresh* opinion. Also the same test is used in

the *FBR* opinion and *ITT* opinion. The question is whether an affirmative statement misleadingly suggested that the subsequently identified deficiencies did not exist. And none of the statements here meet that test.

Nothing in Tuya's registration statement implied that the fake review scheme did not exist. Tuya never discussed its third-party customers' marketing practices at all or whether those practices were compliant with Amazon's policies. It never said anything about its customers' involvement or non-involvement in fake reviews or fake review schemes. It didn't offer assurances, express assurances or implicit assurances about the quality of its customers' reviews. None of Tuya's statements provided any assurances that any of its third-party customers, over whom Tuya had no control, by the way, were in compliance with Amazon's policies. And under *Morgan Stanley*, nothing in Tuya's registration statement gave rise to disclose the fake review scheme.

So I'll walk through the five categories of statements now just to try to touch on each one. In each case, the same principles apply.

So the first is category one are statements about Tuya's relationship with its customers. In general, statements about Tuya's desire to deepen relationships with its customers imply nothing about their customers' existing marketing practices. And likewise statements about Tuya's efforts or

desire to increase brand awareness or mind share among end users implied nothing about what its customers were then doing independently and unbeknownst to Tuya to market products. The *Express Scripts* case --

THE COURT: I'm sorry to interrupt, but about brand awareness, the registration statement mentions brand awareness and talks about how it was due to word-of-mouth referrals, I believe. Wasn't the material disclosed that any increase in brand awareness was also on account of the fake review scheme?

MR. POLUBINSKI: I think what -- if I recall the disclosures here correctly, your Honor, I think the disclosures refer to Tuya's desire or efforts to increase brand awareness. And, respectfully, your Honor, the answer to your question is no; that that didn't imply anything one way or the other about what its customers' current marketing practices were. It didn't give rise to a duty on Tuya's part to disclose conduct that was taking place related to its customers' review practices.

And in addition to that -- actually, I was going to say the *Express Scripts* case is instructive on this when you think about the nexus between the affirmative statement that's made and the allegedly misleading statement. That case involved much more specific statements about **Express Scripts'** largest customer with which Express Scripts said it had a great relationship. The court in Express Scripts concluded that that

did not give rise to a duty to disclose the potential for customer loss even though multiple termination letters had been sent by that customer to Express Scripts. It's also worth noting here that the kind of statements that we're talking about, things like deep relationships with customers, a desire to increase brand awareness, efforts to increase mind share, all of those things are exactly the sorts of statements that courts routinely hold are not actionable under the securities laws because they're inactionable puffery. They're general statements of aspirational generalized wishes on the part of an issuer. And a case there that's, again, helpful and analogous, I believe, is the *Rudman* case, where Judge Kaplan rejected as mere puffery statements about strong relationships with the issuer's customers. So that's category one.

Category two are statements about Tuya's ability to gain new customers and to increase adoption of its products. These statements all relate to Tuya's ability or hopes of winning customers itself and growing its own business, but again, these statements offered no assurances, said nothing about its customers' independent marketing practices or provided assurances -- and they did not provide assurances that Tuya's customers were complying with Amazon's seller policies.

The third category are statements about Tuya's business strength or its financial success or financial results or perhaps also its belief in continued demand. But again,

these statements said nothing about its third-party customers or the marketing practices.  None of the statements suggested or implied that fake reviews didn't exist.

THE COURT:  But that success did rely, at least in part, on the artificially generated customer feedback.

MR. POLUBINSKI:  So, your Honor, two points to that. The first is that it's not clear that the plaintiffs had actually sufficiently alleged a connection there.  But then beyond that, and actually I think the more fundamental point, is that the test here is to whether a potential cause of business success needs to be disclosed is whether the issuer ascribed the success to something that has "a reasonably close connection."  That's the test that's described by Judge Buchwald in the *Menorah Mivtachim* case, which I probably mispronounced.  There's no reasonably close connection here between anything that Tuya said on the one hand and its customers' independent practices, whether or not those practices complied with Amazon's policies.  So the point is nothing that Tuya said put in play the fake review scheme, the alleged fake review scheme such as it was.  That's category three.

