UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                   :

XIAOMENG LIAN, *individually and on behalf of all*     :
*others similarly situated, et al.*,                                  :
                                                           :
                        Plaintiffs,                        :
                                                           :
                -v-                                :                    22 Civ. 6792 (JPC)
                                                        :
TUYA INC., XUEJI (JERRY) WANG, LIAOHAN     :          OPINION AND ORDER
(LEO) CHEN, YI (ALEX) YANG, YAO (JESSIE) LIU,  :
SCOTT SANDELL, CARMEN CHANG, JEFF          :
IMMELT, QING GAO, JING HONG, MORGAN      :
STANLEY & CO. LLC, BofA SECURITIES, INC., and  :
CHINA INTERNATIONAL CAPITAL CORPORATION :
HONG KONG SECURITIES LIMITED,            :
                                                           :
                        Defendants.                  :
                                                           :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        The federal securities laws, while tough, do not bind issuers to a corporate suicide pact.

Issuers must refrain from making false statements as well as from making statements that, while

literally true, lack sufficient context to prevent investors from being misled.  But an issuer has no

freestanding duty to accuse itself or others of unadjudicated misconduct.  So when a private

securities action alleges liability predicated on an issuer's failure to disclose that its success may

partly be based on corporate misconduct, a court must determine whether anything that the issuer

said actually implied that the misconduct was not occurring.  Under that approach, liability attaches

only if the issuer's alleged statements are specific, share at least a reasonably close connection

with the omitted misconduct, and could plausibly have been understood by investors as denying

that the misconduct took place.  When the undisclosed misconduct is committed not by the issuer

itself, but rather independently by third parties, this inquiry compels a court to consider whether a

reasonable investor would understand the issuer's statements as implicitly vouching for the propriety of those third parties' independent operations.

The main defendant in this proposed shareholder class action is Tuya, Inc. ("Tuya"), a Chinese software company behind one of the cloud-based networks that make up the Internet-of-Things. Tuya licenses its technology to third-party brands who bring smart devices integrating Tuya's software to market, often selling their products through e-commerce platforms like Amazon. Tuya went public in the United States in March 2021 through an Initial Public Offering ("IPO"), raising hundreds of millions of dollars in capital.

Lead Plaintiffs Kyle Nelson and Jiyi Qiu (together with Xiaomeng Lian, the original plaintiff who filed this action) allege that the registration statement Tuya filed ahead of its IPO misled investors by failing to disclose that a material percentage of Tuya's customers who sold smart devices on Amazon had been procuring fraudulent reviews for their products. That ploy, which Plaintiffs refer to as the "Fake Review Scheme," only came to light when, a couple months after Tuya's IPO, a cybersecurity organization published an investigative report based on information obtained from a data breach. That report allegedly led Amazon to ban several of Tuya's major customers for violating its seller policies, causing Tuya's business to suffer and its share price to decline. Seeking to recoup their losses, Plaintiffs assert a claim under Section 11 of the Securities Act of 1933 against Tuya, a number of its directors and officers, and a handful of investment banks that underwrote Tuya's IPO, as well as a tagalong control-person claim under Section 15 of that statute.

On March 5, 2024, the Court issued an Opinion and Order dismissing Plaintiffs' Section 15 claim as against one of Tuya's directors and rejecting certain theories for its Section 11 claim, but otherwise largely allowing the case to proceed. *See Lian v. Tuya Inc.*, No. 22 Civ. 6792 (JPC),

2024 WL 966263 (S.D.N.Y. Mar. 5, 2024). Now, Defendants move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) on two grounds that the Court previously held had been improperly presented: that Plaintiffs have failed to allege any false or misleading statements in Tuya's registration statement, and that the existence of the Fake Review Scheme was unknowable prior to Tuya's IPO.

For the following reasons, the Court grants Defendants' motion on the first ground and declines to address the second. The Court, however, will allow Plaintiffs a further opportunity to amend their pleading, as long as Plaintiffs believe in good faith that they can fix the problems identified in this Opinion and Order.

## I. Background

### A.    Factual Background[1]

The factual background of this case, as alleged in the Amended Complaint, was set forth at length in the Court's prior Opinion and Order resolving Defendants' motion to dismiss. *See Lian*, 2024 WL 966263, at *1-4. Accordingly, the Court repeats only those facts that are necessary to resolve the instant motion for judgment on the pleadings.

Headquartered in China, Tuya's business is based on its Internet-of-Things cloud platform. Am. Compl. ¶ 45. The term Internet-of-Things, or "IoT" for short, refers to "the concept of connecting physical devices to a large, interconnected network." *Id.* Tuya's IoT cloud platform

---

[1] The following facts, which are assumed true solely for purposes of this Opinion and Order, are taken from Plaintiffs' Amended Complaint, Dkt. 56 ("Am. Compl."), and the documents incorporated therein by reference. *See Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 80 (2d Cir. 2018); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that on a motion to dismiss, which is analyzed according to the same standard as a motion for judgment on the pleadings, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the [Securities and Exchange Commission ('SEC')], and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

is used to power "smart devices" manufactured and sold by third parties. *Id.* ¶ 46. The term "smart device" generally refers to household appliances and other products that can be connected to the internet, thereby allowing end users to control the items remotely and interact with online services. *Id.* ¶ 45. Tuya licenses its software products to its customers—mostly product brands, original equipment manufacturers, industry operators, and system integrators—who incorporate Tuya's software into the products they sell. *Id.* ¶¶ 46, 48. A significant number of Tuya's customers are Chinese companies that use e-commerce platforms like Amazon to sell smart devices to end users. *See id.* ¶ 52 ("[I]n 2021, 30% of devices powered by Tuya were sold by Chinese cross-border e-commerce merchants."). Because Tuya charges its customers a one-time fee for each device on which its software is deployed, Tuya's business is linked to the success of its customers and the demand among end users for their products. *Id.* ¶¶ 47-48.