Category four are statements describing Tuya's sales and marketing efforts.  Again, these are statements that described Tuya's own efforts to market its own products, and, again, it said nothing about its customers' independent sales

and marketing efforts.

The last category are statements about the risk that Tuya's products might receive negative or insufficiently positive reviews.

Nothing in the statement implied anything about, again, the conduct of independent third parties or other existing reviews by third parties that complied with Amazon seller policy. The statements here said nothing about the presence or absence of fake reviews. They said nothing about Amazon's policy one way or the other or anything that would have put the question of whether sellers were violating Amazon's policy in play, and they certainly weren't warning of a risk that had already transpired because, again, they weren't speaking about fake reviews one way or the other.

Plaintiff's opposition asserted that the Court had already addressed this issue. Respectfully, as your Honor just described it, I don't believe the Court did address this issue. I'm happy to talk about that further, but otherwise I'll just keep moving.

THE COURT: Okay.

MR. POLUBINSKI: In short, the plaintiffs haven't identified anything in Tuya's registration statement that was misleading by omission.

With that, I'll shift to our second argument about the second independent -- it sounds like you've got a question.

THE COURT:  Just one other question.  Just trying to find it here in the complaint.  I believe it's at paragraph 147, there's a quote from the registration statement that:  The recovery of the end-user market and customers' own business are positive signals for our business to maintain rapid growth, which has led to stronger investor confidence in us and in our valuation and future performance.

Why doesn't that speak to Tuya's customers' own business?

MR. POLUBINSKI:  If you give me just one moment.

THE COURT:  Sure.  It's paragraph 147.

MR. POLUBINSKI:  Your Honor, if you can -- I'm looking now at paragraph 147.  I want to make sure --

THE COURT:  Sure.  At the very, very end, right before paragraph 148 "the recovery of."

MR. POLUBINSKI:  Got it.  "The recovery of the end-user market and customers own business are positive signals."

Your Honor, again, here this statement doesn't say anything one way or the other about the third-party customers' review practices.  It doesn't say anything about customer reviews.  Nothing here puts in play the question of whether the reviews were in compliance with Amazon's policy or not in compliance with Amazon's policy.  It's noting simply that the recovery of the end-user market is a positive signal, which

also I think would constitute or qualify as puffery under the same analysis, I think that Judge Kaplan identified in *Rudman*. More fundamentally, the statements here are not sufficiently -- they're not focused on customer reviews or its customers' third-party marketing practices.

So if your Honor doesn't have further questions, I can move along.

THE COURT:  Go ahead.

MR. POLUBINSKI:  The second independent ground, which is that even if plaintiffs have pled something misleading by omission in the registration statement, the amended complaint should still be dismissed for an additional independent reason, which is the fake review scheme was unknowable as a general matter before Tuya's IPO.

As the Court held, Section 11 requires that information be knowable as a general matter for there to be a duty to disclose it.  Plaintiffs do not allege that anyone knew about the fake review scheme, at least as they defined it in the amended complaint, prior to Tuya's IPO.  So, in other words, there's no allegation that a material percentage of Tuya's customers were engaged in fake review practices in violation of Amazon's policy.

The complaint does allege that Safety Detectives came across a database of leaked online reviews at the time of the IPO, and it does allege that the database reflected that there

were fake reviews.  But there's no allegation in the amended complaint that any Tuya customer was implicated, much less that it was a material number of customers.  And a review of the Safety Detectives' report itself, which is attached as Exhibit 3 to my declaration, also doesn't mention any Tuya customers.

The plaintiffs do claim in the opposition that they believe that fake review scheme became knowable to Safety Detectives prior to the IPO.  But, again, respectfully, that's not what the amended complaint itself actually alleged. Paragraph 78 of the amended complaint doesn't allege that any Tuya customers were implicated.  And, in fact, there's a sentence in that paragraph that says the opposite, which is that specific vendors engaged in the fake review scam - all lower case, an undefined term - were not identified.

But even if we could infer that there were some third-party vendors engaged in fake reviews, it still doesn't allege the knowability for the fake review scheme as the plaintiffs defined it because it does not allege that the material percentage of Tuya's customers were engaged in fake reviews or that Safety Detectives or anybody else knew that. But separately --

THE COURT:  Your point is not necessarily that it is -- it was not knowable that some fake reviews were occurring, but rather the specific customers here.