Tuya held its IPO on March 17, 2021, offering 43.6 million American Depositary Shares ("ADSs") for sale at a price of $21 per share. *Id.* ¶¶ 67, 77. In connection with its IPO, Tuya filed a registration statement with the SEC on February 26, 2021, which after two amendments became effective on the date of the IPO (the "Registration Statement"). *Id.* ¶ 67. As relevant to this litigation, Tuya's Registration Statement made a number of statements regarding its customers, business prospects, and marketing efforts, including the following five categories of statements:

> (1) statements touting Tuya's deep relationships with its customers ([Am. Compl.] ¶¶ 125-127, 129, 149); (2) statements discussing Tuya's ability to gain new customers and increase adoption of its products and services ([*id.*] ¶¶ 138, 144); (3) statements attributing Tuya's success to reasons other than its customers' fake review practices ([*id.*] ¶¶ 125, 127, 129, 140, 142, 144, 146-147); (4) statements touting Tuya's sales and marketing efforts ([*id.*] ¶¶ 151, 153); and (5) purported risk warnings describing potential risks of receiving negative reviews of its products and not receiving sufficiently positive reviews of its products ([*id.*] ¶ 132)

Dkt. 145 ("Opposition") at 8 n.5.

Tuya, for instance, touted its relationship with its customers as a source of its success: "[O]ur business is deeply integrated with our customers' own businesses, which in turn are affected by the ultimate demands and purchasing power of the end users. The recovery of the end-user market and customers' own business are positive signals for our business to maintain rapid growth . . . ." Am. Compl. ¶ 147. The Registration Statement also commented on the trend of increased usage of Tuya's products and services: "As this trend continues over time, our brand awareness also increases, generating word-of-mouth referrals that not only attract more brands, developers and partners, but also lead to growing end user demand, better user insights and a more vibrant IoT ecosystem." *Id.* ¶ 138. Tuya further highlighted its marketing efforts: "We strive to acquire new customers to grow our customer base. . . . We will also enhance our sales and marketing efforts to attract new customers to try out our products and services and accelerate their adoption of our platform." *Id.* ¶ 129; *see also id.* ¶ 153 ("[W]e compete favorably on the basis of . . . brand awareness and reputation [and] sales and marketing efforts."). Along similar lines, Tuya explained that it was aiming to "increase brand awareness among the end users by promoting the 'Powered by Tuya'" concept and predicted that "[g]rowing mind share among the end users will attract more business customers and developers to our platform." *Id.* ¶ 129. And on the subject of customer feedback, the Registration Statement warned:

> Our success depends, in part, on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing and potential customers and end users seek and share information. If actions we take or changes we make to our products and services or platform upset these customers and end users, their online commentary could negatively affect our brand and reputation. Complaints or negative publicity about us, our products and services or platform could materially and adversely impact our ability to attract and retain customers and end users, our business, results of operations and financial condition.

*Id.* ¶ 132.

On May 6, 2021, a cybersecurity organization called Safety Detectives published a report that allegedly uncovered the widescale Fake Review Scheme based on a data leak from a "server likely located in China." *Id.* ¶ 78. The Safety Detectives report did not identify any particular vendors involved in the scheme, *id.*, but "[i]n the ensuing days, Amazon suspended the accounts of numerous major Chinese merchants, including significant customers of Tuya," *id.* ¶¶ 79, 82-85. By September 2021, Amazon had banned 600 Chinese brands, causing an estimated $15.4 billion of losses to Chinese cross-border e-commerce businesses. *Id.* ¶ 17. In part because the products of several of Tuya's customers had "suddenly become unavailable on Amazon" shortly after the publication of the Safety Detectives report, the Amended Complaint surmises that "a material percentage of [Tuya's] e-commerce customers were engaged in [the Fake Review Scheme] in violation of Amazon's policies" as of the time of Tuya's March 2021 IPO. *Id.* ¶¶ 11, 79, 131.

Tuya's business suffered in the months after Safety Detectives published its report on the Fake Review Scheme and Amazon's wave of bans. In an August 18, 2021 press release, Tuya disclosed financial results reflecting losses in the second quarter of 2021, as well as an outlook for the third quarter that "disappointed analysts and investors." *Id.* ¶ 88. On an earnings call held the same day, Tuya observed that its "customers face a series of challenges, including Amazon's strict execution of seller policy," an alleged reference to Amazon's having "banned cross-border e-commerce stores," including customers of Tuya. *Id.* ¶ 90. Tuya's share price, which had closed at $15.00 per ADS on August 17, 2021, dropped to $10.41 over the following two days. *Id.* ¶ 16.

This downward trend continued in subsequent months. Plaintiffs characterize Tuya's financial results for the third quarter of 2021 as "disappointing" and allege that Tuya "cit[ed] the impact of 'Amazon store closures'" in announcing those results. *Id.* ¶ 18. Tuya's financial results for the fourth quarter of 2021 and first quarter of 2022 were similarly lackluster. *Id.* ¶¶ 19, 21. By

June 15, 2022, Tuya's ADS price had fallen to $2.42 per share.  *Id.* ¶ 21.  Plaintiffs allege that "Tuya's ADSs never recovered."  *Id.*

## B.    Procedural History

Following the sharp decline in Tuya's share price, Lian, one of the company's stockholders, filed this action on August 9, 2022.  Dkt. 1.  The Court later appointed Nelson and Qiu as Lead Plaintiffs on December 22, 2022.  Dkt. 45.  Plaintiffs then filed the Amended Complaint on March 2, 2023.  Dkt. 56.  Their first cause of action alleges a violation of Section 11 of the Securities Act against all Defendants, Am. Compl. ¶¶ 162-170, and their second cause of action alleges a violation of Section 15 of the Securities Act against a number of Tuya's directors and executives, *id.* ¶¶ 171-178.[2]

On March 5, 2024, the Court issued an Opinion and Order granting in part and denying in part a motion to dismiss the Amended Complaint joined by all Defendants.  *See Lian*, 2024 WL 966263.  The Court dismissed Plaintiffs' Section 11 claim to the extent that it was based on statements concerning Tuya's "Net Promoter Score" on the ground that Plaintiffs had effectively abandoned this part of the claim.  *Id.* at *12.  The Court also dismissed the Section 11 claim to the extent that it was based on alleged violations of Items 303 and 105 of SEC Regulation S-K for failure to allege that Defendants had knowledge of the Fake Review Scheme.  *See id.* at *6-9.  The Court, however, rejected Defendants' arguments that the Section 11 claim should otherwise be