MR. POLUBINSKI:  Correct, the specific customers and,

importantly, your Honor, that it was a material percentage of customers.

At the last argument, you'll recall that I did concede that Safety Detectives were aware - I'll find it here - that some unknown number of third-party customers were not complying with Amazon seller policy. But the point is that there was no allegation in the complaint, and there's no evidence in the Safety Detectives' report that a material percentage of Tuya's customers were engaged in reviews in violation of Amazon's policy, which is what the fake review scheme is alleged to have been here.

But, separately, even if Safety Detectives had actually discovered with nonpublic information that a material number of Tuya's customers had engaged in fake reviews in violation of Amazon's seller policy, that still wouldn't be sufficient to allege knowability as a general matter under the cases.

safety Detectives is a specialized group that fortuitously obtained a database of information that Tuya could not have obtained lawfully. The fact that Safety Detectives obtained and was able to analyze that nonpublic information does not make it knowable as a general matter.

And as we explained in our briefs, your Honor, we believe that the Covid cases that were cited by the Court and cited by Judge Abrams in the *Winter* opinion are instructive

here and illustrate this point, and particularly Judge Crotty's decision in the *Wandel* case. Both of those cases concluded that companies did not need to disclose the Covid-19 pandemic in IPOs that went effective on January 17, 2020.

Covid was clearly known at the time. It was filling up respiratory wards in China. China was instituting temperature checks at airports, train stations and bus stations, and it instituted a level one health emergency. It ordered all businesses closed in Wuhan, but the courts nevertheless concluded that the risk of COVID-19 was neither known nor knowable as a general matter at the time. And that was true even though Covid itself had already transpired, and it was also true even though a specialized person, an epidemiologist, say, with access to information that was then available about the disease, could have been able to discern what the risk actually was and what risk it posed. But the point is that didn't make it knowable to an issuer for purposes of Judge Crotty's analysis in the *Wandel* case.

The same principles apply even more strongly here since none of the information here was public. Even if a specialized organization like Safety Detectives had been able to obtain nonpublic data, and even if Safety Detectives could have analyzed it and hypothetically concluded that a material number of Tuya's customers were involved in fake reviews, which, again, was not even alleged, that would still not make

it knowable as a general matter.

I'll conclude just by --

THE COURT:  Is it your view that it was not possible for Tuya to have lawfully uncovered the general fake review scheme as safety detectives did?

MR. POLUBINSKI:  Yes, your Honor, I think that that is correct; that they could not -- that Tuya could not have lawfully obtained the data.  But I think the additional point beyond is that even if Tuya could have obtained the data, number one, it didn't reflect the material percentage of Tuya's customers that were actually implicated.

And, number two, the analysis that safety detectives would have had to perform on that is not something that an issuer would reasonably be expected to do.  The *Wandel* case is helpful on that in the sense that, again, there was -- the Covid-19 pandemic was out there.  It was available to be studied.  A specialized person could have concluded that it implicated or created a risk, but the point is that an issuer doesn't have a duty to conduct that specialized analysis.  And here, it's doubly problematic because the underlying data itself wasn't public.

THE COURT:  And, lastly, if I were to grant your motion, could you speak as to whether leave to amend should be allowed.

MR. POLUBINSKI:  Yes, your Honor.  The answer to that

question would be no.  At this point plaintiffs have had one opportunity to amend to plead this case.  They had an opportunity to amend if they wished to do it in response to our original motion to dismiss, and then your Honor provided them with another opportunity to amend following the decision on the motion to dismiss opinion.

At this point there is no further -- they've had plenty of opportunities, plenty of bites at the apple.  On top of that, they haven't offered any specific amendment other than a wish at the end of their opposition to amend that would support an amendment.  And under the *Littman* case, the Second Circuit concluded in circumstances like that, it's well within the Court's discretion to deny leave to amend.

The last point that I might make just to conclude is pausing for a moment on what the plaintiffs are asking the Court to do on this motion, which is essentially charging any issuer who makes general statements about its customers or general statements about its business success or general statements about demand for its product, charging those issuers with a duty to uncover and disclose information that it reasonably could not have ever lawfully obtained.