---

[2] Those individuals are Xueji (Jerry) Wang, Liaohan (Leo) Chen, Yi (Alex) Yang, Yao (Jessie) Liu, Scott Sandell, Carmen Chang, Jeff Immelt, Qing Gao, and Jing Hong.  The other Defendants are Tuya itself and three investment banks that served as underwriters for Tuya's IPO, Morgan Stanley & Co., LLC, BofA Securities, Inc., and China International Capital Corporation Hong Kong Securities Limited.

dismissed on the grounds that Tuya lacked knowledge of the Fake Review Scheme[3] or that the Registration Statement's risk warnings adequately apprised investors of the Fake Review Scheme. *Id.* at *10-11, 13-14.  The Court also declined to consider two further arguments for dismissal of the Section 11 claim—that none of the statements in the Registration Statement identified in the Amended Complaint were false or misleading and that the existence of the Fake Review Scheme was not knowable as a general matter—because Defendants did not properly present those arguments in their opening brief.  *Id.* at *11.  Finally, the Court dismissed Plaintiffs' Section 15 claim as against Defendant Jeff Immelt, one of Tuya's directors, because the Amended Complaint did not plausibly allege that Immelt had control over Tuya.  *Id.* at *14-15.[4]

On April 25, 2024, Defendants answered the Amended Complaint.  Dkts. 133-134.  At the same time, Defendants moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), relying on the two grounds that the Court declined to consider in resolving their

---

[3] Following the majority approach in this District, the Court concluded that Section 11, as a strict liability statute, does not require a plaintiff to allege that an issuer had actual knowledge of the facts it failed to disclose.  *Lian*, 2024 WL 966263, at *11 ("Section 11 does not have a requirement that the omitted fact be known, or should have been known, by issuers."); *see Winter v. Stronghold Digit. Mining, Inc.*, 686 F. Supp. 3d 295, 306 (S.D.N.Y. 2023) (collecting cases).  *But see In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) ("In order to state a claim pursuant to Section 11, a plaintiff must allege facts demonstrating the defendant possessed the omitted information at the time the registration statement became effective and that the defendant had a duty to disclose that information." (internal quotation marks omitted)).  To date, neither the Second Circuit nor the Supreme Court has decided whether Section 11, contrary to much of the common law of misrepresentation, creates a duty to disclose facts that are not within the issuer's possession.  *See generally* Restatement (Second) of Torts § 551 (1977) (requiring knowledge or possession of omitted facts as a prerequisite to a duty to disclose them); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 n.11 (2015) (explaining that Section 11 "discards the common law's intent requirement, making omissions unlawful—regardless of the issuer's state of mind—so long as they render statements misleading").

[4] The Court also granted Plaintiffs leave to file a second amended complaint to address any of the pleading deficiencies identified in the Court's Opinion and Order.  *Lian*, 2024 WL 966263, at *15.  Plaintiffs did not file a second amended complaint by the deadline to do so, which leaves the Amended Complaint as the operative pleading.

motion to dismiss.  Dkts. 136, 137 ("Motion").  Plaintiffs opposed the Motion on June 10, 2024,

Dkt. 145, and Defendants filed a reply the following month, Dkt. 147 ("Reply").  The Court held

oral argument on Defendants' Motion on January 22, 2025.  *See* Dkt. 153 ("Oral Arg. Tr.").

## II.  Legal Standard

Rule 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are

closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  A party may advance

arguments through a Rule 12(c) motion even if it could have raised those arguments in an earlier

motion that it brought under Rule 12(b)(6).  *Mex. Infrastructure Fin., LLC v. Corp. of Hamilton*,

No. 17 Civ. 6424 (VSB), 2020 WL 4572679, at *2 n.1 (S.D.N.Y. Aug. 7, 2020).[5]  In deciding a

motion under Rule 12(c), "the court must 'apply the same standard as that applicable to a motion

under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all

reasonable inferences in favor of the nonmoving party.'"  *In re Gen. Elec. Co. Sec. Litig.*, 856 F.

Supp. 2d 645, 652 (S.D.N.Y. 2012) (quoting *Hayden v. Paterson*, 594 F.3d 150, 157 n.4 (2d Cir.

2010)).  Thus, to survive a Rule 12(c) motion, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is

plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.*  In other words, the

plausibility standard requires factual allegations sufficient to "'raise a reasonable expectation that

---

[5] As noted, Defendants did not properly raise the arguments asserted in the instant Motion at the motion to dismiss stage and the Court therefore did not decide those issues.  *See Lian*, 2024 WL 966263, at *11; *infra* III.A.  Accordingly, the Court does not apply the standard applicable to motions for reconsideration or the law of the case doctrine to these arguments.  *See* Opposition at 9-10; Reply at 1-2.

discovery will reveal evidence' of the wrongdoing alleged." *Citizens United v. Schneiderman*, 882

F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556).

## III. Discussion

Section 11 affords shareholders a private right of action in the event that "any part of [an

issuer's] registration statement, when such part became effective, contained an untrue statement

of a material fact or omitted to state a material fact required to be stated therein or necessary to

make the statements therein not misleading." 15 U.S.C. § 77k(a). Unlike claims for securities

fraud brought under Section 10(b) of the Securities Exchange Act of 1934, "[n]either scienter,

reliance, nor loss causation" is an element of a Section 11 claim. *Panther Partners Inc. v. Ikanos

Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). As a result, a Section 11 plaintiff need only

allege that: "(1) she purchased a registered security, either directly from the issuer or in the

aftermarket following the offering; (2) the defendant participated in the offering in a manner

sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an

untrue statement of a material fact or omitted to state a material fact required to be stated therein

or necessary to make the statements therein not misleading.'" *In re Morgan Stanley Info. Fund

Sec. Litig.* ("*In re Morgan Stanley*"), 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C.

§ 77k(a)); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("If a plaintiff

purchased a security issued pursuant to a registration statement, he need only show a material

misstatement or omission to establish his *prima facie* case."). Section 11, in other words, imposes

strict liability on issuers for false or misleading statements contained in a registration statement.

*See Winter*, 686 F. Supp. 3d at 304-05 (explaining that "plaintiffs are not required to allege that

defendants knew of any material omitted facts or misstatements").