That would create an impossible burden for issuers and would create massive liability for companies that are trying to issues securities in the U.S.  It's not the law, and, respectfully, we request that the Court reject that and grant

the motion for judgment on the pleadings in favor of the defendants.

THE COURT:  I take it, we're not aware of any cases that have dealt with that specific issue.  It certainly has an intuitive appeal, but the question of whether the ability to lawfully obtain the information is a prerequisite.

MR. POLUBINSKI:  Your Honor, the cases on the subject are the ones that we've cited in -- that we're aware of are the ones that we've cited in the motion.  I am not aware of a case that specifically addressed the question of whether it would create an insurmountable burden because information would not be able to be lawfully obtained, but I think that flows out of the cases that do say including Judge Winter's case -- not Judge Winter -- the *Winter* case, Judge Abrams' case that says it is important, it's necessary for a fact to be knowable in order for it to be required to be disclosed.

THE COURT:  Thank you, Mr. Polubinski.

MR. POLUBINSKI:  Thank you, your Honor.

If I may, as you offered, I'd love to have an opportunity to do a brief rebuttal.

THE COURT:  Yes.

Mr. Ellman.

MR. ELLMAN:  Good morning, your Honor.

THE COURT:  Good morning.

MR. ELLMAN:  I'd like to focus on the category five

statements regarding Tuya's risk disclosures.  While the Court may not have already held that defendants made false and misleading risk disclosures in Tuya's registration statement, it came very close in its previous order.

At the time of Tuya's March 17, 2021 IPO, several significant Tuya customers were employing fake review practices.  The registration statement misleadingly stated that: "Our success depends in part on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing potential customers and end users seek and share information."

Unbeknownst to investors, Tuya's customers have engaged in and were then engaging in extensive fake review practices designed to generate artificial positive customer feedback.  Thus, defendants' success actually depended, in part, on their ability to generate artificially positive customer feedback.

Defendants also misleadingly warned of purportedly future risks that may harm Tuya's business, including, number one, that they "may receive complaints from our customers and end users on our products and services, pricing and customer support.  If actions we take or changes we make to our products and services or platform upset these customers and end users, their online commentary could negatively affect our brand and reputation."  And two, "independent industry analysts often

provide reviews of our products and competing products and services which may significantly influence the perception of our products and services. If these reviews are negative or not as strong as reviews of our competitors' products and services, our brand may be harmed."

These purported risk disclosures conveyed the misleading impression that Tuya was faced with the risk of negative customer reviews or the inability to achieve positive customer reviews whereas Tuya actually faced the risk of fraudulently positive customer reviews.

In the order, the Court quoted the specific risk disclosure statements related to customer reviews that plaintiffs allege were misleading. The Court then held that Tuya's risk disclosures "plausibly glossed over the relevant risk, focused investors' attention elsewhere, and thereby led them down some primrose path." The Court's holding that defendants' statements focused investors' attention elsewhere thereby leading investors down some primrose path sounds awfully like saying statements misled investors.

Consistent with this explanation, The Court compared this case to *Hunt v. Alliance North American Government Income Trust*. In discussing *Hunt*, the Court faulted Tuya's risk disclosures related to fake customer reviews, holding that "similar to *Hunt*, plaintiff's allegations allow for the reasonable conclusion that Tuya investors were simply warned

about the wrong, or at least an orthogonal, risk related to fake customer reviews. The combination of the registration statements general disclosures about customer loss and specific disclosures about the potential impact of negative publicity on Tuya's ability to retain customers did not put a reasonable investor on a notice of the risk of the fake review schemes. A reasonable investor reviewing the registration statements for customer review-related risks rightly would have placed more emphasis on the specific disclosures than the more general ones." This language is also strikingly similar to saying the statements misled investors. In sum, even if the Court has not already ruled that the risk disclosures are actionable, it has come very close.

In any case, the risk disclosure statements were materially false and misleading at the time of the IPO. Defendants argue that "an affirmative statement is misleading by omission only if it is misleadingly suggested that the subsequently identified information did not exist."