Defendants' Motion concerns whether the Amended Complaint plausibly alleges that any statements made in Tuya's Registration Statement were false or misleading. Trying first to escape that inquiry, Plaintiffs argue that the Court's March 5, 2024 Opinion and Order on Defendants' motion to dismiss effectively held that the Amended Complaint stated a valid claim for a material omission under Section 11 based on the risk disclosures in Tuya's Registration Statement. Opposition at 11-12. But regardless of the Court's prior Opinion and Order, Plaintiffs also maintain that the Amended Complaint plausibly alleges that five categories of statements were rendered misleading by Tuya's omission of the Fake Review Scheme in the Registration Statement. *Id.* at 12-14.

Defendants, on the other hand, contend that the Court's prior Opinion and Order merely rejected their own reliance on Tuya's risk disclosures as a bar to liability, but did not consider whether those disclosures were false or misleading in their own right. Motion at 20 n.17; Reply at 8. Defendants further argue that none of the five identified categories of statements contained in the Registration Statement were false or misleading. Motion at 11-20. And regardless of whether the Amended Complaint has plausibly alleged any otherwise-actionable misstatements or omissions, Defendants maintain that they cannot be held liable under Section 11 because the Fake Review Scheme was unknowable as a general matter prior to Tuya's IPO. *Id.* at 20-24.

For the following reasons, the Court agrees with Defendants on the first two points and does not consider the third.

## A.    The Court Did Not Previously Hold That the Risk Warnings in Tuya's Registration Statement Were Plausibly False or Misleading.

Plaintiffs' first line of defense against the instant Motion is that the Court already held actionable the risk disclosures in Tuya's Registration Statement. Opposition at 11-12. The Court disagrees.

The Court's prior Opinion and Order discussed the Registration Statement's risk warnings only for purposes of addressing Defendants' argument that two particular risk disclosures were sufficient to warn investors of the risk of the Fake Review Scheme. *Lian*, 2024 WL 966263, at *13 ("Finally, Defendants argue that 'the Registration Statement included ample warnings to investors regarding risks posed by losses of Tuya's customers,' thereby foreclosing Section 11 liability." (quoting Dkt. 64 at 18)). The Court ultimately held that "the risk disclosures highlighted by Defendants cannot inoculate them from Section 11 liability premised on the Fake Review Scheme" because neither of the warnings Defendants identified "pertain[ed] to the specific risk that was realized." *Id.* (internal quotation marks omitted). In reaching that conclusion, the Court contrasted the Second Circuit's decision in *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), which held that "cautionary language contained in the prospectus [did] not necessarily foreclose liability because it warned investors of a different contingency than that which plaintiffs allege was misrepresented," *id.* at 729, with other Second Circuit decisions that sustained dismissals of securities cases based on more specific and relevant risk warnings. *See Lian*, 2024 WL 966263, at *14 (discussing *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014), and *Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) (summary order)).

This analysis did not imply that Tuya's risk disclosures were actionable in their own right. Although the Court referred to allegations in Plaintiffs' Amended Complaint that certain of Tuya's risk disclosures were themselves plausibly misleading, *see id.*, the Court did not determine whether that was in fact the case. That was because, as the Court explained, Defendants had forfeited for purposes of their Rule 12(b)(6) motion arguments that the statements in the Registration Statement were not false or misleading, with the exception of their argument as to the Net Promoter Score

theory and their broader argument that the risk warnings generally insulated them from liability. *Id.* at \*11 ("To be sure, Defendants raise a number of reasons to question whether their failure to mention the Fake Review Scheme rendered misleading the five aforementioned categories of statements. But, with two exceptions discussed below—*i.e.*, the Net Promoter Score and the risk warnings—Defendants relegated these arguments to their Reply." (citation omitted)). And again, the Court's "ultimate[] conclu[sion]" was only "that the risk disclosures highlighted by Defendants cannot inoculate them from Section 11 liability premised on the Fake Review Scheme at this stage." *Id.* at \*14.

Accordingly, Plaintiffs are wrong to interpret the Court's prior ruling as holding that the fifth category of allegedly misleading statements (relating to risk factors) is actionable.

## B.    The Amended Complaint Fails to Plausibly Allege That Tuya's Registration Statement Contained Any False or Misleading Statements.

Defendants principally seek judgment on Plaintiffs' Section 11 claim on the ground that none of the five categories of statements identified by Plaintiffs are plausibly false or misleading. Motion at 11. Those (somewhat overlapping) categories are: (1) statements touting Tuya's deep relationships with its customers; (2) statements discussing Tuya's ability to gain new customers and increase adoption of its products and services; (3) statements attributing Tuya's success to reasons other than its customers' fake review practices; (4) statements touting Tuya's sales and marketing efforts; and (5) purported risk warnings describing potential risks of receiving negative reviews of its products and not receiving sufficiently positive reviews of its products. Opposition at 8 n.5. Plaintiffs maintain that each category of statements is misleading in light of Tuya's failure to disclose the Fake Review Scheme. *See id.* at 1. The Court again disagrees with Plaintiffs.

1.     **Applicable Law**

Issuers have no general duty under the federal securities laws to disclose unadjudicated corporate misconduct or to describe their business or customers in needlessly pejorative terms. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG* ("*City of Pontiac*"), 752 F.3d 173, 184 (2d Cir. 2014) ("[D]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." (internal quotation marks omitted)); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377-78 (S.D.N.Y. 2004) (similar).  But when an issuer speaks about its business, reasonable investors may take as much from what the statement implies as from what it says on its face.  Section 11, therefore, requires issuers to disclose any material facts "necessary to make the statements [in their registration statement] not misleading." 15 U.S.C. § 77k(a).  "For that reason, literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund* ("*Omnicare*"), 575 U.S. 175, 192 (2015).  In other words, "when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate."  *In re Morgan Stanley*, 592 F.3d at 366 (internal quotation marks omitted); *see also Macquarie Infrastructure Corp. v. Moab Partners, L. P.* ("*Macquarie*"), 601 U.S. 257, 263 (2024) (explaining that Rule 10b-5's similarly worded prohibition on misleading statements "requires disclosure of information necessary to ensure that statements already made are clear and complete").