That, however, is not the standard by which to determine whether a statement is misleading. Indeed, as defendants note, the *Chen v. Missfresh* case also stated: "The test remains whether, upon examination of defendant's representations, taken together and in context, the affirmative statements that were made are misleading." In any case, plaintiffs meet the standard advocated by defendants.

Tuya's risk statements are actually misleading because at the time of the IPO, several significant Tuya customers were engaged in widespread fake review practices. Tuya misleadingly stated in the registration statement: "Our success depends in part on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing and potential customers and end users seek and share information." This statement suggested that the fake review scheme was not occurring. Unbeknownst to investors, however, Tuya's customers had engaged in and were then in engaging in extensive fake review practices designed to generate artificial positive customer feedback. Thus, Tuya's success actually depended in part on its ability to generate artificially positive customer feedback. Tuya failed to disclose this material fact making its statements about customer feedback materially misleading.

THE COURT: But how did that reflect Tuya was in any way monitoring or vouching these independent practices of its customers? Really what we have here is conduct by Tuya's customers and really by Tuya's customers' customers. How is there any language vouching for what those customers were doing?

MR. ELLMAN: Well, had Tuya not made any statements that impacted upon the importance of specifically customer reviews and customer feedback, I would tend to agree with

defendants that there may not be a duty to disclose that. But once -- and this is bedrock securities law from the Second Circuit from the *Vivendi* case and others, that once an issuer speaks on a topic, they have a duty to speak truthfully. They have a duty to investigate and to make sure that their statements are true. Especially in the context of Section 11 of the Securities Act, which is strict liability, and there's no requirement as opposed to Section 10(b) of the Exchange Act for the issuer to have known or to not have been reckless or to be not reckless in knowing that the statements were false when made.

Defendants argue that plaintiffs' allegation amounts to little more than an assertion that Tuya's disclosures about reviews triggered a generalized duty requiring Tuya to disclose the entire corpus of information on that topic. That is not true. Plaintiffs take issue with defendants' half-truth statements about customer feedback, which suggested to investors that the fake review scheme was not occurring.

Additionally, defendants in their motion never addressed the issue of whether the risk of the fake review scheme had already transpired by the time of the IPO even though the Court expressly stated that it had not reached that point in the order. Thus, defendant's have waived this argument.

THE COURT: Slow down a little bit.

MR. ELLMAN:  Apologies.

Nevertheless, plaintiffs adequately allege the risk of the fake review scheme had already transpired at the time of the IPO because Safety Detectives obtained access to the data server weeks before, and it's reasonable to infer that the fake review scheme was ongoing for a significant amount of time prior to that discovery.

THE COURT:  Well, presumably, however, Safety Detectives obtained access to the server though not done in a lawful manner.  What could Tuya have done to uncover the scheme in advance of the IPO?

MR. ELLMAN:  Well, certainly whether Safety Detectives obtained access to the server legally or not is a question of fact.  Besides for defense counsel's assertion that that is the case, there's nothing in the record showing that that is legal or not.

THE COURT:  Well, then I guess what do you think Tuya could have reasonably done to have uncovered the scheme?

MR. ELLMAN:  Well, plaintiffs posit that that's not the relevant question.  The relevant question is:  Was the scheme occurring at the time of the IPO?  It's not a question of could they have discovered it.

What defendants essentially are arguing is that the scheme had to be knowable to the general public.  Whether or not Safety Detectives, even if they had not discovered it, Tuya

still would be liable for failing to disclose it in the context of their, at least alleged, misstatements because it was occurring at the time of the IPO.

With respect to the argument about this knowability argument, in the Section 11 context knowability means: "Whether the relevant event had already transpired at the time of the offering."  That's a quote from the *Winter* case, as well as from the *Chen v. Missfresh* case.

Defendants ignore the knowability standard.  The question is:  Did the relevant event, the fake review scheme, already transpire at the time of the offering.  We can now know from the fact that Safety Detectives discovered this data breach prior to the IPO that it was occurring.  But even if they had not, that's just a question of proof.  The issue is if it was occurring at the time of the IPO, then it was something that makes the alleged misstatements actionable because it was occurring at the time of IPO.

THE COURT:  It guess it keeps coming back to what could Tuya have done to have known about it?  It would have required the company to divert a considerable amount of its resources to investigate and try to find the existence of the scheme.