Whether any statement in an issuer's offering documents is misleading "depends on the perspective of a reasonable investor."  *Omnicare*, 575 U.S. at 186.  Thus, the key question in assessing whether an affirmative disclosure is misleading is whether a reasonable investor would take from the statement an understanding that is not in accord with the facts. *See Chen v. Missfresh Ltd.*, 701 F. Supp. 3d 236, 254 (S.D.N.Y. 2023) ("[I]n determining whether defendants had a duty

14

to disclose [internal control] deficiencies, the correct question is whether the offering documents misleadingly suggested that the subsequently-identified deficiencies *did not exist*."); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (holding that the defendant's "statements are not misleading because they do not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring"); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 358 (S.D.N.Y. 2008) (similar). The Supreme Court's endearing example of a child telling his parents that he "had dessert" when in fact he "ate a whole cake" is a helpful illustration of this approach: because a reasonable person could understand the phrase "had dessert," in the context of the hypothetical, as a far smaller portion than what was actually consumed, the child's statement, though literally true, plausibly contained an implied assertion that was inconsistent with the true facts. *Macquarie*, 601 U.S. at 264; *see also Roofers Local No. 149 Pension Fund v. Amgen, Inc.*, --- F. Supp. 3d ----, No. 23 Civ. 2138 (JPC), 2024 WL 4354809, at *12 (S.D.N.Y. Sept. 30, 2024). The ultimate question, however, remains whether the defendant failed to disclose a material fact "necessary to make [its] statements not misleading" in light of the surrounding circumstances. 15 U.S.C. § 77k(a).

A recurring situation in which courts in this District have recognized that an issuer's statements concerning its business strengths can be actionably misleading is when the issuer fails to disclose that corporate misconduct is the true reason for its success. For instance, a pharmaceutical manufacturer's statement bragging about its ability to obtain speedy approvals of its drugs would be actionable if in fact its success relied on bribery. *See In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 676-78 (S.D.N.Y. 1990). So too would a company's claim that all telecommunications networks in a foreign market enjoyed equal rights under the law when, in reality, the company's ability to operate its business in that country required it to pay bribes. *See*

*In re VEON Ltd. Sec. Litig.*, No. 15 Civ. 8672 (ALC), 2017 WL 4162342, at *7 (S.D.N.Y. Sept. 19, 2017). In each of these examples, reasonable investors could plausibly have considered the company's positive descriptions of its business strengths as implicit suggestions that those strengths were attributable to legitimate factors instead of to corporate misconduct, thereby rendering the statements actionably misleading.

This principle, however, only holds true "when the factors discussed in the statements are specific and share at least a reasonably close connection to the omitted conduct." *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.* ("*Menora Mivtachim*"), No. 19 Civ. 7536 (NRB), 2021 WL 1199035, at *17 (S.D.N.Y. Mar. 30, 2021). As a result, the mere reference to a given topic "[does] not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding" that subject. *In re Morgan Stanley*, 592 F.3d at 366. Instead, courts must evaluate whether the subject matter of the challenged statement is substantially similar to the omitted misconduct, which includes considering whether there is a significant gap in specificity between the information provided and the misconduct withheld. *See In re Sanofi Sec. Litig.* ("*In re Sanofi*"), 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016). That is so because it is usually unreasonable for an investor to take general statements regarding an issuer's business for more than what they are worth, reading into them sweeping denials of discrete instances of misconduct.

For instance, a reasonable investor would not read a company's statement attributing its "overall financial performance to factors like organic growth, acquisitions, and macroeconomic trends" as implicitly denying that it was involved in a particular bribery scheme in Russia and Ukraine. *Menora Mivtachim*, 2021 WL 1199035, at *17. Nor would a reasonable investor understand a for-profit education company's disclosure of increased student enrollment as an implicit denial of the fact that its marketing strategy included abusive sales tactics. *See In re ITT*

*Educ. Servs.*, 859 F. Supp. 2d at 579.  In these latter examples, the connection between the challenged statements and the omitted misconduct is more tenuous due to a lack of substantial similarity in subject matter (enrollment trends versus marketing strategy) or because of a considerable gap in specificity (overall financial performance versus a specific bribery scheme in a single region).  Reasonable investors, therefore, would not have been likely to understand the challenged statements in these cases as implicit assurances that the omitted misconduct was not occurring.

With these standards in mind, the Court must determine whether reasonable investors would have understood any statements in Tuya's Registration Statement as denying the Fake Review Scheme or as otherwise being inconsistent with that scheme's existence.

### 2.    Analysis

The Court assumes for purposes of its analysis that the Amended Complaint plausibly alleges that the Fake Review Scheme existed as of the date of Tuya's IPO.  *See Lian*, 2024 WL 966263, at *14 n.17.  Even so, under the principles described above, Plaintiffs have not identified any language in Tuya's Registration Statement that could plausibly have suggested to a reasonable investor that the Fake Review Scheme—*i.e.*, that "a material percentage of Tuya's e-commerce customers were engaged in fake review practices in violation of Amazon's policies," Opposition at 1—did not exist.

Start with Tuya's statements regarding its marketing efforts, which appear in categories one, two, and four of the identified statements.  For instance, Plaintiffs complain about Tuya's statement that it planned to "enhance [its] sales and marketing efforts to attract new customers" and use the "'Powered by Tuya' concept" to "increase brand awareness among [its] end users." *Id.* at 17-18 (quoting Am. Compl. ¶ 129).  Plaintiffs also highlight Tuya's statement that as awareness of its brand increased, it would "not only attract more brands, developers and partners,

but also lead to growing end user demand." *Id.* at 19 (quoting Am. Compl. ¶ 138); *see also id.* at 18 ("Defendants stated that '[g]rowing mind share among the end users will attract more business customers and developers to our platform.'" (footnote omitted) (quoting Am. Compl. ¶ 129)); *id.* at 20 (describing similar statements in Tuya's Registration Statement regarding the company's focus on growing its customer base through marketing efforts). Similarly, Plaintiffs point out that Tuya claimed to "compete favorably on the basis of . . . brand awareness and reputation [and] sales and marketing efforts." *Id.* at 24 (quoting Am. Compl. ¶ 153).

This first batch of statements suffers from a mismatch in terms of both subject matter and specificity *vis-à-vis* the Fake Review Scheme. First, each of these statements was directed at Tuya's plans for marketing *its* brand, both to its customers and to end users, not at its *customers'* independent strategies for generating demand for their products. Even the statements concerning the "Powered by Tuya" concept referred only to a joint marketing endeavor between Tuya and its customers, not to those customers' independent marketing strategies. Indeed, none of these statements by their terms refer to independent marketing strategies employed by Tuya's customers for increasing end-user demand, much less to their practices in procuring online reviews on e-commerce platforms like Amazon. And none of the statements referred to Tuya's customers' compliance with e-commerce platforms' seller policies at all.