MR. ELLMAN:  Well, they could have not made statements about customer feedback, and they would not be in this predicament.  Taking upon themselves the statements in the

registration statement brought upon this duty to investigate.

THE COURT:  Do we want a system where a company is dissuaded from making any -- speaking at all on the topics of customer relations or marketing practices out of concern that they could then face liability here under Section 11 if there is something going on that would require them to just divert a ton of resources to?  Isn't this information that the market wants in registration statements?

MR. ELLMAN:  The market certainly wants accurate and truthful registration statements.  The fact that Safety Detectives was able to find it is -- I think that's also a question of fact whether Tuya would have been able to find it as well.  If Tuya -- they're talking about their customers, then they would have had a duty to -- perhaps they would have had a duty to engage their own data security company.

If they're going to make statements that have to do with customer feedback, and they have 30 percent of their sales that are over to Chinese e-commerce companies, okay, this is not an immaterial amount of sales.  Then they would have had a -- if they're going to make statements on the topic, then they had a duty to investigate through something such as Safety Detectives to know whether the fake review scheme was going on or not.

THE COURT:  Inevitably, that would result in less disclosure in registration statements.  Like if that's the

standard, companies would have no incentive to make full disclosures in registration statements.

MR. ELLMAN:  Well, it wasn't a full disclosure.

THE COURT:  Well, robust, or disclosures about certain topics, including ones that would seem to be pretty relevant to investors.

MR. ELLMAN:  Your Honor, under Section 11, as you know from the extensive discussion in the previous order, liability is virtually absolute.  As between investors and issuers, Congress in passing the Securities Act put the onus on the issuer to make truthful statements to undergo and conduct vigorous and comprehensive investigations, or to not make statements at all.  Whether that's something that seems fair to the average person, that's not the question.  That's not what the securities laws require.

The statements certainly regarding the risk disclosures pertain directly to customer feedback and implied that they were not -- Tuya's customers were not involved with artificially positive feedback.

THE COURT:  Here, for example, I believe you allege that Tuya claimed in 2020 that it had over 5,000 customers. Would the company then have had to investigate each one of those before making this disclosure?

MR. ELLMAN:  Whether they had those customers?

THE COURT:  Or to investigate the practices of those

5,000 customers before making the disclosure it made.

MR. ELLMAN:  Well, I believe that they would have had an obligation to engage and see whether they could be able to find out that there was a -- fake reviews were -- there was some obligation there, yes.

Defendants continue to incorrectly premise their arguments on whether they should have known of the fake review scheme.  For example, they argue in their brief "because the knowledge of, and specialized nonpublic information available to a cybersecurity expert does not equate to general knowledge, even if the date of Safety Detectives' access implicated Tuya's customers, the alleged fake review scheme was not knowable as a general matter."  The relevant question, however, is did the fake review scheme exist at the time of the IPO."  And the answer is unequivocally yes.

Here, at the time of Tuya's IPO, a material number of Tuya's customers had already engaged in the fake review scheme for a significant amount of time, and this was discovered by Safety Detectives prior to the IPO.

Concerning your question about whether they had a duty to investigate all 5,000 of their customers, I would say certainly they would have a duty to investigate their major material customers, and the fact as we see from the disclosures of the truth that it was significant customers that were involved in this that were banned by Amazon.  So with respect

to those large customers, they would have had that obligation and duty.

THE COURT:  One of Mr. Polubinski's points though, is there any allegation that a material percentage of Tuya's customers were involved in this scheme?  Or at least that it was knowable that a material percentage were involved in the scheme?

MR. ELLMAN:  Well, Tuya admitted that its customers were negatively affected by the Amazon ban.  We allege in paragraphs 90-91, 104 and 110 of the amended complaint.  They cannot have it both ways.  It's reasonable to infer that Amazon banned these customers due to their participation in the fake review scheme.

THE COURT:  But did that get to whether it was knowable though?  Is there any allegation that whatever Safety Detectives uncovered revealed that a material percentage of Tuya's customers were involved in the scheme?  That's really what is potentially knowable in this case.