Second, the statements were general in nature compared to the Fake Review Scheme. Tuya's broad references to its plans to use marketing to increase brand awareness and demand for its products—statements that almost any company might make in some form in its registration statement—came nowhere close to placing at issue the subject of its customers' compliance with Amazon's seller policies. Only an investor with the most fanciful of imaginations and the most unrealistic of expectations could have understood these statements as implying anything about

whether Tuya's customers were complying with Amazon's seller policies in independently seeking to procure positive reviews for their products.  So because these statements do not "share at least a reasonably close connection" to the Fake Review Scheme and do not otherwise imply any facts inconsistent with the Fake Review Scheme's occurrence, they are not actionable by virtue of the scheme's omission.  *Menora Mivtachim*, 2021 WL 1199035, at *17.

Tuya's statements in category three regarding its relationship with its customers and the sources of its success fall short for similar reasons.  The Registration Statement principally explained that Tuya's "business is deeply integrated with [its] customers' own businesses, which in turn are affected by the ultimate demands and purchasing power of the end users," and that "[t]he recovery of the end-user market and customers' own business are positive signals for [Tuya's] business to maintain rapid growth."  Opposition at 22 (quoting Am. Compl. ¶ 147).  It further noted "[s]ubstantial growth" in Tuya's "business performance and prospects" due in part to an increasing demand for smart devices among consumers.  Am. Compl. ¶ 147; *see* Opposition at 22.  Tuya also stated that the company "work[s] closely with [its customers] to plan, design, develop and market their smart devices."  Am. Compl. ¶ 49; *see also id.* ¶¶ 129-130 (describing joint marketing efforts between Tuya and its customers, including Tuya's efforts to help its customers "penetrate online e-commerce platforms and offline retail channels").

None of these statements placed the Fake Review Scheme at issue.  Tuya's observation of the fact that its business is integrated with that of its customers did not suggest that its customers' independent marketing practices complied with Amazon's seller policies any more than a drill manufacturer's statement that its business depends on the success of (or is integrated with) the oil industry would imply that its mining customers were abiding by the environmental regulations of a particular country.  And the Amended Complaint does not plausibly allege that the recovering

customers referred to in the latter part of the challenged statement were the same customers that engaged in the Fake Review Scheme, making the connection between the statement and violations of Amazon's policies speculative at best. *See In re Sanofi*, 155 F. Supp. 3d at 404 (explaining that statements regarding a company's sales growth were not misleading by virtue of the failure to disclose an illegal kickback scheme where the statements did not attribute the sales growth to the pharmacies implicated in the scheme). Neither did Tuya's partial attribution of its business prospects to increasing consumer demand for smart devices imply anything about its customers' strategies for marketing their products or whether those customers were complying with Amazon's seller policies. Indeed, that statement attributed the increasing demand for smart devices to the COVID-era phenomenon of consumers "continu[ing] to work, learn, and play from home," not to its customers' independent marketing practices or to positive reviews for those customers' products on e-commerce platforms like Amazon. Am. Compl. ¶ 147. And Tuya's statements that it took steps to assist its customers in marketing their products and becoming established on e-commerce and offline retail platforms did not in any way vouch for its customers' compliance with those platforms' policies in independently marketing their products or procuring customer reviews.

For these reasons, it would not have been reasonable for investors to interpret Tuya's statement that its business was integrated with that of its customers, that its business benefitted from increased demand for smart devices, that it took steps to help its customers market their products, or that its customers and the end-user market were recovering, as a tacit endorsement of those customers' independent marketing practices or compliance with Amazon's seller policies. *See In re ITT Educ. Servs.*, 859 F. Supp. 2d at 578 ("Defendants' statements that [the company's] revenue grew because of higher enrollment and tuition say nothing about how [the company] . . . markets itself to prospective students."). Again, the content of these statements does not implicate

20

the subject of Tuya's customers' compliance with Amazon's seller policies or in any way refer to that topic in language specific enough to put the Fake Review Scheme at issue. Because nothing in these statements "misleadingly suggested that the subsequently-identified [Fake Review Scheme] did not exist" or otherwise plausibly misled investors regarding the propriety of Tuya's customers' marketing strategies, they are not actionable. *Chen*, 701 F. Supp. 3d at 254 (emphasis omitted).

Plaintiffs turn next to the Registration Statement's warnings concerning the risk of negative publicity to Tuya's business (category five). The particular language in Tuya's risk disclosures that Plaintiffs rely on states: "Our success depends, in part, on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing and potential customers and end users seek and share information." Opposition at 13 (quoting Am. Compl. ¶ 132); *see also id.* at 4 (describing Tuya's disclosure of risks involving complaints by customers and end users and the risk of negative reviews by industry analysts (citing Am. Compl. ¶ 132)). Plaintiffs argue that this risk disclosure was misleading because it suggested that the Fake Review Scheme was not already occurring. *Id.* at 13; *see In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").

The same subject matter and specificity mismatches described above persist with respect to this risk warning. The subject matter of the highlighted language concerned Tuya's ability to generate positive feedback and minimize negative feedback from its customers on social media channels, not those customers' own ability to generate positive feedback from end users or the nature of their compliance with e-commerce platforms' seller policies. More broadly, the risk

warning did not suggest anything about the methods that Tuya's customers used to generate feedback on their products, much less imply that those customers were not procuring fraudulently positive reviews in violation of Amazon's seller policies. The challenged language was also relatively abstract in comparison to the Fake Review Scheme, communicating the straightforward reality that Tuya's brand could suffer if it received bad publicity and/or failed to generate good publicity.[6] Disclosing the nature of that fundamental publicity risk in no way suggested that Tuya's customers were not violating the seller policies of any e-commerce platforms in how they procured product reviews. In other words, it is implausible that a reasonable investor would have understood the disclosure of a publicity risk that virtually every business in the country, from mom-and-pops to Microsoft, must grapple with in some form or another, as an implicit denial of the Fake Review Scheme.