MR. ELLMAN:  We see from the effect of the Amazon bans on the company that those Amazon bans affected a material percentage of Tuya's customers.  By Tuya's own admission, they discuss, and we allege that, how the effect of Amazon bans impacted the company.  So the inference, which at the pleading stage has to be given to plaintiffs, is that those were customers of Tuya, and they materially affected its bottom

line.  And so their bans from Amazon were material to Tuya and affected them.

So was it knowable?  Those were clearly material customers that were involved in the fake review scheme, and Tuya had an obligation to investigate those customers prior to the IPO if they were going to make statements concerning negative feedback.  As I said, 30 percent of its customers were involved in Chinese e-commerce.  So it's something that they needed to investigate.

Defendants contend that creating a duty to disclose information potentially discoverable only by investigative experts would be a significant shift in securities laws.  But this is a red herring.  Had defendants remained silent about the importance of risks related to customer reviews, they would have had no duty to disclose a fake review scheme.  Having made statements regarding customer reviews that suggested the fake review scheme was not occurring, defendants brought a disclosure obligation upon themselves.

Finally, defendants' motion raises questions of fact.  Whether the fake review scheme and Safety Detectives report were knowable as a general matter is a question of fact that cannot be resolved on a Rule 12(c) motion.  The issues defendants raised are infused with questions of fact.

As I noted before, Mr. Polubinski said Tuya could not have discovered a fake review scheme legally.  This is clearly

a question of fact.  Also, we don't know that the Safety Detectives obtained the data server access illegally.  Again, another question of fact that is important to the resolution of these issues.

With respect to the other statements in categories one through four, category one statements representative statement in paragraph 129:  "We strive to acquire new customers to grow our customer base.  We will also enhance our sales in marketing efforts to attract new customers to try out our products."  The omitted information about the fake review scheme speaks directly to defendants' statements.  And we see that with a number of the statements in the different categories, that the omitted information is directly connected to the statements that defendants made and, therefore, they had a duty to disclose the fake review scheme.

If the Court has no further questions, plaintiffs rest.

THE COURT:  Okay.  Thank you.  Thank you, Mr. Ellman.

Mr. Polubinski.

MR. POLUBINSKI:  Thank you.  I will try to be quick here.

First, your Honor, I wanted to actually continue to answer a question that I think I maybe answered incompletely on the fly that you had raised during my affirmative presentation which related to the statement in paragraph 147.  In

particular, the statement in the last sentence of the quoted language about the recovery of the end-user market and customers own business is positive signals for Tuya's business.

I'm looking more closely at that statement, and it seems fairly clear to me, your Honor, that the statement is focused not on the end-user market for Tuya's products necessarily, but instead on the robustness of the end-user market for products like Tuya in general.

The reason I say that is if you go to the beginning of the prior bullet, it reads "The continued recovery of the global economic situation and the improvement of the Covid-19 situation leading to stronger investor confidence and increased expectations." And then the sentence immediately before the sentence that we've been discussing talks about how our business is deeply integrated with our customers own business, businesses which in turn are affected by the ultimate demands and purchasing power of the end users.

In that context, I think, your Honor, that the most rational way to read the next statement about the recovery of the end-user market is really about the recovery of the market for products like this as a whole.

But even setting that aside, the answer that I gave to you remains at least one valid response here, which is that regardless of whether we're talking about the end-user market as a whole or the end-user market for Tuya's products, nothing

in this statement vouched for its third-party customers' marketing policies or their compliance with Amazon.

Now, turning quickly -- and I'll be brief on this to some of the points that Mr. Ellman made. On our first basis for dismissal, which is that there were no statements in Tuya's registration statement that were misleading by omission, I think Mr. Ellman largely abandoned the categories other than category five and focused principally on category five, which is Tuya's warning of the risk that it might receive negative or insufficiently positive reviews.

But on that, as I said in the opening argument, Tuya was not vouching for its customers in the risk warning. It didn't put reviews that the review practices or their compliance with Amazon's policies in play. And again going back to the legal standard and the test that was articulated in *Missfresh*, nothing in that risk warning implied that the fake review scheme such as it was was not occurring; that if it were the standard that this put fake review scheme in play, it would be contrary to the Morgan Stanley cases standard, which is that it would have required Tuya to have disclosed the entire corpus of its knowledge on reviews more generally. In this case, of course, actually, it wasn't even Tuya's knowledge, but the entire corpus of information in the world as a whole.