Plaintiffs' citation to *Plumbers & Pipefitters National Pension Fund v. Davis*, No. 16 Civ. 3591 (GHW), 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020), does not support their argument that Tuya's risk warnings are actionable. *See* Opposition at 13-14. In *Davis*, the defendants allegedly claimed that "customers were making positive comments about [their company's] products" when in reality "customers were expressing dissatisfaction with [their company's] products." 2020 WL 1877821, at *9. In that context, the challenged statements were plainly misleading (if not outright false) because a company's boasting of positive customer feedback would suggest to investors that customers were not in fact expressing dissatisfaction with the company's products. In other words,

---

[6] In its prior Opinion and Order, the Court referred to this risk disclosure as "specific" in comparison to the even more abstract risk disclosures previously relied on by Defendants for purposes of avoiding liability. *Lian*, 2024 WL 966263, at *13-14. But the fact that investors may have placed more emphasis on this risk disclosure than on the ones Defendants relied on at the motion to dismiss stage does not mean that it was specific enough to place the Fake Review Scheme at issue for purposes of analyzing Section 11's falsity element.

those statements were closely tied to the omitted facts, so a reasonable investor could plausibly have been misled. Here, by contrast, the risk warning Plaintiffs focus on did no more than suggest that Tuya's business could suffer if its customers posted negative feedback regarding its business on public channels, and did not imply anything about the propriety of its customers' strategies for attracting positive reviews of their own products. The connection between Tuya's risk warning and the Fake Review Scheme is therefore much more tenuous than the link between the challenged statements and the omitted facts in *Davis*.

In addition to the considerable mismatch in subject matter and specificity between the challenged statements in Tuya's Registration Statement and the Fake Review Scheme, it is relevant to the Court's analysis that the alleged misconduct underlying Plaintiffs' claim was committed solely by third parties and without any alleged involvement by Tuya itself. To be sure, Section 11 draws no formal distinction between an issuer's duty (if any) to disclose its own wrongdoing and its duty (if any) to disclose wrongdoing by others. Nor does the statute require, for purposes of establishing a *prima facie* case, that an issuer knew or should have known of the allegedly omitted fact. But for purposes of determining whether a statement is actionably misleading, a reasonable investor is generally less likely to understand an issuer's reference to the business of a third party as implicitly vouching for the propriety of that party's independent practices than the issuer's description of its own business as implicitly vouching for the propriety of its own operations. That is so because while the default expectation of a reasonable investor is that an "issuer has special knowledge of *its* business—including the legal issues *the company* faces—not available to an ordinary investor," *Omnicare*, 575 U.S. at 192 n.11 (emphases added), the same is not necessarily true with respect to independent acts of misconduct committed by third parties.

To the contrary, reasonable investors are likely to understand that an issuer generally lacks special insight into whether third parties with whom it has arms-length relationships are secretly engaging in independent acts of corporate misconduct. *See id.* at 190-92 (explaining that a reasonable investor "takes into account the customs and practices of the relevant industry"). As a result, reasonable investors should understand that an issuer is unlikely to have intended broad references to the businesses of third parties or borderline statements that may or may not be referring to third parties to be understood as sweeping endorsements of the propriety of those parties' independent business practices. Absent a higher degree of specificity in the issuer's statements or contrary circumstances, it will therefore typically be unreasonable for investors to take an issuer's references to the businesses of third parties with whom it has arms-length relationships as an implicit assurance that those third parties are not engaged in any independent misconduct that could indirectly threaten the issuer's business.

This case illustrates that principle well. Tuya's Registration Statement told investors that it had over 5,000 customers in 2020 and that smart devices powered by its software were available in over 100,000 stores globally. Dkt. 138, Exh. 1 at 2. Plaintiffs characterize Tuya's customers as "third parties" to whom Tuya licenses software and with whom Tuya "works closely . . . to plan, design, develop and market their smart devices." Am. Compl. ¶¶ 46, 48-49; *see also id.* ¶¶ 129-130 (describing joint marketing efforts between Tuya and its customers). But although Plaintiffs allege that Tuya had a particularly close business relationship with its customers and worked with them on marketing, the Amended Complaint does not allege that Tuya held itself out to investors as having special insight into whether its customers' independent marketing practices complied with applicable regulations, such as Amazon's seller policies. The Amended Complaint does not, for example, allege that Tuya monitored or investigated its customers' independent marketing

activities for the purpose of ensuring their compliance with the seller policies of third-party e-commerce platforms, which for over 5,000 customers would in all likelihood have required a veritably Herculean effort and enormous financial expenditures.  Nor does the Amended Complaint suggest that Tuya held itself out as taking any other steps to verify that its customers' independent marketing practices were consistent with Amazon's policies, or as otherwise having special insight into whether its customers were engaging in fraudulent marketing practices on their own.  In the absence of such circumstances, it is implausible that a reasonable investor could have regarded the references in Tuya's Registration Statement to its customers and its marketing practices as implied assurances that its customers were not engaging in independent violations of Amazon's seller policies.  And neither was Tuya obligated to disclaim that leap of logic expressly, for issuers "are not required to address reasonable investors as if they were children in kindergarten." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (alteration adopted; internal quotation marks omitted).

Indeed, the Fake Review Scheme only came to light by accident.  A server (likely located in China) was breached, and a dedicated cybersecurity organization invested time and effort into analyzing the leaked data and issuing a report on its findings.  But Tuya is an IoT software company, not a consumer-protection watchdog or an enforcement arm of Amazon's seller-relations department that is dedicated to investigating thousands of e-commerce vendors for evidence of abusive marketing practices.  Nor did any of the challenged statements in Tuya's Registration Statement concerning its marketing strategies or its relationship with its customers suggest that it would assume such a role or otherwise launch a pre-IPO inquisition into its 5,000-plus customers.  As a result, it would have been unreasonable for an investor to understand the challenged statements in Tuya's Registration Statement as a stamp of approval for its customers'

compliance with Amazon's policies. In the factual context presented by the Amended Complaint, the nature of the undisclosed misconduct as having been committed by third parties therefore further weighs against a conclusion that Tuya's Registration Statement plausibly misled investors regarding the Fake Review Scheme.