Which leads to the second point. I think from your exchange with Mr. Ellman, it sounds like there's no dispute

that there's any allegation -- there's no dispute that there is no allegation in the complaint that Tuya could have lawfully discovered the fake review scheme. There is no allegation that there was any way for Tuya to do that. Mr. Ellman's response, if I heard it right, was that that's not the standard. Respectfully, your Honor, I think it is the standard. It's the standard that your Honor articulated in the motion to dismiss and in the starred that Judge Abrams articulated in the *Winter* case, which is that a fact must be knowable to give rise to liability. And here the fact is simply not knowable to an issuer, not knowable to an issuer in the way that Judge Crotty considered that issue in the *Wandel* case. And that the perverse result of the situation which Tuya would be forced to disclose information that it could not have possibly lawfully learned simply by virtue of making good faith risk disclosures would lead to perverse results. It would create an impossible standard for issuers. It would potentially, as your Honor noted, lead to less disclosure perversely out of concern of inadvertently stumbling upon liability because of some fact that the issuer never could have lawfully discovered.

So again, for those reasons, your Honor, respectfully --

THE COURT: Let me just go back to your first point that you were talking about.

I'm going to try to think about how the reasonable

investor standard plays out here in cases like *Missfresh*, look at the question being whether a reasonable investor would take from the statement or omission in understanding that is not in accord with the facts.

Do you think that whether the reasonable investor standard in your view differs if we're talking about an issuer statement about its own business versus its customer's business? In other words, is a reasonable investor -- reasonable investor's takeaway from a statement different when a company is talking -- an issuer is talking about what itself is doing versus the conduct of its customers?

MR. POLUBINSKI: Let me answer that question in two ways. The first way is a very direct response to your question, and the answer is yes. That makes sense to me, and here is why: The question is whether a reasonable investor here would have anticipated that Tuya was conducting some kind of independent audit of these wholly independent third-party customers over whom they had no control. No reasonable investor could plausibly have expected that Tuya was in a position to do that. So if we're thinking about it purely from the perspective of a reasonable investor and materiality, which is the context in which that standard comes into play, I think that that distinction makes lots of sense.

But stepping back even a step further, I think the question here is a more basic question about whether there is a

duty to disclose and about whether the underlying statement itself was misleading by omission. And on that point -- and I guess the two questions really do collapse and flow together but the question is really whether these highly generic statements that Tuya made in the registration statement that, at most, tangentially referred to reviews or to its customers, that any of them could plausibly be read to be offering assurances to investors about these third-parties' marketing practices. And the answer is no, whether you're considering it from the perspective of reasonable investor. However you're considering it, these statements are so far afield from the topic that plaintiffs allege should have been disclosed, that there is no reasonable basis for there to be a duty to disclose.

In fact, going back and looking at the cases, actually, the cases do offer, as I continue to think about it now and to answer your question, they do offer a basis to draw a distinction, at least in part, on the question of whether or not an issuer is talking about its own conduct versus third-parties' conduct. I think it's always dangerous to make broadbrush statements, but I think I can say with some confidence that the cases that plaintiffs have cited on this point about failures to disclose additional information, either universally or mere universally, relate to information about the issuer's own conduct as opposed to information about some

third parties or some other unknowable conduct.

Again, I think there are different ways of explaining that, but I think the reasonable investor standard is a good one. I also think just plausibly thinking about whether a statement puts an issue in play, I think it also -- that that distinction makes sense. So apologies for the long answer to the question

THE COURT: No. Thank you.

MR. POLUBINSKI: Unless your Honor has further questions, I will leave it there.

THE COURT: I don't.

Mr. Ellman, I will give you the opportunity if there is anything further you wish to address. You're not required to, but if you do...

MR. ELLMAN: I have nothing further. Thank you.

THE COURT: Thank you all. I will obviously take the motion under advisement. I do thank counsel again, as you did, I believe last February, for excellent argument and excellent briefing in this case. Hope to get the decision out relatively soon, so that everyone can figure out next steps here.

Thank you.

(Adjourned)