These facts also illustrate how the instant case differs from *In re Dentsply Sirona, Inc. Securities Litigation* ("*Dentsply Sirona*"), 665 F. Supp. 3d 255 (E.D.N.Y. 2023), another decision that Plaintiffs rely on. *See* Opposition at 21-24. In *Dentsply Sirona*, the court held that the plaintiffs adequately pleaded as misleading a company's statements describing the factors that contributed to its success and characterizing its relevant markets as "highly competitive," where the company allegedly failed to disclose that its distributors were engaged in an anticompetitive conspiracy. 665 F. Supp. 3d at 285-87. There, however, the plaintiffs plausibly alleged not just that the defendants' distributors were engaging in independent misconduct that may have indirectly benefitted the defendants, but that the defendants "acquiesced in" and took "affirmative steps" to assist the distributors' abusive business practices. *Id.* at 286 (describing plausible allegations that the defendants "assist[ed] the distributors in eliminating competition from gray market sellers"). In addition, the challenged statements in *Dentsply Sirona* included direct references to the competitive nature of the defendants' markets, which had a clear connection to the omitted conspiracy in terms of both subject matter and specificity. *See id.* at 285-86. While a reasonable investor could easily understand a company's description of its relevant markets as "highly competitive" as suggesting that the company is not aiding or abetting its distributors in widespread anticompetitive conduct, an investor would not as readily take more tangential statements as an implicit endorsement of the business practices engaged in by third parties while

acting independently of the company. And as discussed above, this case more closely resembles the latter scenario than the former.

One last note. Although a *prima facie* case under Section 11—a strict-liability statute—does not depend on whether the defendant knew or should have known of the omitted facts, the result in this case is still consistent with Congress's purpose in enacting the statute. *See Chen*, 701 F. Supp. 3d at 254 ("Limiting defendants' liability in these circumstances also makes sense from a policy perspective."). Based on the facts alleged in the Amended Complaint, Defendants lacked any means of uncovering the Fake Review Scheme short of dedicating a substantial portion of Tuya's operations or finances to investigating thousands of its customers for potential violations of countless applicable policies—or exploiting information leaked through a data breach of dubious propriety. Nor have Plaintiffs suggested any other way that Defendants could have avoided liability under their theory given Section 11's strict-liability operation—or what Defendants could possibly do to avoid being subject to a similar claim in the future should their customers again find themselves in hot water—other than to completely refrain from speaking on the topics of its customer relationships and marketing practices, despite the obvious importance of both subjects to Tuya's investors. *See* Opposition at 17 ("Had Defendants remained silent about the importance of, and risks related to, customer reviews, they would have had no duty to disclose the Fake Review Scheme at all."); Oral Arg. Tr. at 26:23-24 (suggesting that Defendants "could have not made statements about customer feedback, and they would not be in this predicament").

Even a more robust set of risk disclosures warning against the potential for Tuya's customers to engage in independent misconduct may not entirely negate the risk of liability where, unbeknownst to Tuya, such misconduct is already occurring. *See Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 562 (S.D.N.Y. 2020) (observing that "risk disclosures are

actionable half-truths when a company discloses a risk that could have an impact on its business when, in fact, that risk has already materialized"); *cf.* Dkt. 66 at 19-21 (Plaintiffs arguing at the motion to dismiss stage that Tuya's existing risk disclosures were inadequate because, among other reasons, they warned about risks that had already transpired).  And as explained, the federal securities laws do not impose any general duty on an issuer to kneecap itself by preemptively suggesting that its customers' businesses, and by extension its own business, may be benefitting from some undetected, unadjudicated misconduct.  *See City of Pontiac*, 752 F.3d at 184.

So although Section 11's strict-liability operation represents an intentional policy choice by Congress that this Court must (and does) respect, the Court cannot ignore that adopting Plaintiffs' sweeping theory of falsity in the factual context of this case would encourage less transparency by issuers, not more.  If there is no realistic way to avoid liability for speaking on a topic, issuers might simply choose not to speak on that topic at all.  That result would risk denying to investors valuable information about an issuer's business that otherwise would have been disclosed, thereby undermining Section 11's core purpose of "promoting full and fair disclosure of material information." *Omnicare*, 575 U.S. at 193 (internal quotation marks omitted).  For the reasons explained earlier, the Court does not construe Section 11's reasonable-investor standard as requiring the application of Plaintiffs' theory here.

* * *

For these reasons, the Court holds that Plaintiffs have failed to plausibly allege that any statements in Tuya's Registration Statement were false or misleading by virtue of Defendants' failure to disclose the Fake Review Scheme.  Accordingly, Defendants are entitled to judgment on the pleadings on Plaintiffs' Section 11 and Section 15 claims.  *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) ("Because Plaintiffs failed to plead a § 11 claim, their

§ 15 claim necessarily fails.").  And since the Court concludes that Plaintiffs have failed to identify any false or misleading statements in Tuya's Registration Statement, it is unnecessary to consider Defendants' alternative argument that the Fake Review Scheme was unknowable as a general matter.  *See* Motion at 20-24.

## C.    Leave to Amend

Plaintiffs' Opposition requests leave to amend in the event that the Court grants any part of Defendants' Motion.  Opposition at 25.  Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Although Plaintiffs have amended once already and declined a further opportunity to amend following the Court's Opinion and Order partially granting Defendants' motion to dismiss, the Court had not yet ruled on whether Plaintiffs have adequately alleged that Tuya's Registration Statement contained false or misleading statements.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").  Because it is also not obvious to the Court that any attempt at further amendment would necessarily be futile, the Court grants Plaintiffs' request.  *See AK Meeting IP, LLC v. Epic Games, Inc.*, No. 23 Civ. 8214 (GHW), 2024 WL 4299686, at *9 (S.D.N.Y. Sept. 26, 2024) ("The Court cannot hold at this relatively early stage that the pleading deficiencies identified in this opinion cannot be corrected, such that amendment would be futile.").

Plaintiffs, however, should only file an amended pleading if they believe in good faith that they can correct the deficiencies identified in this Opinion and Order.  As explained herein, that will require, at minimum, the addition of concrete factual allegations plausibly demonstrating that reasonable investors could have viewed the challenged statements in Tuya's Registration

Statement as suggesting that the Fake Review Scheme did not exist or as otherwise implying facts inconsistent with the Fake Review Scheme's occurrence.

## IV.  Conclusion

For these reasons, the Court grants Defendants' motion for judgment on the pleadings. Plaintiffs may, however, file a second amended complaint on or before March 28, 2025.  Plaintiffs are warned that the failure to file a timely amended pleading, absent an extension received for good cause shown, will result in the entry of judgment in favor of Defendants.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 136.

SO ORDERED.

Dated: March 7, 2025
       New York, New York

JOHN P. CRONAN
United States District Judge